IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GLORIA SIMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NUMBER: |
| | ) | 2:07-cv-704-MEF |
| COOSA COUNTY BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | | |

**MOVANT'S EVIDENTIARY SUBMISSION
IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Comes now Defendant Coosa County Board of Education to submit this evidentiary submission in support of Defendant's Motion for Summary Judgment filed concurrently herewith. As additional support of the motion, Defendant submits the following evidence attached hereto:

1.    Affidavit of Jan Forbus

2.    Affidavit of Pam Jones

3.    Affidavit of Keith Bullard

4.    Deposition transcript with exhibits of Todd Wingard

5.    Deposition transcript with exhibits of Jan Forbus

6.    Deposition transcript with exhibits of Pam Jones

7.    Deposition transcript with exhibits of Gloria Sims


s/Donald B. Sweeney, Jr.
DONALD B. SWEENEY, JR.


s/Anne R. Yuengert
ANNE R. YUENGERT


OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800


CERTIFICATE OF RETENTION OF ORIGINAL

As attorney for the filer of this document, I hereby certify that the filer or the filer's attorney currently holds the original signature document with any required formalities, will make the same available upon request of the Court or of a party, and will retain the hard copy of the same for one year after the expiration of all time periods for appeals, or resolution of appeals, whichever is later.

s/ Donald B. Sweeney, Jr.
Attorney for Coosa County Board
of Education

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jerry Roberson, Esq.
Roberson & Roberson
P.O. Box 380487
Birmingham, AL  35238

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

None

Respectfully submitted,

s/ Anne R. Yuengert
Anne R. Yuengert

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GLORIA SIMS,                              )
                                         )
        Plaintiff,                        )
                                         )
v.                                        )   CIVIL ACTION NUMBER:
                                         )   2:07-cv-704-MEF
COOSA COUNTY BOARD OF                     )
EDUCATION,                                )
                                         )
        Defendant.                        )

## AFFIDAVIT OF JAN FORBUS

STATE OF ALABAMA )
                 )
COUNTY OF COOSA  )

        Before me, this undersigned authority, personally appeared Jan Forbus, who is known to me and being duly sworn, deposes and says as follows:

        1.      My name is Jan Forbus.  I am over the age of 18 and I have no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.  The matters in this affidavit are based on my personal knowledge and my review of school board records.

        2.      I worked as the Cafeteria Manager at Central High School from August 2003 until I went on personal leave on October 27, 2006.  My doctor

1

EXHIBIT 1

put me on leave for my health and because of my husband's health issues. I never returned to work from my leave and I retired in May 2007.

3. Gloria Sims worked as a substitute in the Central High School cafeteria for about 5 or 6 weeks in the fall of 2006.

4. I was on the committee that interviewed applicants for the Lunchroom Worker vacancy in September 2006. Several people applied for the job and we interviewed a number of people, including Gloria Sims.

5. One of the questions we asked Ms. Sims was whether she had a high school diploma or a GED. She did not and we did not consider her any further for the job. We did not consider her because of her lack of the posted qualification; it had nothing to do with her race or gender.

6. ~~We~~ Mr. Bullard & mrs Pam Jones Jr recommended Jerry McKinney for the position because he had the educational qualification and ~~he had a lot of experience~~ J.K. It had nothing to do with his race or gender.

7. On Ms. Sims' last day of work she walked off the job. I told her that she did not get the Lunchroom Worker job and she got very upset. She was ugly to me and left me without staff I needed.

8. When I got a call from someone seeking a job reference for Ms. Sims several months later, I told them the truth. I told them she walked off

2

the job and left me in the lurch (or words to that effect). I gave him my honest opinion.

9.    When the person called for the reference, they called me at home. By then I had not been at work for several months, and I felt I was giving my personal opinion about Ms. Sims. No one at the Board of Education, including Mr. Wingard, had given me the authority to speak on the Board's behalf.

10.    I do not remember when I first heard that Ms. Sims had made a discrimination complaint but when I got the reference call at my home I knew about her complaint. Her filing a complaint did not matter to me and it did not affect what I said to the person calling for a reference. I told him the truth and gave my honest opinion.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

11.    The foregoing affidavit is true and correct to the best of my personal knowledge.

Jan Forbus

Sworn to and subscribed to before me this 29th day of May, 2008.

Notary Public

My commission expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES:  July 28, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

Notary Seal

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| GLORIA SIMS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION NUMBER: |
| | )   2:07-cv-704-MEF |
| COOSA COUNTY BOARD OF | ) |
| EDUCATION, | ) |
| | ) |
|     Defendant. | |

## AFFIDAVIT OF PAMELA JONES

STATE OF ALABAMA )
               )
COUNTY OF COOSA  )

      Before me, this undersigned authority, personally appeared Pamela Jones, who is known to me and being duly sworn, deposes and says as follows:

      1.    My name is Pamela Jones and I am over the age of 18 and I have no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me. The matters in this affidavit are based on my personal knowledge and my review of school board records.

      2.    Since 2001 I have served as the Child Nutrition Director for the Coosa County Board of Education. In this job I am involved in the hiring of

EXHIBIT 2

Lunchroom Workers. State law (Ala. Code § 16-22-15) requires that we post vacancies for positions and during my time as the Director, we have posted the same qualifications for the job and required a high school diploma or its equivalent. I used the posting that had been used before I became Director. The Board has used this same educational requirement since 1997.

3.   Prior to the Fall of 2006, I did not participate in the interview process for Lunchroom Workers. Instead I had the school where the employee was going to work screen and interview candidates and make a recommendation to me about who to hire. I assumed the interviewers were following the educational requirement on the job postings and I did not question their recommendations. Until this lawsuit, I did not know that we had ever hired a Lunchroom Worker who did not have a high school diploma or its equivalent.

4.   We currently have 13 Lunchroom Workers. Five are African American (McKinney, Moon, Owens, Chapman, Billingsley) and eight are white (Beasley, Henderson, Murphy, Thompson, Rayfield, Sayers, Cleveland, Mitchell). Nine of them have been hired since I became Director. Each time we posted the job, the posting said the qualifications were a high school diploma or its equivalent.

2

5.    We posted a vacancy for a 6-Hour Temporary Lunchroom Worker on September 5, 2006. We used the same posting we had used for prior vacancies and it stated that the qualifications for the job were a high school diploma or a GED.

6.    I participated in the interview process to fill the September 2006 Lunchroom Worker vacancy. The interview committee was me, Jan Forbus (white female), the Cafeteria Manager at Central High School, and Keith Bullard (white male), the Principal at Central High School.

7.    We interviewed seven people on September 22 and 25, 2006. We interviewed the following people who reported to us the following education:

| Candidate Name | Race/Gender | Diploma/GED |
|---|---|---|
| Plaintiff | White/Female | No |
| Krystal Benson | African American/Female | high school diploma |
| Anthony Braxton Borden | African American/Male | high school diploma |
| Gladdis M. Harris | African American/Female | No |
| Frank T. Jones | African American/Male | No |
| Jerry W. McKinney | African American/Male | high school diploma |
| Larry Wayne Rogers | White/Male | No |

8.    During the interviews, we asked the candidates a number of questions about their qualifications and suitability for the job. We also asked each candidate whether he or she had a high school diploma or a GED. Four of the candidates, including Ms. Sims, reported that they did not

3

have a high school diploma or GED. After learning that they did not possess the posted qualifications, we did not consider those candidates (Ms. Sims, Gladdis Harris, Frank Jones, or Wayne Rogers) any further.

9.     The committee recommended Jerry McKinney for the position because we thought he was the best candidate. He had a high school diploma and answered the questions in the interview well.

10.     Todd Wingard made a written recommendation to the Board that it hire McKinney for the 6-Hour Temporary Lunchroom Worker position. The Board unanimously voted in favor of hiring McKinney.

11.     We did not consider the race or gender of any of the candidates. Once we learned that Ms. Sims did not have a high school diploma or a GED, we did not consider her for the job. Our decision to recommend Mr. McKinney had nothing to do with his or anyone else's race or gender.

12.     The foregoing affidavit consisting of 4 pages is true and correct to the best of my personal knowledge.

_Pamela P. Jones_
Pamela Jones

Sworn to and subscribed to before me this 29th day of May, 2008.

_Ony Pater_
Notary Public

My commission expires:
NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: July 28, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

Notary Seal

4

# Coosa County Board of Education

| | | |
|---|---|---|
| **TODD WINGARD**<br>*Superintendent* | (256) 377-4913<br>Fax: (256) 377-2385<br>boe@coosaschools.k12.al.us | P.O. Box 37<br>Rockford, AL 35136 |

STATE OF ALABAMA   )
COOSA COUNTY     )

## **AFFIDAVIT**
## **OF**
## **KEITH BULLARD**

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Keith Bullard, who being by me first duly sworn, deposes and says as follows:

My name is Keith Bullard. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am employed by the Coosa County Board of Education as the Principal of the Coosa County Central High School.

I know Gloria Sims. I know that she applied for a position that had become vacant in the lunchroom.

As principal, I participated in the interview process to make a recommendation to the superintendent to hire a replacement.

During the interview, I learned that Gloria Sims did not have a high school diploma. We posted the position as required under state law. The requirement stated was for a high school diploma or its equivalent. When I learned that Gloria Sims did not have a high school diploma or its equivalent, I did not consider her further.

EXHIBIT 3

The person hired, Jerry McKinney, had a high school diploma. He also had an excellent background and experience indicating that he would do a good job in the position. We all thought that he gave the best interview.

Gloria Sims was not considered because she did not meet the qualifications for the position. She is wrong in saying that she did not get the job because she is a woman. She is wrong in saying that she did not get the job because we wanted a black male. She did not get the job because she did not meet the qualifications for the job.

_Keith Bullard_
Keith Bullard

Sworn to and subscribed before me this the ___9th___ day of April, 2007.

_Sharon E. Massie_
Notary Public

My Commission expires:    ~~NOTARY PUBLIC STATE OF ALABAMA AT LARGE~~
(Seal)    ~~MY COMMISSION EXPIRES: Nov 18, 2007~~
~~BONDED THRU NOTARY PUBLIC UNDERWRITERS~~

In The Matter Of:

**GLORIA SIMS**
v.
**COOSA COUNTY BOARD OF EDUCATION**

**NO. 2:07-CV-704-MEF**

---

**TODD WINGARD**
**May 21, 2008**

---



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
—————— www.TylerEaton.com

EXHIBIT 4

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NO. 2:07-CV-704-MEF

GLORIA SIMS,
　　　Plaintiff,
vs.
COOSA COUNTY BOARD OF EDUCATION,
　　　Defendant.


VIDEO DEPOSITION
OF
TODD WINGARD
May 21, 2008


REPORTED BY: Gail B. Pritchett
　　　Certified Realtime Reporter,
　　　Registered Professional
　　　Reporter and Notary Public

---

**Page 2**

```
 1      S T I P U L A T I O N
 2
 3          IT IS STIPULATED AND AGREED,
 4  by and between the parties, through their
 5  respective counsel, that the deposition of
 6  TODD WINGARD may be taken before Gail B.
 7  Pritchett, Commissioner, Certified
 8  Realtime Reporter, Registered Professional
 9  Reporter and Notary Public;
10          That the signature to and
11  reading of the deposition by the witness
12  is waived, the deposition to have the same
13  force and effect as if full compliance had
14  been had with all laws and rules of Court
15  relating to the taking of depositions;
16          That it shall not be necessary
17  for any objections to be made by counsel
18  to any questions, except as to form or
19  leading questions, and that counsel for
20  the parties may make objections and assign
21  grounds at the time of trial, or at the
22  time said deposition is offered in
23  evidence, or prior thereto.
```

---

**Page 3**

```
 1      A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF:
 4      Mr. Jerry D. Roberson
 5      Attorney at Law
 6      Roberson & Roberson
 7      3765 Kinross Drive
 8      P. O. Box 380487
 9      Birmingham, Alabama 35238-0487
10
11  FOR THE DEFENDANT:
12      Ms. Anne R. Yuengert
13      Attorney at Law
14      Bradley, Arant, Rose & White, LLP
15      One Federal Place
16      1819 Fifth Avenue North
17      Birmingham, Alabama 35203
18
19
20
21
22
23
```

---

**Page 4**

```
 1          INDEX OF EXAMINATION
 2                   PAGE:
 3  EXAMINATION BY MR. ROBERSON       7
 4  EXAMINATION BY MS. YUENGERT      59
 5
 6
 7          INDEX OF EXHIBITS
 8                   PAGE:
 9  Plaintiff's Exhibit 4       14
10  Plaintiff's Exhibit 5       37
11  Plaintiff's Exhibit 6       41
12
13
14
15
16
17
18
19
20
21
22
23
```

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                          http://www.TylerEaton.com

Page 5

1    I, Gail B. Pritchett, a
2  Certified Realtime Reporter and Registered
3  Professional Reporter of Birmingham,
4  Alabama, and a Notary Public for the State
5  of Alabama at Large, acting as
6  Commissioner, certify that on this date,
7  as provided by the Federal Rules of Civil
8  Procedure of the United States District
9  Court, and the foregoing stipulation of
10 counsel, there came before me at the Coosa
11 County Board of Education, 2001 Nixburg
12 Road, Rockford, Alabama, on the 21st day
13 of May, 2008, commencing at 10:50 a.m.,
14 TODD WINGARD, witness in the above cause,
15 for oral examination, whereupon the
16 following proceedings were had:
17
18    MR. ROBERSON:  This is tape
19 one of the videotape deposition of Todd
20 Wingard.  Today is May 21st.  We are at
21 the offices of the Coosa County Board of
22 Education in Rockford, Alabama.  This case
23 is Gloria Sims versus the Coosa County

Page 6

1  Board of Education.  It's pending in the
2  United States District Court for the
3  Middle District of Alabama, Northern
4  Division, CV 07-704.
5    My name is Jerry Roberson.  I
6  represent the plaintiff, Gloria Sims.  And
7  I would ask all counsel of record to state
8  their name and the party they represent.
9    MS. YUENGERT:  I'm Anne
10 Yuengert.  And along with Donald Sweeney,
11 I represent the Coosa County Board of
12 Education.
13    MR. ROBERSON:  Ma'am, would
14 you swear our witness?  It's 10:50.
15
16    TODD WINGARD,
17 having been first duly sworn, was examined
18 and testified as follows:
19
20    THE COURT REPORTER:  Usual
21 stipulations?
22    MR. ROBERSON:  Yes.
23    MS. YUENGERT:  Do you want to

Page 7

1  read and sign?
2    THE DEPONENT:  Possibly.
3    MS. YUENGERT:  Okay.  We will
4  just leave that open and you can let us
5  know.
6
7  EXAMINATION BY MR. ROBERSON:
8    Q.   Mr. Wingard, you have been
9  here for the deposition of Ms. Forbus,
10 correct?
11   A.   Yes, sir.
12   Q.   And you are Todd Wingard?
13   A.   Yes, sir.
14   Q.   And you are the present
15 superintendent of the Coosa County Board
16 of Education?
17   A.   Yes, sir.
18   Q.   That's an elected position,
19 correct?
20   A.   Yes, sir.
21   Q.   So you have to run for office
22 -- is it every four years?
23   A.   Yes, sir.

Page 8

1    Q.   I saw your signs as I was
2  driving to the deposition, so you are up
3  for election this year?
4    A.   Yes, sir.
5    Q.   How long have you held that
6  position, sir?
7    A.   Seven and one-half years.
8    Q.   Okay.  So you have been
9  elected twice so far?
10   A.   Correct.
11   Q.   Now, what did you do before
12 you became the superintendent?
13   A.   I was an elementary/middle
14 school principal.
15   Q.   Here in Coosa?
16   A.   Here in Coosa County, yes.
17   Q.   And as the superintendent, how
18 many schools are you over?
19   A.   We are actually -- we actually
20 have four schools currently, one
21 elementary school, one middle school, one
22 high school and one career/technical
23 center.

2 (Pages 5 to 8)

Page 9

1    Q.    Okay.  And besides you as the
2  superintendent, is there a school board?
3    A.    Yes, sir.
4    Q.    How many members on that
5  board?
6    A.    Five board members.
7    Q.    Are they elected as well?
8    A.    Yes, sir.
9    Q.    Are their terms staggered so
10  you don't get a new board every time?
11    A.    Yes, sir, they are staggered.
12    Q.    Okay.  And then does the board
13  and the superintendent on a day-to-day
14  basis manage the school system -- or maybe
15  you on a day-to-day basis and them more
16  oversee it?
17    A.    Yes, sir.
18    Q.    Okay.  Do you know how many
19  employees, approximately, y'all have here?
20    A.    Approximately two hundred.
21    Q.    And do I understand that Coosa
22  County was formerly subject -- the subject
23  or one of many school systems that were

Page 10

1  the subject of a lawsuit and a consent
2  decree about their hiring practices, et
3  cetera?
4    A.    Yes, sir.
5    Q.    Okay.  And you are aware of
6  that lawsuit?
7    A.    Yes, sir.
8    Q.    And I assume you have had some
9  responsibility for dealing with that
10  lawsuit, not that you were here when it
11  began, but the aftermath?
12    A.    Yes, sir.
13    Q.    And have you recently
14  petitioned to get back to making your own
15  decisions, that is, not having a decree
16  that you have to follow?
17    A.    We applied for unitary status
18  probably over -- about a year ago.  I'm
19  not sure of the date, but we have received
20  unitary status and have been lifted from
21  the federal court order.
22    Q.    Okay.  And unitary status
23  means they returned the control to you and

Page 11

1  the board, is that correct?
2    A.    Correct.
3    Q.    Okay.  And so now since the
4  last year, y'all are making the hiring
5  decisions, correct?
6    A.    We made the hiring decisions
7  before.
8    Q.    Okay.
9    A.    And still make them.
10    Q.    Okay.  Well, maybe that's a
11  poor question.
12         You weren't -- you are not now
13  subject to a consent decree about your
14  hiring decisions --
15    A.    Correct.
16    Q.    -- is that a fair statement?
17    A.    Correct, yes.
18    Q.    Okay.  And up until you
19  received this unitary status, you were
20  subject to that decree, correct?
21    A.    Yes, sir.
22    Q.    Okay.  And one of the things
23  that that lawsuit addressed was minority

Page 12

1  hiring, is that -- do you agree with that?
2    A.    Yes, sir.
3    Q.    And so y'all had to keep
4  statistics about how many employees you
5  had and what their races were, correct?
6    A.    Yes, sir.
7    Q.    And you had to report that
8  information to the Court periodically,
9  correct?
10    A.    Yes, sir.
11    Q.    And in addition, you had to
12  make efforts to attract and retain
13  minorities in staffing your schools,
14  correct?
15    A.    Yes, sir.  The main emphasis
16  on the recruitment was in the certified
17  areas.
18    Q.    Teachers?
19    A.    Teachers, yes.
20    Q.    Right, okay.  And it is
21  difficult to attract and retain minority
22  candidates for certified positions, would
23  you agree with that?

3 (Pages 9 to 12)

Page 13

1    A.    Yes, sir.
2    Q.    I mean, they are -- they are
3  very much in demand?
4    A.    Correct.
5    Q.    Okay.  Now, had y'all received
6  unitary status at the time of this hiring
7  decision where Mr. McKinney was hired?
8    A.    I can't recall the time line
9  on that.  I would have to go back and look
10  at our records to see exactly when we
11  received unitary status.  I'm not sure if
12  we were still under the court order or not
13  at that time.
14    Q.    Well, do you know when this
15  system did receive unitary status?  Would
16  that be by a court order?
17    A.    Yes.
18    Q.    So that should be available to
19  me?
20    A.    Correct.
21    Q.    But do you happen to know the
22  date?
23    A.    Not off the top of my head, I

Page 14

1  don't.
2    Q.    Okay.  Now, you heard Ms.
3  Forbus testify, correct?
4    A.    Correct.
5    Q.    In fact, Ms. Forbus denied
6  knowing about Ms. Sims' EEOC charge; do
7  you recall that testimony?
8    A.    Correct.
9    Q.    But, in fact, Ms. Forbus
10  signed an affidavit for the EEOC about Ms.
11  Sims' EEOC charge, didn't she?
12    A.    Correct.
13    Q.    And I'm going to mark as
14  Exhibit 4 --
15        MR. ROBERSON:  We will keep
16  the numbers sequential from the earlier
17  deposition.
18    Q.    (BY MR. ROBERSON:)  I'm going
19  to mark as Exhibit 4 the affidavit that
20  Ms. Forbus gave to the EEOC.
21        (Whereupon, Plaintiff's
22        Exhibit 4 was marked for
23        identification.)

Page 15

1    Q.    Have you seen that, sir?  I
2  shouldn't -- maybe I shouldn't say to the
3  EEOC.  She gave it at the request of the
4  school, which was provided to the EEOC.
5  Maybe that's a better -- a more accurate
6  way of saying it.
7        MS. YUENGERT:  Correct.
8    A.    I have seen this document.
9  And I would like to say that Ms. Forbus --
10  I remember Ms. Forbus doing an affidavit
11  with our board attorney and I believe we
12  were asked to -- once it was typed up to
13  get it back to Ms. Forbus to review it to
14  make sure this was accurate on what her
15  testimony was at that time.  I would also
16  like to say that most of our support
17  personnel with acronyms such as EEOC
18  probably don't even know what that means.
19    Q.    The point of my question is
20  not to cast some aspersion on Ms.
21  Forbus' --
22    A.    Okay.
23    Q.    -- integrity or credibility.

Page 16

1  It's simply to say that she was, indeed,
2  involved in this process, perhaps she has
3  forgotten that she was, but she -- she may
4  have been on leave, so -- what's the date
5  of Exhibit 4?
6    A.    It was certified and signed by
7  Ms. Jan Forbus on 11th day of April, 2007.
8    Q.    Okay.  Thank you.  And as you
9  say, she met with the lawyer for the
10  school board, correct?
11    A.    Correct.
12        MS. YUENGERT:  Object to the
13  form.
14    Q.    Would that be Mr. Sweeney?
15    A.    Correct.
16    Q.    Okay.  And the purpose of her
17  providing this information was to provide
18  her statement to the EEOC; whether she
19  knew it or not, that was the purpose,
20  correct?
21    A.    Correct.
22    Q.    Okay.  And so I assume that --
23  I know Mr. Sweeney, I practice law with

4 (Pages 13 to 16)

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD
May 21, 2008

Page 17

1  him, that he would make her aware of what
2  she was doing, so I -- it wasn't a secret,
3  was it, what the purpose was? Y'all
4  didn't --
5      A.    No, sir. No, sir.
6      Q.    Okay. Now, I want to talk to
7  you about the hiring of Mr. McKinney and
8  that process, okay?
9      A.    Yes, sir.
10      Q.    And I understand that Mr.
11  McKinney was hired by a committee who
12  interviewed him that Ms. Forbus
13  identified, Mr. Bullard, Ms. Forbus and
14  Ms. Jones, correct?
15      A.    Correct.
16      Q.    And you didn't participate in
17  the interviews, correct?
18      A.    Correct.
19      Q.    But you did have some
20  recommendation or approval concerning the
21  candidate, correct?
22      A.    Correct.
23      Q.    There were numerous

Page 18

1  applicants; is that a fair statement?
2      A.    Yes.
3      Q.    And do you agree with me that
4  although the lunchroom worker is not a
5  high dollar job, they do have valuable
6  benefits associated with those positions?
7      A.    Yes.
8      Q.    And so from that sense they --
9  that encourages candidates to apply; and
10  they did in this case, correct?
11      A.    Correct.
12      Q.    And it's also desirable
13  because it -- at the time Ms. Sims was
14  working a six-hour shift from 8:30 to
15  2:30, correct?
16      A.    Correct.
17      Q.    Is that still the same shift
18  that that position is working, or do you
19  know?
20      A.    I'm not sure.
21      Q.    But my point is that if you
22  have school-aged children, it's a job that
23  you can work and not have to have day

Page 19

1  care, correct?
2      A.    Correct.
3      Q.    I mean, it coincides with the
4  times that your children will be going and
5  coming from school, correct?
6      A.    Correct.
7      Q.    Okay. And -- now, the job as
8  -- I'm going to use the term substitute, a
9  substitute lunchroom worker. Do your
10  requirements -- do you have to post that,
11  that there is a substitute job open or
12  available?
13      A.    No.
14      Q.    How does that word get out,
15  usually by people that work in the
16  lunchroom and say --
17      A.    Well, it's not that a job is
18  open. We hire substitutes for lunchroom
19  workers, janitors, bus drivers and
20  teachers. And it's not that a position is
21  open, it's just that we know someone
22  that's in the regular position may be out
23  at some point and we would need a

Page 20

1  substitute in that position.
2      Q.    Sure. They might have a brief
3  illness or something or a situation that
4  requires them to miss some work, so you
5  just get a substitute?
6      A.    Correct.
7      Q.    All right. And is there a
8  list of people who are substitutes?
9      A.    Yes, sir.
10      Q.    For the cafeteria?
11      A.    Yes, sir.
12      Q.    How do you get on that list?
13      A.    You fill out a substitute
14  application, and there are different
15  choices as far as if you want to be a
16  substitute worker for the cafeteria
17  program or custodial program or teacher --
18  substitute teacher program. There are
19  different requirements to be -- to receive
20  the substitute teacher license than just
21  to be a cafeteria worker or a substitute
22  secretary or -- and there are different
23  requirements to be a substitute bus driver

5 (Pages 17 to 20)

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD
May 21, 2008

Page 21

1   too. So each position has different
2   requirements.
3       Q.   You have to have a driver's
4   license, I assume, to be a bus driver,
5   correct?
6       A.   Correct.
7       Q.   You don't have to have a CDL,
8   do you?
9       A.   Yes.
10      Q.   You do have to have a CDL?
11      A.   Yes.
12      Q.   Okay. So would that be what
13  you mean by the different requirements --
14      A.   Yes.
15      Q.   -- you have to have a CDL in
16  order to be a bus driver?
17      A.   Yes.
18      Q.   And what about a teacher, do
19  you have to have some requirement to be a
20  substitute teacher?
21      A.   They make application for a
22  substitute teacher license through the
23  State.

Page 22

1       Q.   Are you aware of what
2   requirements there are?
3       A.   The requirements for a
4   substitute teacher, I think they are
5   required to go through a criminal
6   background check. And I think that's the
7   main requirement is to pass the criminal
8   background check.
9       Q.   Is there any educational
10  requirement?
11      A.   Not for --
12      Q.   A substitute?
13      A.   Not for a substitute teacher.
14      Q.   Okay. And lunchroom worker,
15  are you aware of any requirements for that
16  to be a substitute?
17      A.   Requirements for that, I'm
18  pretty sure that a substitute lunchroom
19  worker would have to go through a criminal
20  background check too. I'm not certain on
21  that, but I think that's the case.
22      Q.   Okay. Now, Mr. Wingard, when
23  you filled this position permanently --

Page 23

1   and you heard the conversation I had with
2   Ms. Forbus about the lunchroom, they get
3   tenure after -- in their fourth year, is
4   that correct?
5       A.   I don't think that's correct.
6       Q.   Okay.
7       A.   I think sometimes it's
8   confused with certified teachers that when
9   they are hired back for their fourth year
10  they receive tenure.
11      Q.   That's right.
12      A.   I think on support personnel,
13  if they complete their third year they
14  receive tenure, I believe, I'm not -- on
15  that. I think it's a little different
16  than the teacher.
17      Q.   All right. Let's discuss
18  during the first three years, if we can.
19      A.   Okay.
20      Q.   Do they have an annual
21  contract? I know they are not a teacher,
22  but do they have an annual agreement?
23      A.   Yes.

Page 24

1       Q.   Okay. So if they are awarded
2   the permanent position, they are awarded
3   it for a year, correct?
4       A.   Correct.
5       Q.   And then if -- assuming their
6   job performance was satisfactory, they
7   could be renewed for additional years,
8   correct?
9       A.   Correct.
10      Q.   And if you renew them for
11  three years, then they are tenured, or I
12  assume that's tenure?
13      A.   Continue -- tenured in a
14  sense. Continuing service for support
15  personnel is what -- the terminology we
16  use.
17      Q.   All right. And does that mean
18  it takes -- it's more difficult for them
19  to lose their position?
20      A.   Yes.
21      Q.   You have to have some kind of
22  just cause in order to remove them?
23      A.   Correct.

6 (Pages 21 to 24)

Page 25

1    Q.    Okay.  That's all I want to --
2  so -- but during this three-year time
3  period, are they called a temporary
4  lunchroom worker?
5    A.    No, sir.
6    Q.    Okay.  What do you mean --
7  what job position are you referring to as
8  a temporary lunchroom worker?
9    A.    Temp -- the temporary
10  lunchroom worker that was posted was a
11  position that we thought we would not need
12  possibly for the entire school year
13  because of construction going on with a
14  new kitchen.  And with the new kitchen, we
15  didn't think we were going to need as many
16  labor hours to get the job completed.
17         And the reason we look at meals
18  per laborer hour in our child nutrition
19  program is that there are recommended
20  guidelines from the State that you don't
21  need to have too many laborer hours per
22  meal served.  So we felt like -- we knew
23  our meals per laborer hour was over, but

Page 26

1  we had a situation where we were
2  transporting a lot of food, satelliting
3  food in because we did not have a kitchen,
4  it was under construction, and we thought
5  we might have that finished during that
6  school year and not need as many
7  employees.  So that's the reason we posted
8  a temporary position.
9    Q.    Is that the position that Lisa
10  received, the temporary position?
11    A.    I don't recall.  I don't
12  recall.
13    Q.    What school was that, do you
14  know?
15    A.    The temporary position that
16  I'm familiar -- most familiar with is the
17  one -- involves this lawsuit, and that was
18  for Central High School.
19    Q.    Okay.  Well, my client is
20  under the impression that --
21    MR. ROBERSON:  What's Lisa's
22  last name?
23    MS. SIMS:  Cleveland.

Page 27

1    Q.    Do you know a Lisa Cleveland?
2    A.    I do.
3    Q.    Do you know if she has a high
4  school education?
5    A.    I think during this process it
6  was checked, and I don't think she has a
7  high school education.
8    Q.    Do you know if she has a GED?
9    A.    I don't think so.
10    Q.    Do you know what position she
11  is working?
12    A.    She is working as a lunchroom
13  worker.
14    Q.    Is it a permanent position?
15    A.    Support personnel --
16    Q.    That's a poor question.
17    A.    Okay.
18    Q.    Let me rephrase it so you can
19  try to understand what I really mean.
20         Is her position the same or
21  equivalent to the position that Mr.
22  McKinney was awarded?
23    A.    Again, I don't recall when she

Page 28

1  was hired if we had posted that as a
2  temporary position.  That's possible, but
3  I would have to go back and look at that
4  job posting, because I don't remember on
5  her.  I do know the one Jerry McKinney was
6  hired for was a temporary job posting for
7  that position for that school year.
8    Q.    Okay.  So if -- if Ms.
9  Cleveland's job position was temporary,
10  those would be similar or equivalent
11  positions?
12    A.    Correct.
13    Q.    Okay.  All right.  Well, how
14  can she work that job but Ms. Sims be
15  ineligible to hold the position?
16    A.    Because she was hired and
17  recommended to the Board of Education to
18  be hired for that job, and Ms. Sims was
19  not.
20    Q.    But the reason Ms. Sims was
21  not was because she didn't meet the
22  educational requirements, correct?
23    A.    Correct.

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD
May 21, 2008

Page 29

1    Q.    Why don't the educational
2    requirements apply to her --
3    A.    Well, let me -- let me
4    elaborate --
5    Q.    -- Ms. Cleveland?
6    A.    -- on that.  That's part of
7    the reason she was not hired for the job.
8    Q.    Part?
9    A.    Part of the reason.
10    Q.    What was the other part?
11    A.    The three-person committee
12    made a recommendation to me on who they
13    thought was best for that job, best
14    qualified for that job.  So that's the
15    other part.
16    Q.    Ms. Forbus, Ms. Jones and Mr.
17    Bullard?
18    A.    Correct.
19    Q.    And you approved it based on
20    their recommendation?
21    A.    Correct.
22    Q.    Well, is there a requirement
23    with this school board that in order to

Page 30

1    work as a lunchroom worker that you have
2    to have a high school education or a GED?
3    A.    If we post that as the
4    qualification on the job posting, then
5    it's required for this Board.
6    Q.    Do y'all have some option
7    about whether you can post it or not?
8    A.    The superintendent usually
9    makes the decision on what the job
10    qualifications should be for each job.
11    Q.    Well, you made the decision,
12    then, to require a high school diploma
13    when Mr. McKinney was awarded the
14    position?
15    A.    Correct.
16    Q.    When Ms. Cleveland was awarded
17    the position, you did not require a high
18    school diploma?
19    A.    No, I'm not -- I don't think
20    that's the case.
21    Q.    Oh, I --
22    A.    I would think that we were
23    consistent in our job postings that it did

Page 31

1    require a high school education diploma.
2    Q.    Well, how did she get the job
3    if she doesn't have one?
4    A.    Well, at the time Ms.
5    Cleveland was hired -- was hired, we did
6    not have a three-person committee.  We had
7    -- I would call it a less formal process
8    of getting a recommendation back to me, in
9    that probably when Ms. Cleveland was
10    hired, a lunchroom manager -- she would
11    probably have been a substitute, a
12    lunchroom manager made a recommendation to
13    Ms. Jones that this is who we needed to
14    hire.  And evidently they did not do a
15    good job of screening, and then it was
16    recommended to me and I did not do a good
17    job of screening Ms. Cleveland to see if
18    she had that high school diploma and met
19    that requirement.
20    Q.    Well, you know now she doesn't
21    have it?
22    A.    Correct.
23    Q.    Have you taken any action

Page 32

1    against her?
2    A.    No.
3    Q.    Well, so the requirement can
4    be waived by the superintendent, correct?
5    A.    Can be waived?
6    Q.    Yeah.
7    A.    I wouldn't say it could be
8    waived, but I didn't think it was fair to
9    go back and fire her after we made the
10    mistake.  She didn't make the mistake.
11    Q.    Well, has she been able to --
12    Ms. Cleveland been able to satisfactorily
13    perform her job without a high school
14    education?
15    A.    She has.
16    Q.    So the requirement is really
17    unnecessary, isn't it?
18    MS. YUENGERT:  Object to the
19    form.  You can answer.
20    A.    No, I don't think it is
21    unnecessary.
22    Q.    Well, we know Ms. Cleveland is
23    doing a satisfactory job and she is not --

8 (Pages 29 to 32)

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD
May 21, 2008

---

Page 33

1  doesn't possess a high school education,
2  correct?
3      A.   Correct.
4      Q.   We know Ms. Murphy is doing a
5  satisfactory job and she doesn't possess a
6  high school education, correct?
7      A.   Correct.
8      Q.   These people don't provide any
9  instruction -- academic instruction, do
10 they?
11     A.   No.
12     Q.   But your substitute teachers
13 do, correct?
14     A.   Correct.
15     Q.   And a substitute schoolteacher
16 doesn't have to have a high school degree,
17 correct?
18     A.   Correct.
19     Q.   Well, I'm not in education,
20 but I don't understand why that is.  Can
21 you explain it to me?
22     A.   I certainly can.  I certainly
23 can.  We are in the education business.

---

Page 34

1      Q.   Yes, sir.
2      A.   And we think it sets a good
3  example for people who work in our school
4  system to have at least a high school
5  diploma or a GED equivalent.  And we think
6  anyone that works in our cafeteria program
7  would have a better chance with a high
8  school diploma or GED equivalent to be
9  able to read recipe labels, read product
10 information on cleaning products to make
11 sure they are mixing chemicals correctly.
12 So there are a number of reasons why it
13 would be good to make sure someone can
14 read before they are hired in a cafeteria
15 worker position.
16     Q.   Ms. Sims have any problem
17 following recipes or using cleaning
18 products?
19     A.   I'm not aware of any problems.
20     Q.   Does Ms. Cleveland have any
21 such problems?
22     A.   I haven't had any problems
23 reported to me.

---

Page 35

1      Q.   Is this rule that in order to
2  hold the position -- I'm going to use the
3  -- not a substitute, is that a permanent
4  position or temporary, how -- I just want
5  to use your terminology.  A temporary
6  school lunchroom worker position, what's
7  the source of the requirement that you
8  have to have a high school education?
9      A.   The source is, first of all,
10 our previous superintendent felt like --
11 felt like that was -- since we are in the
12 education business, felt like the
13 education of employees should have at
14 least a high school diploma or GED
15 equivalent.  We also have recommended --
16 recommended policy sample -- manuals from
17 the State Department of Education with
18 sample job postings for child nutrition
19 workers that had that same language in it,
20 high school diploma or GED equivalent.
21 And so that's what we decided to put on
22 our job postings.
23     Q.   Is there any State

---

Page 36

1  requirement?
2      A.   I don't think there is a State
3  requirement.
4      Q.   So if you chose to, you could
5  eliminate that requirement, correct?
6      A.   Correct.
7      Q.   I mean, it's up to the school
8  board's discretion, correct?
9      A.   Yes.
10     Q.   And, in fact, you just
11 recently came out from under a consent
12 decree where you were supposed to attract
13 minority applicants to all your staff
14 positions, correct?
15     A.   That's not correct.
16     Q.   It's not?  Y'all weren't
17 supposed to attempt to make efforts to
18 attract and obtain minority applicants in
19 all of your staffing positions?
20     A.   No.
21     Q.   There is no -- well, do you
22 attract those statistics in your -- in
23 your staffing?

---

9 (Pages 33 to 36)

Page 37

1    A.    We do in every area but
2  transportation.
3    Q.    Okay.  And how many --
4    A.    Or we did in every area but
5  transportation.  We do not now.
6        (Whereupon, Plaintiff's
7        Exhibit 5 was marked for
8        identification.)
9    Q.    Mr. Wingard, I'm going to show
10  you what I will mark as Exhibit 5 to your
11  deposition and ask you if you are familiar
12  with this document.  And I will represent
13  to you, I don't want you to read it on
14  tape, but it's a forty-one page consent
15  decree in CV 3101-N, Anthony Lee versus
16  United States of America, NEA, Coosa
17  County Board of Education.
18        Have you seen that document?
19    A.    Yes, sir.
20    Q.    Are you familiar with it?
21    A.    Yes, sir.
22    Q.    Is that the consent decree
23  that governed until you -- until you were

Page 38

1  awarded unitary status?
2    A.    Yes, sir.
3    Q.    Okay.  Fine, thank you.
4        Do you know Ms. Jones?  I
5  assume you do, she works for you?
6    A.    Yes.
7    Q.    She is a black female?
8    A.    Yes.
9    Q.    Child nutrition -- what is her
10  title?
11    A.    Child nutrition director.
12    Q.    Do you know what the extent of
13  her education is?
14    A.    She has completed a four-year
15  degree in teacher education, and I know
16  she has had extensive training through the
17  State Department in child nutrition
18  program.
19    Q.    Is she certified in some
20  capacity by the State regarding child
21  nutrition?
22    A.    I think she is in the process
23  of going through certification.

Page 39

1    Q.    How long has she been the
2  child nutrition director?
3    A.    She has been child nutrition
4  director for -- she has been the child
5  nutrition director since I have been in
6  office, seven and a half --
7    Q.    Seven years?
8    A.    Seven and a half years.
9    Q.    Okay.  Do you know if that
10  position -- a requirement of that position
11  is that you have an educational background
12  and training and certification in child
13  nutrition?
14    A.    I know that child nutrition
15  directors are required to go to training
16  to get certain certifications.  I was not
17  -- she was hired before I took office, so
18  I'm not sure exactly what the
19  qualifications were when that job was
20  posted.
21    Q.    In fact, she was hired while
22  y'all were under this consent decree,
23  correct?

Page 40

1    A.    Correct.
2    Q.    And under the consent decree,
3  you could waive requirements in order to
4  attract and retain minority applicants,
5  correct?
6    A.    I'm not familiar -- if that's
7  in the consent decree, I'm not familiar
8  with waiving any requirements for teachers
9  or support personnel since we were under
10  the court order.
11    Q.    Well, Ms. Jones has been
12  obtaining her educational requirements
13  since she became -- she was hired here,
14  correct?
15    A.    Correct.
16    Q.    She has had seven years to
17  obtain them, right?
18    A.    Correct.
19    Q.    Gloria Sims, had she been
20  hired, she could have obtained a GED or
21  high school equivalency after she was
22  hired, correct?
23        MS. YUENGERT:  Object to the

10 (Pages 37 to 40)

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD
May 21, 2008

Page 41

1  form. You can answer if you can.
2     A.   I don't know if she could have
3  received it or not.
4     Q.   Well, she could have pursued a
5  course of study to obtain it, correct?
6     A.   Correct.
7     Q.   Do y'all offer those courses
8  here?
9     A.   We do not offer those, but we
10 have adult education that we allow our
11 facilities to offer tutoring for those
12 classes, yes.
13    Q.   Who provides that adult
14 education, sir?
15    A.   I'm not sure who funds -- I
16 think some of it is volunteer services,
17 but Central Alabama Community College
18 operates the adult education program, they
19 are over that and the surrounding
20 counties.
21        (Whereupon, Plaintiff's
22        Exhibit 6 was marked for
23        identification.)

Page 42

1     Q.   I'm going to show you what I
2  have marked as -- I will mark as Exhibit
3  6. This is the affidavit of Pam Jones. I
4  would ask you to read that, and I would
5  direct your attention to the second page
6  about the posting qualifications.
7     A.   (Reviewing document.) Okay.
8     Q.   Do you see in about the middle
9  of the second page where Ms. Jones
10 indicates that the requirements for the
11 position were -- just let me let you read
12 it because, I will probably misquote it if
13 I don't. I will read it. "Ms. Sims was
14 not qualified. She did not meet the
15 qualifications we stated as required for
16 the jobs. These jobs were posted in
17 compliance with State law."
18        State law requires that the
19 positions be posted, correct?
20    A.   Correct.
21    Q.   State law does not require
22 that you have a high school education or a
23 GED, that's your requirement?

Page 43

1     A.   Correct.
2     Q.   Okay. I want to be straight
3  about that.
4         Mr. Wingard, in the seven years
5  that y'all -- that you were superintendent
6  and y'all were under the consent decree,
7  did you come to the conclusion that
8  lawsuits were expensive?
9     A.   Yes.
10        MS. YUENGERT: Object to the
11 form. You can answer.
12    A.   Yes.
13    Q.   And, in fact, they are a very
14 inefficient monetarily way of
15 accomplishing certain things; would you
16 agree with that?
17        MS. YUENGERT: Object to the
18 form. You can answer.
19    A.   Repeat that question.
20    Q.   Well, let me explain it to
21 you.
22        Everything that was
23 accomplished by the consent decree could

Page 44

1  have been accomplished without spending
2  all that money on lawyers; would you agree
3  with that?
4         MS. YUENGERT: I'm going to
5  object to the form. You can answer.
6     Q.   I'm talking myself out of a
7  job here. Did y'all have lawyers?
8     A.   Yes. The --
9     Q.   Did you pay them?
10    A.   Yes.
11    Q.   Lots of money that could have
12 been used for educational purposes?
13    A.   Yes.
14    Q.   Did the other side, the
15 plaintiffs in that lawsuit, have lawyers?
16    A.   Yes.
17    Q.   Did they get paid?
18    A.   Yes.
19    Q.   By you?
20    A.   Yes.
21    Q.   Lots of money that could have
22 been used for educational purposes?
23    A.   Correct.

11 (Pages 41 to 44)

Page 45

1    Q.    My point is it's an
2    inefficient way of accomplishing change,
3    correct?
4         MS. YUENGERT:  Object to the
5    form.  You can answer.
6    A.    I would rather not have to pay
7    attorneys.  I would rather not even have
8    to deal with them.
9    Q.    I understand that.  Make your
10   life a lot easier, wouldn't it?
11   A.    Yes, sir.
12   Q.    This job that -- when was Lisa
13   Cleveland's job filled, do you know?  And
14   I apologize, y'all gave me some records.
15   A.    I don't know.
16        MR. ROBERSON:  I tell you
17   what, let me go off the record and take a
18   break and find these.
19        MS. YUENGERT:  Okay.
20        MR. ROBERSON:  We will go off
21   the record at 11:30.
22        (Whereupon, a break was had
23        from 11:30 a.m. until 11:40

Page 46

1         a.m.)
2         MR. ROBERSON:  We are back on
3    the record with Mr. Wingard.  It's 11:40.
4    Q.    (BY MR. ROBERSON:)  Mr.
5    Wingard, there are -- this is number --
6    this Sims case number 0035 of documents
7    provided to me by the school board's
8    attorney.  And this document lists the
9    staff members, correct, at the -- the
10   lunchroom staff members, those top people
11   are at the high school, correct?
12   A.    Correct.
13   Q.    And the lower members are at
14   the elementary school?
15   A.    Elementary, middle school,
16   correct.
17   Q.    Okay.  Now, of the lunchroom
18   workers at the high school, there are five
19   listed, is that correct?
20   A.    Five, yes.
21   Q.    And only Ms. Murphy doesn't
22   have a high school education or GED,
23   correct?

Page 47

1    A.    Correct.
2    Q.    Okay.  And is only Mr.
3    McKinney out of those five individuals, is
4    only he a black?
5    A.    Correct.
6    Q.    He is the only black, okay.
7    And at your elementary and middle schools,
8    how many lunchroom workers are there?  Are
9    those two different facilities?
10   A.    Yes.
11   Q.    How many total are there?
12   A.    Seven.
13   Q.    Okay.  How many do not have a
14   high school or --
15   A.    I'm sorry, eight.  Three out
16   of those eight --
17   Q.    Can you just identify on the
18   record who those individuals are who don't
19   have a high school degree?
20   A.    Lisa Cleveland, Essie Moon,
21   Calvin Owens.
22   Q.    And Ms. Cleveland was -- does
23   it show her hire date on that document?

Page 48

1    A.    Yes.
2    Q.    When was that?
3    A.    August 8th, 2005.
4    Q.    Now, is that her hire date as
5    a -- as a substitute or is that her hire
6    date for this position?
7    A.    For the position.
8    Q.    So she was hired in 2005 as a
9    temporary worker?
10   A.    Correct.
11   Q.    All right.  Well, did y'all
12   have that requirement, high school degree
13   at that time?
14   A.    I'm -- I know we had that
15   requirement that we should have posted on
16   that position for her.  I haven't seen
17   that posting, but I would -- I'm thinking
18   that we probably had that requirement on
19   the posting if we were consistent with the
20   way we had been posting cafeteria worker
21   positions.
22   Q.    When was Ms. Murphy hired?
23   A.    Ms. Murphy was hired September

Page 49

1   9th, 2003.
2     Q.   Okay. Were you the
3   superintendent?
4     A.   Yes, I was.
5     Q.   Did y'all have the requirement
6   then?
7     A.   Again, that should have been a
8   requirement on that job posting.
9     Q.   Okay. Now, the other two
10   individuals at the other schools, when
11   were they hired? Give me the name and
12   when they were hired.
13     A.   Essie Moon was hired September
14   1st, 1978.
15     Q.   Okay. So she is a long -- has
16   been here a long time?
17     A.   Correct.
18     Q.   Before your tenure?
19     A.   Calvin -- correct, correct.
20     Q.   Okay. So it would be -- it
21   wouldn't be fair to suggest that that was
22   a requirement back when she was hired, is
23   that correct?

Page 50

1     A.   Correct.
2     Q.   Okay. Now, who's the other
3   individual?
4     A.   Calvin Owens.
5     Q.   When was he hired?
6     A.   July 22nd, 2002.
7     Q.   Were you superintendent?
8     A.   Yes.
9     Q.   And he doesn't have a high
10   school education?
11     A.   No.
12     Q.   What race is he?
13     A.   He is -- he is African-
14   American.
15     Q.   And Ms. Moon, what race is
16   she?
17     A.   African-American.
18     Q.   Okay. Now, the position that
19   Ms. Cleveland filled, do you know who held
20   it before she did?
21     A.   No, I don't.
22     Q.   Do you know what race they
23   were or what gender?

Page 51

1     A.   I don't know, but Ms.
2   Cleveland is white.
3     Q.   I understand that, and do you
4   know if she replaced another white female
5   who retired?
6     A.   I have no idea.
7     Q.   Okay.
8     MS. SIMS: I can't think of
9   her name.
10     Q.   Okay. Now, Ms. Murphy was
11   hired, Calvin was hired and Lisa were
12   hired all while you were superintendent,
13   all while this supposed requirement that
14   you have a high school education, and none
15   of them do, correct?
16     A.   Correct.
17     Q.   The only person who has been
18   prevented from being hired because she did
19   not possess a high school education or GED
20   is Gloria Sims, correct?
21     MS. YUENGERT: Object to the
22   form.
23     A.   Answer?

Page 52

1     Q.   Yes.
2     MS. YUENGERT: You can answer
3   if you can.
4     A.   No.
5     Q.   No?
6     A.   No.
7     Q.   Who else?
8     A.   Well, for the position that
9   Ms. Sims applied for, there was a -- there
10   was a black male that was not -- that did
11   not have a high school diploma. There was
12   a -- there were three or four applicants
13   that did not have a high school diploma.
14     Q.   Let me rephrase my question.
15     A.   Okay.
16     Q.   I apologize.
17     A.   Okay.
18     Q.   The only time that candidates
19   were required to have a high school
20   diploma or a GED was in the hiring of Mr.
21   McKinney; would that be a fair statement?
22     A.   No.
23     Q.   Okay. All right. I don't

13 (Pages 49 to 52)

Page 53

1 want to split hairs with you.
2    A.    Okay.
3    Q.    Do you know why a high school
4 diploma wasn't required for Calvin?
5    A.    I'm assuming it should have
6 been required for Calvin.
7    Q.    Do you know why it wasn't
8 required?
9    A.    We -- as I said before, we at
10 that time had a lot less formal -- before
11 this one a lot less formal interviewing
12 and screening process where cafeteria
13 managers interviewed, made recommendations
14 to the child nutrition director and
15 eventually was recommended to me to the
16 Board -- to recommend the Board, and we
17 did not do a good job of screening our
18 application to make sure they had the
19 requirement on the job posting.
20    Q.    Did you know at the time he
21 was hired he didn't have a high school
22 education?
23    A.    No.

Page 54

1    Q.    Ms. Murphy didn't have one.
2 Were you -- why wasn't one required for
3 her?  Same reason?
4    A.    I'm assuming it was required
5 for her on the job posting, but for the
6 same reason, yes.
7    Q.    Did you know she didn't have a
8 high school education when you approved
9 her?
10    A.    No.
11    Q.    Lisa Cleveland, why wasn't one
12 required for her?  Same reason?
13    A.    Same reason.
14    Q.    Did you know when she was
15 hired she didn't have one?
16    A.    No, I didn't know any of these
17 three didn't have one until it was brought
18 up in this complaint.
19    Q.    Well, now you know.  Are you
20 going to take any action against any of
21 them?
22    A.    Not for that.
23    Q.    Well, can you understand why

Page 55

1 Ms. Sims might be confused as to why she
2 was required to have one and no one else
3 has been, can you understand that?
4        MS. YUENGERT:  Object to the
5 form.  You can answer.
6    A.    I don't know about confused.
7 I understand why she might be upset that
8 she didn't get the job.
9    Q.    And others did get the job,
10 correct?
11        MS. YUENGERT:  Object to the
12 form.  You can answer.
13    A.    Yes.
14    Q.    In fact, your requirement has
15 been violated more than it has been
16 observed, correct?
17    A.    We probably hired more -- I
18 think we have hired more with a high
19 school diploma since we required that than
20 -- so no, that's not correct.
21    Q.    Looking at the hire dates?
22 Was Ms. Cleveland --
23    A.    Let me finish answering that.

Page 56

1    Q.    I'm sorry, I thought you had.
2 I apologize.
3    A.    Okay.  (Reviewing document.)
4 Seven have been hired since that
5 requirement was in place since I have been
6 in office that did have high school
7 diplomas.
8    Q.    Okay.  And three without them,
9 is that correct?
10    A.    Three, correct.
11    Q.    Okay.  Hey, does Calvin do a
12 good job for you?
13    A.    Yeah, he has done a good job,
14 yeah.
15    Q.    Does Lisa do a good job for
16 you?
17    A.    Yes.
18    Q.    Would you agree Barbara does a
19 good job?
20    A.    Yes.
21    Q.    Would you agree that a high
22 school education isn't necessary to do a
23 good job as a lunchroom worker?

14 (Pages 53 to 56)

Page 57

1    A.    No, I think it would depend on
2    how much -- how much knowledge you had
3    before you didn't get that high school
4    diploma.
5    Q.    Do y'all have positions that
6    are male positions here at the school?
7    A.    No.
8    Q.    Is every position open to
9    applicants of each gender?
10    A.    I can't think of any position
11    that would require -- that wouldn't
12    require -- that would require a gender.
13    Q.    Me either.
14    A.    Okay.
15    Q.    Can you think of one that
16    would require any particular race, or
17    would any race be okay?
18    A.    Any race would be okay, yes.
19    Q.    Any race, any gender, any
20    position, correct?
21    A.    Correct.
22    Q.    So why would someone say
23    that's a man's job, referring to a

Page 58

1    lunchroom position?
2    MS. YUENGERT:  Object to the
3    form.
4    A.    I can't -- I can't answer
5    that, why they would say that.
6    Q.    Why would someone say we need
7    to get some color in the lunchroom if any
8    race could apply?
9    A.    I couldn't answer why anyone
10    would say that.
11    Q.    Would you agree with me that
12    those would be inappropriate remarks if --
13    A.    Yes.
14    Q.    -- they were made?
15    A.    Yes.
16    MR. ROBERSON:  Mr. Wingard,
17    I'm going to let you go to your meeting.
18    It's ten till 12.
19    Ms. Anne, do you have any
20    questions?
21    MS. YUENGERT:  If you can give
22    me just a second.
23    MR. ROBERSON:  I can, but it's

Page 59

1    53:43, just to --
2    MS. YUENGERT:  Understood.
3    MR. ROBERSON:  -- let you
4    know.  Do you want to go off the record
5    for a second?
6    MS. YUENGERT:  No, go right
7    ahead.
8
9    EXAMINATION BY MS. YUENGERT:
10    Q.    Mr. Wingard, I'm Anne
11    Yuengert, and I represent the Board of
12    Education.
13    At one point you said that you
14    did not become aware that Ms. Cleveland or
15    Ms. Murphy or Mr. Owens did not have high
16    school educations until -- you said this
17    process.  When you referred to this
18    process, do you mean this lawsuit?
19    A.    Correct.
20    MS. YUENGERT:  That's all I
21    have.
22    MR. ROBERSON:  Thank you, Mr.
23    Wingard.  Off the record.

Page 60

1    (Whereupon, the deposition of
2    Todd Wingard was concluded at
3    11:52 a.m. on the 21st day of
4    May, 2008.)
5
6    FURTHER THE DEPONENT SAITH NOT

15 (Pages 57 to 60)

Page 61

```
 1        C E R T I F I C A T E
 2
 3
 4     STATE OF ALABAMA)
 5     JEFFERSON COUNTY)
 6
 7          I hereby certify that the
 8     above and foregoing deposition was taken
 9     down by me in stenotypy, and the questions
10     and answers thereto were reduced to
11     typewriting under my supervision, and that
12     the foregoing represents a true and
13     correct transcript of the deposition given
14     by said witness upon said hearing.
15          I further certify that I am
16     neither of counsel nor of kin to the
17     parties to the action, nor am I in anywise
18     interested in the result of said cause.
19
20
21
22
           COMMISSIONER - NOTARY PUBLIC
23         ACCR LICENSE NO. 116
```

GLORIA SIMS                                                    TODD WINGARD
COOSA COUNTY BOARD OF EDUCATION                               May 21, 2008

**A**

able
32:11,12 34:9
academic
33:9
accomplished
43:23 44:1
accomplishing
43:15 45:2
ACCR
61:23
accurate
15:5,18
acronyms
15:17
acting
5:5
action
1:5 31:23 54:20 61:17
addition
12:11
additional
24:7
addressed
11:23
adult
41:10,13,18
affidavit
14:10,19 15:10 42:3
African
50:13
African-American
50:17
aftermath
10:11
ago
10:18
agree
12:1,23 18:3 43:16 44:2
56:18,21 58:11
AGREED
2:3
agreement
23:22
ahead
59:7
Alabama
1:2 3:9,17 5:4,5,12,22
6:3 41:17 61:4
allow
41:10
America
37:16
American
50:14
Anne
3:12 6:9 58:19 59:10
annual
23:20,22
answer

32:19 41:1 43:11,18 44:5
45:5 51:23 52:2 55:5
55:12 58:4,9
answering
55:23
answers
61:10
Anthony
37:15
anywise
61:17
apologize
45:14 52:16 56:2
applicants
18:1 36:13,18 40:4 52:12
57:9
application
20:14 21:21 53:18
applied
10:17 52:9
apply
18:9 29:2 58:8
approval
17:20
approved
29:19 54:8
approximately
9:19,20
April
16:7
Arant
3:14
area
37:1,4
areas
12:17
asked
15:12
aspersion
15:20
assign
2:20
associated
18:6
assume
10:8 16:22 21:4 24:12
38:5
assuming
24:5 53:5 54:4
attempt
36:17
attention
42:5
attorney
3:5,13 15:11 46:8
attorneys
45:7
attract
12:12,21 36:12,18,22 40:4
August
48:3

available
13:18 19:12
Avenue
3:16
awarded
24:1,2 27:22 30:13,16
38:1
aware
10:5 17:1 22:1,15 34:19
59:14
a.m
5:13 45:23 46:1 60:3

**B**

B
1:20 2:6 5:1
back
10:14 13:9 15:13 23:9
28:3 31:8 32:9 46:2
49:22
background
22:6,8,20 39:11
Barbara
56:18
based
29:19
basis
9:14,15
began
10:11
believe
15:11 23:14
benefits
18:6
best
29:13,13
better
15:5 34:7
Birmingham
3:9,17 5:3
black
38:7 47:4,6 52:10
board
1:10 5:11,21 6:1,11 7:15
9:2,5,6,10,12 11:1 15:11
16:10 28:17 29:23 30:5
37:17 53:16,16 59:11
board's
36:8 46:7
Box
3:8
Bradley
3:14
break
45:18,22
brief
20:2
brought
54:17
Bullard

17:13 29:17
bus
19:19 20:23 21:4,16
business
33:23 35:12

**C**

C
3:1 61:1,1
cafeteria
20:10,16,21 34:6,14 48:20
53:12
call
31:7
called
25:3
Calvin
47:21 49:19 50:4 51:11
53:4,6 56:11
candidate
17:21
candidates
12:22 18:9 52:18
capacity
38:20
care
19:1
career/technical
8:22
case
5:22 18:10 22:21 30:20
46:6
cast
15:20
cause
5:14 24:22 61:18
CDL
21:7,10,15
center
8:23
Central
26:18 41:17
certain
22:20 39:16 43:15
certainly
33:22,22
certification
38:23 39:12
certifications
39:16
certified
1:21 2:7 5:2 12:16,22
16:6 23:8 38:19
certify
5:6 61:7,15
cetera
10:3
chance
34:7
change

45:2
charge
14:6,11
check
22:6,8,20
checked
27:6
chemicals
34:11
child
25:18 35:18 38:9,11,17,20
39:2,3,4,12,14 53:14
children
18:22 19:4
choices
20:15
chose
36:4
Civil
1:5 5:17
classes
41:12
cleaning
34:10,17
Cleveland
26:23 27:1 29:5 30:16
31:5,9,17 32:12,22
34:20 47:20,22 50:19
51:2 54:11 55:22 59:14
Cleveland's
28:9 45:13
client
26:19
coincides
19:3
College
41:17
color
58:7
come
43:7
coming
19:5
commencing
5:13
Commissioner
2:7 5:6 61:22
committee
17:11 29:11 31:6
Community
41:17
complaint
54:18
complete
23:13
completed
25:16 38:14
compliance
2:13 42:17
concerning
17:20

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                          http://www.TylerEaton.com

concluded
60:2
conclusion
43:7
confused
23:8 55:1,6
consent
10:1 11:13 36:11 37:14,22
39:22 40:2,7 43:6,23
consistent
30:23 48:19
construction
25:13 26:4
Continue
24:13
Continuing
24:14
contract
23:21
control
10:23
conversation
23:1
Coosa
1:10 5:10,21,23 6:11 7:15
8:15,16 9:21 37:16
correct
7:10,19 8:10 11:1,2,5,15,17
11:20 12:5,9,14 13:4,20
14:3,4,8,12 15:7 16:10
16:11,15,20,21 17:14,15
17:17,18,21,22 18:10,11
18:15,16 19:1,2,5,6 20:6
21:5,6 23:4,5 24:3,4,8
24:9,23 28:12,22,23
29:18,21 30:15 31:22
32:4 33:2,3,6,7,13,14,17
33:18 36:5,6,8,14,15
39:23 40:1,5,14,15,18
40:22 41:5,6 42:19,20
43:1 44:23 45:3 46:9
46:11,12,16,19,23 47:1,5
48:10 49:17,19,19,23
50:1 51:15,16,20 55:10
55:16,20 56:9,10 57:20
57:21 59:19 61:13
correctly
34:11
counsel
2:5,17,19 5:10 6:7 61:16
counties
41:20
County
1:10 5:11,21,23 6:11 7:15
8:16 9:22 37:17 61:5
course
41:5
courses
41:7
court
1:1 2:14 5:9 6:2,20 10:21

12:8 13:12,16 40:10
credibility
15:23
criminal
22:5,7,19
currently
8:20
custodial
20:17
CV
6:4 37:15

### D

D
3:4
date
5:6 10:19 13:22 16:4
47:23 48:4,6
dates
55:21
day
5:12 16:7 18:23 60:3
day-to-day
9:13,15
deal
45:8
dealing
10:9
decided
35:21
decision
13:7 30:9,11
decisions
10:15 11:5,6,14
decree
10:2,15 11:13,20 36:12
37:15,22 39:22 40:2,7
43:6,23
Defendant
1:11 3:11
degree
33:16 38:15 47:19 48:12
demand
13:3
denied
14:5
Department
35:17 38:17
depend
57:1
DEPONENT
7:2 60:6
deposition
1:14 2:5,11,12,22 5:19 7:9
8:2 14:17 37:11 60:1
61:8,13
depositions
2:15
desirable
18:12

different
20:14,19,22 21:1,13 23:15
47:9
difficult
12:21 24:18
diploma
30:12,18 31:1,18 34:5,8
35:14,20 52:11,13,20
53:4 55:19 57:4
diplomas
56:7
direct
42:5
director
38:11 39:2,4,5 53:14
directors
39:15
discretion
36:8
discuss
23:17
District
1:1,2 5:8 6:2,3
Division
1:3 6:4
document
15:8 37:12,18 42:7 46:8
47:23 56:3
documents
46:6
doing
15:10 17:2 32:23 33:4
dollar
18:5
Donald
6:10
Drive
3:7
driver
20:23 21:4,16
drivers
19:19
driver's
21:3
driving
8:2
duly
6:17

### E

E
3:1,1 61:1,1
earlier
14:16
easier
45:10
education
1:10 5:11,22 6:1,12 7:16
27:4,7 28:17 30:22 31:1
32:14 33:1,6,19,23 35:8
examined

35:12,13,17 37:17 38:13
38:15 41:10,14,18 42:22
46:22 50:10 51:14,19
53:22 54:8 56:22
59:12
educational
22:9 28:22 29:1 39:11
40:12 44:12,22
educations
59:16
EEOC
14:6,10,11,20 15:3,4,17
16:18
effect
2:13
efforts
12:12 36:17
eight
47:15,16
either
57:13
elaborate
29:4
elected
7:18 8:9 9:7
election
8:3
elementary
8:21 46:14,15 47:7
elementary/middle
8:13
eliminate
36:5
emphasis
12:15
employees
9:19 12:4 26:7 35:13
encourages
18:9
entire
25:12
equivalency
40:21
equivalent
27:21 28:10 34:5,8 35:15
35:20
Essie
47:20 49:13
et
10:2
eventually
53:15
evidence
2:23
evidently
31:14
exactly
13:10 39:18
examination
4:1,3,4 5:15 7:7 59:9
examined

6:17
example
34:3
Exhibit
4:9,10,11 14:14,19,22 16:5
37:7,10 41:22 42:2
EXHIBITS
4:7
expensive
43:8
explain
33:21 43:20
extensive
38:16
extent
38:12

### F

F
61:1
facilities
41:11 47:9
fact
14:5,9 36:10 39:21 43:13
55:14
fair
11:16 18:1 32:8 49:21
52:21
familiar
26:16,16 37:11,20 40:6,7
far
8:9 20:15
federal
3:15 5:7 10:21
felt
25:22 35:10,11,12
female
38:7 51:4
Fifth
3:16
fill
20:13
filled
22:23 45:13 50:19
find
45:18
Fine
38:3
finish
55:23
finished
26:5
fire
32:9
first
6:17 23:18 35:9
five
9:6 46:18,20 47:3
follow
10:16

following
  5:16  34:17
follows
  6:18
food
  26:2,3
Forbus
  7:9  14:3,5,9,20  15:9,10
    15:13,21  16:7  17:12,13
    23:2  29:16
force
  2:13
foregoing
  5:9  61:8,12
forgotten
  16:3
form
  2:18  16:13  32:19  41:1
    43:11,18  44:5  45:5
    51:22  55:5,12  58:3
formal
  31:7  53:10,11
formerly
  9:22
forty-one
  37:14
four
  7:22  8:20  52:12
fourth
  23:3,9
four-year
  38:14
full
  2:13
funds
  41:15
further
  60:6  61:15

_____ G _____

Gail
  1:20  2:6  5:1
GED
  27:8  30:2  34:5,8  35:14
    35:20  40:20  42:23
    46:22  51:19  52:20
gender
  50:23  57:9,12,19
getting
  31:8
give
  49:11  58:21
given
  61:13
Gloria
  1:7  5:23  6:6  40:19  51:20
go
  13:9  22:5,19  28:3  32:9
    39:15  45:17,20  58:17
    59:4,6

going
  14:13,18  19:4,8  25:13,15
    35:2  37:9  38:23  42:1
    44:4  54:20  58:17
good
  31:15,16  34:2,13  53:17
    56:12,13,15,19,23
governed
  37:23
grounds
  2:21
guidelines
  25:20

_____ H _____

hairs
  53:1
half
  39:6,8
happen
  13:21
head
  13:23
heard
  14:2  23:1
hearing
  61:14
held
  8:5  50:19
Hey
  56:11
high
  8:22  18:5  26:18  27:3,7
    30:2,12,17  31:1,18  32:13
    33:1,6,16  34:4,7  35:8
    35:14,20  40:21  42:22
    46:11,18,22  47:14,19
    48:12  50:9  51:14,19
    52:11,13,19  53:3,21
    54:8  55:18  56:6,21
    57:3  59:15
hire
  19:18  31:14  47:23  48:4,5
    55:21
hired
  13:7  17:11  23:9  28:1,6,16
    28:18  29:7  31:5,5,10
    34:14  39:17,21  40:13,20
    40:22  48:8,22,23  49:11
    49:12,13,22  50:5  51:11
    51:11,12,18  53:21  54:15
    55:17,18  56:4
hiring
  10:2  11:4,6,14  12:1  13:6
    17:7  52:20
hold
  28:15  35:2
hour
  25:18,23
hours

25:16,21
hundred
  9:20

_____ I _____

idea
  51:6
identification
  14:23  37:8  41:23
identified
  17:13
identify
  47:17
illness
  20:3
impression
  26:20
inappropriate
  58:12
INDEX
  4:1,7
indicates
  42:10
individual
  50:3
individuals
  47:3,18  49:10
inefficient
  43:14  45:2
ineligible
  28:15
information
  12:8  16:17  34:10
instruction
  33:9,9
integrity
  15:23
interested
  61:18
interviewed
  17:12  53:13
interviewing
  53:11
interviews
  17:17
involved
  16:2
involves
  26:17

_____ J _____

Jan
  16:7
janitors
  19:19
JEFFERSON
  61:5
Jerry
  3:4  6:5  28:5
job

18:5,22  19:7,11,17  24:6
  25:7,16  28:4,6,9,14,18
  29:7,13,14  30:4,9,10,23
  31:2,15,17  32:13,23
  33:5  35:18,22  39:19
  44:7  45:12,13  49:8
  53:17,19  54:5  55:8,9
  56:12,13,15,19,23  57:23
jobs
  42:16,16
Jones
  17:14  29:16  31:13  38:4
    40:11  42:3,9
July
  50:6

_____ K _____

keep
  12:3  14:15
kin
  61:16
kind
  24:21
Kinross
  3:7
kitchen
  25:14,14  26:3
knew
  16:19  25:22
know
  7:5  9:18  13:14,21  15:18
    16:23  18:19  19:21  23:21
    26:14  27:1,3,8,10  28:5
    31:20  32:22  33:4  38:4
    38:12,15  39:9,14  41:2
    45:13,15  48:14  50:19,22
    51:1,4  53:3,7,20  54:7
    54:14,16,19  55:6  59:4
knowing
  14:6
knowledge
  57:2

_____ L _____

L
  2:1
labels
  34:9
labor
  25:16
laborer
  25:18,21,23
language
  35:19
Large
  5:5
law
  3:5,13  16:23  42:17,18,21
laws
  2:14

lawsuit
  10:1,6,10  11:23  26:17
    44:15  59:18
lawsuits
  43:8
lawyer
  16:9
lawyers
  44:2,7,15
leading
  2:19
leave
  7:4  16:4
Lee
  37:15
Let's
  23:17
license
  20:20  21:4,22  61:23
life
  45:10
lifted
  10:20
line
  13:8
Lisa
  26:9  27:1  45:12  47:20
    51:11  54:11  56:15
Lisa's
  26:21
list
  20:8,12
listed
  46:19
lists
  2:4
little
  23:15
LLP
  3:14
long
  8:5  39:1  49:15,16
look
  13:9  25:17  28:3
Looking
  55:21
lose
  24:19
lot
  26:2  45:10  53:10,11
Lots
  44:11,21
lower
  46:13
lunchroom
  18:4  19:9,16,18  22:14,18
    23:2  25:4,8,10  27:12
    30:1  31:10,12  35:6
    46:10,17  47:8  56:23
    58:1,7

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD
May 21, 2008

**M**

main
12:15 22:7
making
10:14 11:4
male
52:10 57:6
manage
9:14
manager
31:10,12
managers
53:13
manuals
35:16
man's
57:23
mark
14:13,19 37:10 42:2
marked
14:22 37:7 41:22 42:2
Ma'am
6:13
McKinney
13:7 17:7,11 27:22 28:5
    30:13 47:3 52:21
meal
25:22
meals
25:17,23
mean
13:2 19:3 21:13 24:17
    25:6 27:19 36:7 59:18
means
10:23 15:18
meet
28:21 42:14
meeting
58:17
members
9:4,6 46:9,10,13
met
16:9 31:18
middle
6:3 8:21 42:8 46:15 47:7
minorities
12:13
minority
11:23 12:21 36:13,18 40:4
misquote
42:12
mistake
32:10,10
mixing
34:11
monetarily
43:14
money
44:2,11,21
Moon

47:20 49:13 50:15
Murphy
33:4 46:21 48:22,23
    51:10 54:1 59:15

**N**

2:1 3:1
name
6:5,8 26:22 49:11 51:9
NEA
37:16
necessary
2:16 56:22
need
19:23 25:11,15,21 26:6
    58:6
needed
31:13
neither
61:16
new
9:10 25:14,14
Nixburg
5:11
North
3:16
Northern
1:2 6:3
Notary
1:23 2:9 5:4 61:22
number
34:12 46:5,6
numbers
14:16
numerous
17:23
nutrition
25:18 35:18 38:9,11,17,21
    39:2,3,5,13,14 53:14

**O**

2:1 3:8
object
16:12 32:18 40:23 43:10
    43:17 44:5 45:4 51:21
    55:4,11 58:2
objections
2:17,20
observed
55:16
obtain
36:18 40:17 41:5
obtained
40:20
obtaining
40:12
offer
41:7,9,11

offered
2:22
office
7:21 39:6,17 56:6
offices
5:21
Oh
30:21
okay
7:3 8:8 9:1,12,18 10:5,22
    11:3,8,10,18,22 12:20
    13:5 14:2 15:22 16:8,16
    16:22 17:6,8 19:7 21:12
    22:14,22 23:6,19 24:1
    25:1,6 26:19 27:17
    28:8,13 37:3 38:3 39:9
    42:7 43:2 45:19 46:17
    47:2,6,13 49:2,9,15,20
    50:2,18 51:7,10 52:15
    52:17,23 53:2 56:3,8,11
    57:14,17,18
once
15:12
one-half
8:7
open
7:4 19:11,18,21 57:8
operates
41:18
option
30:6
oral
5:15
order
10:21 13:12,16 21:16
    24:22 29:23 35:1 40:3
    40:10
oversee
9:16
Owens
47:21 50:4 59:15

**P**

P
2:1 3:1,1,8
page
4:2,8 37:14 42:5,9
paid
44:17
Pam
42:3
part
29:6,8,9,10,15
participate
17:16
particular
57:16
parties
2:4,20 61:17
party

6:8
pass
22:7
pay
44:9 45:6
pending
6:1
people
19:15 20:8 33:8 34:3
    46:10
perform
32:13
performance
24:6
period
25:3
periodically
12:8
permanent
24:2 27:14 35:3
permanently
22:23
person
51:17
personnel
15:17 23:12 24:15 27:15
    40:9
petitioned
10:14
place
3:15 56:5
plaintiff
1:8 3:3 6:6
plaintiffs
44:15
Plaintiff's
4:9,10,11 14:21 37:6
    41:21
point
15:19 18:21 19:23 45:1
    59:13
policy
35:16
poor
11:11 27:16
position
7:18 8:6 18:18 19:20,22
    20:1 21:1 22:23 24:2,19
    25:7,11 26:8,9,10,15
    27:10,14,20,21 28:2,7,9
    28:15 30:14,17 34:15
    35:2,4,6 39:10,10 42:11
    48:6,7,16 50:18 52:8
    57:8,10,20 58:1
positions
12:22 18:6 28:11 36:14,19
    42:19 48:21 57:5,6
possess
33:1,5 51:19
possible
28:2

possibly
7:2 25:12
post
19:10 30:3,7
posted
25:10 26:7 28:1 39:20
    42:16,19 48:15
posting
28:4,6 30:4 42:6 48:17
    48:19,20 49:8 53:19
    54:5
postings
30:23 35:18,22
practice
16:23
practices
10:2
present
7:14
pretty
22:18
prevented
51:18
previous
35:10
principal
8:14
prior
2:23
Pritchett
1:20 2:7 5:1
probably
10:18 15:18 31:9,11 42:12
    48:18 55:17
problem
34:16
problems
34:19,21,22
Procedure
5:8
proceedings
5:16
process
16:2 17:8 27:5 31:7
    38:22 53:12 59:17,18
product
34:9
products
34:10,18
Professional
1:22 2:8 5:3
program
20:17,17,18 25:19 34:6
    38:18 41:18
provide
16:17 33:8
provided
5:7 15:4 46:7
provides
41:13
providing

16:17
Public
1:23 2:9 5:4 61:22
purpose
16:16,19 17:3
purposes
44:12,22
pursued
41:4
put
35:21

**Q**

qualification
30:4
qualifications
30:10 39:19 42:6,15
qualified
29:14 42:14
question
11:11 15:19 27:16 43:19
52:14
questions
2:18,19 58:20 61:9

**R**

R
3:1,12 61:1
race
50:12,15,22 57:16,17,18,19
58:8
races
12:5
read
7:1 34:9,9,14 37:13 42:4
42:11,13
reading
2:11
really
27:19 32:16
Realtime
1:21 2:8 5:2
reason
25:17 26:7 28:20 29:7,9
54:3,6,12,13
reasons
34:12
recall
13:8 14:7 26:11,12 27:23
receive
13:15 20:19 23:10,14
received
10:19 11:19 13:5,11 26:10
41:3
recipe
34:9
recipes
34:17
recommend
53:16

recommendation
17:20 29:12,20 31:8,12
recommendations
53:13
recommended
25:19 28:17 31:16 35:15
35:16 53:15
record
6:7 45:17,21 46:3 47:18
59:4,23
records
13:10 45:14
recruitment
12:16
reduced
61:10
referred
59:17
referring
25:7 57:23
regarding
38:20
Registered
1:22 2:8 5:2
regular
19:22
relating
2:15
remarks
58:12
remember
15:10 28:4
remove
24:22
renew
24:10
renewed
24:7
Repeat
43:19
rephrase
27:18 52:14
replaced
51:4
report
12:7
reported
1:20 34:23
Reporter
1:21,23 2:8,9 5:2,3 6:20
represent
6:6,8,11 37:12 59:11
represents
61:12
request
15:3
require
30:12,17 31:1 42:21 57:11
57:12,12,16
required
22:5 30:5 39:15 42:15

52:19 53:4,6,8 54:2,4
54:12 55:2,19
requirement
21:19 22:7,10 29:22 31:19
32:3,16 35:7 36:1,3,5
39:10 42:23 48:12,15,18
49:5,8,22 51:13 53:19
55:14 56:5
requirements
19:10 20:19,23 21:2,13
22:2,3,15,17 28:22 29:2
40:3,8,12 42:10
requires
20:4 42:18
respective
2:5
responsibility
10:9
result
61:18
retain
12:12,21 40:4
retired
51:5
returned
10:23
review
15:13
Reviewing
42:7 56:3
right
12:20 20:7 23:11,17 24:17
28:13 40:17 48:11
52:23 59:6
Road
5:12
Roberson
3:4,6,6 4:3 5:18 6:5,13
6:22 7:7 14:15,18 26:21
45:16,20 46:2,4 58:16
58:23 59:3,22
Rockford
5:12,22
Rose
3:14
rule
35:1
rules
2:14 5:7
run
7:21

**S**

S
2:1 3:1
SAITH
60:6
sample
35:16,18
satelliting

26:2
satisfactorily
32:12
satisfactory
24:6 32:23 33:5
saw
8:1
saying
15:6
school
8:14,21,21,22 9:2,14,23
15:4 16:10 19:5 25:12
26:6,13,18 27:4,7 28:7
29:23 30:2,12,18 31:1
31:18 32:13 33:1,6,16
34:3,4,8 35:6,8,14,20
36:7 40:21 42:22 46:7
46:11,14,15,18,22 47:14
47:19 48:12 50:10
51:14,19 52:11,13,19
53:3,21 54:8 55:19
56:6,22 57:3,6 59:16
schools
8:18,20 12:13 47:7 49:10
schoolteacher
33:15
school-aged
18:22
screening
31:15,17 53:12,17
second
42:5,9 58:22 59:5
secret
17:2
secretary
20:22
see
13:10 31:17 42:8
seen
15:1,8 37:18 48:16
sense
18:8 24:14
September
48:23 49:13
sequential
14:16
served
25:22
service
24:14
services
41:16
sets
34:2
seven
8:7 39:6,7,8 40:16 43:4
47:12 56:4
shift
18:14,17
show
37:9 42:1 47:23

side
44:14
sign
7:1
signature
2:10
signed
14:10 16:6
signs
8:1
similar
28:10
simply
16:1
Sims
1:7 5:23 6:6 14:6,11
18:13 26:23 28:14,18,20
34:16 40:19 42:13 46:6
51:8,20 52:9 55:1
sir
7:11,13,17,20,23 8:4,6
9:3,8,11,17 10:4,7,12
11:21 12:2,6,10,15 13:1
15:1 17:5,5,9 20:9,11
25:5 34:1 37:19,21
38:2 41:14 45:11
situation
20:3 26:1
six-hour
18:14
sorry
47:15 56:1
source
35:7,9
SOUTHERN
1:3
spending
44:1
split
53:1
staff
36:13 46:9,10
staffing
12:13 36:19,23
staggered
9:9,11
state
5:4 6:7 21:23 25:20
35:17,23 36:2 38:17,20
42:17,18,21 61:4
stated
42:15
statement
11:16 16:18 18:1 52:21
States
1:1 5:8 6:2 37:16
statistics
12:4 36:22
status
10:17,20,22 11:19 13:6,11
13:15 38:1

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD
May 21, 2008

stenotypy
61:9
STIPULATED
2:3
stipulation
5:9
stipulations
6:21
straight
43:2
study
41:5
subject
9:22,22 10:1 11:13,20
substitute
19:8,9,11 20:1,5,13,16,18
20:20,21,23 21:20,22
22:4,12,13,16,18 31:11
33:12,15 35:3 48:5
substitutes
19:18 20:8
suggest
49:21
superintendent
7:15 8:12,17 9:2,13 30:8
32:4 35:10 43:5 49:3
50:7 51:12
supervision
61:11
support
15:16 23:12 24:14 27:15
40:9
supposed
36:12,17 51:13
sure
10:19 13:11 15:14 18:20
20:2 22:18 34:11,13
39:18 41:15 53:18
surrounding
41:19
swear
6:14
Sweeney
6:10 16:14,23
sworn
6:17
system
9:14 13:15 34:4
systems
9:23

_____

T

T
2:1,1 61:1,1
take
45:17 54:20
taken
2:6 31:23 61:8
takes
24:18

talk
17:6
talking
44:6
tape
5:18 37:14
teacher
20:17,18,20 21:18,20,22
22:4,13 23:16,21 38:15
teachers
12:18,19 19:20 23:8 33:12
40:8
tell
45:16
Temp
25:9
temporary
25:3,8,9 26:8,10,15 28:2
28:6,9 35:4,5 48:9
ten
58:18
tenure
23:3,10,14 24:12 49:18
tenured
24:11,13
term
19:8
terminology
24:15 35:5
terms
9:9
testified
6:18
testify
14:3
testimony
14:7 15:15
thank
16:8 38:3 59:22
thereto
2:23 61:10
things
11:22 43:15
think
22:4,6,21 23:5,7,12,15
25:15 27:5,6,9 30:19,22
32:8,20 34:2,5 36:2
38:22 41:16 51:8 55:18
57:1,10,15
thinking
48:17
third
23:13
thought
25:11 26:4 29:13 56:1
three
23:18 24:11 47:15 52:12
54:17 56:8,10
three-person
29:11 31:6
three-year

25:2
till
58:18
time
2:21,22 9:10 13:6,8,13
15:15 18:13 25:2 31:4
48:13 49:16 52:18
53:10,20
times
19:4
title
38:10
Today
5:20
Todd
1:16 2:6 5:14,19 6:16
7:12 60:2
top
13:23 46:10
total
47:11
training
38:16 39:12,15
transcript
61:13
transportation
37:2,5
transporting
26:2
trial
2:21
true
61:12
try
27:19
tutoring
41:11
twice
8:9
two
9:20 47:9 49:9
typed
15:12
typewriting
61:11

_____

U

U
2:1
understand
9:21 17:10 27:19 33:20
45:9 51:3 54:23 55:3,7
Understood
59:2
unitary
10:17,20,22 11:19 13:6,11
13:15 38:1
United
1:1 5:8 6:2 37:16
unnecessary

32:17,21
upset
55:7
use
19:8 24:16 35:2,5
Usual
6:20
usually
19:15 30:8

_____

V

valuable
18:5
versus
5:23 37:15
VIDEO
1:14
videotape
5:19
violated
55:15
volunteer
41:16
vs
1:9

_____

W

waive
40:3
waived
2:12 32:4,5,8
waiving
40:8
want
6:23 17:6 20:15 25:1
35:4 37:13 43:2 53:1
59:4
wasn't
17:2 53:4,7 54:2,11
way
15:6 43:14 45:2 48:20
weren't
11:12 36:16
white
3:14 51:2,4
Wingard
1:16 2:6 5:14,20 6:16 7:8
7:12 22:22 37:9 43:4
46:3,5 58:16 59:10,23
60:2
witness
2:11 5:14 6:14 61:14
word
19:14
work
18:23 19:15 20:4 28:14
30:1 34:3
worker
18:4 19:9 20:16,21 22:14
22:19 25:4,8,10 27:13

30:1 34:15 35:6 48:9
48:20 56:23
workers
19:19 35:19 46:18 47:8
working
18:14,18 27:11,12
works
34:6 38:5
wouldn't
32:7 45:10 49:21 57:11

_____

Y

yeah
32:6 56:13,14
year
8:3 10:18 11:4 23:3,9,13
24:3 25:12 26:6 28:7
years
7:22 8:7 23:18 24:7,11
39:7,8 40:16 43:4
Yuengert
3:12 4:4 6:9,10,23 7:3
15:7 16:12 32:18 40:23
43:10,17 44:4 45:4,19
51:21 52:2 55:4,11 58:2
58:21 59:2,6,9,11,20
y'all
9:19 11:4 12:3 13:5 17:3
30:6 36:16 39:22 41:7
43:5,6 44:7 45:14
48:11 49:5 57:5

_____

0

0035
46:6
07-704
6:4

_____

1

1st
49:14
10:50
5:13 6:14
11th
16:7
11:30
45:21,23
11:40
45:23 46:3
11:52
60:3
116
61:23
12
58:18
14
4:9
1819
3:16
1978

_____

| | |
|---|---|
| 49:14 | 4:3 |
| **2** | **8** |
| 2:07-CV-704-MEF | 8th |
| 1:5 | 48:3 |
| 2:30 | 8:30 |
| 18:15 | 18:14 |
| 2001 | |
| 5:11 | **9** |
| 2002 | 9th |
| 50:6 | 49:1 |
| 2003 | |
| 49:1 | |
| 2005 | |
| 48:3,8 | |
| 2007 | |
| 16:7 | |
| 2008 | |
| 1:17  5:13  60:4 | |
| 21 | |
| 1:17 | |
| 21st | |
| 5:12,20  60:3 | |
| 22nd | |
| 50:6 | |
| **3** | |
| 3101-N | |
| 37:15 | |
| 35203 | |
| 3:17 | |
| 35238-0487 | |
| 3:9 | |
| 37 | |
| 4:10 | |
| 3765 | |
| 3:7 | |
| 380487 | |
| 3:8 | |
| **4** | |
| 4 | |
| 4:9  14:14,19,22  16:5 | |
| 41 | |
| 4:11 | |
| **5** | |
| 5 | |
| 4:10  37:7,10 | |
| 53:43 | |
| 59:1 | |
| 59 | |
| 4:4 | |
| **6** | |
| 6 | |
| 4:11  41:22  42:3 | |
| **7** | |
| 7 | |

# COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD
*Superintendent*

(256) 377-4913
Fax: (256) 377-2385
boe@coosaschools.k12.al.us

P.O. Box 37
Rockford, AL 35136



PLAINTIFF'S EXHIBIT
4
Wingard
PENGAD 800-631-6989

STATE OF ALABAMA     )
COOSA COUNTY          )

## AFFIDAVIT
## OF
## JAN FORBUS

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Jan Forbus, who being by me first duly sworn, deposes and says as follows:

My name is Jan Forbus. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am employed by the Coosa County Board of Education as the supervisor of the lunchroom at Coosa County Central High School.

In this position, I know Gloria Sims, who was a substitute worker in our lunchroom.

I have read Ms. Sims' complaint to the EEOC. In that complaint, she says that I, Jan Forbus, told her that we needed to "get some color in the lunchroom."

I deny making such a statement.

It is true that the vacancy created in the lunchroom was previously held by a black male. It is also true that we have a number of heavy lifting jobs that must be done as part of our routine operation – lifting groceries and supplies, moving objects, taking

*Sims v. CCBE*
Produced to EEOC
No. 0011

out garbage. It was helpful to have a man among our team, but it was not ever said that the position had to be filled by a man or a black man.

It is also true that Coosa County Board operated under a federal desegregation order. The order required that the Board take affirmative action to seek qualified African-Americans to be employed with the Coosa County Board of Education.

The order did not require the Board to show preferential treatment to African-Americans, but to be sure that they were treated fairly.

Gloria Sims, a white female, applied for a lunchroom position. The position required a high school diploma or its equivalent.

I participated in the interview process. One of the first questions asked was whether she had a high school diploma or its equivalent. She did not have a high school diploma or its equivalent. For that reason alone, she was not considered further.

Stated otherwise, Gloria Sims was not considered for the position she applied for because of her qualifications. The fact that she was a woman had nothing to do with the decision not to consider her. The fact that she was white had nothing to do with the decision.

The person that was hired, Jerry McKinney, was a black male. But he was not hired because he was black. He was not hired because he was a male. He was hired because he was qualified. He had a high school diploma or its equivalent and he had extensive experience.

As I said, I was part of the interview team that made the recommendation to hire Jerry McKinney. I know that Gloria Sims' gender or race had nothing to do with the decision not to employ her in the position for which she applied.

Sims v. CCBE
Produced to EEOC
No. 0012

_____Jan Forbus_____
Jan Forbus

Sworn to and subscribed before me this the 11th day of April, 2007.

_____Notary Public_____
Notary Public

My Commission expires:
(Seal)

NOTARY PUBLIC STATE OF ALABAMA AT LARGE.
MY COMMISSION EXPIRES: July 28, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

Sims v. CCBE
Produced to EEOC
No. 0013

RECEIVED

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
1999 AUG 13  P 4: 20RTHERN DIVISION

FILED

SEP 10 1999

<table>
<tr><td>ANTHONY T. LEE, et al.</td><td>)</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>)</td><td rowspan="3">CLERK<br>U. S. DISTRICT COURT<br>MIDDLE DIST. OF ALA.</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff-Intervenor<br>and Amicus Curiae,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>NATIONAL EDUCATION ASSOCIATION, INC.,</td><td>)</td><td>CIVIL ACTION NO. 3101-N</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff-Intervenor,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>COOSA COUNTY BOARD OF EDUCATION,<br>et al.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
</table>

PLAINTIFF'S
EXHIBIT
5
Wingard

**CONSENT DECREE**

**I. PROCEDURAL HISTORY**

This case was part of a state-wide action against numerous Alabama school districts alleging that the State operated a compulsory, segregated school system in violation of the Fourteenth Amendment. See Lee v. Macon County Bd. of Educ., 267  F. Supp. 458 (M.D. Ala. 1967).  The Lee v. Macon County litigation was filed in 1963 to desegregate the public schools in Macon County, Alabama.  On July 16, 1963 the United States was added as a party, Plaintiff-Intervenor and amicus curiae.  On February 3, 1964, a supplemental complaint was filed adding the State Superintendent and the State Board of Education as party defendants and requesting the Court to enjoin the Defendants from operating a racially dual school system throughout the State of Alabama.  By Order of March 22, 1967,  the Lee Court ordered the State Superintendent to

**EOD**      9/10/99

require that the Coosa County Board of Education, along with numerous other school districts, desegregate its schools. The comprehensive orders included provisions for desegregation of faculty, students, facilities, transportation and other areas deemed necessary for effective desegregation. By Order of August 25, 1969, the Superintendent of Education and individual members of the Board of Education of Coosa County (hereinafter referred to as "the Board" or "the District") were added as a party defendant in this case. By Order of February 4, 1970, the Court ordered implemented, with certain modifications and supplemental provisions, the desegregation plan filed by the Board .

On June 24, 1970, the three-judge court in Lee transferred the jurisdiction of this case to a single district judge of the U.S. District Court of the Middle District of Alabama, where the school district is located.

## II. SCHOOL DISTRICT PROFILE

The Board currently educates approximately 1853 students in five schools; four elementary schools serving grades kindergarten through eighth and one high school serving grades ninth through twelfth. The current student racial enrollment at each school is as follows:

| School | 1997-98 Total Enroll-ment | 1997-98 Black Enroll-ment #/% | 1997-98 White Enroll-ment #/% | 1998-99 Total Enroll-ment | 1998-99 Black Enroll-ment #/% | 1998-99 White Enroll-ment #/% |
|---|---|---|---|---|---|---|
| West Coosa ES | 421 | 23/5% | 398/95% | 395 | 18/4.5% | 377/95.5% |
| Goodwater ES | 251 | 243/97 | 8/3% | 253 | 241/95% | 12/5% |
| Kellyton ES | 269 | 130/48% | 139/52% | 264 | 138/52% | 126/48% |
| Rockford ES | 384 | 201/52% | 183/48% | 410 | 226/55% | 184/45% |
| Central High | 527 | 241/46% | 286/54 | 531 | 275/52% | 256/48% |
| TOTAL | 1852 | 838/45% | 1014/55% | 1853 | 898/48% | 955/52% |

The racial make-up of the teaching staff, 22% black District-wide for 1998-99, was as follows at each school:

| School | 1997-98 Total Faculty | 1997-98 Black Faculty #/% | 1997-98 White Faculty #/% | 1998-99 Total Faculty | 1998-99 Black Faculty #/% | 1998-99 White Faculty #/% |
|---|---|---|---|---|---|---|
| West Coosa ES | 24 | 2/8% | 22/92% | 25 | 2/8% | 23/92% |
| Goodwater ES | 16 | 8/50% | 8/50% | 16 | 10/63% | 6/37% |
| Kellyton ES | 17 | 3/15% | 14/85% | 18 | 2/11% | 16/89% |
| Rockford ES | 24 | 6/25% | 18/75% | 25 | 4/16% | 21/84% |
| Central High | 27 | 5/19% | 22/81% | 26 | 6/23% | 20/77% |
| TOTAL | 108 | 24/22% | 84/78% | 110 | 24/22% | 86/78% |

### III. CURRENT STATUS

On July 22, 1998, this Court issued an Order requiring that any party objecting to the Coosa County school system being declared unitary should file objections with the Court. Representatives for the plaintiff parties did so file objections. After a status conference with all parties, the Court, on September 25, 1999, issued an Order establishing a schedule for proceeding in this case.

Pursuant to the September 25, 1998 Order, the parties undertook significant efforts to resolve the outstanding issues. The defendants responded to two rounds of joint informal information requests. A site visit was conducted by attorneys for the United States and the Lee plaintiffs on March 24, 1999, accompanied by the Assistant Superintendent of Schools and counsel for the Board. All schools in the district were visited. Preliminary issues were also identified and discussed at this time.

On May 5, 1999, plaintiff parties sent the Board a letter identifying the areas which were believed to require additional remedial action on the part of the Board before the attainment of unitary status, as well as those areas in which no further relief would be requested, and a description of the standards employed in arriving at these positions. Plaintiff-parties identified nine areas in need of further remediation: (1) faculty assignment and hiring; (2) student assignment; (3) intra-district transfers; (4) in-class assignments; (5) special education; (6) graduation rates; (7) discipline; (8) extracurricular activities; and (9) facilities and equipment.

On June 3, 1999, the parties held a conference call in which the Board provided a response to the plaintiff parties' May 5, 1999 letter. The Board communicated its willingness to implement many of the suggested approaches made by the plaintiff parties, as well as a number of its own

specific approaches. On July 22, 1999, the parties held conference calls to discuss identified issues. The parties agreed that the Board's special education issues pose a special problem, and negotiations on this subject would be dependant, in part, on the outcome of negotiations involving the State Department of Education.

## IV. LEGAL STANDARD

This Court's September 25, 1998 Order required the parties in this case to confer for the purpose of determining and negotiating:

> (a)  Whether, in any of the areas set forth in <u>Green v. School Board of New Kent County</u>, 391 U.S. 430, 88 S. Ct. 1689, (1968), the defendants have achieved unitary status and, if so, whether the court may relinquish jurisdiction as to these areas. <u>Freeman v. Pitts</u>, 503 U.S. 467, 112 S. Ct. 1430 (1992) [These areas are: student attendance patterns, faculty, staff, transportation, extracurricular activities, facilities, and quality of education (footnote omitted)].
> (b) Whether there are <u>Green</u> or other areas as to which the plaintiff parties claim that the defendants have not eliminated the vestiges of prior de jure segregation.
> (c) Whether the parties can amicably develop a  procedure through which the school system can achieve unitary status.

The parties have worked diligently and have expended tremendous effort in producing and reviewing the information in this case necessary to fully comply with the Court's orders and to determine whether this school district has met the standards entitling the school system to a declaration of unitary status, in whole or in part.

Basically, these standards are three-fold: (1) whether the Board has fully and satisfactorily complied with the court's decrees for a reasonable period of time, (2) whether the vestiges of past discrimination have been eliminated to the extent practicable, and (3) whether the Board has demonstrated a good faith commitment to the whole of the Court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention. ⌉ <u>Missouri v.</u>

Jenkins, 515 U.S. 70, 87-89, 115 S. Ct. 2038, 2049 (1995).[1]

The legal standards for analyzing whether a formerly de jure segregated school system has

attained unitary status are well established in the Eleventh Circuit. See United States v. State of

Georgia, Meriwether County, 171 F.3d 1344, 1347 (11th Cir. 1999); Lockett v. Board of

Education of Muscogee County School District, 111 F.3d 839, 842 (11th Cir. 1997); Lee v.

Etowah County Board of Education, 963 F.2d 1416, 1425 (11th Cir. 1992). The plaintiff parties

used these factors in framing the information requests, in reviewing the data provided and in

formulating the issues to be resolved, in an attempt to resolve these matters to the benefit of the

students in this school district. The parties attempted to determine whether any burdens related to

the operation of a desegregated or desegregating school system are equitably allocated. Similarly,

the parties attempted to determine whether the access to educational opportunities is similarly

available to all students. "Until the school system is found to have attained unitary status, the

defendant has the burden of proving that any current racial imbalance within the school system is

not related proximately to the prior violation." Lee v. Etowah County Bd. of Educ., 963 F.2d

1416, 1425 (11th Cir. 1992) (citing Freeman). The plaintiff parties interpreted this to include not

only the assignment of students to schools, but the assignment of students within a school. While

the parties acknowledge that there is no requirement that every school reflect the racial

composition of the system as a whole, Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1,

---

[1] These factors are interrelated. Further, the good faith component has two parts; a
school district must show not only past good faith compliance, but a good faith commitment to
the future operation of the school system. See Brown v. Bd. of Educ., 978 F.2d 585, 592 (10th
Cir. 1992); United States v. Unified Sch. Dist. No. 500, Kansas City (Wyandotte County),
Kansas 974 F. Supp. 1367 (D. Kan.1997).

23-24, 91 S. Ct. 1267, 1280 (1971), the parties believe that there should be equitable access to educational programs and activities.

[Finally, it is the position of the parties that a school district that has not yet achieved unitary status remains under an "affirmative duty to eliminate the effects of its prior unconstitutional conduct. To fulfill this duty, school officials are obligated not only to avoid any official action that has the effect of perpetuating or reestablishing a dual school system, but also to render decisions that further desegregation and help to eliminate the effects of the previous dual school system." Harris v. Crenshaw County Bd. of Educ., 968 F.2d 1090 (11th Cir. 1992).

As indicated by signatures of counsel, the parties agree that the Board has not achieved unitary status with respect to the areas addressed below and have reached an agreement on the terms set forth below.

## V. INJUNCTIVE RELIEF

The parties to this Consent Decree agree that the prior orders of this Court shall continue in full force and effect except to the extent that they are modified by this Order.

Accordingly, upon review, this Court has determined that this Decree is consistent with the objectives and requirements of the Fourteenth Amendment to the United States Constitution, Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6, the Equal Educational Opportunities Act, 20 U.S.C. § 1701 et seq., and the extant orders in this case. This determination is based upon discovery conducted by the plaintiff parties, including an on-site visit to all of the schools in the school system, and representations made by the parties to the Court in the Joint Reports, including all attachments, filed January 29, 1999, March 31, 1999 and July 1, 1999. Therefore, it is

ORDERED, ADJUDGED and DECREED that the Board has achieved unitary status in the area of transportation. No further need remains for the Court to retain jurisdiction over this area of the Board's activities. Accordingly, all injunctions or portions thereof pertaining to transportation are hereby dissolved. This function is appropriately returned to the control of the local governing body, the Board.

The parties agree and the Court FURTHER FINDS that, in order to attain unitary status in the remaining areas, the School Board has negotiated with the United States and the Plaintiffs to develop policies and procedures in the areas of faculty assignment and hiring; student assignment; intra-district transfers; in-class assignments; special education; graduation rates; discipline; extracurricular activities; and facilities and equipment. The parties agree that the Court retains jurisdiction of this cause, to the extent set out herein, until further orders of this Court.

The parties also agree that the issues of special education and student assignment/attendance zones remain open for discovery and negotiation at this time and will be addressed in a subsequent Decree.

## VI. ADDITIONAL REMEDIAL MEASURES

Wherefore, with regard to the issues identified above and herein, defendant Board, et al., hereby agrees and is hereby ORDERED to implement in good faith the following provisions:

## A. FACULTY ASSIGNMENT AND HIRING

### 1. RECRUITMENT

The Board will make every reasonable effort to increase the pool of black applicants from which it selects its teachers, staff and administrators and to fill all vacancies. It is expected that the Board's success in recruiting more black applicants will lead to its success in hiring and

retaining more black faculty, staff and administrators.    In the event that these efforts do not result in a significant increase in the black applicant pool over the next two years, the Board will reevaluate its recruitment efforts prior to the 2001-2002 school year.  With respect to recruiting new faculty, staff and administrators, the Board shall:

a.  Review and evaluate current recruiting methods for seeking new applicants for faculty, staff and administrative positions.  The Board shall formulate and implement a recruiting plan by September 1, 1999, which shall include, but is not limited to:  having a representative of the Superintendent annually attend career days at predominantly black colleges and universities throughout Alabama (which grant degrees in education), as well as at each college and university in the immediate area;  when a specific vacancy occurs,  having a representative of the Superintendent recruit at predominantly black colleges and universities throughout Alabama (which grant degrees in education), as well as at each college and university in the immediate area; encouraging all faculty, but particularly current black faculty, coaches, staff and administrators, to actively participate in recruitment efforts; investigating the possibility of establishing internship opportunities with predominantly black teachers' colleges throughout Alabama; retention of a recruiting consultant, such as an individual with the Southeastern Equity Center, to aid in implementing the measures specified herein; consult with community groups regarding recruitment strategies and the identification of minority candidates; placing recruiting ads as public service/public interest announcements on Alabama radio and television stations having a substantial minority listening/viewing audience; filing notices of faculty and administrative vacancies with the Alabama Education Association (AEA) Placement Service and with the Alabama State Department of Education (SDE) Placement Service, including posting

notices on these agencies' internet sites, if available; contacting other Alabama school districts with large black applicant pools for referrals of applications to insure that those minority applicants are made aware of positions to be filled in the Coosa County system; surveying other school districts with regard to their successful strategies in recruitment and employment of qualified minority candidates; and, with enough time to be effective, filing notices of faculty and administrator vacancy announcements with each historically black college and university in Alabama, the local and regional chapters of the NAACP, SCLC, Urban League, AEA, SDE, and news publications with a substantial minority readership in the Montgomery, Alabama and Birmingham, Alabama areas. The Board will make every reasonable effort to create a panel of applicants to be considered for every position that reflects the relevant labor market. To the extent that the Board already has engaged in any of these activities, they specifically will be expanded in the recruitment plan to aid in eradicating this vestige.

b. The Board and Superintendent shall conscientiously monitor and record all recruitment efforts. The Board shall submit records of these efforts, distinguishing between existing and newly formulated efforts, in its first annual report. The Board shall include in each annual report a complete description of any modifications to these efforts. The Board shall also include in each annual report the number of applicants by race, for each certified position sought and shall indicate the number of new hires by race, position, the certification required by the position, and the school and subject/specialty (if applicable) to which the newly-hired teacher, coach, staff or administrator was assigned.

## 2. HIRING AND PROMOTIONS

Hiring for all positions in the Coosa County school system shall be done on a non-

discriminatory basis. Decisions for all positions will be made on a non-discriminatory basis, regardless of whether the applicant is a person presently employed by the Board or whether the applicant is a non-employee of the system. The Board shall maintain written procedures that will be reasonably followed when filling vacancies. With respect to the hiring of employees, the Board shall:

a. Review and evaluate its application forms, interview questions and its existing written criteria for selecting candidates from among applicants for all school district positions to ensure that objective, non-discriminatory criteria are being used. Subject to such review and evaluation, the Board may, as appropriate, continue to use existing written criteria. Where such criteria do not presently exist, the Board shall formulate and use written, objective non-discriminatory criteria for selecting candidates from among applicants for all positions. All written criteria, including changes or modifications to forms, used in the application and interview process will be furnished to the Plaintiff parties for their review and comment. Use of such forms will be held in abeyance for twenty days pending comments or suggestions from the Plaintiff parties. The Board shall submit copies of all such criteria, both existing and newly formulated, with its first annual report. The Board shall include in each annual report a complete description of its hiring policies, as well as any changes in such policies and/or criteria, and the reasons therefor.

b. Take affirmative steps to insure that all Central Office staff and administrators are hired on a non-discriminatory basis, make and retain a complete written record describing these steps, and include in the first annual report a complete description of the steps taken. The Board shall include in each annual report a complete description of its hiring policies, as well as

any changes in such plans and the reasons therefor. Subject to the requirements of these paragraphs, these steps may include use of any existing non-discriminatory hiring practices and procedures.

    c. Designate the Superintendent and other appropriate administrators to supervise and review the application and preliminary screening and hiring process. Each year, and not later than the last board meeting before the end of the school year, the Superintendent shall report to the Board the then-existing minority/white ratios of certificated staff, faculty and coaches and non-certificated employees system-wide. Such reports shall be made available to the plaintiff parties upon request and reasonable notice. The Board, acting through the Superintendent, shall insure that all certificated staff and faculty are informed of the provisions of this Decree, and of the criteria and procedures for disseminating application forms, receiving and processing applications, selecting candidates from among applicants, conducting interviews, and for making the final recommendation to the Board that the selectee be hired. The Board shall notify school principals that hiring qualified minority teachers, coaches and staff is a priority. The supervisors managing the application and hiring process shall continually review and evaluate the operation and conduct of these processes by the designated staff at an appropriate time at least once each school year. Prior to September 30, 1999, and thereafter in each annual report, the Board shall identify the staff and supervisors involved in the recruitment and employment function(s) by name, position, and race. The Board shall include in each annual report any changes in any of these positions, including designation of name, race and position, and a complete description of any changes in the procedures referred to in this paragraph and the reasons therefor.

    d. The Board shall include in each annual report a detailed description of the review

and evaluation of the process and procedures employed in advertising or announcing position vacancies, receiving applications, selecting from among all applications on file those applicants who will be interviewed, interviewing applicants and for selecting successful applicants who will be recommended for employment by the Board. This description shall also include any changes in procedures and practices resulting from these reviews and evaluations and the reasons therefor.

　　　　e. Advertise vacancies for faculty, staff and administrative positions at least 20 calendar days before the position is to be filled unless the position is filled by a minority. The Board shall formulate position announcements for each faculty, staff and administrative vacancy that occurs or that is newly-created. These announcements are to be advertised in accordance with the provisions set forth in VI.A.1. and are to be posted on bulletin boards at all schools in the system and at the Central Office, and disseminated to other local school districts and to as many other universities in Alabama having significant black enrollment as is reasonably practicable within the time requirements set out above. All above identified positions are to be announced and advertised in such a way as to reasonably maximize the potential for minority applicants to become aware of the fact that such positions are available to be filled and that they are encouraged to apply. The Board shall include copies of all such documents or announcements that are posted, all advertisements published and scripts of all radio or television announcements, with each annual report. The Board shall maintain on file copies of all of these documents in an orderly fashion in a central location, and shall produce them for inspection by the United States or the Plaintiffs upon request and reasonable notice.

　　　　f. Emergencies might arise that make it impossible for the Board to hold a faculty, staff or administrative vacancy open for the minimum 20 days. When such circumstances arise,

the Board shall do the following: send out vacancy notices within one working day of learning of the emergency; allow the maximum amount of time practicable before filling the position; and contemporaneously file a report of the circumstances for the emergency hire.

g. Persons hired under emergency situations (other than minority employees) will be nonrenewed as of course at the end of the school year, but shall be considered for reemployment with other applicants for the following school year. The parties agree that under no circumstances shall an emergency hire gain an advantage over other applicants by virtue of the emergency employment. In each annual report, the Board shall provide the number of new hires hired through the standard application process and the number of new hires hired on an emergency basis, by name, race, school and position filled, and the nature of the emergency triggering the emergency hire provision.

h. Commencing immediately, the Board shall create a database of all applications received by position, by race, by the date the application was received, by highest degree, rank and type of certificate and areas of endorsement. The Board shall modify its procedures to allow for all applications to be retained for a three year period from the date of submission and the applicant will be considered for any and all vacancies (for which he or she qualifies) occurring during the period of retention unless he or she indicated no further interest in employment with the Board. Prior to filling vacancies, the Board shall review all applications and shall give fair consideration to each such applicant. The Board shall retain all applications and written records evidencing review of the applications in a central location in an orderly fashion, and shall produce them for inspection by the United States or the Plaintiffs upon request and reasonable notice.

i. Commencing immediately, the Board shall maintain a database of information on the hiring process for each vacancy filled, including, for each named position: 1) a list of all qualified applicants, by name, race, qualification and date application was filed; 2) all qualified applicants who completed the central screening process or any other informal screening process, by name and race ; 3) all applicants referred or selected for an interview, by name, race, rank and type of certification, and area(s) of endorsement; 4) all applicants actually interviewed, by name, race, rank and type of certification, and area(s) of endorsement; 5) the applicant(s) offered the position, by name, race, degree, rank and type of certification and area(s) of endorsement; and 6) the applicant who ultimately filled the position, by name, race, degree, rank and type of certification, and area(s) of endorsement; and 7) the reasons that any minority applicants were not selected for such position.  Such information shall be provided with each annual report.

### 3. FACULTY AND ADMINISTRATOR ASSIGNMENT

The Board shall make every reasonable effort to ensure that no school in the Coosa County school system can be perceived as a white school or a minority school because of the racial make-up of its faculty, staff, or its administrators. All school-based faculty, staff, and administrators shall be assigned on a non-discriminatory basis such that the proportion of minority faculty, staff, and administrators at each school is substantially the same as the ratio District-wide.  See Singleton v. Jackson Municipal Separate Sch. Dist., 419 F.2d 1211, 1218 (5th Cir. 1969).  All faculty, staff, and administrator assignments and/or transfers shall be granted or made in a manner designed to ensure that faculty, staff, and administrators are not disproportionately assigned, by race, to any school.  All teacher assignments to teach special programs and advanced classes, or to sponsor extracurricular activities, shall be made on a non-

discriminatory basis.

In accordance with this objective, the Board shall take steps necessary and appropriate to achieve a percentage of (1) black certificated staff; (2) black non-certificated staff; (3) black professional staff; and (4) black faculty and administrators at each school that approximates the District-wide average of black certificated staff, black non-certificated staff, black professional staff and black faculty, coaches and administrators.

The Board shall include a list and description of all such steps taken, including assignment and reassignment, in each annual report.

The Board shall create and implement support groups or programs for new and currently employed minority administrators, faculty and staff as well as cultural diversity and sensitivity programs targeted at all administrators, faculty and staff.

## B. STUDENT ASSIGNMENT

### 1. ATTENDANCE ZONES

The parties agree that the attendance zones established on pages sixteen through twenty of the plan filed by the Coosa County Board of Education on January 13, 1970, and approved by the Court, with modifications, in its Order of February 4, 1970, will be modified. The Board shall review and redraw its student attendance zone lines in order to desegregate, to the maximum extent practicable, the elementary schools in Coosa County. In addition, the Board shall request assistance from an outside entity such as the Southeastern Equity Center, and thereafter consult with the plaintiff parties regarding its proposed changes. If the parties are unable to reach agreement on this issue, this matter will be presented to the Court for resolution.

## 2. STUDENT ASSIGNMENT

Except as otherwise provided in the section on transfers, student assignments to all Coosa County Schools shall be made on a non-discriminatory basis with strict enforcement of attendance zones, cf. Singleton, 419 F. 2d 1211; provided however, that:

      a. Nothing contained herein shall prohibit the Board from establishing area learning centers and transporting students to and from such centers on a non-discriminatory basis to receive instruction during a portion of the school day;

      b. Nothing contained herein shall prohibit the Board from establishing area centers for providing special education services and transporting students to and from such centers on a nondiscriminatory basis when such services cannot reasonably and economically be provided in the child's attendance area, and the child's individualized education plan or personalized education program requires that he or she attend such center.

## C. INTRA-DISTRICT TRANSFERS

Beginning with the 1999-2000 school year and continuing thereafter, the Board shall take all steps necessary and appropriate to enforce school attendance zone lines, including but not limited to: requiring all students seeking to enroll, or to continue to enroll, in the Coosa County School District to register at the school they wish to attend; in accordance with the procedures set forth below, verifying the residency of each student who seeks to enroll or continue to enroll; ensuring that students attend the grade appropriate school for which they are zoned; and distributing official board policies reflecting the requirements set forth herein. Violators will be promptly removed and reassigned to their correct school. The Board will keep copies of all letters to parents and/or guardians, advising them that their children will be required to attend the school

which they are zoned to attend, in the Central Office and all such letters will be made available to the plaintiff parties upon request.

Provided, however, that students whose parents or guardians are employees of the Coosa County School System may attend school in the Coosa County School District and in the attendance zone in which the parent or guardian works. Further, the Superintendent may, in special or hardship cases, allow students to attend school in an attendance zone other than the one to which he or she is assigned. All such exceptions must be supported by compelling circumstances and will be effective for only one school year at a time. The Board shall maintain on file a written record signed by the Superintendent or his/her representative documenting the reason for each exception granted.

Each student seeking to enroll or to continue to enroll shall establish his or her residency in the following manner:

1. Students living with parent or legal guardian. The parent or legal guardian of a student seeking to enroll must provide the school with at least two of the items numbered (a) through (h) below, as verification of their address, except that any document with a post office box as an address will not be accepted:

  a. Property tax records;

  b. Mortgage documents or property deed;

  c. Apartment or home lease;

  d. Utility bills;

  e. Driver's license;

  f. Voter precinct identification;

g. Automobile registration;

h. Homeowners insurance policy

i. With regard to a student living with a legal guardian, a Court decree declaring the district resident to be the legal guardian of the student.

2. <u>Students living with adults other than parents or legal guardians.</u>

a. The non-parent claiming district residency must meet the criteria of subparagraph (1)(a) through (h) above, required of a parent of legal guardian; and

b. The school district resident must provide the school board with a sworn Affidavit stating his or her relationship to the student, and that the student will be living in his or her home for a period of time encompassing the entire upcoming school year, and fully explaining the reason(s) (other than school attendance zone or district preference) for this arrangement; and

c. The Board must verify that the student is actually living within the attendance zone by sending a representative to physically visit the residence which the student has represented as his or her home for the upcoming year.

3. <u>Students whose addresses have been verified pursuant to subparagraphs one or two above.</u> Once a student's address has been verified as provided above, then such student's address may be verified in any subsequent school year by permitting the parent, guardian, or custodian to execute a written certification that the student continues to reside at the verified address. If, however, a student's address has changed since such address was last verified, then the student's new address shall be verified as provided in subparagraph one or two above.

The Board shall appoint a member of the Central Office administration responsible for monitoring and coordinating compliance with the subsection. This individual's name shall be

Page 19 of 41

provided to the plaintiff parties. Each school principal shall be required to demonstrate to this appointee annually that the requirements of this subsection have been satisfied.

In turn, in its annual report to the Court and the plaintiff parties, the Board shall provide a detailed statement of its above-listed compliance efforts demonstrating that the Board has reviewed and verified both the information contained in the registration forms and the residence of all students currently attending, or seeking to enroll, in the Coosa County public schools and that all students are enrolled in the grade-appropriate school for which they are zoned.

## D. WITHIN-SCHOOL ASSIGNMENTS

Student assignments to all classes within Coosa County schools shall be made on a non-discriminatory basis. Cf. Singleton, 419 F. 2d 1211. The District shall review its student assignment policies and procedures to determine the basis for racially identifiable classes within the system. In this regard, the Board will contact the Southeastern Equity Center for assistance. Consistent with the District's obligation to eliminate such assignments to the extent practicable, and prior to August 1, 1999, the Board will adopt policies and procedures to eliminate racially identifiable classes, to the extent such racially identifiable classes are not compelled by sound educational justifications. Such policies and procedures shall include, but is not limited to, a policy whereby the racial composition of students assigned to all non-elective classes, and all elective classes to the extent practicable, shall reflect the racial composition, within a ten percentage point range, of the students enrolled in that particular grade level at that particular school.

## E. SPECIAL EDUCATION

Student assignments to special education in Coosa County schools shall be made on a

purely non-discriminatory basis.

## 1. IDENTIFICATION OF STUDENTS AS MENTALLY RETARDED

With regard to the high proportion of black students identified as mentally retarded (hereinafter referred to as "MR"), the parties recognize that the outcome of any analysis in this area will be dependent upon the results of the parties' ongoing negotiations with the State Department of Education. In the interim, with respect to student assignments to special education, the Board shall:

a. Request the assistance of the Alabama State Department of Education to address what appears to be an overrepresentation of black students in the MR exceptionality. It is specifically agreed that if the parties are unable to reach agreement on the issues in this section, the matter shall be submitted to the Court for resolution, provided all requisite administrative remedies have been exhausted.

b. The parties will report back to the Court on this issue and will supplement this Decree regarding any remedial measures, if any, to be taken and the establishment of additional reporting requirements.

c. Conduct full reevaluation of all students currently designated as MR to determine validity of placement. Reevaluation may be conducted by an outside entity such as the State or a special education consultant;

d. Provide staff development or other appropriate intervention with general education teachers on an annual basis, to assist them in gaining the knowledge and ability to implement appropriate intervention strategies for students who are having academic and/or behavioral difficulties;

e. Monitor referral data by race of student and race of teacher to determine whether there are any problem areas; ensure that reasons for referrals and interventions attempted are fully documented;

f. Instruct and provide that principals include more special education students in District-wide standardized testing to determine whether the programs are benefitting the students and to possibly consider returning those who are improving to the regular classroom;

g. Increase parent involvement in the special education decision-making process; assist parents in understanding their rights regarding intervention, referral, evaluation, placement, reevaluation, and decertification criteria; encourage parents to attend meetings and to actively participate in decision-making;

h. Provide supplemental counseling to parents before they consent to placing their child in any special education program;

i. Refine early intervention strategies and intervention so that problems can be corrected without resorting to the special education setting;

j. Consult with the State on the referral, identification, evaluation and placement of special education students.

## 2. IDENTIFICATION OF STUDENTS AS GIFTED AND TALENTED

With regard to the low number of black students identified as gifted and talented in the Coosa County school system, the parties recognize that, on February 25, 1999,[2] the United States

---

[2]This agreement was executed by the Alabama State Superintendent of Education on February 16, 1999 and executed by the Director of the Atlanta Field Office of the U.S. Department of Education's Office for Civil Rights on February 25, 1999.

Department of Education's Office for Civil Rights entered into an agreement with the Alabama State Department of Education (hereinafter referred to as the "OCR Agreement of February 25, 1999"), a copy of which is attached as Attachment A to this Consent Decree.

In order to ensure full implementation of the OCR Agreement of February 25, 1999, the Board shall :

 a. With respect to the screening/referral of students for the academically gifted program

  i. Annually provide written notice of its gifted program including an outline of referral/screening procedures and eligibility requirements, copies of which will be provided to the plaintiff parties in the Board's first annual report;

  ii. Establish and implement effective mechanisms for ensuring that the annual notices referenced in VI.E.2.(a)(i) immediately above are disseminated to all students and parents/guardians;

  iii. Develop and implement procedures for screening and referring potentially gifted students from traditionally underserved populations, and copies of such procedures which will be provided to the plaintiff parties in the Board's first annual report;

  iv. Provide training/guidance to teachers and other district staff involved in the screening and referral process regarding the characteristics of intellectual giftedness in general and special populations. A list of training provided and participants in such training, identified by title, grade taught and school to which they are assigned, will be provided in each annual report to the plaintiff parties ;

  v. Utilize nondiscriminatory screening criteria and procedures which are directly related to the purpose of the gifted program, i.e., identifying all students with potential for high

academic or creative performance as well as those who have demonstrated such performance. Copies of the criteria and procedures will be provided to the plaintiff parties in the Board's first annual report;

vi. Use a multi-step, multi-standard screening process and not use the eligibility criteria (score or standard) prescribed in the regulation, singularly or in combination with any other criteria, as a threshold standard for referral or evaluation. A description of this multi-step, multi-standard screening process will be provided to the plaintiff parties in the Board's first annual report;

vii. To the extent that a standardized test is used as part of the Board's screening process, both the test and the referral cut off score will be validated with respect to the purpose for which they are being used (as a screening test and screening score) and the populations for whom they are used; and

viii. If the Board uses screening criteria and procedures which have a disparate and adverse impact on minority (underrepresented group) students, it will be required to demonstrate to the Alabama State Department of Education and the plaintiff parties that the criteria and procedures are consistent with educational objectives of the program and no less discriminatory alternatives exist which achieve the same result, i.e., identifying for evaluation students who evidence characteristics of giftedness.

b. If the Board uses evaluation and placement practices for the intellectually gifted program which have a disparate and adverse impact on minority (underrepresented group) students, it will demonstrate to the Alabama State Department of Education and the plaintiff parties that its practices and procedures are consistent with educational objectives of the program

and no less discriminatory alternative exists which achieves the same result, i.e., identifying for evaluation students who evidence characteristics of giftedness.

      c. The Board shall ensure that all eligible gifted students are provided with equal access to services and to services which are comparable in quality and duration.

      d. In accordance with the pending revisions to the Alabama Administrative Code pertaining to the gifted program, referenced in the OCR Agreement of February 25, 1999, the Board will, once those Code revisions are finalized, submit a plan for implementation of the revised Code. This plan will address all components of the gifted program, e.g., notice, referral, evaluation, etc.

      c. In its annual report to the Court and the plaintiff parties, the Board also shall provide statistical data regarding

            i. the number of students, broken down by race, referred for evaluation for eligibility for gifted education services;

            ii. The number of students, broken down by race, determined eligible for services;

            iii. the number of students, broken down by race and grade, actually served during the just completed school year.

## F. GRADUATION RATES

      The Board shall make every reasonable effort to ensure that any existing special program(s) (including, but not limited to, College Preparatory, Honors and Advanced Placement), and any such program(s) that are modified or added at schools in the Coosa County school system shall be conducted on a non-discriminatory basis. The Board shall:

      1. For all special programs in which Coosa County students participate, formulate and

adopt procedures and practices designed to inform the parents of all eligible students about such

special programs. Where black students are underrepresented in special programs, prior to

September 1, 1999, the Board shall formulate and adopt procedures and practices designed

specifically to inform, attract, and recruit black students. All such procedures and practices will

be furnished to the Plaintiff parties for their review and comment. Use of such procedures will be

held in abeyance for twenty days pending comments or suggestions from the Plaintiff parties.

2. Take all reasonable steps to ensure that all parents and students in the Coosa County

school system, and particularly black parents and students, are informed of the nature of, benefits

of, the application and selection processes, admission criteria or course prerequisites, and all

applicable deadlines, for each special program, and in particular, all high school academic courses

and programs. The Board shall make a written record of all such steps taken. The Board, through

its guidance counselors, shall send written notices containing the information set forth in sentence

one of this paragraph to all parents at least once each year, and shall disseminate such information

at appropriate public meetings (such as Parent/Teacher Organization meetings and community

meetings at locations accessible and familiar to the local black community) at a convenient time

and location. Such notices shall be written for an 8th grade reading comprehension level. The

notice and meetings will take place in ample time to allow students to apply, be considered, and

be tested (if required), selected and/or enrolled in each such special program. The Board shall

make every reasonable effort to ensure that appropriate written announcements of the public

meetings are sent on a timely basis to all parents of Coosa County students, and that they are

displayed on bulletin boards at all Coosa County schools. The Board shall retain all such

notifications, announcements, and written records of steps taken to publicize such special

Page 26 of 41

programs and shall include them in each annual report.

3. Prior to September 1, 1999, the Board shall formulate and adopt methods to attract and encourage black students to enroll in any and all of the system's special programs; copies of all plans developed in this regard shall be furnished to the Plaintiff parties for their review and comment. Implementation of such plans shall be held in abeyance for twenty days pending review and comment by the Plaintiff parties.

4. The Board shall recruit, encourage, assign, and support black faculty to teach special program courses. The Superintendent of the Coosa County public schools shall formulate and recommend methods to attract black faculty to teach special program courses and to actively recruit applicants for new hires to teach those courses.

5. The Board shall conduct reviews and evaluations of the student application and selection processes (where relevant), and admission criteria for each program, including teacher recommendations, to ensure non-discrimination. The Board shall take all appropriate and necessary steps, based on these reviews and evaluations, in order to ensure that there are no systemic barriers to access and participation by black students (systemic barriers are those over which the District has some degree of control). These measures shall include, but are not limited to, implementing teacher training to ensure that teachers are able to identify students from all cultures who are capable of doing advanced or special work; encouraging teachers to identify minority students for possible inclusion in advanced classes; contacting the State Department of Education to request a review of the District's policies and practices; and contacting such organizations as the Southern Educational Board and the Southeastern Equity Center to determine how other school districts have addressed disproportionality in student assignment. The results of

Page 27 of 41

all District and State reviews and evaluations and any actions planned shall be submitted to the plaintiff parties as soon as practicable and prior to the filing of the first annual report for the plaintiff parties' review and comment. All planned actions will be held in abeyance for twenty days pending comments or suggestions from the plaintiff parties. A complete description of any changes in the application and selection processes and admission criteria, and reasons therefor, shall be included in each annual report.

6. Prior to September 1, 1999, the District shall develop a plan that shall provide, among other things, that school administrators or faculty and staff affirmatively counsel, guide and review student course selections and will organize and schedule course offerings and classes in a manner that will develop and enhance student skills and interests and challenge students' abilities. The plan shall include a parent outreach and information program to provide parents with information to assist in selection of advanced and elective course offerings and activities in preparation for graduation from high school. The plan also shall include training for guidance counselors to work with minority students and families to identify and encourage students to take higher level courses. Copies of the plan and training schedule shall be furnished to the Plaintiff parties and implementation shall be held in abeyance for twenty days pending their review and comments.

7. In conjunction with the above measures, the Board shall conduct parent pre-registration meetings that explain course offerings for seventh and eighth grade and all four years of high school and the requirements of the Board's advanced diploma. In addition, the Board shall send home with the students packets containing such information and require that they be signed and returned by the parents and/or guardians. If parents and/or guardians fail to sign and return the

material, counselors will make all reasonable efforts to ensure that the parents/guardians do so.

## G. DISCIPLINE

Student discipline in all Coosa County schools shall be administered on a non-discriminatory basis. With respect to student discipline, the Coosa County Board shall:

1. Implement by December 31, 1999, a computer database at all schools that will track discipline referrals and disciplinary action.[3] The information gathered will include, but is not limited to, race of referring teacher, race of student, race of disciplinarian, infraction, discipline received by the student, and referrals to the police. The information will be reported in a form that will permit the parties to ascertain, by race, the infractions within each category of discipline received. This information will be provided in each annual report. If disciplinary figures at an individual school, including referrals to the Alternative School, exceed the racial balance of that school by more than 15%, the central office administrator responsible for discipline shall meet with the principal of each such school and the employee responsible for student discipline to determine the reasons for the disparity, and shall include in each annual report the reasons for such disparity;

2. Immediately appoint a member of the central office administration as the Coosa County school system's Discipline Coordinator. (S)he shall be responsible for monitoring and coordinating development and implementation of uniform student discipline policies for all public schools in the Coosa County school system. Such name shall be provided to the plaintiff parties. The Discipline Coordinator shall adopt a uniform discipline reporting form. This form shall be

---

[3]Though not implemented until December 31, 1999, the data base will contain all discipline referral and disciplinary actions for the entire 1999-2000 school year.

used by each school in the Coosa County school system effective within 90 days of the entry of this Consent Decree. The Discipline Coordinator will also review the recidivism rates at the Alternative School, consider and develop, if appropriate, alternative approaches.

3. Require each school principal to oversee database collection and to prepare a written report to be presented annually to the Coosa County Board. The Coosa County Board shall include in each annual report the written disciplinary report as presented to the Board.

4. Conduct training for all teachers, counselors, administrators, bus drivers, and other staff who come into contact with students and who may report disciplinary infractions and/or administer discipline, to ensure that discipline is imposed consistently, uniformly and in a nondiscriminatory manner. In this regard, the Board shall also design and implement cultural sensitivity training for all administrators, faculty and staff, including non-certified staff.

5. Provide weekly opportunities for students attending the Alternative School to meet with their regularly assigned teachers to discuss assigned coursework.

## H. EXTRACURRICULAR ACTIVITIES

The Board shall take all reasonable steps to ensure an equal opportunity for students of all races to participate in extracurricular activities, including but not limited to:

1. Sponsors, directors and coaches of extracurricular activities of the Coosa County school system shall be instructed in writing by the Superintendent to take affirmative steps to encourage participation in each such program by students of all races.

2. Sponsors, directors and coaches of extracurricular programs of the Coosa County school system shall notify all eligible students at the school by posting notices and/or by disseminating fliers or something similar, which contain the name, title and contact telephone

number for each sponsor and coach, at the beginning of each school year that students of all races are encouraged to participate in all extracurricular programs. This notification shall also state that each sponsor, director and coach is available to meet, upon request, with any interested student to fully inform him/her about each extracurricular program in order to encourage participation by students of all races. A general notification to this effect shall also be posted prominently on bulletin boards in each school for a reasonable period of time, and shall be included in the student handbook.

3. The Board shall recruit and encourage black faculty members to sponsor extracurricular activities and clubs, particularly extracurricular activities with an academic focus. The Superintendent shall formulate and recommend methods to encourage black faculty members to become sponsors, to encourage new hires to become sponsors and to determine what types of support such teachers may need to successfully sponsor activities or clubs.

4. The Board shall distribute appropriate information to parents and students throughout the system by school level (e.g., information on high school activities to high school students and their parents), about all extracurricular programs and sports designed to encourage broad participation by students of all races in such programs.

5. Commencing with the 1999-2000 school year, at the beginning of each school year, counselors, in conjunction with school administrators and the student government, shall conduct a survey of students, by race, to determine interest, and monitor participation, in activities and clubs to develop effective strategies to encourage participation by students of all races. Wherever there is underrepresentation of any racial group (either minority or non-minority) in any extracurricular activity, the Board shall conduct a study to determine the cause of such underrepresentation and,

where appropriate, develop strategies to address the causes for such underrepresentation. Copies of such studies shall be furnished to the Plaintiff parties and implementation of such strategies shall be held in abeyance for twenty days pending their review and comment.

6. To the extent practicable, the Board will ensure that the cheerleading squads are racially diverse. To that end, the Board will widely advertise cheerleader tryouts in each school in a timely manner, and include in each advertisement announcements: that cheerleader positions are open to all students, regardless of race; that all students are encouraged to try out; the time, place and date of all cheerleader tryouts; the requirements to become a cheerleader; and the availability of guidance for students preparing for cheerleader tryouts. In addition, to further encourage participation of minority children in cheerleading, the Board will consider additional steps to encourage such participation, including, for example, contacting the leaders of recreational programs that have a large number of black participants to encourage the development of cheerleader activities for younger children.

7. The Board shall include the notices, postings, announcements and survey results in the first annual report.

8. The Board shall ensure that there are no systemic barriers to participation by black students in any extracurricular programs and sports (systemic barriers are those over which the District has some degree of control). If the selection process or criteria are modified, such changes and any effects therefrom shall be included in the Board's annual report.

9. The Board shall remove the requirement to have a recommendation from within a club or extracurricular activity as a prerequisite to participation.

Page 32 of 41

## I. FACILITIES AND EQUIPMENT

The underutilization and inferior upkeep and maintenance of Goodwater Elementary School and the inferior equipment at this overwhelmingly black school, especially when viewed in comparison with the overwhelmingly white West Coosa Elementary School and nearby Kellyton Elementary School are of great concern to the plaintiff parties.

1. The Board shall contract with outside consultants in the area of student attendance zones, programmatic and architectural evaluation, selected in consultation with the plaintiff parties, to conduct a detailed equity study to determine whether access to equitable educational opportunities is available to all students in the Coosa County school system. Such study also shall include a detailed architectural analysis of all facilities and an analysis of how well each facility is maintained and supports its educational courses and programs.

2. The Board shall include the results of such study in its first annual report, and shall include the measures taken pursuant to such study in each subsequent report.

3. The Board will also contact the State Department of Education and request an audit of its facilities and educational programs.

4. In each annual report, the Board will include a detailed itemization of the materials and facilities projects it has funded in the past year, by school, including detailed project descriptions and amounts spent or committed.

5. The Board also shall include its current 5-year enrollment projections and facilities plan in each annual report. Such report shall identify facilities needs and proposed construction projects.

## VII.    MONITORING AND REPORTING

The Board shall submit to the Court and to the parties' counsel of record annual reports fully detailing its efforts with respect to items I through VI until such time as the Coosa County school system is declared unitary. These reports shall be submitted each year by June 30th, with the first report due June 30, 2000. The Superintendent shall certify in writing that all of the information contained in each annual report is true and correct to the best of his/her information, knowledge, and belief and that a copy of the report has been furnished to the Board. This certification shall be included with each annual report. The United States and the private plaintiffs shall review the information submitted in each annual report and any comments, recommendations, and objections by the United States and private plaintiffs concerning the information contained in these annual reports shall be made in writing in a timely manner. Such timely review and response by the United States and the private plaintiffs is subject to the Board providing complete and accurate information in a timely manner. These reports shall include the information set forth supra, and, in addition thereto:

1.    The number and percentage of students, by race, enrolled in the school district;

2.    The number and percentage of students, by race, enrolled in each school in the district;

3.    The number and percentage of students enrolled in special programs, by race, by class, by grade, by school, and by program (including but not limited to students in the remedial, college preparatory, honors and advanced placement classes);

4.    The number and percentage of students, by race, graduating with advanced diplomas, standard diplomas, or certificates of completion for the school year ended

Page 34 of 41

in May of that year;

5.   The number and percentage of students, by race, grade, and school, who dropped

out during that school year, and the reasons therefore, when available, including the

detailed information noted in Section VI;

6.   The number and percentage of full-time and part-time teachers, by race, in the

school district, including the District's definition of "full-time" and "part-time"

teacher;

7.   The number and percentage of full-time and part-time teachers, by race, in each

school in the district;

8.   The number and percentage of teachers by race and by program, employed and

assigned by the Coosa County Board of Education to each special program in which

Coosa County students participate (including but not limited to special education

[including exceptionality], college preparatory, honors and advanced placement

classes);

9.   The number and percentage of principals, assistant principals, administrative

assistants, and other support staff (separately listing both certified and non-certified

staff), by race and by position, in each school in the district;

10.  The certified and non-certified staff of the central office, by position and race;

11.  The number of guidance counselors, by race, school and grade;

12.  A list of all recruitment trips, including schools visited, date and duration of each

visit, whether or not the school visited is a predominantly minority institution, and

of the recruiters visiting the school, by race, ethnicity and position;

Page 35 of 41

13.  A list of the vacancies occurring/created and filled for school-based administrators, faculty and staff (separately listing certified and non-certified), by school, and by position, including the detailed information required in Section VI. A.2. (Faculty Hiring and Promotions) of this Decree;

14.  The number of applicants for each vacancy, by race, ethnicity, school, positions being filled, rank and type of certificates, area of endorsement and highest degree;

15.  Identification of the individuals to whom offers were made to fill each vacancy (separately listing certified and non-certified staff), by position filled, school, race, ethnicity, and whether the person ultimately hired was an existing employee of the school district at the time of hire, or a new hire from outside the school district. Where the person hired was an existing employee at the time of hire, identify the departing school and position;

16.  Any material modifications to the written hiring and assignment practices and procedures, and the reasons for each such modification;

17.  A list of the teacher and administrator transfer requests denied and granted from one school to another, by departing and receiving school, race and ethnicity of transferee, position transferred from and to, and the total duration of the transferee's assignment to the sending school that immediately preceded the transfer, and the reason(s) for each denial or grant. The same information is to be provided as to teacher and administrator reassignment;

18.  Student enrollment in each extracurricular activity, by school, and for each activity a list of the participants by race or ethnicity;

19. Any material modifications to the eligibility requirements for participation in each extracurricular activity, by school and by activity;

20. Identification of the sponsors and coaches, by position, by race, for each extracurricular activity, by school and by salary supplement, if any, and by dates contracts as sponsors and/or coaches were executed;

21. In addition to the information required pursuant to paragraphs VI.G. (Discipline) 1 and 3, the number and percentage of suspensions, referrals to the Alternative School and expulsions, by school, race of student, and reason for the disciplinary action.

22. In addition to the reporting requirements set forth in VI.C. (Intra-district Transfers), where a student is enrolled in a school on the basis of the residence of his/her legal guardian, the annual report to the Court and the plaintiff parties shall contain the names, race, age and grade of the student; the name, race, residence and date of appointment of the legal guardian; the relationship of the legal guardian to the student; and the names, race and residence of the parents of the student(s).

23. The academic status (e.g. alert, caution or clear) given to each public school in the Coosa County system.

## VIII. ATTORNEYS' FEES

Defendants shall pay to counsel for the private plaintiffs' class (excluding the United States) their reasonable attorneys' fees and costs incurred in connection with this action. The parties (excluding the United States) will attempt to agree upon the fees and costs, but if they cannot, they shall submit the matter to the Court for decision. Additionally, counsel for the private plaintiffs' class (excluding the United States) shall be provided reasonable attorneys' fees

and costs incurred in monitoring compliance with this Consent Decree. Each year on or about the anniversary of the entry of this Decree, counsel for the private plaintiffs' class shall submit to the defendants their reasonable attorneys' fees and costs. The parties (excluding the United States) will attempt to agree upon the fees and costs, but if they cannot, they shall submit the matter to the Court for decision.

## IX. REVIEW AND TERMINATION

The United States and the private plaintiffs shall have the right to seek judicial resolution of any noncompliance with this Decree occurring during the pendency of the Decree, by motion or other appropriate means. Three years after final approval of this agreement by the Court, and after filing of the third annual report, the Defendant Board may move for dismissal of this case. The United States or the private plaintiffs shall file any objection that they may have to the dismissal within thirty days from the filing of the Defendants' Board. The Court shall thereafter schedule appropriate proceedings, make appropriate findings, and render appropriate orders with respect to the school district's unitary status, in accordance with applicable law.

Consent Decree entered and approved in Montgomery, Alabama, on this _14th_ th day of _Sept._ , 1999.

HON. HAROLD ALBRITTON
U.S. DISTRICT COURT JUDGE

Page 38 of 41

Approved as to Form and Content:

_____

TODD A. COX
NAACP Legal Defense and
   Educational Fund, Inc.
1444 "I" Street, N.W.
10th Floor
Washington , D.C.  20005
(202) 216-5568
Fax: (202) 682-1312
D.C. Bar I.D. 445316

   Attorney for Plaintiffs


ERNESTINE S. SAPP
Gray, Langford, Sapp, McGowan,
   Gray & Nathanson
108 Eastside Street
Tuskegee, AL 36083-0239
(334) 727-4830
Fax: (334) 727-5877
SAP 004

   Attorney for Plaintiffs

REDDING PITT
U.S. Attorney

ANITA S. HODGKISS
Deputy Assistant Attorney General

JEREMIAH GLASSMAN
JOHN R. MOORE
KATHLEEN S. DEVINE
U. S. Department of Justice
Civil Rights Div.--Educational Opp. Section
P.O. Box 65958
Washington, DC 20035-5958
(202) 307-0480
Fax: (202) 514-8337
SSAN 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

Attorneys for United States

DONALD B. SWEENEY
Rives & Peterson
1700 Financial Center
505 North Twentieth Street
Birmingham, AL 35203-2607
(205) 328-8141
Fax: (205) 328-7234
SSAN 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

Attorneys for Defendants

Page 40 of 41

MICHAEL WHITE
ANITA L. KELLY
Alabama State Department of
  Education
5107 Gordon Persons Building
Montgomery, AL 36130
(334) 242-1899
Fax: (334) 242-0982
WHI-027

Attorneys for Alabama State Board
  of Education

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ANTHONY T. LEE, et al.,                    )
                                           )
            Plaintiffs,                    )
                                           )
NATIONAL EDUCATION                         )
ASSOCIATION, INC.,                         )
                                           )
            Plaintiff-Intervenor,          )
                                           )
UNITED STATES OF AMERICA,                  )
                                           )
            Amicus Curiae,                 )
                                           )
      v.                                   )   CIVIL ACTION NO. 2: 70CV3101-WHA
                                           )
COOSA COUNTY BOARD OF                      )
EDUCATION, et al.,                         )
                                           )

## MEMORANDUM OPINION AND ORDER
### I. Facts and Procedural History

This case began as part of a state-wide class action filed in 1963 alleging that the State had

a mandatory, segregated school system in violation of the Fourteenth Amendment. The Coosa

County Board of Education ("the Board") was added as a defendant in the case and the court

subsequently ordered the Board to implement a desegregation plan.

On September 10, 1999, this court approved a Consent Decree agreed to by the parties

which provided that the Board had achieved unitary status in the area of transportation. The court

retained jurisdiction in the areas of faculty assignment and hiring, student assignment, intra-district

transfers, in-class assignment, special education,[1] graduation rates, discipline, extracurricular activities, and facilities and equipment.

The Board was required to file a comprehensive report with the court each year for three years, and the Plaintiff parties had the opportunity to advise the school system of any concerns they had about compliance with the terms of the Consent Decree. The Board has filed five annual reports. In its Order approving the Consent Decree, the court noted the parties were in agreement that if the terms of the agreement were carried out in good faith, the school system should be ready for a declaration of unitary status and a complete return to local control within three years.

The Coosa County School System operates three schools, an elementary school, a middle school, and a high school. The system formerly had multiple elementary and middle schools, but the schools were consolidated as part of the Board's compliance with the Consent Decree.

On May 5, 2005, the Coosa County Board of Education filed a Motion to Dismiss and For Declaration of Unitary Status (Doc. #109) seeking a declaration of full unitary status and a dismissal of the case. The court set the Motion to Dismiss for a fairness hearing and required the Board to give all plaintiff class members appropriate notice of the motion as well as procedures for making objections. The Board published notice of the proposed termination of this litigation and the date of the fairness hearing in the local newspaper. The notice provided procedures for class members and interested persons to file objections with the court regarding the proposed dismissal. Forms for objections were made available at the schools and notice was provided to

---

[1] The statewide issues involving special education were resolved by a consent decree, which was adopted and approved in this case. According to the terms of the statewide decree, any claims in the area of special education are to be raised with the State defendants. Therefore, claims concerning a local school system do not affect a declaration of unitary status, since the matter must be addressed with State defendants as part of the commitments made under the statewide decree.

2

the parent or guardian of each student enrolled in the school district. On the basis of record evidence, the court finds that the Board complied with the order of the court and that notice of the fairness hearing was properly given.

The court received written comments from interested citizens which were reviewed prior to the fairness hearing. On June 22, 2006 , the court held a fairness hearing. During the fairness hearing, the court heard evidence presented by the Board through its Superintendent and heard from a member of the school board who was opposed to the declaration of unitary status. During the fairness hearing, the superintendent submitted a proposed resolution to the court to be voted on by the Board, to demonstrate its future commitment to the Constitution and laws that were the predicate for judicial intervention. Although the parties were in agreement that the system was due to be declared unitary, the court postponed ruling on the motion until the Board had had an opportunity to vote on the resolution.

After having been advised by the Board's attorney that the Board failed to approve the resolution, the court set the case for a hearing during which time the Board members would be questioned about their intent to continue to operate the school system in accordance with the Constitution and laws of the United States.

A hearing was held on August 24, 2006. During the hearing, the superintendent and each of the members of the Coosa County Board of Education gave the court assurance, under oath, of his commitment to the continued operation of the school system in accordance with the Constitution and laws of the United States, including their personal commitment to policies which have been implemented pursuant to the Consent Decree.

## II. Legal Standard

3

The purpose of a desegregation case is to convert a school system which violates the Constitution because it is a *de jure* segregated school system to a system which has schools which are not racially segregated. See Green v. Co. School Bd. of New Kent, 391 U.S. 430, 442 (1968). "[T]he court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." Freeman v. Pitts, 503 U.S. 467, 489 (1992). If a school system is successful in this effort, it can be declared "unitary," and control returned to the local school board. Id. at 486-87.

The three requirements for dismissal of the case, as set out in the Consent Decree, are that (1) the Board has fully complied with the court's decrees for a reasonable period of time, (2) the vestiges of past discrimination have been eliminated to the extent practicable, and (3) the Board has demonstrated a good-faith commitment to the court's decrees and to the Constitution and laws that were the predicate for judicial intervention. See Missouri v. Jenkins, 515 U.S. 70, 87-89 (1955). The good-faith component requires that a school district must show not only past good-faith compliance, but a good-faith commitment to the future operation of the school system, which can be shown through specific policies, decisions, and courses of action that extend into the future." Lee v. Phenix City Bd. of Educ. 3:70cv854-T , 2005 WL 2850392 *6 (M.D. Ala. Oct. 27, 2005) (citing Dowell v. Bd. of Educ. of the Oklahoma City Public Schools, 8 F.3d 1501, 1513 (10th Cir.1993)).

The burden of proving that the school system has achieved unitary status is placed on the Board. See Lee v. Etowah Co. Bd. of Educ., 963 F.2d 1416, 1424 (11th Cir. 1992). In addition to its responsibilities under the United States Constitution, the Board was required to comply with the requirements of the Consent Decree which set forth the steps the Board had to take to achieve unitary status.

## III. Discussion

The Board has sought unitary status in the areas remaining under the Consent Decree. The Board has outlined its compliance with the Consent Decree in the remaining areas through the annual reports it has filed. At the hearing conducted on June 22, 2006, the Superintendent also presented evidence pertinent to those remaining areas. The superintendent testified to the recruitment plan for minority faculty, that he had consulted the Southeastern Equity Center, and that he or other Board representatives attended job fairs at traditionally black colleges and universities. With regard to student assignment, the superintendent described the efforts to get students to pursue advanced diplomas through parent teacher conferences and outlined specific course offerings for students, such as algaebraic connections which are designed to assist students. With regard to graduation rates, the superintendent outlined policies such as placing children in a transition program to move them to the high school level, conducting parent workshops, and checking attendance. With regard to discipline, the superintendent outlined efforts to monitor discipline referrals and a grant which the school system had received to train faculty on mental health issues. The system also has complied with the terms of the Consent Decree by notifying all eligible students about extracurricular activities and encouraging their participation. The Superintendent also outlined the difficult process involved in consolidating schools, and building and renovating schools.

As stated above, the court was satisfied, based on the evidence presented and the parties agreement that the system was due to be declared unitary, that the Board has fully complied with the court's decrees for a reasonable period of time, the vestiges of past discrimination have been eliminated to the extent practicable, and the Board has demonstrated a good-faith commitment to the court's decrees and to the Constitution and laws that were the predicate for judicial

5

intervention. Based upon the evidence received at the August 24, 2006 hearing as to the
Superintendent and board members' intent to continue the school system in compliance with the
Constitution and laws of the United States; the evidence of specific policies, decisions, and
courses of action that extend into the future; and the parties' agreement, the court concludes that the
Board has had and continues to have a good faith commitment to the court's decrees and to the
Constitution and laws that were the predicate for judicial intervention

### IV. Conclusion

On the basis of the record evidence, witness testimony, and averments of counsel, the court
finds that the school district defendants have met the standards entitling the district to a declaration
of unitary status in the areas of faculty assignment and hiring, student assignment, intra-district
transfers, in-class assignment, graduation rates, discipline, extracurricular activities, and facilities
and equipment. The Board has fully and satisfactorily complied with the orders of this court with
regard to these areas. The vestiges of the prior *de jure* segregated school system have been
eliminated to the extent practicable. The court also finds that the Board has demonstrated a good
faith commitment to the whole of the court's decrees and to those provisions of the law and the
Constitution that were the predicate for judicial intervention in this school system in the first
instance, through the Board's compliance with the court's orders over the years, through its good
faith implementation of its contractual obligations under the Consent Decree, and through its
policies, decisions, and courses of action that extend into the future.

The plaintiff parties have succeeded in the task they began decades ago to seek the end of
the *de jure* system of school desegregation in the Coosa County school system. By this lawsuit,
they sought to bring the district in compliance with the constitutional requirement of equal

6

protection under the law, and the court states today that they have succeeded. See NAACP, Jacksonville Branch v. Duval County Schools, 273 F.3d 960, 976 (11th Cir. 2001).

"[L]ocal autonomy of school districts is a vital national tradition." Dayton Bd. of Education v. Brinkman, 433 U.S. 406, 410 (1977). Where control lies, however, so too does responsibility. Freeman, 503 U.S. at 490. Although this court is confident that the Board will live up to its public commitment to continue the operation of its school system in compliance with the Constitution, now that control over the schools can be returned to the Board, in the future the Board, of course, "can be held accountable to the citizenry, to the political process, and to the courts in the ordinary course." Id.

Control over the Coosa County school system is properly returned to the Coosa County Board of Education. Accordingly, it is hereby ORDERED as follows:

1. The Board's Motion to Dismiss (Doc. #109) is hereby GRANTED.

2. All outstanding orders and injunctions are hereby DISSOLVED.

3. Court supervision of the Coosa County Board of Education and the Coosa County School System is ended.

A separate Judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this 24th day of August, 2006.


/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE

7

STATE OF ALABAMA        )
COOSA COUNTY            )



PLAINTIFF'S
EXHIBIT
6
Wingard

## AFFIDAVIT
## OF
## PAMELA P. JONES

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Pamela P. Jones, who being by me first duly sworn, deposes and says as follows:

My name is Pamela P. Jones. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am employed by the Coosa County Board of Education as Child Nutrition Director. In this position I oversee the lunchroom programs and operations at our schools.

I know Gloria Sims and I have read her EEOC Charge of Discrimination dated November 21, 2006.

Ms. Sims applied for a lunchroom worker position.

As a public school system, the Coosa County Board of Education must post positions of employment when they become vacant. Ala. Code § 16-22-15. (Copy attached as Appendix A.)

For this position the qualifications were stated as follows:

Qualifications: High School Diploma or GED

(Copy attached as Appendix B.)

Sims v. CCBE
Produced to EEOC
No. 0002

The requirement for a high school diploma or GED is necessary in our opinion because the position requires the person to read and follow recipes and directions.

Ms. Sims did not have a high school diploma or a GED.

Since she did not meet the qualifications required for the job, she was not eligible to be hired. The person hired met the qualifications as were stated in the posting notice.

Ms. Sims is wrong in her assertions that she was not hired because of her gender and race. The position was filled by an African-American male. He met the requirements posted for the position. Ms. Sims did not. She was not discriminated against because of her race or gender.

Ms. Sims was not qualified. She did not meet the qualifications we stated as required for the job. Those requirements were posted in compliance with State law. The posting law states that we must advertise the required qualifications:

(2)    Required qualifications.

We did so. We honored those requirements. Ms. Sims did not meet those requirements and she was not hired.

If Ms. Sims had been a male but did not have a high school diploma or GED, she would not have been hired.

If Ms. Sims had been an African-American but did not have a high school diploma or a GED, she would not have been hired.

Neither Ms. Sims' gender nor race were the reasons she was not hired.

The reason she was not hired was because she did not meet the "posted requirements."

**Sims v. CCBE**
Produced to EEOC
**No. 0003**

*Pamela P. Jones*

Pamela P. Jones

Sworn to and subscribed before me this the 39th day of March, 2007.

Judy Ward

Notary Public

My Commission expires: 5-13-08
(Seal)

**Sims v. CCBE**
*Produced to EEOC*
**No. 0004**

In The Matter Of:

# GLORIA SIMS
v.
# COOSA COUNTY BOARD OF EDUCATION

## NO. 2:07-CV-704-MEF

---

## JAN FORBUS
## May 21, 2008

---



## TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
——————— www.TylerEaton.com -

EXHIBIT 5

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

JAN FORBUS
May 21, 2008

---

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NO. 2:07-CV-704-MEF

GLORIA SIMS,
    Plaintiff,
vs.
COOSA COUNTY BOARD OF EDUCATION,
    Defendant.

VIDEO DEPOSITION
OF
JAN FORBUS
May 21, 2008

REPORTED BY: Gail B. Pritchett
    Certified Realtime Reporter,
    Registered Professional
    Reporter and Notary Public

---

Page 2

1    S T I P U L A T I O N
2
3        IT IS STIPULATED AND AGREED,
4    by and between the parties, through their
5    respective counsel, that the deposition of
6    JAN FORBUS may be taken before Gail B.
7    Pritchett, Commissioner, Certified
8    Realtime Reporter, Registered Professional
9    Reporter and Notary Public;
10       That the signature to and
11   reading of the deposition by the witness
12   is waived, the deposition to have the same
13   force and effect as if full compliance had
14   been had with all laws and rules of Court
15   relating to the taking of depositions;
16       That it shall not be necessary
17   for any objections to be made by counsel
18   to any questions, except as to form or
19   leading questions, and that counsel for
20   the parties may make objections and assign
21   grounds at the time of trial, or at the
22   time said deposition is offered in
23   evidence, or prior thereto.

---

Page 3

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Jerry D. Roberson
    Attorney at Law
    Roberson & Roberson
    3765 Kinross Drive
    P. O. Box 380487
    Birmingham, Alabama 35238-0487

FOR THE DEFENDANT:
    Ms. Anne R. Yuengert
    Attorney at Law
    Bradley, Arant, Rose & White, LLP
    One Federal Place
    1819 Fifth Avenue North
    Birmingham, Alabama 35203

OTHERS PRESENT:
    Mr. Todd Wingard

---

Page 4

INDEX OF EXAMINATION
PAGE:
EXAMINATION BY MR. ROBERSON    7
EXAMINATION BY MS. YUENGERT    59

INDEX OF EXHIBITS
PAGE:
Plaintiff's Exhibit 1    38
Plaintiff's Exhibit 2    47
Plaintiff's Exhibit 3    55

---

1 (Pages 1 to 4)

Page 5

1    I, Gail B. Pritchett, a
2    Certified Realtime Reporter and Registered
3    Professional Reporter of Birmingham,
4    Alabama, and a Notary Public for the State
5    of Alabama at Large, acting as
6    Commissioner, certify that on this date,
7    as provided by the Federal Rules of Civil
8    Procedure of the United States District
9    Court, and the foregoing stipulation of
10   counsel, there came before me at the Coosa
11   County Board of Education, 2001 Nixburg
12   Road, Rockford, Alabama, on the 21st day
13   of May, 2008, commencing at 9:34 a.m., JAN
14   FORBUS, witness in the above cause, for
15   oral examination, whereupon the following
16   proceedings were had:
17
18       MR. ROBERSON:  All right.
19   This is the videotape deposition of Ms.
20   Jan Forbus.  It's being taken today, which
21   is May 21st, 2008, at the offices of the
22   Coosa County Board of Education, 201
23   Nixburg Road, Rockford, Alabama 35136.

Page 6

1        This case is pending in the
2    United States District Court for the
3    Middle District of Alabama, Northern
4    Division.  Gloria Sims is the plaintiff,
5    Coosa County Board of Education is the
6    defendant.  It's CV-07-704.
7        My name is Jerry Roberson.  I'm
8    the attorney for the plaintiff, Gloria
9    Sims.  I would ask all counsel of record
10   to state their name and the party they
11   represent.
12       MS. YUENGERT:  Anne Yuengert,
13   along with Donald Sweeney.  I represent
14   the Coosa County Board of Education.
15       MR. ROBERSON:  Okay.  Ma'am,
16   would you swear our witness, please?
17
18       JAN FORBUS,
19   having been first duly sworn, was examined
20   and testified as follows:
21
22       THE COURT REPORTER:  Usual
23   stipulations?

Page 7

1        MR. ROBERSON:  Yes.
2        MS. YUENGERT:  Yes.  And she
3    will tell us whether she wants to read and
4    sign.
5
6    EXAMINATION BY MR. ROBERSON:
7        Q.   Ms. Forbus, have you ever
8    given a deposition before?
9        A.   No, sir.
10       Q.   Okay.  Well, there are a few
11   rules that we need to follow today, okay?
12       A.   Yes, sir.
13       Q.   And one of the rules is if I
14   ask you a question, you need to be -- to
15   understand it.  So if I ask you something
16   you don't understand, please tell me and I
17   will try to rephrase it, okay?
18       A.   Okay, uh-huh.
19       Q.   If you don't tell me, I will
20   assume you understood it.  Fair enough?
21       A.   Yes, sir.
22       Q.   And the other rule is today
23   you have to answer out loud, audibly.

Page 8

1    Normally in conversation we nod our head
2    or say uh-huh or uh-uh, but we can't do
3    that today because she has got to take
4    everything down.
5        A.   Yes, sir.
6        Q.   Okay.  And we can't both talk
7    at the same time.  So if you'll let me
8    finish my question, I'll try to let you
9    finish your answer.
10       A.   Okay.
11       Q.   All right.  Now, you are Jan
12   Forbus?
13       A.   Yes, sir.
14       Q.   And you are employed with the
15   Coosa County Board of Education?
16       A.   I'm retired now.
17       Q.   Oh, okay.  When did you
18   retire, ma'am?
19       A.   In May, last -- whatever.
20       Q.   2007?
21       A.   Yes.
22       Q.   Okay.
23       A.   2006.  Was it --

Page 9

1    Q.    Well, how long did you work
2  for the --
3    A.    Twenty-six years.
4    Q.    Just can't keep a job, huh?
5  And what was your position at the time you
6  retired?
7    A.    Cafeteria manager.
8    Q.    Which cafeteria?
9    A.    Central High School, Coosa
10  County.
11    Q.    And as the cafeteria manager,
12  who is your supervisor now -- or who was
13  your supervisor?
14    A.    Pam Jones.
15    Q.    What's her position?
16    A.    Child nutrition director.
17    Q.    Does she have an office at the
18  high school?
19    A.    No, sir.
20    Q.    Where is her office located?
21    A.    Here in the central office.
22    Q.    Okay.  Here at the --
23    A.    Board of Education.

Page 10

1    Q.    Okay.  So I take it, then,
2  that Ms. Jones' position, she supervises
3  all of the food programs --
4    A.    Yes, sir.
5    Q.    -- for all of your schools,
6  correct?
7    A.    Yes, sir.
8    Q.    Okay.  Now, at the time you
9  retired, how many workers did you
10  supervise at the Central High School, how
11  many lunchroom workers?
12    A.    Four.
13    Q.    And do you know who they were,
14  ma'am?
15    A.    Margaret Henderson, Barbara
16  Murphy, Sandra Thompson, and at the time
17  Michael Kelley held the position that was
18  being subbed for.
19    Q.    Okay.  Now, of those people
20  you have just identified, how many of them
21  are still there, do you know?
22    A.    Three.
23    Q.    Ms. Henderson?

Page 11

1    A.    Uh-huh.
2    Q.    Is that yes?
3    A.    Yes.  Excuse me.
4    Q.    That's all right.  I will just
5  try to remind you, okay?
6          And Ms. Murphy, is she still
7  there?
8    A.    Yes.
9    Q.    And Sandra Thompson?
10    A.    Yes.
11    Q.    Mr. Kelley is no longer there?
12    A.    No, sir, he is not there no
13  more.
14    Q.    Okay.  Now, is he the person
15  that Ms. Sims was substituting for when
16  she --
17    A.    Yes, sir.
18    Q.    -- worked there?  Okay.
19  Before he left, how long had he worked
20  there in the lunchroom?
21    A.    I don't know, because I wasn't
22  there at the time he was hired.
23    Q.    Okay.  Well, maybe I

Page 12

1  misunderstood, then.
2          You retired with twenty-six
3  years, but how long were you the cafeteria
4  manager at Central High School?
5    A.    Four.  Four years.
6    Q.    Okay.  Before that what were
7  your --
8    A.    I was at Kellyton Elementary
9  School.  And then they closed those
10  schools and I moved to the high school.
11    Q.    Were you the cafeteria manager
12  there?
13    A.    Yes, sir.
14    Q.    Okay.  I see.  And so when you
15  arrived, it would have been 2003,
16  approximately, school year of 2003 at
17  Coosa Valley?
18    A.    At Coosa Central?
19    Q.    Coosa Central.
20    A.    Mr. Wingard is going to have
21  to help me on that, I don't know --when
22  did they -- whenever they closed all of
23  the elementary schools.  I'm not sure,

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Page 13

1    sir.
2         Q.    Okay.  That's fine.  Mr.
3    Kelley was already there, he was
4    working --
5         A.    Yes, sir.
6         Q.    Okay.  Now, who held the
7    position as cafeteria manager before you
8    at the high school?
9         A.    Patty Williams.
10        Q.    And is she still employed?
11        A.    No, sir.
12        Q.    Did she retire?
13        A.    Yes, sir.
14        Q.    Now, you've identified four
15   people, three women, correct?
16        A.    Yes, sir.
17        Q.    Are all of those women white?
18        A.    Yes, sir.
19        Q.    And Michael Kelley, was he a
20   black male?
21        A.    Yes, sir.
22        Q.    Okay.  Now, this is what I
23   don't understand, so help me, if you

Page 14

1    would.
2              In the lunchroom when a
3    position is vacant, is there a period of
4    time when one can work as a substitute or
5    -- substitute lunchroom worker?
6         A.    I don't understand what you
7    are saying.
8         Q.    Okay.  Well, Ms. Sims worked
9    as a substitute lunchroom worker, is that
10   right?
11        A.    Yes, sir.
12        Q.    Okay.  Are there any job
13   requirements, any -- any requirements in
14   order to hold that position as a
15   substitute lunchroom worker?
16        A.    Not on a substitute.
17        Q.    Okay.  Anyone can hold the
18   position as a substitute, correct?
19        A.    Yes, sir.
20        Q.    Okay.  Now --
21        A.    If the board approves them as
22   a substitute.
23        Q.    Okay.  Now, explain to me, the

Page 15

1    position, if it's awarded on a -- is it
2    awarded on a permanent basis?
3         A.    No, sir.
4         Q.    It's awarded on a temporary
5    basis?
6         A.    No, sir.
7         Q.    All right.  Well, for example,
8    Ms. Murphy who is working there now, do
9    you know how long she has worked there?
10        A.    No, sir, I don't.  She was
11   already employed in the system.
12        Q.    Okay.  Is she on some kind of
13   an annual contract or do you know?
14        A.    I don't know.
15        Q.    Well, I mean, does she have to
16   be rehired every year or do you know?
17        A.    I don't -- I don't know.
18        Q.    Okay.  Well, have you fired
19   anybody --
20        A.    No, sir.
21        Q.    -- as a cafeteria manager?
22        A.    No, sir.
23        Q.    Do you know if you have that

Page 16

1    ability, that authority?
2         A.    I wouldn't think I did.
3         Q.    Okay.  Do you evaluate these
4    employees in any way?
5         A.    Yeah.
6         Q.    Do you have a written
7    evaluation of them?
8         A.    No.
9         Q.    Okay.  Well, I'm trying to
10   understand -- and maybe I need ask some
11   other people.  I'm trying to understand
12   how these positions are filled and what it
13   is to hold one, what it means to hold one.
14             So do you know if you have a --
15   if Barbara Murphy has a job, under what
16   circumstances she can be replaced?  Why
17   she can be -- her position can be ended?
18        A.    Could you re -- I mean, I
19   don't understand what you are trying to
20   ask me here.
21        Q.    Well, you know, teachers in
22   Alabama get tenure after so many years.
23        A.    Yes, sir.

4 (Pages 13 to 16)

Page 17

1    Q.    You understand what that
2  means?
3    A.    Yes, sir.
4    Q.    Do lunchroom workers ever get
5  tenure?
6    A.    Yes, sir.
7    Q.    Okay.  How many years does it
8  take to get tenure?
9    A.    You have to be asked back on
10  your fourth year.
11    Q.    Okay.
12    A.    Three years and asked back.
13    Q.    So is there a distinction
14  between someone who is working in their
15  first three years versus someone who is --
16  I'm going to use the term tenured as a
17  lunchroom worker?
18    A.    As I understood it when I came
19  to work, the three-year period was just a
20  probationary period to see if you
21  qualified for the job.  Now, that's just
22  an understanding.  No one ever really -- I
23  heard -- was never told that, I have just

Page 18

1  heard that.
2    Q.    Okay.  Now, in order -- if the
3  position, a lunchroom --
4          First of all, what time do
5  these people report for work?
6    A.    Well, they have different
7  schedules.
8    Q.    Okay.
9    A.    Different time schedules.
10    Q.    Do y'all -- at the high
11  school, do y'all serve breakfast?
12    A.    We didn't at the time I was
13  there.
14    Q.    Okay.
15    A.    They do now.
16    Q.    They do serve breakfast now?
17    A.    Uh-huh.
18    Q.    Is that yes?
19    A.    Yes.
20    Q.    Okay.
21    A.    Sorry.
22    Q.    And so -- but at the time you
23  were the manager, they were only serving a

Page 19

1  lunchtime meal, is that correct?
2    A.    Yes, sir.
3    Q.    No other meals other than
4  lunch?
5    A.    No, sir.
6    Q.    All right.  And the different
7  -- there are four positions there.  Do
8  they have different responsibilities?
9    A.    Yes, sir.
10    Q.    Okay.  Tell me what Ms.
11  Henderson does -- or did when you were
12  cafeteria manager.
13    A.    Well, they have a rotation
14  schedule.  They rotate into what they --
15  one makes bread one time, you know, and --
16  something like that.  They didn't have a
17  specific thing to do other than bread
18  rotation.  They just worked together on
19  the rest.
20    Q.    Well, the position held by Mr.
21  Kelley --
22    A.    Well, yes, sir.
23    Q.    -- when he was there, did he

Page 20

1  cook?
2    A.    Some, yes.
3    Q.    Okay.  And what else did he
4  do?  What were his other job activities?
5    A.    He fixed up the snack rack.
6  He cleaned the -- done the -- kept the
7  food on the hot bar during the serving
8  period time.  He done the cleaning,
9  mopping and cleaning in the afternoons.
10    Q.    Emptied the trash?
11    A.    Yes, sir.
12    Q.    Anything else?  Did he do
13  loading and unloading boxes?
14    A.    Yes, sir.  Yes, sir, loading
15  and stocking the -- when the groceries
16  come in, the inventory come in, he stocked
17  it.
18    Q.    Does a truck deliver the
19  groceries?
20    A.    Yes, sir.
21    Q.    Is that -- where is that truck
22  from?  Do y'all have a vendor or vendors
23  that --

Tyler Eaton Morgan Nichols & Pritchett, Inc.

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

JAN FORBUS
May 21, 2008

---

Page 21

1    A.   Yes, sir, we have vendors.
2    Q.   -- that drop off, say, milk or
3    whatever?
4    A.   Yes, sir.
5    Q.   Now, when Ms. Sims worked
6    there in Mr. Kelley's spot, took his spot,
7    did she do the same things that he did?
8    A.   Yes.
9         MS. YUENGERT:  Object to the
10   form.  You can answer.
11   Q.   I mean, she had the same job
12   activities as he did, correct?
13        MS. YUENGERT:  You can answer.
14   A.   Yes.
15   Q.   Okay.  And she did the
16   cleaning, she did the emptying the trash
17   and she did the loading, and she cooked
18   some and kept up the hot bar, correct?
19   A.   Yes, sir.
20   Q.   Did you -- were you her
21   supervisor?
22   A.   Yes, sir.
23   Q.   Did you observe her job

Page 22

1    performance?
2    A.   Yes, sir.
3    Q.   Was it satisfactory to you?
4    A.   I don't know how to answer
5    that one, because that's not a specific --
6    in the beginning, can I put it that way?
7    Q.   Ma'am, you can put it any way
8    you would like.  I'm just asking you
9    questions about Ms. Sims' job performance.
10        Well, did -- was there ever any
11   time you felt her job performance was
12   deficient?
13   A.   Yes, sir.
14   Q.   Tell me about that.
15   A.   Stocking the groceries,
16   freezer items, she couldn't -- she didn't
17   always get those stocked the way they --
18   on the time limit that we had set for it.
19   Q.   I'm not -- I'm not
20   understanding.  Of course, I have never
21   worked in the lunchroom, so what do you
22   mean by that?
23   A.   Well, because the thing -- the

Page 23

1    groceries had to be stocked when they came
2    in, in the freezer especially, because the
3    ladies -- the job she held, she came in
4    later than the other employees.
5    Q.   What time did she report to
6    work?
7    A.   8:30.
8    Q.   And when did she quit work,
9    what was her --
10   A.   At 2:30.
11   Q.   So it was a six-hour shift?
12   A.   Yes, sir.
13   Q.   And how much was she paid?
14   A.   I didn't deal with the salary.
15   I wasn't on the --
16   Q.   You don't know?
17   A.   No, sir, I do not know.
18   Q.   Do you know how much any of
19   the --
20   A.   No, sir.
21   Q.   -- people there were paid?
22   Okay.
23        All right.  So you -- did you

Page 24

1    ever reprimand Ms. Sims for anything
2    during the time that she worked there?
3    A.   Are you talking about a
4    written recommend -- reprimand?
5    Q.   Written or oral.
6    A.   I don't know how to answer
7    that one, honestly, because -- I just --
8    the freezer doings, I did reprimand her
9    on.
10   Q.   What would you tell her?
11   A.   I asked her that if she could
12   not stay in the afternoons, you know -- if
13   her time limit was going to be limited --
14   she said she had to leave exactly on time,
15   you know, and I understand that.  But we
16   can't work people over, so you have to get
17   your job done in your time frame.  And
18   there was days that she didn't on the
19   freezer items.
20   Q.   Well, did other people leave
21   at 2:30?  Did the entire staff leave at
22   2:30?
23   A.   They got off at 2:00.

6 (Pages 21 to 24)

Page 25

1    Q.    Anything else that you ever
2  took exception to her job performance?
3    A.    I don't remember.
4    Q.    Do you know how long she
5  worked?
6    A.    I don't.
7    Q.    Did she keep the cafeteria
8  clean?
9    A.    Yes.
10   Q.    Did she keep the trash empty?
11   A.    No, sir.  She had to have help
12 in the end on that.  She got to getting
13 the students to help her.  It was a --
14 it's a heavy job.
15   Q.    Did she do the mopping
16 satisfactory to you?
17   A.    Yes, sir.
18   Q.    Keep the hot bar in good
19 shape?
20   A.    Yes, sir.
21   Q.    And the snack food rack?
22   A.    Well, she had help with that.
23 The other workers helped her on that.

Page 26

1    Q.    What about her cooking, was
2  she a --
3    A.    Yeah.
4    Q.    -- satisfactory cook?
5    A.    When she participated, yes.
6    Q.    Did she seem to get along with
7  the other workers in the cafeteria?
8    A.    Yes, sir.
9    Q.    I mean, wasn't any friction or
10 unpleasant work situations, were there?
11   A.    No, sir.
12   Q.    All right.  Now, did you ever
13 have any occasion during the time that she
14 worked here to have to give her a written
15 reprimand about her job performance?
16   A.    Sir, we didn't do written
17 reprimands on substitutes, because they
18 are just substitutes.
19   Q.    What does that mean?  I'm
20 sorry, I'm not following you.  You mean
21 you just tell them if they are -- if it
22 requires a written reprimand, you just
23 send them home and get somebody else, is

Page 27

1  that what you --
2    A.    I wouldn't -- that would have
3  been referred to the supervisor.  That
4  wouldn't have been my -- I would have had
5  to went through a supervisor.
6    Q.    Ms. Jones?
7    A.    Yes, sir.
8    Q.    Okay.  Did you ever have any
9  discussions with Ms. Jones about Diane
10 Sims', Gloria Sims', job performance?
11   A.    I don't remember having
12 anything.  I guess -- I would have to say
13 yes, I did talk to her about Ms. Sims.
14   Q.    What did you tell her, do you
15 recall?
16   A.    Well, when we had -- when we
17 had problems about the --
18   Q.    Freezer?
19   A.    Uh-huh.
20   Q.    Do these people punch a time
21 clock?
22   A.    No, sir.
23   Q.    So how does their time get

Page 28

1  reported?  That is --
2    A.    They have a sign-in sheet and
3  a sign-out sheet, but we have no time
4  clock.
5    Q.    I got you.  Well, are you
6  there during their work hours?
7    A.    Yes, sir.
8    Q.    So do you make some notation
9  that they are arriving on time and they
10 are leaving at the scheduled time?
11   A.    Yes, sir.
12   Q.    Do you keep it or does the
13 employee keep it, sign it in?
14   A.    The employee signs it in.
15   Q.    And you have to approve it?
16   A.    Well, I look at -- looked at
17 it, but --
18   Q.    Okay.  And is that turned in
19 to the office or to payroll in some way
20 or --
21   A.    Well, I -- no, sir, that
22 sheet's not.  No, sir.
23   Q.    Is there some document that is

7 (Pages 25 to 28)

Page 29

1  turned in so that they get their pay?
2      A.    Yes, sir.
3      Q.    What is that?
4      A.    It's a payroll sheet, comes
5  from the central office.
6      Q.    Do you fill that out?
7      A.    Yes, sir.
8      Q.    Okay.  And so, for example, if
9  somebody has a personal -- some personal
10 matters to attend to and they are not at
11 work, you know, they let you know, their
12 pay is reduced, right, if they don't work
13 all of their hours?
14     A.    Yes, sir.
15     Q.    Okay.  And that's something
16 they need to get your approval about,
17 correct?
18     A.    Yes, sir.
19     Q.    And what's your policy on,
20 say, personal days?  Do they get so many
21 or --
22     A.    Yes, sir.
23     Q.    What about your tardy policy,

Page 30

1  are there any repercussions if they are
2  tardy, if they are late for work?
3      A.    I don't know what the policy
4  would be on that.  I'm not a -- I don't
5  know.  I would dock their time.
6      Q.    Okay.  Did you have occasions
7  where you had to do that to Ms. Sims?
8      A.    No.
9      Q.    Okay.  Did she come to work?
10 Did she have a good attendance record?
11     A.    Yes.
12     Q.    Now, Ms. Forbus, this is a
13 case that Ms. Sims has brought against the
14 -- her employer, the Coosa County Board of
15 Education.  You understand that?
16     A.    Yes, sir.
17     Q.    She didn't get a position that
18 she applied for, and so she has brought a
19 claim against the Board of Education.
20         Now, you were her supervisor.
21 Were you involved in the decision to hire
22 whoever the gentleman was who was hired in
23 this case?  Do you know his name?

Page 31

1      A.    Yes, sir.
2      Q.    What is that?
3      A.    Jerry McKinney.
4      Q.    Mr. McKinney.  And Mr.
5  McKinney is a black male, correct?
6      A.    Yes, sir.
7      Q.    Michael Kelley was a black
8  male, correct?
9      A.    Yes, sir.
10     Q.    Diane Gloria Sims is a white
11 female, correct?
12     A.    Yes, sir.
13     Q.    All right.  And she has
14 testified -- she has given a deposition
15 just like you today, and she -- Ms. Sims
16 has testified that she overheard
17 statements that you made during the time
18 that she worked here.  And she says that
19 you told her that this job she was working
20 was a man's job.
21         Do you recall ever making that
22 statement in her presence?
23     A.    No, I don't.

Page 32

1      Q.    And do you -- is Pam Jones
2  black?
3      A.    Yes, sir.
4      Q.    Did you -- do you recall her
5  -- you ever making the statement in Ms.
6  Sims' presence that you needed to get some
7  color in the lunchroom?  Did you ever make
8  that statement?
9      A.    Did I make what?
10     Q.    The statement that you needed
11 to get some color in the lunchroom.
12     A.    Did I make that statement?
13     Q.    Yes.
14     A.    No, sir.
15     Q.    Have you ever heard Pam Jones
16 make that statement?
17     A.    No, sir.
18     Q.    Okay.  Have you ever heard
19 anyone in management at the Coosa County
20 Board of Education make that statement?
21     A.    No, sir.
22     Q.    Now, are you aware that until
23 recently, this school board was under a

Tyler Eaton Morgan Nichols & Pritchett, Inc.

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

JAN FORBUS
May 21, 2008

---

Page 33

1    federal decree about minority and minority
2    hiring, staffing, were you aware of that?
3        A.    No, sir.
4        Q.    Are you aware of it today?
5        A.    Well, you just told me.
6        Q.    Well, I know.  I did tell you,
7    but you can't always believe me.
8            Now, when somebody applies for
9    a job here in the lunchroom, are you on a
10   committee that interviews them?
11       A.    I was on this job
12   interviewing.  I haven't been always.
13       Q.    All right.  The position that
14   was filled by Mr. McKinney, you were on
15   the committee?
16       A.    Yes, sir.
17       Q.    Who else was on there?
18       A.    Ms. Jones, Mr. Bullard.
19       Q.    What's his position, Keith
20   Bullard?
21       A.    He's the principal.
22       Q.    At the high school?
23       A.    At the high school.

Page 34

1        Q.    And Mr. Wingard?
2        A.    Uh-huh.
3        Q.    Is that yes?
4        A.    Mr. Wingard wasn't there the
5    day we interviewed.
6        Q.    Okay.  But he was -- he was on
7    the committee --
8        A.    Yes, sir.
9        Q.    -- or he has a vote, so to
10   speak?
11       A.    Yes, sir.
12       Q.    But you three interviewed the
13   applicants, correct?
14       A.    Yes, sir.
15       Q.    And you interviewed Ms. Sims,
16   correct?
17       A.    Yes, sir.
18       Q.    And how many applicants did
19   you have?
20       A.    Sir, I don't --
21       Q.    Several?
22       A.    Several, yes, sir.
23       Q.    Okay.  Do you know a Rebecca

Page 35

1    Beasley?
2        A.    Yes, sir.
3        Q.    She was hired August of 2007.
4    Would that be after you retired?
5        A.    I was out on leave when she
6    was hired.  My doctor had put me on leave.
7        Q.    Okay.  Now, you know Barbara
8    Murphy, you worked with her?
9        A.    Yes, sir.
10       Q.    Is she a good employee?
11       A.    Yes, sir.
12       Q.    And she performed her job
13   duties satisfactory to you?
14       A.    Yes, sir.
15       Q.    She doesn't have a high school
16   diploma or a GED; did you know that?
17       A.    Not until this took place.  I
18   wasn't in on her hiring.  I wasn't on the
19   committee that hired Barbara Murphy.
20       Q.    I understand that.  But Ms.
21   Murphy has performed the requirements of
22   the job satisfactory to you even though
23   she doesn't have a high school degree or a

Page 36

1    GED, correct?
2        A.    Yes, sir.
3        Q.    Well, does that imply to you
4    that that criteria is not necessary to do
5    the work?
6            MS. YUENGERT:  I'm going to
7    object to the form.  You can answer.
8        A.    I don't guess that it implies
9    that they can't do the work.  I was going
10   by the rules that were set before me on
11   the --
12       Q.    I completely understand what
13   you're saying.  What I'm asking you is,
14   from what you've observed as the manager,
15   Ms. Murphy has done a good job even though
16   she doesn't have a high school degree,
17   right?
18       A.    Yes, sir.
19       Q.    Well -- now, the lunchroom
20   workers, they don't provide any
21   instruction to the students in terms of
22   their academic instructions --
23       A.    No, sir.

9 (Pages 33 to 36)

Page 37

1    Q.   -- correct?
2         A substitute teacher does
3    provide instruction to the students,
4    correct?
5    A.   I don't know.  I would assume.
6    Q.   Well, did you ever have a
7    substitute when you were in school?
8    A.   Oh, yeah, sure.
9    Q.   And of course they provide
10   instruction, correct?
11   A.   Yeah, I would --
12   Q.   All right.  Now, is Ms. Murphy
13   an honest woman, in your experience?
14   A.   Yes.
15   Q.   All right.  Well, did you know
16   that Ms. Sims filed an EEOC charge in this
17   case; that's a prerequisite to filing a
18   Title VII lawsuit.
19        Were you aware that she had
20   filed a charge of discrimination?
21   A.   On this lawsuit?
22   Q.   Yes.
23   A.   Everybody knows that.

Page 38

1    Q.   Okay.  And the school has an
2    obligation to investigate her charge of
3    discrimination and file a response.  Were
4    you aware of that?
5    A.   No.
6    Q.   And the school has done that.
7    In fact, the school obtained an affidavit
8    -- or their lawyer, I assume, obtained an
9    affidavit of Barbara Murphy.
10        Have you ever seen that
11   document?
12   A.   No, sir.
13        (Whereupon, Plaintiff's
14        Exhibit 1 was marked for
15        identification.)
16   Q.   Well, lucky you, I'm going to
17   show it to you.  I have marked it as
18   Exhibit 1 to your deposition.  And this is
19   from the EEOC.  Would you take a moment
20   and read that?
21   A.   (Reviewing document.)
22   Q.   And if you would, just let me
23   know when you have finished reading it.

Page 39

1    A.   (Reviewing document.)
2    Q.   Have you had an opportunity to
3    read that, Ms. Forbus?
4    A.   Uh-huh.
5    Q.   And you understand that an
6    affidavit is a sworn statement given in a
7    case, a lawsuit, a civil case?
8    A.   Yes, sir.
9    Q.   And Ms. Murphy indicates that
10   -- well, let me -- I want to quote her
11   accurately.  "I heard Jan Forbus say it
12   was a man's job."
13        You still deny making that
14   statement, ma'am?
15   A.   Sir, I don't ever remember
16   saying it was a man's job.  A man had
17   always held that position is what I said.
18   Q.   Okay.  "And I heard Jan Forbus
19   say that Pam said she was putting some
20   color in the lunchroom."  Did -- you still
21   deny making that statement?
22   A.   I'm not strictly denying.  I
23   heard it.

Page 40

1    Q.   Okay.  You heard Pam make that
2    statement?
3    A.   No, sir, never have I heard
4    Pam make that statement.
5    Q.   Okay.  Well --
6    A.   That was a hearsay, a been
7    told thing.  Never heard her make that
8    statement.
9    Q.   Okay.  Well, I don't --
10   please, I'm not trying to argue with you,
11   I just don't understand the source of what
12   you heard.  So could you clarify that?
13   You heard someone else say that Pam said
14   it --
15   A.   Yes, sir.
16   Q.   -- is that what you are
17   telling me?
18   A.   Yes, sis.
19   Q.   Who did you hear say Pam said
20   it?
21   A.   Kim Abrams.
22   Q.   Who is that?
23   A.   She was employed before.

10 (Pages 37 to 40)

Page 41

1    Q.    In the lunchroom?
2    A.    Uh-huh.
3    Q.    Okay.  All right, thank you.
4  You cleared that up for me.
5    A.    Uh-huh.
6    Q.    Is she no longer working for
7  the school?
8    A.    No, sir.
9    Q.    Now, when y'all hire -- make a
10  decision about hiring someone to fill the
11  job -- I'm going to use the term
12  permanently, at least permanently if they
13  keep it three years, okay?
14    A.    Okay.
15    Q.    Like Mr. McKinney, is he still
16  on his three years or is he gone?  Is Mr.
17  McKinney still employed?
18    A.    No, he is still on his three
19  years.
20    Q.    Okay.  And during this period
21  of time, how do you refer to his job
22  position?  Is that a temporary employee in
23  the lunchroom or -- is that what y'all

Page 42

1  refer to him as?
2    A.    Sir, I don't know how he would
3  be referred to there.
4    Q.    Okay.  Well, when y'all are
5  making a hiring decision and you have
6  several candidates, to investigate them,
7  do you check their references, that is,
8  where they have worked before?
9    A.    That's for Mr. Wingard to do.
10    Q.    Do you know if that's done by
11  the school?
12    A.    No, sir, I don't know.
13    Q.    Well, after Ms. Sims didn't
14  get this position, the lunchroom worker
15  job -- and I understand that you were told
16  -- you were instructed that a successful
17  applicant had to have a high school
18  degree, correct?
19    A.    Yes, sir.
20    Q.    And Ms. Sims did not have
21  one --
22    A.    No, sir.
23    Q.    -- correct?

Page 43

1         So she couldn't get the job,
2  from what you understood, correct?
3    A.    Yes, sir.
4    Q.    I'm not quibbling with you
5  about that, all right?
6         Do you know if anybody checked
7  Mr. McKinney's references?
8    A.    I don't know.
9    Q.    Okay.  Do you know what
10  investigation they made into his previous
11  employment?
12    A.    No, sir, I don't know.
13    Q.    Okay.  Now, after Ms. Sims did
14  not get the job at the school --
15         Oh, and that was another thing.
16  Did you tell her that she didn't get the
17  job?  Did y'all have a conversation about
18  that while she was still working here?
19    A.    I really don't remember.
20    Q.    Well, do you recall her
21  getting upset when she found -- when she
22  learned she wasn't getting the permanent
23  position?

Page 44

1    A.    Yes, sir.
2    Q.    Okay.  And could you
3  understand why she would be upset?
4    A.    Yes, sir.
5    Q.    Okay.  I mean, the job she was
6  working, she didn't have -- were you aware
7  that she didn't have benefits?
8    A.    Yes, sir.
9    Q.    Okay.  Because it's a
10  temporary position?
11    A.    Yes, sir.
12    Q.    And if she got the job on a
13  permanent basis, then she would be
14  eligible to get benefits, correct?
15    A.    Yes, sir.
16    Q.    And quite frankly, a cafeteria
17  worker doesn't make a huge amount of
18  money; you agree with that?
19    A.    I agree.
20    Q.    And one of the most important
21  things to most of the people who are
22  employed in that capacity is that they
23  receive benefits, health insurance and

11 (Pages 41 to 44)

Page 45

1   things like that, correct?
2       A.   Yes, sir.
3       Q.   Are the cafeteria workers, are
4   they in the State Retirement System too --
5       A.   Yes, sir.
6       Q.   -- like a teacher?
7            So that's an additional
8   benefit, correct?
9       A.   Yes, sir.
10      Q.   And they accept, perhaps,
11  lower wages in order to obtain those
12  benefits and that retirement --
13           MS. YUENGERT:  Object to the
14  form.
15      Q.   -- do you agree?  I mean,
16  that's a motivation for most of those
17  workers?
18           MS. YUENGERT:  You can answer.
19  I'm just objecting to the form of his
20  question.
21      A.   I'm sure it would be.
22      Q.   Well, in your own situation,
23  was it?

Page 46

1       A.   Yes, sir.
2       Q.   I mean -- please don't -- Ms.
3   Forbus, when you retired with twenty-six
4   years, you can draw a -- at what age can
5   you start drawing a pension?
6       A.   What do you mean?
7       Q.   Can you draw your pension
8   immediately or do you have to wait until
9   you hit some age?
10      A.   No, sir, you draw immediately.
11      Q.   Okay.  Well, that's a valuable
12  benefit, don't you think?
13      A.   Yes, sir.
14      Q.   And believe me, I think you
15  earned it, okay?  But that's an -- I'm
16  trying to explain why Ms. Sims would be
17  upset that she didn't get the job, okay?
18      A.   Yes, sir.
19      Q.   And you agree with me that
20  that would be a reason?
21      A.   Yes, sir.
22      Q.   Now, after she didn't get that
23  position, she applied for a job at the

Page 47

1   Coosa Valley Medical Center.  Were you
2   aware of that?
3       A.   I knew I received a call.  I
4   didn't know where she was applying for.
5       Q.   Okay.  Someone, and in fact
6   it's a screening service, contacted you
7   because when she applied she listed the
8   school; she was applying for work I
9   believe as a cafeteria worker, and she
10  listed the school as being a job that she
11  had performed in that field, okay?  And
12  you were contacted.  Do you agree with me
13  about that?
14      A.   Yes, sir, I was.
15      Q.   And you provided information
16  to whoever contacted you.  Did they just
17  call you on the phone?
18      A.   Yes, sir.
19           (Whereupon, Plaintiff's
20           Exhibit 2 was marked for
21           identification.)
22      Q.   Okay.  Well, I'm going to show
23  you what I have marked as Exhibit 2 and

Page 48

1   ask you if you've ever seen this document.
2       A.   (Reviewing document.)
3            MS. YUENGERT:  And I'm going
4   to look over your shoulder.
5       A.   No, I did not know what she
6   was looking --
7            MR. ROBERSON:  I sent that to
8   Don --
9            MS. YUENGERT:  Just read the
10  document.  And then, Jerry, I'm going to
11  ask you to answer -- ask your question
12  again when she has read it.
13           MR. ROBERSON:  Sure.
14      A.   (Reviewing document.)
15           MS. YUENGERT:  Have you read
16  it?
17      A.   Yeah.
18           MS. YUENGERT:  Okay.  Jerry,
19  why don't you ask her a question?
20      Q.   (BY MR. ROBERSON:)  All right.
21  Do you recall being contacted -- I think
22  it's -- is that document dated?
23           MS. YUENGERT:  It has a date

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Page 49

1  ordered and date completed at the top.
2      Q.  (BY MR. ROBERSON:)  Okay.
3  What is the date it was ordered?
4      A.  4/24/07.
5      Q.  Okay.  And you were still
6  working here with Coosa --
7      A.  I was on leave.
8      Q.  Did they contact you at home?
9      A.  Yes, sir, they did.
10     Q.  Okay.  Well, I -- and you
11  spoke with them, correct?
12     A.  Yes, sir.
13     Q.  Okay.  And did you provide
14  this information about Ms. Sims?
15         MS. YUENGERT:  Are you talking
16  about the highlighted portions?
17         MR. ROBERSON:  Yes, what's
18  highlighted there.
19     A.  I don't remember giving a -- I
20  don't remember on the attendance what I
21  said.
22     Q.  (BY MR. ROBERSON:)  What's on
23  that document about her attendance?

Page 50

1      A.  It said attendance poor.
2      Q.  Well, that wouldn't be
3  accurate, would it?
4      A.  That's debatable on the final
5  issues of her work.
6      Q.  Well, her attendance wasn't
7  poor, was it?
8      A.  Well, no, I don't guess you
9  could say it was.  I don't remember what I
10  told those people.  I was upset at that
11  time due to personal tragedies in my home.
12     Q.  Okay.
13     A.  Didn't need to be bothered at
14  that time.
15     Q.  Well, I'm sorry, Ms. Forbus,
16  but these people contacted you, not my
17  client.
18     A.  Yes, sir.
19     Q.  You understand that?
20     A.  Can I ask the lawyer -- my
21  lawyer a question?
22     Q.  Absolutely.
23         MS. YUENGERT:  Can we -- can

Page 51

1  we just go off the record?
2         MR. ROBERSON:  We certainly
3  can.  Let's just do it formally.
4         MS. YUENGERT:  Okay.  Sure.
5         MR. ROBERSON:  We will go off
6  the record at -- at 10:20.
7         (Whereupon, a break was had
8          from 10:20 a.m. until 10:25
9          a.m.)
10         MR. ROBERSON:  We will go back
11  on the record at 10:25.  This is still the
12  first tape of the videotape deposition of
13  Ms. Forbus.
14     Q.  (BY MR. ROBERSON:)  Ms.
15  Forbus, we took a break to let you discuss
16  some things with your attorney.
17         Now, if I may see the document,
18  it says -- and it says start date.  Would
19  that be for Ms. Sims?  Would be April of
20  -- April of '04, and end date is September
21  of '06?  That's not correct, is it?  She
22  just worked less than a year, didn't she?
23     A.  She didn't work but about six

Page 52

1  weeks, I don't think.
2      Q.  Okay.
3      A.  I don't remember exactly how
4  long she worked.
5      Q.  Okay.  But it was only during
6  one school year -- part of one school
7  year, correct?
8      A.  Yes, sir.
9      Q.  And it says, "per cafeteria
10  manager at the number listed."  That would
11  be you, right?
12     A.  Well, they called me at my
13  home, yes.
14     Q.  "Applicant walked off the job.
15  Now, "she was not an employee, but worked
16  as needed," are you referring to her
17  status as a substitute there?
18     A.  Yes, sir.
19     Q.  Okay.  And this "employee
20  walked off the job," are you referring to
21  the incident when she was told she didn't
22  get the permanent position and she was
23  upset and she left work?

13 (Pages 49 to 52)

Page 53

1    A.   Yes, sir.
2    Q.   Okay.  Now, did you tell
3 anybody at the hospital or their screening
4 service the circumstances surrounding why
5 she walked off the job?
6    A.   I don't remember.
7    Q.   Well, Ms. Forbus, if you --
8 and it says eligible for rehire, and
9 you've indicated no?
10        MS. YUENGERT:  I'm going to
11 object to the form.  You can answer.
12    A.   No, sir.
13    Q.   I apologize, let me rephrase
14 that.
15    A.   Okay.
16    Q.   Don't answer that question.
17        On this document, it has
18 eligibility for rehire and they have put
19 no.  Is that what you told them?
20    A.   No, sir.
21    Q.   What did you tell them about
22 her eligibility?
23    A.   I told them she wasn't hired

Page 54

1 because she didn't meet the requirements
2 that was put before me for the job.
3    Q.   Okay.  Thank you.  I asked a
4 poor question, I apologize.
5        Now, when they contacted you at
6 home, and I'm sorry about your situation,
7 but did you refer them to Ms. Jones or
8 anyone at the Board of Education and
9 indicate that you really weren't in a
10 position to talk at that time?
11    A.   No, sir, I didn't.
12    Q.   Could you have?
13    A.   I guess I could have.
14    Q.   Well --
15    A.   I was surprised.
16    Q.   In fact, this was after Ms.
17 Jones -- Sims had filed an EEOC charge,
18 correct?
19    A.   I don't know that.
20    Q.   Okay.  Well, let me show you
21 what I'm going to mark as Exhibit 3 to
22 your deposition, ma'am, which is Ms. Sims'
23 charge of discrimination which was state

Page 55

1 stamped November 14th, 2006.  And this
2 document indicates that it was in April of
3 2007.
4        (Whereupon, Plaintiff's
5        Exhibit 3 was marked for
6        identification.)
7    Q.   Have you seen Ms. Sims' charge
8 of discrimination?
9    A.   No, sir.
10    Q.   Did they come and interview
11 you about her charge?
12    A.   I don't remember them doing
13 that.
14    Q.   Okay.  Do you recall when you
15 went off on leave what the date of that
16 was?
17    A.   October the 27th of -- would
18 that be '06 -- '05 or '06, Mr. Wingard?
19    Q.   Well, did anyone at the school
20 make you aware that Ms. Sims had filed a
21 charge of --
22    A.   I don't remember anybody
23 calling me and telling me that, no, sir.

Page 56

1    Q.   Where do you live, Ms. Forbus?
2    A.   Kellyton, Alabama.
3    Q.   How far is that from where we
4 are today?
5    A.   About twelve or fifteen miles.
6    Q.   Do you agree with me that news
7 travels fast in a small town?
8        MS. YUENGERT:  If you can
9 answer, answer.
10    A.   I'm -- yeah.
11    Q.   When did you return back to
12 the school system after your leave?
13    A.   I didn't.  I was on leave
14 until the end of the year, and I retired.
15    Q.   Did Ms. Sims ever tell you
16 that the fact that they hired a black man
17 in the permanent position, that that was
18 discrimination?
19    A.   Would you repeat that?
20    Q.   Yeah.  Do you remember a
21 conversation you had with Ms. Sims where
22 she told you that by putting a black man
23 in that position permanent rather than

Page 57

1   her, that that was discrimination?
2        A.   I don't remember a
3   conversation like that.
4        Q.   Well, did you ever have any
5   conversation with Ms. Sims where she
6   indicated she felt like she was being
7   treated in a discriminatory manner?
8        A.   I don't remember having a
9   conversation with her like that.
10       Q.   Who held the position before
11  -- Mr. Kelley, what did we say his name
12  was, Michael Kelley?
13       A.   I don't -- do not know.
14       Q.   Do you know if they were male
15  or female?
16       A.   I don't know.
17       Q.   Did you feel like -- whether
18  you said it or not, did you feel like that
19  position was better suited for a male
20  applicant?
21       A.   Yes, sir.
22       Q.   Because of the lifting?
23       A.   Yes, sir.

Page 58

1        Q.   Okay.  And were you under any
2   pressure from any source to put -- to
3   recruit and retain minority applicants,
4   that is, in this instance, a black male?
5        A.   No, sir.
6        Q.   So your sole criteria is
7   whoever is best for the job?
8        A.   Yes, sir.
9        Q.   And it's just a coincidence
10  that a black male held the position before
11  and a black male was awarded the position
12  at this time, is that correct?
13       A.   Yes, sir.
14       MR. ROBERSON:  Okay.  We will
15  go off the record.  I want to talk to my
16  client, and I think I'm about through.  We
17  will go off the record at 10:32.
18       (Whereupon, a break was had
19       from 10:32 a.m. until 10:40
20       a.m.)
21       MR. ROBERSON:  We are back on
22  the record at 10:40.
23       I don't have any further

Page 59

1   questions.  Thank you, Ms. Forbus.
2
3   EXAMINATION BY MS. YUENGERT:
4        Q.   Ms. Forbus, I'm Anne Yuengert,
5   and I represent the Board of Education.
6   You mentioned you --
7        MR. ROBERSON:  Let me just
8   change tapes.
9        MS. YUENGERT:  Oh, okay.
10       MR. ROBERSON:  It's doing
11  something crazy.
12       (Off-the-record discussion.)
13       MR. ROBERSON:  Let me just say
14  we went off the record, and this is tape
15  two of the videotape deposition of Ms.
16  Forbus.  I finished all of my questions on
17  tape one, and this is the beginning of the
18  examination from her lawyer.  Okay.
19       Q.   (BY MS. YUENGERT:)  Ms.
20  Forbus, I'm Anne Yuengert, and I represent
21  the Board of Education.
22       In your discussion with Mr.
23  Roberson, he -- you mentioned Kim Abrams;

Page 60

1   do you remember that?
2        A.   Yes.  Yes, ma'am.
3        Q.   When did -- you said Ms.
4   Abrams no longer works for the Board of
5   Education?
6        A.   That's correct.
7        Q.   When did she leave?
8        A.   She left the first year I was
9   there.
10       Q.   At the high school?
11       A.   Yes, sir -- yes, ma'am.
12  Excuse me.
13       Q.   And then you looked at the
14  sheet from the people checking the
15  references --
16       A.   Yes, ma'am.
17       Q.   -- on Ms. Sims.  There was a
18  portion where it said attendance and they
19  had recorded poor; do you remember that on
20  the sheet?
21       A.   Yes, ma'am.
22       Q.   Did you tell them that her
23  attendance was poor?

15 (Pages 57 to 60)

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

JAN FORBUS
May 21, 2008

Page 61

1   A.   I don't remember telling them
2   that.
3   Q.   Did you think her attendance
4   was poor?
5   A.   No, I didn't.
6   Q.   Okay.
7   MS. YUENGERT:  That's all I
8   have.
9   MR. ROBERSON:  Okay.  I don't
10  have any further questions.  And thank
11  you, Ms. Forbus.
12  Off the record here at 10:42.
13
14  (Whereupon, the deposition of
15  Jan Forbus was concluded at
16  10:42 a.m. on the 21st day of
17  May, 2008.)
18
19  FURTHER THE DEPONENT SAITH NOT
20
21
22
23

Page 62

1   C E R T I F I C A T E
2
3
4   STATE OF ALABAMA)
5   JEFFERSON COUNTY)
6
7   I hereby certify that the
8   above and foregoing deposition was taken
9   down by me in stenotypy, and the questions
10  and answers thereto were reduced to
11  typewriting under my supervision, and that
12  the foregoing represents a true and
13  correct transcript of the deposition given
14  by said witness upon said hearing.
15  I further certify that I am
16  neither of counsel nor of kin to the
17  parties to the action, nor am I in anywise
18  interested in the result of said cause.
19
20
21
22
23  COMMISSIONER - NOTARY PUBLIC
    ACCR LICENSE NO. 116

16 (Pages 61 to 62)

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

JAN FORBUS
May 21, 2008

| A |
|---|
ability
16:1
Abrams
40:21 59:23 60:4
Absolutely
50:22
academic
36:22
accept
45:10
ACCR
62:23
accurate
50:3
accurately
39:11
acting
5:5
action
1:5 62:17
activities
20:4 21:12
additional
45:7
affidavit
38:7,9 39:6
afternoons
20:9 24:12
age
46:4,9
agree
44:18,19 45:15 46:19
47:12 56:6
AGREED
2:3
Alabama
1:2 3:9,17 5:4,5,12,23
6:3 16:22 56:2 62:4
amount
44:17
Anne
3:12 6:12 59:4,20
annual
15:13
answer
7:23 8:9 21:10,13 22:4
24:6 36:7 45:18 48:11
53:11,16 56:9,9
answers
62:10
anybody
15:19 43:6 53:3 55:22
anywise
62:17
apologize
53:13 54:4
applicant
42:17 52:14 57:20
applicants

34:13,18 58:3
applied
30:18 46:23 47:7
applies
33:8
applying
47:4,8
approval
29:16
approve
28:15
approves
14:21
approximately
12:16
April
51:19,20 55:2
Arant
3:14
argue
40:10
arrived
12:15
arriving
28:9
asked
17:9,12 24:11 54:3
asking
22:8 36:13
assign
2:20
assume
7:20 37:5 38:8
attend
29:10
attendance
30:10 49:20,23 50:1,6
60:18,23 61:3
attorney
3:5,13 6:8 51:16
audibly
7:23
August
35:3
authority
16:1
Avenue
3:16
awarded
15:1,2,4 58:11
aware
32:22 33:2,4 37:19 38:4
44:6 47:2 55:20
a.m
5:13 51:8,9 58:19,20
61:16

| B |
|---|
B
1:20 2:6 5:1

back
17:9,12 51:10 56:11 58:21
bar
20:7 21:18 25:18
Barbara
10:15 16:15 35:7,19 38:9
basis
15:2,5 44:13
Beasley
35:1
beginning
22:6 59:17
believe
33:7 46:14 47:9
benefit
45:8 46:12
benefits
44:7,14,23 45:12
best
58:7
better
57:19
Birmingham
3:9,17 5:3
black
13:20 31:5,7 32:2 56:16
56:22 58:4,10,11
board
1:10 5:11,22 6:5,14 8:15
9:23 14:21 30:14,19
32:20,23 54:8 59:5,21
60:4
bothered
50:13
Box
3:8
boxes
20:13
Bradley
3:14
bread
19:15,17
break
51:7,15 58:18
breakfast
18:11,16
brought
30:13,18
Bullard
33:18,20

| C |
|---|
C
3:1 62:1,1
cafeteria
9:7,8,11 12:3,11 13:7
15:21 19:12 25:7 26:7
44:16 45:3 47:9 52:9
call
47:3,17

called
52:12
calling
55:23
candidates
42:6
capacity
44:22
case
6:1 30:13,23 37:17 39:7
39:7
cause
5:14 62:18
Center
47:1
central
9:9,21 10:10 12:4,18,19
29:5
certainly
51:2
Certified
1:21 2:7 5:2
certify
5:6 62:7,15
change
59:8
charge
37:16,20 38:2 54:17,23
55:7,11,21
check
42:7
checked
43:6
checking
60:14
Child
9:16
circumstances
16:16 53:4
civil
1:5 5:7 39:7
claim
30:19
clarify
40:12
clean
25:8
cleaned
20:6
cleaning
20:8,9 21:16
cleared
41:4
client
50:17 58:16
clock
27:21 28:4
closed
12:9,22
coincidence
58:9

color
32:7,11 39:20
come
20:16,16 30:9 55:10
comes
29:4
commencing
5:13
Commissioner
2:7 5:6 62:22
committee
33:10,15 34:7 35:19
completed
49:1
completely
36:12
compliance
2:13
concluded
61:15
contact
49:8
contacted
47:6,12,16 48:21 50:16
54:5
contract
15:13
conversation
8:1 43:17 56:21 57:3,5,9
cook
20:1 26:4
cooked
21:17
cooking
26:1
Coosa
1:10 5:10,22 6:5,14 8:15
9:9 12:17,18,19 30:14
32:19 47:1 49:6
correct
10:6 13:15 14:18 19:1
21:12,18 29:17 31:5,8,11
34:13,16 36:1 37:1,4,10
42:18,23 43:2 44:14
45:1,8 49:11 51:21 52:7
54:18 58:12 60:6 62:13
counsel
2:5,17,19 5:10 6:9 62:16
County
1:10 5:11,22 6:5,14 8:15
9:10 30:14 32:19 62:5
course
22:20 37:9
Court
1:1 2:14 5:9 6:2,22
crazy
59:11
criteria
36:4 58:6
CV-07-704
6:6

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                    http://www.TylerEaton.com

## D

**D**
3:4
**date**
5:6 48:23 49:1,3 51:18
51:20 55:15
**dated**
48:22
**day**
5:12 34:5 61:16
**days**
24:18 29:20
**deal**
23:14
**debatable**
50:4
**decision**
30:21 41:10 42:5
**decree**
33:1
**defendant**
1:11 3:11 6:6
**deficient**
22:12
**degree**
35:23 36:16 42:18
**deliver**
20:18
**deny**
39:13,21
**denying**
39:22
**DEPONENT**
61:19
**deposition**
1:14 2:5,11,12,22 5:19 7:8
31:14 38:18 51:12 54:22
59:15 61:14 62:8,13
**depositions**
2:15
**Diane**
27:9 31:10
**different**
18:6,9 19:6,8
**diploma**
35:16
**director**
9:16
**discrimination**
37:20 38:3 54:23 55:8
56:18 57:1
**discriminatory**
57:7
**discuss**
51:15
**discussion**
59:12,22
**discussions**
27:9
**distinction**

17:13
**District**
1:1,2 5:8 6:2,3
**Division**
1:3 6:4
**dock**
30:5
**doctor**
35:6
**document**
28:23 38:11,21 39:1 48:1
48:2,10,14,22 49:23
51:17 53:17 55:2
**doing**
55:12 59:10
**doings**
24:8
**Don**
48:8
**Donald**
6:13
**draw**
46:4,7,10
**drawing**
46:5
**Drive**
3:7
**drop**
21:2
**due**
50:11
**duly**
6:19
**duties**
35:13

## E

**E**
3:1,1 62:1,1
**earned**
46:15
**Education**
1:10 5:11,22 6:5,14 8:15
9:23 30:15,17 32:20
54:8 59:5,21 60:5
**EEOC**
37:16 38:19 54:17
**effect**
2:13
**elementary**
12:8,23
**eligibility**
53:18,22
**eligible**
44:14 53:8
**employed**
8:14 13:10 15:11 40:23
41:17 44:22
**employee**
28:13,14 35:10 41:22

52:15,19
**employees**
16:4 23:4
**employer**
30:14
**employment**
43:11
**Emptied**
20:10
**empty**
25:10
**emptying**
21:16
**ended**
16:17
**entire**
24:21
**especially**
23:2
**evaluate**
16:3
**evaluation**
16:7
**Everybody**
37:23
**evidence**
2:23
**exactly**
24:14 52:3
**examination**
4:1,3,4 5:15 7:6 59:3,18
**examined**
6:19
**example**
15:7 29:8
**exception**
25:2
**Excuse**
11:3 60:12
**Exhibit**
4:9,10,11 38:14,18 47:20
47:23 54:21 55:5
**EXHIBITS**
4:7
**experience**
37:13
**explain**
14:23 46:16

## F

**F**
62:1
**fact**
38:7 47:5 54:16 56:16
**Fair**
7:20
**far**
56:3
**fast**
56:7

**federal**
3:15 5:7 33:1
**feel**
57:17,18
**felt**
22:11 57:6
**female**
31:11 57:15
**field**
47:11
**fifteen**
56:5
**Fifth**
3:16
**file**
38:3
**filed**
37:16,20 54:17 55:20
**filing**
37:17
**fill**
29:6 41:10
**filled**
16:12 33:14
**final**
50:4
**fine**
13:2
**finish**
8:8,9
**finished**
38:23 59:16
**fired**
15:18
**first**
6:19 17:15 18:4 51:12
60:8
**fixed**
20:5
**follow**
7:11
**following**
5:15 26:20
**follows**
6:20
**food**
10:3 20:7 25:21
**Forbus**
1:16 2:6 5:14,20 6:18 7:7
8:12 30:12 39:3,11,18
46:3 50:15 51:13,15
53:7 56:1 59:1,4,16,20
61:11,15
**force**
2:13
**foregoing**
5:9 62:8,12
**form**
2:18 21:10 36:7 45:14,19
53:11
**formally**

**51:3**
**found**
43:21
**four**
10:12 12:5,5 13:14 19:7
**fourth**
17:10
**frame**
24:17
**frankly**
44:16
**freezer**
22:16 23:2 24:8,19 27:18
**friction**
26:9
**full**
2:13
**further**
58:23 61:10,19 62:15

## G

**Gail**
1:20 2:6 5:1
**GED**
35:16 36:1
**gentleman**
30:22
**getting**
25:12 43:21,22
**give**
26:14
**given**
7:8 31:14 39:6 62:13
**giving**
49:19
**Gloria**
1:7 6:4,8 27:10 31:10
**go**
51:1,5,10 58:15,17
**going**
12:20 17:16 24:13 36:6,9
38:16 41:11 47:22 48:3
48:10 53:10 54:21
**good**
25:18 30:10 35:10 36:15
**groceries**
20:15,19 22:15 23:1
**grounds**
2:21
**guess**
27:12 36:8 50:8 54:13

## H

**head**
8:1
**health**
44:23
**hear**
40:19
**heard**

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

17:23 18:1 32:15,18
  39:11,18,23 40:1,3,7,12
  40:13
hearing
62:14
hearsay
40:6
heavy
25:14
held
10:17 13:6 19:20 23:3
  39:17 57:10 58:10
help
12:21 13:23 25:11,13,22
helped
25:23
Henderson
10:15,23 19:11
high
9:9,18 10:10 12:4,10 13:8
  18:10 33:22,23 35:15
  35:23 36:16 42:17
  60:10
highlighted
49:16,18
hire
30:21 41:9
hired
11:22 30:22 35:3,6,19
  53:23 56:16
hiring
33:2 35:18 41:10 42:5
hit
46:9
hold
14:14,17 16:13,13
home
26:23 49:8 50:11 52:13
  54:6
honest
37:13
honestly
24:7
hospital
53:3
hot
20:7 21:18 25:18
hours
28:6 29:13
huge
44:17
huh
9:4

**I**

identification
38:15 47:21 55:6
identified
10:20 13:14
immediately

46:8,10
implies
36:8
imply
36:3
important
44:20
incident
52:21
INDEX
4:1,7
indicate
54:9
indicated
53:9 57:6
indicates
39:9 55:2
information
47:15 49:14
instance
58:4
instructed
42:16
instruction
36:21 37:3,10
instructions
36:22
insurance
44:23
interested
62:18
interview
55:10
interviewed
34:5,12,15
interviewing
33:12
interviews
33:10
inventory
20:16
investigate
38:2 42:6
investigation
43:10
involved
30:21
issues
50:5
items
22:16 24:19

**J**

Jan
1:16 2:6 5:13,20 6:18
  8:11 39:11,18 61:15
JEFFERSON
62:5
Jerry
3:4 6:7 31:3 48:10,18

job
9:4 14:12 16:15 17:21
  20:4 21:11,23 22:9,11
  23:3 24:17 25:2,14
  26:15 27:10 31:19,20
  33:9,11 35:12,22 36:15
  39:12,16 41:11,21 42:15
  43:1,14,17 44:5,12
  46:17,23 47:10 52:14
  52:20 53:5 54:2 58:7
Jones
9:14 10:2 27:6,9 32:1,15
  33:18 54:7,17

**K**

keep
9:4 25:7,10,18 28:12,13
  41:13
Keith
33:19
Kelley
10:17 11:11 13:3,19 19:21
  31:7 57:11,12
Kelley's
21:6
Kellyton
12:8 56:2
kept
20:6 21:18
Kim
40:21 59:23
kin
62:16
kind
15:12
Kinross
3:7
knew
47:3
know
10:13,21 11:21 12:21 15:9
  15:13,14,16,17,23 16:14
  16:21 19:15 22:4 23:16
  23:17,18 24:6,12,15
  25:4 29:11,11 30:3,5,23
  33:6 34:23 35:7,16
  37:5,15 38:23 42:2,10
  42:12 43:6,8,9,12 47:4
  48:5 54:19 57:13,14,16
knows
37:23

**L**

L
2:1
ladies
23:3
Large
5:5
late

30:2
Law
3:5,13
laws
2:14
lawsuit
37:18,21 39:7
lawyer
38:8 50:20,21 59:18
leading
2:19
learned
43:22
leave
24:14,20,21 35:5,6 49:7
  55:15 56:12,13 60:7
leaving
28:10
left
11:19 52:23 60:8
Let's
51:3
LICENSE
62:23
lifting
57:22
limit
22:18 24:13
limited
24:13
listed
47:7,10 52:10
live
56:1
LLP
3:14
loading
20:13,14 21:17
located
9:20
long
9:1 11:19 12:3 15:9 25:4
  52:4
longer
11:11 41:6 60:4
look
28:16 48:4
looked
28:16 60:13
looking
48:6
loud
7:23
lower
45:11
lucky
38:16
lunch
19:4
lunchroom
10:11 11:20 14:2,5,9,15

17:4,17 18:3 22:21 32:7
  32:11 33:9 36:19 39:20
  41:1,23 42:14
lunchtime
19:1

**M**

making
31:21 32:5 39:13,21 42:5
male
13:20 31:5,8 57:14,19
  58:4,10,11
man
39:16 56:16,22
management
32:19
manager
9:7,11 12:4,11 13:7 15:21
  18:23 19:12 36:14
  52:10
manner
57:7
man's
31:20 39:12,16
Margaret
10:15
mark
54:21
marked
38:14,17 47:20,23 55:5
matters
29:10
ma'am
6:15 8:18 10:14 22:7
  39:14 54:22 60:2,11,16
  60:21
McKinney
31:3,4,5 33:14 41:15,17
McKinney's
43:7
meal
19:1
meals
19:3
mean
15:15 16:18 21:11 22:22
  26:9,19,20 44:5 45:15
  46:2,6
means
16:13 17:2
Medical
47:1
meet
54:1
mentioned
59:6,23
Michael
10:17 13:19 31:7 57:12
Middle
6:3

56:5
milk
21:2
minority
33:1,1 58:3
misunderstood
12:1
moment
38:19
money
44:18
mopping
20:9 25:15
motivation
45:16
moved
12:10
Murphy
10:16 11:6 15:8 16:15
  35:8,19,21 36:15 37:12
  38:9 39:9

**N**

N
2:1 3:1
name
6:7,10 30:23 57:11
necessary
2:16 36:4
need
7:11,14 16:10 29:16 50:13
needed
32:6,10 52:16
neither
62:16
never
17:23 22:20 40:3,7
news
56:6
Nixburg
5:11,23
nod
8:1
Normally
8:1
North
3:16
Northern
1:2 6:3
Notary
1:23 2:9 5:4 62:22
notation
28:8
November
55:1
number
52:10
nutrition
9:16

**O**

O
2:1 3:8
object
21:9 36:7 45:13 53:11
objecting
45:19
objections
2:17,20
obligation
38:2
observe
21:23
observed
36:14
obtain
45:11
obtained
38:7,8
occasion
26:13
occasions
30:6
October
55:17
offered
2:22
office
9:17,20,21 28:19 29:5
offices
5:21
Off-the-record
59:12
Oh
8:17 37:8 43:15 59:9
okay
6:15 7:10,11,17,18 8:6,10
  8:17,22 9:22 10:1,8,19
  11:5,14,18,23 12:6,14
  13:2,6,22 14:8,12,17,20
  14:23 15:12,18 16:3,9
  17:7,11 18:2,8,14,20
  19:10 20:3 21:15 23:22
  27:8 28:18 29:8,15
  30:6,9 32:18 34:6,23
  35:7 38:1 39:18 40:1,5
  40:9 41:3,13,14,20 42:4
  43:9,13 44:2,5,9 46:11
  46:15,17 47:5,11,22
  48:18 49:2,5,10,13
  50:12 51:4 52:2,5,19
  53:2,15 54:3,20 55:14
  58:1,14 59:9,18 61:6,9
opportunity
39:2
oral
5:15 24:5
order
14:14 18:2 45:11
ordered
278:

49:1,3
overheard
31:16

**P**

P
2:1 3:1,1,8
PAGE
4:2,8
paid
23:13,21
Pam
9:14 32:1,15 39:19 40:1,4
  40:13,19
part
52:6
participated
26:5
parties
2:4,20 62:17
party
6:10
Patty
13:9
pay
29:1,12
payroll
28:19 29:4
pending
6:1
pension
46:5,7
people
10:19 13:15 16:11 18:5
  23:21 24:16,20 27:20
  44:21 50:10,16 60:14
performance
22:1,9,11 25:2 26:15
  27:10
performed
35:12,21 47:11
period
14:3 17:19,20 20:8 41:20
permanent
15:2 43:22 44:13 52:22
  56:17,23
permanently
41:12,12
person
11:14
personal
29:9,9,20 50:11
phone
47:17
place
3:15 35:17
plaintiff
1:8 3:3 6:4,8
Plaintiff's
4:9,10,11 38:13 47:19

55:4
please
6:16 7:16 40:10 46:2
policy
29:19,23 30:3
poor
50:1,7 54:4 60:19,23
  61:4
portion
60:18
portions
49:16
position
9:5,15 10:2,17 13:7 14:3
  14:14,18 15:1 16:17 18:3
  19:20 30:17 33:13,19
  39:17 41:22 42:14
  43:23 44:10 46:23
  52:22 54:10 56:17,23
  57:10,19 58:10,11
positions
16:12 19:7
prerequisite
37:17
presence
31:22 32:6
PRESENT
3:19
pressure
58:2
previous
43:10
principal
33:21
prior
2:23
Pritchett
1:20 2:7 5:1
probationary
17:20
problems
27:17
Procedure
5:8
proceedings
5:16
Professional
1:22 2:8 5:3
programs
10:3
provide
36:20 37:3,9 49:13
provided
5:7 47:15
Public
1:23 2:9 5:4 62:22
punch
27:20
put
22:6,7 35:6 53:18 54:2
  58:2

putting
39:19 56:22

**Q**

qualified
17:21
question
7:14 8:8 45:20 48:11,19
  50:21 53:16 54:4
questions
2:18,19 22:9 59:1,16
  61:10 62:9
quibbling
43:4
quit
23:8
quite
44:16
quote
39:10

**R**

R
3:1,12 62:1
rack
20:5 25:21
read
7:3 38:20 39:3 48:9,12
  48:15
reading
2:11 38:23
really
17:22 43:19 54:9
Realtime
1:21 2:8 5:2
reason
46:20
Rebecca
34:23
recall
27:15 31:21 32:4 43:20
  48:21 55:14
receive
44:23
received
47:3
recommend
24:4
record
6:9 30:10 51:1,6,11 58:15
  58:17,22 59:14 61:12
recorded
60:19
recruit
58:3
reduced
29:12 62:10
refer
41:21 42:1 54:7
references

42:7 43:7 60:15
referred
  27:3 42:3
referring
  52:16,20
Registered
  1:22 2:8 5:2
rehire
  53:8,18
rehired
  15:16
relating
  2:15
remember
  25:3 27:11 39:15 43:19
  49:19,20 50:9 52:3
  53:6 55:12,22 56:20
  57:2,8 60:1,19 61:1
remind
  11:5
repeat
  56:19
repercussions
  30:1
rephrase
  7:17 53:13
replaced
  16:16
report
  18:5 23:5
reported
  1:20 28:1
Reporter
  1:21,23 2:8,9 5:2,3 6:22
represent
  6:11,13 59:5,20
represents
  62:12
reprimand
  24:1,4,8 26:15,22
reprimands
  26:17
requirements
  14:13,13 35:21 54:1
requires
  26:22
respective
  2:5
response
  38:3
responsibilities
  19:8
rest
  19:19
result
  62:18
retain
  58:3
retire
  8:18 13:12
retired

8:16 9:6 10:9 12:2 35:4
  46:3 56:14
retirement
  45:4,12
return
  56:11
Reviewing
  38:21 39:1 48:2,14
right
  5:18 8:11 11:4 14:10 15:7
  19:6 23:23 26:12 29:12
  31:13 33:13 36:17 37:12
  37:15 41:3 43:5 48:20
  52:11
Road
  5:12,23
Roberson
  3:4,6,6 4:3 5:18 6:7,15
  7:1,6 48:7,13,20 49:2
  49:17,22 51:2,5,10,14
  58:14,21 59:7,10,13,23
  61:9
Rockford
  5:12,23
Rose
  3:14
rotate
  19:14
rotation
  19:13,18
rule
  7:22
rules
  2:14 5:7 7:11,13 36:10

——————————
S
——————————
S
  2:1 3:1
SAITH
  61:19
salary
  23:14
Sandra
  10:16 11:9
satisfactory
  22:3 25:16 26:4 35:13,22
saying
  14:7 36:13 39:16
says
  31:18 51:18,18 52:9 53:8
schedule
  19:14
scheduled
  28:10
schedules
  18:7,9
school
  9:9,18 10:10 12:4,9,10,16
  13:8 18:11 32:23 33:22
  33:23 35:15,23 36:16

37:7 38:1,6,7 41:7
  42:11,17 43:14 47:8,10
  52:6,6 55:19 56:12
  60:10
schools
  10:5 12:10,23
screening
  47:6 53:3
see
  12:14 17:20 51:17
seen
  38:10 48:1 55:7
send
  26:23
sent
  48:7
September
  51:20
serve
  18:11,16
service
  47:6 53:4
serving
  18:23 20:7
set
  22:18 36:10
shape
  25:19
sheet
  28:2,3 29:4 60:14,20
sheet's
  28:22
shift
  23:11
shoulder
  48:4
show
  38:17 47:22 54:20
sign
  7:4 28:13
signature
  2:10
signs
  28:14
sign–in
  28:2
sign–out
  28:3
Sims
  1:7 6:4,9 11:15 14:8 21:5
  22:9 24:1 27:10,10,13
  30:7,13 31:10,15 32:6
  34:15 37:16 42:13,20
  43:13 46:16 49:14 51:19
  54:17,22 55:7,20 56:15
  56:21 57:5 60:17
sir
  7:9,12,21 8:5,13 9:19
  10:4,7 11:12,17 12:13
  13:1,5,11,13,16,18,21
  14:11,19 15:3,6,10,20,22

16:23 17:3,6 19:2,5,9
  19:22 20:11,14,14,20
  21:1,4,19,22 22:2,13
  23:12,17,20 25:11,17,20
  26:8,11,16 27:7,22 28:7
  28:11,21,22 29:2,7,14,18
  29:22 30:16 31:1,6,9,12
  32:3,14,17,21 33:3,16
  34:8,11,14,17,20,22
  35:2,9,11,14 36:2,18,23
  38:12 39:8,15 40:3,15
  41:8 42:2,12,19,22 43:3
  43:12 44:1,4,8,11,15
  45:2,5,9 46:1,10,13,18
  46:21 47:14,18 49:9,12
  50:18 52:8,18 53:1,12
  53:20 54:11 55:9,23
  57:21,23 58:5,8,13
  60:11
sis
  40:18
situation
  45:22 54:6
situations
  26:10
six
  51:23
six–hour
  23:11
small
  56:7
snack
  20:5 25:21
sole
  58:6
somebody
  26:23 29:9 33:8
sorry
  18:21 26:20 50:15 54:6
source
  40:11 58:2
SOUTHERN
  1:3
speak
  34:10
specific
  19:17 22:5
spoke
  49:11
spot
  21:6,6
staff
  24:21
staffing
  33:2
stamped
  55:1
start
  44:6 51:18
state
  5:4 6:10 45:4 54:23

62:4
statement
  31:22 32:5,8,10,12,16,20
  39:6,14,21 40:2,4,8
statements
  31:17
States
  1:1 5:8 6:2
status
  52:17
stay
  24:12
stenotypy
  62:9
STIPULATED
  2:3
stipulation
  5:9
stipulations
  6:23
stocked
  20:16 22:17 23:1
stocking
  20:15 22:15
strictly
  39:22
students
  25:13 36:21 37:3
subbed
  10:18
substitute
  14:4,5,9,15,16,18,22 37:2
  37:7 52:17
substitutes
  26:17,18
substituting
  11:15
successful
  42:16
suited
  57:19
supervise
  10:10
supervises
  10:2
supervision
  62:11
supervisor
  9:12,13 21:21 27:3,5
  30:20
sure
  12:23 37:8 45:21 48:13
  51:4
surprised
  54:15
surrounding
  53:4
swear
  6:16
Sweeney
  6:13

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

| | | | | |
|---|---|---|---|---|
| sworn<br>6:19 39:6<br>system<br>15:11 45:4 56:12 | 34:12 41:13,16,18<br>three-year<br>17:19<br>time<br>2:21,22 8:7 9:5 10:8,16<br>11:22 14:4 18:4,9,12,22<br>19:15 20:8 22:11,18<br>23:5 24:2,13,14,17<br>26:13 27:20,23 28:3,9<br>28:10 30:5 31:17 41:21<br>50:11,14 54:10 58:12 | uh-huh<br>7:18 8:2 11:1 18:17 27:19<br>34:2 39:4 41:2,5<br>uh-uh<br>8:2<br>understand<br>7:15,16 13:23 14:6 16:10<br>16:11,19 17:1 24:15<br>30:15 35:20 36:12 39:5<br>40:11 42:15 44:3 50:19<br>understanding<br>17:22 22:20 | 52:14,20 53:5<br>want<br>39:10 58:15<br>wants<br>7:3<br>wasn't<br>11:21 23:15 26:9 34:4<br>35:18,18 43:22 50:6<br>53:23<br>way<br>16:4 22:6,7,17 28:19<br>weeks<br>52:1 | year<br>12:16 15:16 17:10 51:22<br>52:6,7 56:14 60:8<br>years<br>9:3 12:3,5 16:22 17:7,12<br>17:15 41:13,16,19 46:4<br>Yuengert<br>3:12 4:4 6:12 7:2 21:9<br>21:13 36:6 45:13,18<br>48:3,9,15,18,23 49:15<br>50:23 51:4 53:10 56:8<br>59:3,4,9,19,20 61:7 |

**T**

| | | | | |
|---|---|---|---|---|
| T<br>2:1,1 62:1,1<br>take<br>8:3 10:1 17:8 38:19<br>taken<br>2:6 5:20 62:8<br>talk<br>8:6 27:13 54:10 58:15<br>talking<br>24:3 49:15<br>tape<br>51:12 59:14,17<br>tapes<br>59:8<br>tardy<br>29:23 30:2<br>teacher<br>37:2 45:6<br>teachers<br>16:21<br>tell<br>7:3,16,19 9:10 22:14<br>24:10 26:21 27:14 33:6<br>43:16 53:2,21 56:15<br>60:22<br>telling<br>40:17 55:23 61:1<br>temporary<br>15:4 41:22 44:10<br>tenure<br>16:22 17:5,8<br>tenured<br>17:16<br>term<br>17:16 41:11<br>terms<br>36:21<br>testified<br>6:20 31:14,16<br>thank<br>41:3 54:3 59:1 61:10<br>thereto<br>2:23 62:10<br>thing<br>19:17 22:23 40:7 43:15<br>things<br>21:7 44:21 45:1 51:16<br>think<br>16:2 46:12,14 48:21 52:1<br>58:16 61:3<br>Thompson<br>10:16 11:9<br>three<br>10:22 13:15 17:12,15 | Title<br>37:18<br>today<br>5:20 7:11,22 8:3 31:15<br>33:4 56:4<br>Todd<br>3:20<br>told<br>17:23 31:19 33:5 40:7<br>42:15 50:10 52:21<br>53:19,23 56:22<br>top<br>49:1<br>town<br>56:7<br>tragedies<br>50:11<br>transcript<br>62:13<br>trash<br>20:10 21:16 25:10<br>travels<br>56:7<br>treated<br>57:7<br>trial<br>2:21<br>truck<br>20:18,21<br>true<br>62:12<br>try<br>7:17 8:8 11:5<br>trying<br>16:9,11,19 40:10 46:16<br>turned<br>28:18 29:1<br>twelve<br>56:5<br>twenty-six<br>9:3 12:2 46:3<br>two<br>59:15<br>typewriting<br>62:11 | understood<br>7:20 17:18 43:2<br>United<br>1:1 5:8 6:2<br>unloading<br>20:13<br>unpleasant<br>26:10<br>upset<br>43:21 44:3 46:17 50:10<br>52:23<br>use<br>17:16 41:11<br>Usual<br>6:22<br><br>**V**<br><br>vacant<br>14:3<br>Valley<br>12:17 47:1<br>valuable<br>46:11<br>vendor<br>20:22<br>vendors<br>20:22 21:1<br>versus<br>17:15<br>VIDEO<br>1:14<br>videotape<br>5:19 51:12 59:15<br>VII<br>37:18<br>vote<br>34:9<br>vs<br>1:9<br><br>**W**<br><br>wages<br>45:11<br>wait<br>46:8<br>waived<br>2:12<br>walked | went<br>27:5 55:15 59:14<br>weren't<br>54:9<br>white<br>3:14 13:17 31:10<br>Williams<br>13:9<br>Wingard<br>3:20 12:20 34:1,4 42:9<br>55:18<br>witness<br>2:11 5:14 6:16 62:14<br>woman<br>37:13<br>women<br>13:15,17<br>work<br>9:1 14:4 17:19 18:5 23:6<br>23:8 24:16 26:10 28:6<br>29:11,12 30:2,9 36:5,9<br>47:8 50:5 51:23 52:23<br>worked<br>11:18,19 14:8 15:9 19:18<br>21:5 22:21 24:2 25:5<br>26:14 31:18 35:8 42:8<br>51:22 52:4,15<br>worker<br>14:5,9,15 17:17 42:14<br>44:17 47:9<br>workers<br>10:9,11 17:4 25:23 26:7<br>36:20 45:3,17<br>working<br>13:4 15:8 17:14 31:19<br>41:6 43:18 44:6 49:6<br>works<br>60:4<br>wouldn't<br>16:2 27:2,4 50:2<br>written<br>16:6 24:4,5 26:14,16,22<br><br>**Y**<br><br>yeah<br>16:5 26:3 37:8,11 48:17<br>56:10,20 | y'all<br>18:10,11 20:22 41:9,23<br>42:4 43:17<br><br>**O**<br><br>04<br>51:20<br>05<br>55:18<br>06<br>51:21 55:18,18<br><br>**1**<br><br>1<br>4:9 38:14,18<br>10:20<br>51:6,8<br>10:25<br>51:8,11<br>10:32<br>58:17,19<br>10:40<br>58:19,22<br>10:42<br>61:12,16<br>116<br>62:23<br>14th<br>55:1<br>1819<br>3:16<br><br>**2**<br><br>2<br>4:10 47:20,23<br>2:00<br>24:23<br>2:07-CV-704-MEF<br>1:5<br>2:30<br>23:10 24:21,22<br>2001<br>5:11<br>2003<br>12:15,16<br>2006<br>8:23 55:1<br>2007 |

**U**

| | |
|---|---|
| U<br>2:1 | |

```
    8:20  35:3  55:3
2008
  1:17  5:13,21  61:17
201
  5:22
21
  1:17
21st
  5:12,21  61:16
27th
  55:17

_____
            3

3
  4:11  54:21  55:5
35136
  5:23
35203
  3:17
35238-0487
  3:9
3765
  3:7
38
  4:9
380487
  3:8

_____
            4

4/24/07
  49:4
47
  4:10

_____
            5

55
  4:11
59
  4:4

_____
            7

7
  4:3

_____
            8

8:30
  23:7
_____
            9

9:34
  5:13
```

# COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD
*Superintendent*

(256) 377-4913
Fax: (256) 377-2385
boe@coosaschools.k12.al.us

P.O. Box 37
Rockford, AL 35136



STATE OF ALABAMA       )
COOSA COUNTY           )

## AFFIDAVIT
## OF
## BARBARA MURPHY

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Barbara Murphy, who being by me first duly sworn, deposes and says as follows:

My name is Barbara Murphy. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am employed by the Coosa County Board of Education as a lunchroom worker at Coosa County Central High School.

I am aware of the statements that Gloria Sims makes in her complaint to the EEOC.

As part of the operation of the lunchroom, there is a lot of heavy lifting that must be done. I have heard Jan Forbus say something like it was a man's job.

I heard Jan Forbus say it was a man's job and I heard Jan Forbus say that Pam said that she was putting some color in the lunchroom.

**Sims v. CCBE**
Produced to EEOC
*No. 0007*

After the decision was made to offer Jerry McKinney the position, I heard Jan Forbus say that Gloria Sims was not considered because she did not have a high school diploma.

*Barbara Murphy*
Barbara Murphy

Sworn to and subscribed before me this the __17__ day of April, 2007.

*Rebecca Dee Beasley*
Notary Public

My Commission expires: *September 27, 2008*
(Seal)

**Sims v. CCBE**
Produced to EEOC
**No. 0008**



**ESS**

*A Hire Rate of Success*

# Employment Screening Services

http://www.es2.com
1401 Providence Park Birmingham, AL 35242
Phone: 205-879-0143
Fax: 205-380-7548
Email: results@es2.com



**Coosa Valley Medical Center**
Attn: Human Resources 315 West Hickory Street
Sylacauga, AL 35150

## Profile Information

**Name:** gloria sims
**DOB:** 06/06/****

**The following are included in this report:**

| Search Type | Detail | Status |
|---|---|---|
| Social Security Report | | Complete |
| Statewide Criminal | Alabama | Complete - No Record |
| Past Employment Verification | chs | Complete |

## Social Security Report

**Social Security Number**      434-39-****
**Name**                        gloria sims
**DOB**                         06/06/****
**Search ID**                   596129
**Date Ordered**                04/24/2007
**Date Completed**              04/24/2007
**Results**

| Valid SSN | yes |
|---|---|
| State Issued | Louisiana |
| Date Issued | 1980 |

| **D CARDEN, GLORIA** (DOB: September, ****) (SSN: 43439xxxx) | |
|---|---|
| **Address 1**<br>153 HWY 231 N<br>HARPERSVILLE AL 35078<br>County: SHELBY AL<br>Date first reported: September, 1996<br>Date last reported: June, 2001 | **Address 2**<br>6935 OLD SYL HWY<br>CHILDERSBURG AL 35044<br>County: TALLADEGA AL<br>Date first reported:<br>Date last reported: |
| **Address 3**<br>RR 1 | |

Gloria Sims

0013

CHILDERSBURG AL 35044 -9801
County: TALLADEGA AL
Date first reported:
Date last reported:

---

**CARDEN, GLORIA D** (DOB: September, ****) (SSN: 43439xxxx)

| **Address 1** | **Address 2** |
|---|---|
| 6935 OLD SYLACAUGA HWY | RR 1 BOX 310 |
| CHILDERSBURG AL 35044 -8811 | CHILDERSBURG AL 35044 -9801 |
| County: TALLADEGA AL | County: TALLADEGA AL |
| Date first reported: | Date first reported: |
| Date last reported: | Date last reported: |
| **Address 3** | **Address 4** |
| 153 HWY 231 N | 11A MAIN ST APT A |
| HARPERSVILLE AL 35078 | BIRMINGHAM AL 35213 -3727 |
| County: SHELBY AL | County: JEFFERSON AL |
| Date first reported: | Date first reported: |
| Date last reported: | Date last reported: |

---

**SIMS, GLORIA D** (DOB: September, ****) (SSN: 43439xxxx)

| **Address 1** | **Address 2** |
|---|---|
| 153 HWY 231 N | RR 1 BOX 310 |
| HARPERSVILLE AL 35078 | CHILDERSBURG AL 35044 -9801 |
| County: SHELBY AL | County: TALLADEGA AL |
| Date first reported: September, 1996 | Date first reported: |
| Date last reported: April, 2006 | Date last reported: |

**Other Names Found**

---

**CARDEN, RAYMOND** (DOB: ) (SSN: 43439xxxx)

| **Address 1** |
|---|
| 506 WOODLAWN AVE |
| SYLACAUGA AL 35150 -1970 |
| County: TALLADEGA AL |
| Date first reported: |
| Date last reported: |

---

### Statewide Criminal

| | |
|---|---|
| **Jurisdiction Searched** | Alabama |
| **Name Searched** | gloria sims |
| **DOB Searched** | 06/06/**** |
| **SSN Searched** | 434-39-**** |
| **Search ID** | 596130 |
| **Date Ordered** | 04/24/2007 |
| **Date Completed** | 04/24/2007 |
| **Records Searched** | Felony and Misdemeanor |
| **Status** | No Records Found |

### Past Employment Verification

| | |
|---|---|
| **Name Searched** | gloria sims |
| **DOB** | 06/06/**** |
| **SSN** | 434-39-**** |
| **Search ID** | 596131 |

Gloria Sims
0014

**Date Ordered**      04/24/2007
**Date Completed**    04/24/2007

| **Information Provided** | | **Information Searched** | |
|---|---|---|---|
| Company | chs | Company | CENTRAL HIGH SCHOOL |
| Company Phone | (256) 329-9437 | Company Phone | (256) 329-9437 |
| Company Location | alexander city | Company Location | COOSA COUNTY, AL |
| Position Held | sub teacher | Position Verified | GENERAL CLEANING - SUBSTITUTE |
| Start Date | 04/04 | | |
| End Date | 9/06 | End Date | 2006 |
| | | Source Contacted | JAN (CAFETERIA MANAGER) |

Answers to Standard Questions
Attendance        Poor
Eligibility for Rehire No

Additional Comments
PER CAFETERIA MANAGER AT THE NUMBER LISTED, APPLICANT WALKED OFF THE JOB. SHE WAS NOT AN
EMPLOYEE BUT WORKED AS NEEDED.

---

Employment Screening Services, Inc. (ESS) does not make any representation, guarantee or warranty as to
the accuracy of the information provided to Client. Information provided to Client will be obtained from
various sources and accurately transcribed in all material respects; however, neither ESS can guarantee the
reliability of any informing source. Please note: The information In this report is derived from records in
accordance with the Fair Credit Reporting Act (FCRA, U.S.C.§1681). This Information may only be used to
verify statements made by an individual for employment purposes or in connection with other legitimate
business needs. The depth of information available varies. Although every effort has been made to insure
accuracy or completeness, final verification of an individual's identity and proper uses of report contents are
the user's responsibility.

Gloria Sims
0015

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| | |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | **CHARGE NUMBER** 420-2007-00692 |

and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Gloria Sims | (256) 208-0600 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 414 McClellan Lane | Sylacauga, Al. 35151 | 09/09/1961 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below).

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Coosa County Board of Education | Over 15 | (256) 377-4913 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| P.O. Box 37 Rockford, Al. 35136 | | Coosa |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| | |
|---|---|
| ☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ AGE | DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA)   LATEST (ALL) |
| ☒ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER (Specify) | Position filled October 2006 |
| | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

## See Attachment A

PLAINTIFF'S EXHIBIT 3 Forbus

RECEIVED EEOC

NOV 1 4 2006

BIRMINGHAM DISTRICT OFFICE

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT *Gloria D. Sims* |
| *Gloria D. Sims* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) 11/14/06 |
| Date 11/14/06   Charging Party (Signature) | |

EEOC FORM 5 (10/94)

## Gloria Sims v. Coosa County Board of Education
### Attachment A

I was hired as a substitute worker to work in the lunch room at the Coosa County Central High School in August 2006. I worked in the lunchroom performing the duties of what was posted as a six hour temporary lunchroom worker. I enclose a copy of that posting as Exhibit A.

I performed my duties in an exemplary manner. I received numerous compliments on the way the lunchroom was kept clean and on how well I performed my job.

My position was previously held by a black male. During the course of my performing the job, I was told the position would be posted permanently. I was only paid minimum wage to work the job. The position, if permanent, would pay $11.25 per hour and would have benefits.

I applied for the temporary position. When I applied, I was told by Jan Forbus, my supervisor, that this was a "man's position". Jan Forbus also told me that Pam Jones, a black female who works as a child nutritionist, and Forbus' supervisor, told her that she needed to "get some color in the lunchroom". I told her that was discrimination. She agreed. After the black man quit this job, the lunchroom was comprised of an all white staff. I took this statement to mean that they preferred to hire a black in the position.

My coworkers, Barbara Murphy and Sandra allegedly heard Jan Forbus make the statement that Pam made that statement.

I believe that I have been discriminated against in the terms and condition of my employment. My employer has violated Title VII by discriminating against me on the basis of my gender, female, as well as my race, white. The person hired into the permanent position is a black male. The Defendant has violated Title VII by retaliating against me for opposing its unlawful hiring practices.

RECEIVED
EEOC

NOV 1 4 2006

BIRMINGHAM DISTRICT OFFICE

In The Matter Of:

## GLORIA SIMS
v.
## COOSA COUNTY BOARD OF EDUCATION

### NO. 2:07-CV-704-MEF

---

### PAM JONES
### May 21, 2008

---



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
———————— www.TylerEaton.com

EXHIBIT 6

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NO. 2:07-CV-704-MEF

GLORIA SIMS,
        Plaintiff,
vs.
COOSA COUNTY BOARD OF EDUCATION,
        Defendant.


                DEPOSITION
                    OF
                PAM JONES
                May 21, 2008


REPORTED BY:  Gail B. Pritchett
        Certified Realtime Reporter,
        Registered Professional
        Reporter and Notary Public

---

Page 2

1      S T I P U L A T I O N
2
3           IT IS STIPULATED AND AGREED,
4   by and between the parties, through their
5   respective counsel, that the deposition of
6   PAM JONES may be taken before Gail B.
7   Pritchett, Commissioner, Certified
8   Realtime Reporter, Registered Professional
9   Reporter and Notary Public;
10          That the signature to and
11  reading of the deposition by the witness
12  is waived, the deposition to have the same
13  force and effect as if full compliance had
14  been had with all laws and rules of Court
15  relating to the taking of depositions;
16          That it shall not be necessary
17  for any objections to be made by counsel
18  to any questions, except as to form or
19  leading questions, and that counsel for
20  the parties may make objections and assign
21  grounds at the time of trial, or at the
22  time said deposition is offered in
23  evidence, or prior thereto.

---

Page 3

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Jerry D. Roberson
    Attorney at Law
    Roberson & Roberson
    3765 Kinross Drive
    P. O. Box 380487
    Birmingham, Alabama 35238-0487

FOR THE DEFENDANT:
    Ms. Anne R. Yuengert
    Attorney at Law
    Bradley, Arant, Rose & White, LLP
    One Federal Place
    1819 Fifth Avenue North
    Birmingham, Alabama 35203


OTHERS PRESENT:
    Mr. Todd Wingard

---

Page 4

INDEX OF EXAMINATION
                    PAGE:
EXAMINATION BY MR. ROBERSON        7
EXAMINATION BY MS. YUENGERT        34
REEXAMINATION BY MR. ROBERSON      36


INDEX OF EXHIBITS
                    PAGE:
Plaintiff's Exhibit 7        18

---

1 (Pages 1 to 4)

Page 5

1    I, Gail B. Pritchett, a
2    Certified Realtime Reporter and Registered
3    Professional Reporter of Birmingham,
4    Alabama, and a Notary Public for the State
5    of Alabama at Large, acting as
6    Commissioner, certify that on this date,
7    as provided by the Federal Rules of Civil
8    Procedure of the United States District
9    Court, and the foregoing stipulation of
10   counsel, there came before me at the Coosa
11   County Board of Education, 2001 Nixburg
12   Road, Rockford, Alabama, on the 21st day
13   of May, 2008, commencing at 12:08 p.m.,
14   PAM JONES, witness in the above cause, for
15   oral examination, whereupon the following
16   proceedings were had:
17
18       MR. ROBERSON:  All right.
19   This is the videotape deposition of Ms.
20   Pam Jones.  Today is May 21st, 2008.  We
21   are at the Coosa County Board of Education
22   offices in Rockford, Alabama.  My name is
23   Jerry Roberson.  I'm the attorney for the

Page 6

1    plaintiff, Gloria Sims, and I'm also
2    operating the video camera.
3        This case is pending in the
4    United States District Court for the
5    Middle District of Alabama, Northern
6    Division, CV 07-704.  It's styled Gloria
7    Sims, plaintiff, versus Coosa County Board
8    of Education, defendant.
9        I would ask all counsel to
10   state their name and the party they
11   represent.
12       MS. YUENGERT:  I'm Anne
13   Yuengert.  And along with Donald Sweeney,
14   I represent the Coosa County Board of
15   Education.
16       MR. ROBERSON:  Would you
17   please swear our witness, ma'am?
18
19       PAM JONES,
20   having been first duly sworn, was examined
21   and testified as follows:
22
23       THE COURT REPORTER:  Usual

Page 7

1    stipulations?
2        MR. ROBERSON:  Yes.
3        MS. YUENGERT:  Yes.  Ms. Jones
4    will let us know whether she wants to read
5    and sign.
6        MR. ROBERSON:  Okay.
7
8    EXAMINATION BY MR. ROBERSON:
9        Q.    Would you state your full
10   name, please?
11       A.    Pamela Patrice Jones.
12       Q.    And are you presently employed
13   with the Coosa County Board of Education?
14       A.    I am.
15       Q.    How long have you been
16   employed with them?
17       A.    Since 1994.
18       Q.    What is your position, ma'am?
19       A.    Child nutrition, general fund
20   secretary.
21       Q.    And have you been in that
22   position the whole time?
23       A.    Yes -- no, not child

Page 8

1    nutrition, I have not.  I have been child
2    nutrition director for eight years.
3        Q.    Okay.  What position did you
4    hold previously?
5        A.    I was general fund, child
6    nutrition secretary.
7        Q.    Who did you work under?
8        A.    William Campbell.
9        Q.    Is he still --
10       A.    No, he passed away.
11       Q.    Oh, I'm sorry.
12            Now, could you tell me about
13   your education and background?
14       A.    Presently I hold a BS degree
15   in elementary education.  I have an
16   associate's degree in elementary
17   education.  Working on my certification
18   for child nutrition director.
19       Q.    Okay.  And have you been
20   working for the last eight years on that
21   certification?
22       A.    No.  I just started working on
23   my certification.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                    http://www.TylerEaton.com

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

PAM JONES
May 21, 2008

---

Page 9

1    Q.    Okay.  Is that a requirement
2    for the position you hold?
3         A.    Yes.
4         Q.    Okay.  And was it a
5    requirement at the time you were awarded
6    the position?
7         A.    Was it a requirement.  Yes.
8         Q.    And so they hired you with the
9    understanding that you were going to work
10   toward this degree?
11        A.    Correct.
12        Q.    Okay.  And that's what you are
13   doing?
14        A.    That's correct.
15        Q.    Okay.  Now, as part of your
16   job, do you oversee the lunchroom programs
17   at all of the schools in Coosa County?
18        A.    Yes.
19        Q.    And so in the chain of
20   command, so to speak --
21        A.    Yes.
22        Q.    -- are you over all of the
23   cafeteria managers and lunchroom workers?

Page 10

1         A.    Correct.
2         Q.    Do you know how many,
3    approximately, employees there are that
4    you supervise?
5         A.    Approximately seventeen.
6         Q.    Okay.  At four schools?
7         A.    Three.
8         Q.    Three schools.  High school --
9         A.    Central Elementary, Middle and
10   High School.
11        Q.    Okay.  And those are -- when
12   we say schools, those are different
13   facilities, that is, structures,
14   buildings, correct?
15        A.    Correct.
16        Q.    Okay.  And each one of them
17   has a cafeteria?
18        A.    No.
19        Q.    No?
20        A.    Central Elementary and Middle
21   has one kitchen.  The high school has one
22   kitchen.
23        Q.    Okay.  So that's why they

Page 11

1    lumped all of the people together?
2         A.    Right.
3         Q.    Okay.  I'm with you now.
4              And I understand, Ms. Jones,
5    that you were one of the members of a
6    three-person committee that interviewed
7    the applicants when the lunchroom worker
8    position was awarded to Mr. McKinney --
9         A.    Correct.
10        Q.    -- is that correct?  You
11   interviewed him along with Ms. Forbus and
12   the principal, Mr. Bullard?
13        A.    Correct.
14        Q.    And based on your interview
15   and the other applicants you interviewed,
16   you made the decision to hire him,
17   correct?
18        A.    I made a recommendation.
19        Q.    Okay.  You made the
20   recommendation that he was the best
21   candidate?
22        A.    Correct.
23        Q.    Okay.  And then I assume Mr.

Page 12

1    Bullard -- I mean, not Mr. Bullard, Mr. --
2    was it unanimous?  I mean, all three of
3    y'all had the same recommendation?
4         A.    Was it a unanimous decision.
5    I took into consideration that Mr. Bullard
6    and Ms. Forbus would be working directly
7    with Mr. McKinney, and not me myself.
8         Q.    Correct.
9         A.    So whatever decision they
10   made, I went along with it.
11        Q.    Okay.  Whose decision was it?
12        A.    Final?  Final decision or --
13        Q.    No.
14        A.    -- initial decision?
15        Q.    Initial.
16        A.    Mr. Bullard and Ms. Forbus.
17        Q.    Okay.  So they recommended Mr.
18   McKinney --
19        A.    Correct.
20        Q.    -- and you agreed?
21        A.    Correct.
22        Q.    And then Mr. Wingard has to
23   approve it?

3 (Pages 9 to 12)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

PAM JONES
May 21, 2008

---

**Page 13**

1    A.    Correct.
2    Q.    Does the Board have to approve
3    it?
4    A.    Yes.
5    Q.    Okay.  So they said grace over
6    it, they -- they approved him?
7    A.    Yes.
8    Q.    Okay.  What was important to
9    you in terms of Mr. McKinney's
10   qualifications?  And what I'm asking is
11   why was he awarded the position?  Why did
12   you feel he was the best candidate?
13   A.    He met all qualifications that
14   we were asking for.
15   Q.    And what were those
16   qualifications?
17   A.    We had a list -- we gave them
18   a -- we had a list of questions.  And the
19   questions that were on the list, he met
20   all of those requirements.
21   Q.    He had a high school
22   education?
23   A.    He said he did.

---

**Page 14**

1    Q.    Did you confirm that in some
2    way?
3    A.    I did not.
4    Q.    Do you know if anybody did?
5    A.    I do not know that.
6    Q.    Did you contact any of his
7    previous employers?
8    A.    I did not.
9    Q.    Did anyone?
10   A.    Not of my knowing.
11   Q.    What was the race of the
12   person who -- whose position -- who had
13   held that position previous to this?
14   A.    Black.
15   Q.    And who was that individual?
16   A.    Michael Kelley.
17   Q.    Is he a black male?
18   A.    Yes.
19   Q.    And is the person that was
20   selected for the position a black male,
21   Mr. McKinney?
22   A.    Yes.
23   Q.    And was he the only black who

---

**Page 15**

1    at the time of his hiring was working as a
2    lunchroom worker at the high school?  That
3    is, were all of the other cafeteria
4    workers white?
5    A.    Can you repeat that?
6    Q.    Sure.  Were all of the other
7    cafeteria workers white?
8          MS. YUENGERT:  At the high
9    school?
10   Q.    At the high school, yes,
11   ma'am.
12   A.    That were working --
13   Q.    At the time he was hired.
14   A.    Yes.
15   Q.    So he was replacing a black
16   who was the only black, and then he became
17   the only black, correct?
18   A.    Yes.
19   Q.    Now -- and he was replacing
20   the only male, and he became the only male
21   at the high school, correct?
22   A.    Yes.
23   Q.    Okay.  Was any of that

---

**Page 16**

1    important to you in making your decision?
2    A.    No.
3    Q.    So --
4    A.    Because we had other people
5    that were in consideration for that
6    position, and they were not male and they
7    were not black.
8    Q.    So to your way of thinking, it
9    would have been perfectly appropriate to
10   hire a woman in that position if you felt
11   she was the best candidate?
12   A.    Yes.
13   Q.    And it would have been
14   perfectly appropriate to hire a white
15   person, male or female, in that position
16   if you felt they were the best candidate?
17   A.    Yes.
18   Q.    Now, Ms. Jones, have you ever
19   in the presence of Ms. Forbus made the
20   statement that you wanted to get some
21   color in the lunchroom?
22   A.    No.
23   Q.    Have you ever made the

---

4 (Pages 13 to 16)

Page 17

1  statement that that position now occupied
2  by Mr. McKinney was a man's position or a
3  man's job?
4      A.    No.
5      Q.    Have you ever made that
6  statement anytime to anybody?
7      A.    No.
8      Q.    Either of those statements?
9      A.    No.
10     Q.    Now, you are aware that you
11 presently have three -- you have been
12 child nutrition director since 2000 --
13     A.    1.
14     Q.    -- 1.  That since you have
15 been hired, you -- as child nutrition
16 director, you have hired three cafeteria
17 workers who do not have a high school
18 education?
19     A.    I was made aware of that when
20 this lawsuit came about.
21     Q.    Well, I'm glad to have
22 educated you, ma'am.
23     A.    Thank you.

Page 18

1      Q.    To your knowledge, was it a
2  requirement in 2003 when Ms. Murphy was
3  hired?
4      A.    Yes.
5      Q.    To your knowledge, was it a
6  requirement in 2002 when Calvin Owens was
7  hired?
8      A.    Yes.
9      Q.    And was it a requirement in
10 2005 when Lisa Cleveland was hired?
11     A.    Yes.
12     Q.    And you agree with me that all
13 three of those individuals do not possess
14 a high school diploma or a GED, correct?
15     A.    That I have not checked to
16 see.
17     Q.    Okay.
18     A.    I was not in on that interview
19 process, so --
20         (Whereupon, Plaintiff's
21         Exhibit 7 was marked for
22         identification.)
23     Q.    Let me show you what I have

Page 19

1  marked as Exhibit 7 to your deposition.
2  And this is a multipage document which
3  includes things that were produced to me
4  today at my request; I asked for these
5  documents, concerning that information.
6  And if you would on -- it's on the page
7  0035, it has a list of the staff at the
8  schools.  Do you see that, ma'am?
9      A.    Yes.
10     Q.    And it has a category with
11 their name, the date they were hired and
12 their educational status.  Do you see
13 that?
14     A.    Yes.
15     Q.    And do you agree with me that
16 the people I identified do not possess
17 those educational requirements?
18     A.    (Reviewing document.)  I have
19 not checked to see if they do, but
20 according to this they don't.
21     Q.    That's what --
22     A.    Yes.
23     Q.    I don't have any information

Page 20

1  other than this document.
2      A.    Right.
3      Q.    Okay.  But according to this
4  document, they do not possess that?
5      A.    That's correct.
6      Q.    And you don't know any reason
7  why your lawyers would provide me with a
8  document that would be inaccurate?
9      A.    No, they should not.
10     Q.    Okay.  Now, I'm going to show
11 you what's marked as -- also a document
12 out of Exhibit 7, 0037, and it looks like
13 it's just a statement or memo from you to
14 Todd Wingard.  Have you seen that document
15 before?
16     A.    Yes.
17     Q.    What is that document, 0037?
18     A.    It's a recommendation for
19 Terry Chambers and Lisa Cleveland for a
20 temporary lunchroom position.
21     Q.    Okay.  And you recommended
22 them?
23     A.    That's correct.

Page 21

1    Q.    Well, you are aware of this
2    requirement, right?
3    A.    Yes.
4    Q.    Why did you recommend Lisa
5    Chambers when she doesn't possess a high
6    school education?
7    A.    Lisa Cleveland?
8    Q.    I'm sorry, Lisa Cleveland.
9    Excuse me, I apologize.
10    A.    Repeat that question.
11    Q.    Why did you recommend Lisa
12    Cleveland for a job for which, according
13    to your testimony, she is not qualified?
14    A.    Because whoever interviewed
15    her recommended her to me, and I
16    recommended them to Mr. Wingard for the
17    Board to approve.
18    Q.    Well, who recommended her to
19    you?
20    A.    Whoever did the interview
21    process. And it wasn't me.
22    Q.    Who was it?
23    A.    I do not know. As of right

Page 22

1    now, whenever we did the interview for Mr.
2    McKinney, we were more structured then; we
3    had more people; we sat down like a
4    roundtable discussion, like you sitting
5    there and we'd ask him questions. And at
6    that time it was not like that. Doing a
7    better job of the hiring process.
8    Q.    All right. Page 0038, can you
9    tell me what that document is?
10    A.    That's a letter of
11    understanding concerning temporary
12    employment for Lisa Cleveland.
13    Q.    Is that the job that she got
14    in the lunchroom?
15    A.    Yes, temporary position.
16    Q.    And what about that hiring --
17    what would be considered the exigent
18    circumstances that necessitated her
19    hiring, do you know?
20    A.    Exigent?
21    Q.    Yes.
22    A.    Explain that to me.
23    Q.    The first paragraph, "I

Page 23

1    understand a determination has been made
2    by this school system that due to exigent
3    circumstances." You don't -- do you know
4    what that means?
5    A.    I'm assuming it means that she
6    may or may not be here permanently.
7    Q.    Well, exigent circumstances
8    normally mean time is of the essence --
9    A.    Okay.
10    Q.    -- that due to -- we are under
11    some time constraint --
12    A.    Okay.
13    Q.    -- or something is requiring
14    us to take action immediately.
15    A.    Okay.
16    Q.    "The position of a six-hour
17    lunchroom worker must be filled on a
18    temporary basis." Do you know anything
19    that caused her position to be filled on
20    such a basis?
21    A.    On a temporary basis?
22    Q.    On --
23    A.    Because at that time we did

Page 24

1    not have a lunchroom. And the only reason
2    she would be temporary is because once we
3    filled -- once we got our prep kitchen,
4    which is up there now, we may or may not
5    need her as a worker.
6    Q.    Okay. She is still working,
7    though, isn't she?
8    A.    Yes.
9    Q.    Even though you have got your
10    kitchen completed now, right?
11    A.    Yes. It is still because of
12    the way we are having to do things. And
13    that's just a prep kitchen; it's not a
14    cafeteria.
15    Q.    You see what has been marked
16    as Exhibit -- or 0045, that page out of
17    Exhibit 7, this new hire checklist, Ms.
18    Cleveland?
19    A.    Yes.
20    Q.    Is there any requirement about
21    a high school education on there?
22    A.    You are asking me do I see
23    that?

Page 25

1  Q.   Yes, ma'am.
2  A.   No, I don't.
3  Q.   Thank you. And Ms. Cleveland
4  has been rehired, that is, a lunchroom
5  worker works on a year contract, correct?
6  A.   Correct.
7  Q.   And then they are renewed or
8  not renewed every year?
9  A.   Correct.
10  Q.   And then after three years,
11  they are considered permanent or --
12  A.   No.
13  Q.   No?
14  A.   She has to be hired back for
15  the fourth year.
16  Q.   Oh, okay. So she doesn't
17  receive what I'm going to call tenure --
18  A.   Correct.
19  Q.   -- until the fourth year of
20  employment?
21  A.   That's correct.
22  Q.   Okay. So is Ms. Cleveland --
23  she will have to be hired back next year

Page 26

1  in order to have tenure --
2  A.   That is correct.
3  Q.   -- is that correct?
4  A.   That's correct.
5  Q.   She has worked -- this is her
6  third year?
7  A.   But she is still in a
8  temporary position.
9  Q.   Does that matter? I mean,
10  what I'm saying is does it matter --
11  doesn't it count toward her tenure?
12  A.   That's not my part of my job.
13  I have no clue how that -- how that works.
14  Q.   Okay. All right. Now, Ms.
15  Jones, you are a minority, correct?
16  A.   Yes.
17  Q.   And you ought to be especially
18  sensitive to a case like this, correct?
19  A.   Correct.
20  Q.   I mean, in fact, this -- the
21  state school system, but Coosa County as
22  well, has been in a lawsuit for a long
23  time about minority practices, hiring

Page 27

1  practices. Were you aware of that?
2  A.   That Coosa County Board?
3  Q.   Yes --
4  A.   No.
5  Q.   -- school board. That they
6  just recently came out from under --
7  A.   Oh, are you talking about Lee
8  versus Macon?
9  Q.   Yes, ma'am, I am.
10  A.   Oh, yes, I'm aware of that.
11  Q.   And the school has made
12  efforts to attract and retain minority
13  candidates; do you agree with that?
14  A.   Like I said, I've only been in
15  this hiring process thing for the last two
16  or three years. I have never just sat
17  down and just interviewed someone to hire,
18  so I have not been involved in that.
19  Q.   Well, do you agree with me
20  that all positions should be open to
21  candidates of either sex, either gender?
22  A.   Yes.
23  Q.   I mean, a principal could be a

Page 28

1  female, couldn't it?
2  A.   Yes.
3  Q.   A cafeteria worker could be a
4  male or a female, right?
5  A.   Yes.
6  Q.   And every position can be
7  filled by a black or a white; do you agree
8  with that?
9  A.   Every position here at Coosa
10  County?
11  Q.   Yes.
12  A.   Yes.
13  Q.   I mean, you are not
14  disqualified from holding a position
15  because of your gender or your race?
16  A.   That's correct.
17  Q.   Okay. And it would be illegal
18  to do that, wouldn't it?
19  A.   On that basis?
20  Q.   Absolutely. And you agree
21  with me that an employer who intentionally
22  violates that law should be punished, you
23  would agree with that, wouldn't you?

7 (Pages 25 to 28)

Page 29

1    MS. YUENGERT: I'm going to
2  object to the form to the extent it
3  requires some kind of legal conclusion,
4  but you can answer it.
5    A.    You said what now?  What did
6  you say?
7    MS. YUENGERT: I made an
8  objection for the record.
9    A.    Okay.
10    MS. YUENGERT: And I told you
11  that to the extent you understand it, his
12  question, go ahead and answer it.
13    A.    To the extent that I
14  understand it.  Say that again, then.
15    Q.    (BY MR. ROBERSON:) Let me try
16  it a different way.
17    A.    Yes, please.
18    Q.    You understand that the law
19  requires that employers do not
20  discriminate when they make hiring
21  decisions or other employment decisions,
22  you understand that?
23    A.    I understand that we cannot

Page 30

1  discriminate, yes.
2    Q.    And it is unlawful to
3  discriminate based on race or gender; do
4  you agree that that's the law?
5    A.    Yes.
6    Q.    And you agree that if an
7  employer violates that law, just like if
8  you violate the law, they should be
9  punished, correct?
10    MS. YUENGERT: And I'm going
11  to object to the form.  You can answer.
12    A.    I don't know what kind of
13  answer I'm supposed to be giving you for
14  that.
15    Q.    Well, ma'am --
16    A.    You are asking me to prosecute
17  someone for doing it?
18    Q.    I am not. I'm saying if you
19  violate the law, you expect to be
20  punished?
21    A.    If I violate the law.
22    Q.    If you run a stop sign and the
23  police see you, you expect to get a

Page 31

1  ticket, don't you?
2    A.    Yes.
3    Q.    If you write a bad check
4  knowingly, you expect to get -- you expect
5  to have charges brought against you, don't
6  you?
7    A.    Yes.
8    Q.    Okay.  Same thing for an
9  employer; if they knowingly violate a law,
10  you would expect them to be punished for
11  it, correct?
12    MS. YUENGERT: Objection to
13  the form.  You can answer if you can.
14    A.    I do not know what kind of
15  answer to give to that kind of question,
16  so --
17    Q.    A truthful one.
18    A.    I'm not a lawyer, so I don't
19  know.
20    Q.    Okay.
21    A.    I'm not going to do anything
22  knowingly -- me personally, I'm not going
23  to do anything knowingly.

Page 32

1    Q.    When Ms. Sims worked here as a
2  substitute --
3    A.    Yes.
4    Q.    -- cafeteria worker, did you
5  have -- I know your office is located
6  here --
7    A.    Right.
8    Q.    -- and you are not at the high
9  school on a day-to-day basis, correct?
10    A.    That's correct.
11    Q.    But did you have opportunities
12  to observe her work performance?
13    A.    Very little, but I would go in
14  and watch.
15    Q.    Did you take any exception to
16  how she did her job?
17    A.    I just watched.
18    Q.    Did you ever reprimand her or
19  take any disciplinary action against her?
20    A.    I did not.
21    Q.    Did you have discussions with
22  Ms. Forbus about Ms. Sims' job
23  performance?

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Page 33

1    A.    I did.
2    Q.    What did Ms. Forbus tell you
3   about her job performance?
4    A.    On a couple of occasions, Ms.
5   Forbus told me she was doing a good job.
6   Is that enough?
7    Q.    Did she tell you anything
8   negative about her job performance?
9    A.    Maybe on the day that she
10   left, she walked off the job, she was
11   upset that day.
12   Q.    And would that be the day that
13   she found out she didn't get awarded the
14   permanent position or the position that
15   Mr. McKinney got the position for?
16   A.    No, it was not that day.
17   Q.    Do you know when it was or why
18   she walked off the job?
19   A.    I can't recall what happened
20   that day, but it was not the day that Mr.
21   McKinney got the position.
22   Q.    Now, I think I'm near through,
23   if you would give me just one moment to

Page 34

1   talk to Ms. Sims.
2       MS. YUENGERT:  Do you want us
3   to step out?
4       MR. ROBERSON:  Let's go off
5   the record and -- we'll go off the record
6   at 12:35.
7       (Whereupon, a break was had
8       from 12:35 p.m. until 12:40
9       p.m.)
10      MR. ROBERSON:  We are back on
11   the record at 12:40.
12      Ms. Jones, I don't have any
13   further questions.  Thank you, ma'am.
14   A.    Thank you.
15
16   EXAMINATION BY MS. YUENGERT:
17   Q.    Ms. Jones, I'm Anne Yuengert,
18   and I represent the Board of Education.
19   And I just have a couple of follow-up
20   questions.
21       In your testimony about your
22   recommendation for the hiring of Terry
23   Chambers and Lisa Cleveland, you were

Page 35

1   asked why did you recommend Ms. Cleveland
2   for the job when you knew she wasn't
3   qualified.
4       When you made the
5   recommendation that the Board hire Ms.
6   Cleveland, did you know that she didn't
7   have a high school diploma?
8    A.    I did not.
9    Q.    Did you know that she didn't
10   have a GED?
11   A.    I did not.
12   Q.    And when did you learn that
13   she didn't?
14   A.    Whenever this -- whenever this
15   lawsuit came about.
16   Q.    Okay.  And you also testified
17   about some conversations you had with Ms.
18   Forbus about Ms. Sims' job performance.
19   And you said that on a couple of
20   occasions, Ms. Forbus told you that Ms.
21   Sims was doing a good job and that Ms.
22   Forbus also talked to you about the day
23   that Ms. Sims walked off the job.  Were

Page 36

1   there any other things that you talked
2   with Ms. Forbus about regarding Ms. Sims'
3   performance?
4    A.    Ms. Forbus told me on a couple
5   of occasions that Ms. Sims were letting
6   the high school boys take her -- carry the
7   trash to the garbage can and when she had
8   heavy lifting to do that she would let the
9   young guys do the lifting.
10   Q.    Anything else?
11   A.    That's all I can recall right
12   now that Ms. Forbus came to me about with
13   Ms. Sims.
14       MS. YUENGERT:  Okay.  That's
15   all I have.
16
17   REEXAMINATION BY MR. ROBERSON:
18   Q.    Ms. Jones, is there any
19   writing that reflects anything that Ms.
20   Forbus told you about Ms. Sims?
21   A.    Do you mean any documentation?
22   Q.    Yes, ma'am, that's exactly
23   what I mean.

9 (Pages 33 to 36)

Page 37

1    A.   Yes.
2    Q.   Where is it?
3    A.   In a folder in my office.
4    Q.   Is it part of her personnel
5    file?
6    A.   No.
7    Q.   Do you keep folders on the
8    other employees?
9    A.   Yes.
10   Q.   All of the cafeteria people?
11   A.   Yes.
12   Q.   Have you shared the contents
13   of that folder with the attorneys for the
14   school?
15   A.   This has been an ongoing -- I
16   do not remember whether they were or not.
17   Q.   Did you share it with the EEOC
18   who was investigating her complaint?
19   A.   I don't remember that either.
20   Q.   Well --
21   A.   It has been going on for a
22   while. I have had to come up with a lot
23   of stuff since then, I --

Page 38

1    Q.   When did you make -- did you
2    create the documents?
3    A.   Yes.
4    Q.   When?
5    A.   The days that it happened.
6    Q.   Is it a notebook, just a scrap
7    paper?
8    A.   No, it's a folder that has got
9    notes in it.
10   Q.   Well, do you keep notes on all
11   of the employees or is it -- are these
12   notes only about Ms. Sims?
13   A.   No, I keep notes on -- when
14   there is an issue or a problem, I keep
15   notes.
16   Q.   Okay. So --
17   A.   I document.
18   Q.   For all of the employees, it's
19   in the same notebook?
20   A.   No. They're -- it's not a
21   notebook. It's their folders.
22   Q.   Oh. You tear it out of your
23   notebook and put it in their folder?

Page 39

1    A.   I type it and put it in a
2    folder.
3    Q.   And so how many pages are
4    there for Ms. Sims?
5    A.   I do not know.
6    Q.   Have you reviewed that folder
7    recently?
8    A.   I have not.
9    Q.   Does it still exist?
10   A.   I hope so.
11   Q.   Can you provide it to your
12   attorneys?
13   A.   If they ask for it, yes.
14   Q.   Well, what if I ask for it,
15   can you provide it to your attorneys?
16   A.   If she asks for it, she can
17   have it.
18   Q.   Are they school board records
19   or are they your records?
20   A.   They are mine.
21   Q.   Do you have these notes for
22   all your cafeteria workers?
23   A.   If there was an issue, I do.

Page 40

1        MR. ROBERSON: All right.
2    Thank you, ma'am. I don't have anything
3    else.
4        A.   You are welcome.
5        MS. YUENGERT: I don't have
6    anything else. Thank you.
7        MR. ROBERSON: We will go off
8    the record at 12:45.
9
10
11       (Whereupon, the deposition of
12       Pam Jones was concluded at
13       12:45 p.m. on the 21st day of
14       May, 2008.)
15
16   FURTHER THE DEPONENT SAITH NOT
17
18
19
20
21
22
23

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                    http://www.TylerEaton.com



Page 41

1       C E R T I F I C A T E
2
3
4       STATE OF ALABAMA)
5       JEFFERSON COUNTY)
6
7              I hereby certify that the
8       above and foregoing deposition was taken
9       down by me in stenotypy, and the questions
10      and answers thereto were reduced to
11      typewriting under my supervision, and that
12      the foregoing represents a true and
13      correct transcript of the deposition given
14      by said witness upon said hearing.
15             I further certify that I am
16      neither of counsel nor of kin to the
17      parties to the action, nor am I in anywise
18      interested in the result of said cause.
19
20
21
22
               COMMISSIONER - NOTARY PUBLIC
23      ACCR LICENSE NO. 116

**A**

Absolutely
28:20
ACCR
41:23
acting
5:5
action
1:5 23:14 32:19 41:17
agree
18:12 19:15 27:13,19 28:7
28:20,23 30:4,6
agreed
2:3 12:20
ahead
29:12
Alabama
1:2 3:9,17 5:4,5,12,22
6:5 41:4
Anne
3:12 6:12 34:17
answer
29:4,12 30:11,13 31:13,15
answers
41:10
anybody
14:4 17:6
anytime
17:6
anywise
41:17
apologize
21:9
applicants
11:7,15
appropriate
16:9,14
approve
12:23 13:2 21:17
approved
13:6
approximately
10:3,5
Arant
3:14
asked
19:4 35:1
asking
13:10,14 24:22 30:16
asks
39:16
assign
2:20
associate's
8:16
assume
11:23
assuming
23:5
attorney

3:5,13 5:23
attorneys
37:13 39:12,15
attract
27:12
Avenue
3:16
awarded
9:5 11:8 13:11 33:13
aware
17:10,19 21:1 27:1,10

**B**

B
1:20 2:6 5:1
back
25:14,23 34:10
background
8:13
bad
31:3
based
11:14 30:3
basis
23:18,20,21 28:19 32:9
best
11:20 13:12 16:11,16
better
22:7
Birmingham
3:9,17 5:3
black
14:14,17,20,23 15:15,16,17
16:7 28:7
board
1:10 5:11,21 6:7,14 7:13
13:2 21:17 27:2,5 34:18
35:5 39:18
Box
3:8
boys
36:6
Bradley
3:14
break
34:7
brought
31:5
BS
8:14
buildings
10:14
Bullard
11:12 12:1,1,5,16

**C**

3:1 41:1,1
cafeteria
9:23 10:17 15:3,7 17:16

24:14 28:3 32:4 37:10
39:22
call
25:17
Calvin
18:6
camera
6:2
Campbell
8:8
candidate
11:21 13:12 16:11,16
candidates
27:13,21
carry
36:6
case
6:3 26:18
category
19:10
cause
5:14 41:18
caused
23:19
Central
10:9,20
certification
8:17,21,23
Certified
1:21 2:7 5:2
certify
5:6 41:7,15
chain
9:19
Chambers
20:19 21:5 34:23
charges
31:5
check
31:3
checked
18:15 19:19
checklist
24:17
child
7:19,23 8:1,5,18 17:12,15
circumstances
22:18 23:3,7
Civil
1:5 5:7
Cleveland
18:10 20:19 21:7,8,12
22:12 24:18 25:3,22
34:23 35:1,6
clue
26:13
color
16:21
come
37:22
command

9:20
commencing
5:13
Commissioner
2:7 5:6 41:22
committee
11:6
complaint
37:18
completed
24:10
compliance
2:13
concerning
19:5 22:11
concluded
40:12
conclusion
29:3
confirm
14:1
consideration
12:5 16:5
considered
22:17 25:11
constraint
23:11
contact
14:6
contents
37:12
contract
25:5
conversations
35:17
Coosa
1:10 5:10,21 6:7,14 7:13
9:17 26:21 27:2 28:9
correct
9:11,14 10:1,14,15 11:9,10
11:13,17,22 12:8,19,21
13:1 15:17,21 18:14
20:5,23 25:5,6,9,18,21
26:2,3,4,15,18,19 28:16
30:9 31:11 32:9,10
41:13
counsel
2:5,17,19 5:10 6:9 41:16
count
26:11
County
1:10 5:11,21 6:7,14 7:13
9:17 26:21 27:2 28:10
41:5
couple
33:4 34:19 35:19 36:4
Court
1:1 2:14 5:9 6:4,23
create
38:2
CV

6:6

**D**

D
3:4
date
5:6 19:11
day
5:12 33:9,11,12,16,20,20
35:22 40:13
days
38:5
day-to-day
32:9
decision
11:16 12:4,9,11,12,14 16:1
decisions
29:21,21
defendant
1:11 3:11 6:8
degree
8:14,16 9:10
DEPONENT
40:16
deposition
1:14 2:5,11,12,22 5:19
19:1 40:11 41:8,13
depositions
2:15
determination
23:1
different
10:12 19:6
diploma
18:14 35:7
directly
12:6
director
8:2,18 17:12,16
disciplinary
32:19
discriminate
29:20 30:1,3
discussion
22:4
discussions
32:21
disqualified
28:14
District
1:1,2 5:8 6:4,5
Division
1:3 6:6
document
19:2,18 20:1,4,8,11,14,17
22:9 38:17
documentation
36:21
documents
19:5 38:2

GLORIA SIMS
COOSA COUNTY BOARD OF EDUCATION

PAM JONES
May 21, 2008

doing
9:13 22:6 30:17 33:5
  35:21
Donald
6:13
Drive
3:7
due
23:2,10
duly
6:20

_____

**E**

E
3:1,1 41:1,1
educated
17:22
education
1:10 5:11,21 6:8,15 7:13
  8:13,15,17 13:22 17:18
  21:6 24:21 34:18
educational
19:12,17
EEOC
37:17
effect
2:13
efforts
27:12
eight
8:2,20
either
17:8 27:21,21 37:19
elementary
8:15,16 10:9,20
employed
7:12,16
employees
10:3 37:8 38:11,18
employer
28:21 30:7 31:9
employers
14:7 29:19
employment
22:12 25:20 29:21
especially
26:17
essence
23:8
evidence
2:23
exactly
36:22
examination
4:1,3,4 5:15 7:8 34:16
examined
6:20
exception
32:15
Excuse

21:9
Exhibit
4:10 18:21 19:1 20:12
  24:16,17
EXHIBITS
4:8
exigent
22:17,20 23:2,7
exist
39:9
expect
30:19,23 31:4,4,10
Explain
22:22
extent
29:2,11,13

_____

**F**

F
41:1
facilities
10:13
fact
26:20
Federal
3:15 5:7
feel
13:12
felt
16:10,16
female
16:15 28:1,4
Fifth
3:16
file
37:5
filled
23:17,19 24:3 28:7
Final
12:12,12
first
6:20 22:23
folder
37:3,13 38:8,23 39:2,6
folders
37:7 38:21
following
5:15
follows
6:21
follow-up
34:19
Forbus
11:11 12:6,16 16:19 32:22
  33:2,5 35:18,20,22
  36:2,4,12,20
force
2:13
foregoing
5:9 41:8,12

form
2:18 29:2 30:11 31:13
found
33:13
four
10:6
fourth
25:15,19
full
2:13 7:9
fund
7:19 8:5
further
34:13 40:16 41:15

_____

**G**

Gail
1:20 2:6 5:1
garbage
36:7
GED
18:14 35:10
gender
27:21 28:15 30:3
general
7:19 8:5
give
31:15 33:23
given
41:13
giving
30:13
glad
17:21
Gloria
1:7 6:1,6
go
29:12 32:13 34:4,5 40:7
going
9:9 20:10 25:17 29:1
  30:10 31:21,22 37:21
good
33:5 35:21
grace
13:5
grounds
2:21
guys
36:9

_____

**H**

happened
33:19 38:5
hearing
41:14
heavy
36:8
held
14:13
high

10:8,10,21 13:21 15:2,8,10
  15:21 17:17 18:14 21:5
  24:21 32:8 35:7 36:6
hire
11:16 16:10,14 24:17
  27:17 35:5
hired
9:8 15:13 17:15,16 18:3,7
  18:10 19:11 25:14,23
hiring
15:1 22:7,16,19 26:23
  27:15 29:20 34:22
hold
8:4,14 9:2
holding
28:14
hope
39:10

_____

**I**

identification
18:22
identified
19:16
illegal
28:17
immediately
23:14
important
13:8 16:1
inaccurate
20:8
includes
19:3
INDEX
4:1,8
individual
14:15
individuals
18:13
information
19:5,23
initial
12:14,15
intentionally
28:21
interested
41:18
interview
11:14 18:18 21:20 22:1
interviewed
11:6,11,15 21:14 27:17
investigating
37:18
involved
27:18
issue
38:14 39:23

_____

**J**

JEFFERSON
41:5
Jerry
3:4 5:23
job
9:16 17:3 21:12 22:7,13
  26:12 32:16,22 33:3,5,8
  33:10,18 35:2,18,21,23
Jones
1:16 2:6 5:14,20 6:19 7:3
  7:11 11:4 16:18 26:15
  34:12,17 36:18 40:12

_____

**K**

keep
37:7 38:10,13,14
Kelley
14:16
kin
41:16
kind
29:3 30:12 31:14,15
Kinross
3:7
kitchen
10:21,22 24:3,10,13
knew
35:2
know
7:4 10:2 14:4,5 20:6
  21:23 22:19 23:3,18
  30:12 31:14,19 32:5
  33:17 35:6,9 39:5
knowing
14:10
knowingly
31:4,9,22,23
knowledge
18:1,5

_____

**L**

L
2:1
Large
5:5
law
3:5,13 28:22 29:18 30:4
  30:7,8,19,21 31:9
laws
2:14
lawsuit
17:20 26:22 35:15
lawyer
31:18
lawyers
20:7
leading
2:19
learn
35:12

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                    http://www.TylerEaton.com

Lee
27:7
left
33:10
legal
29:3
letter
22:10
letting
36:5
Let's
34:4
LICENSE
41:23
lifting
36:8,9
Lisa
18:10 20:19 21:4,7,8,11
22:12 34:23
list
13:17,18,19 19:7
little
32:13
LLP
3:14
located
32:5
long
7:15 26:22
looks
20:12
lot
37:22
lumped
11:1
lunchroom
9:16,23 11:7 15:2 16:21
20:20 22:14 23:17 24:1
25:4

**M**

Macon
27:8
making
16:1
male
14:17,20 15:20,20 16:6,15
28:4
managers
9:23
man's
17:2,3
marked
18:21 19:1 20:11 24:15
matter
26:9,10
ma'am
6:17 7:18 15:11 17:22
19:8 25:1 27:9 30:15
34:13 36:22 40:2

McKinney
11:8 12:7,18 14:21 17:2
22:2 33:15,21
McKinney's
13:9
mean
12:1,2 23:8 26:9,20
27:23 28:13 36:21,23
means
23:4,5
members
11:5
memo
20:13
met
13:13,19
Michael
14:16
Middle
6:5 10:9,20
mine
39:20
minority
26:15,23 27:12
moment
33:23
multipage
19:2
Murphy
18:2

**N**

N
2:1 3:1
name
5:22 6:10 7:10 19:11
near
33:22
necessary
2:16
necessitated
22:18
need
24:5
negative
33:8
neither
41:16
never
27:16
new
24:17
Nixburg
5:11
normally
23:8
North
3:16
Northern
1:2 6:5

Notary
1:23 2:9 5:4 41:22
notebook
38:6,19,21,23
notes
38:9,10,12,13,15 39:21
nutrition
7:19 8:1,2,6,18 17:12,15

**O**

O
2:1 3:8
object
29:2 30:11
objection
29:8 31:12
objections
2:17,20
observe
32:12
occasions
33:4 35:20 36:5
occupied
17:1
offered
2:22
office
32:5 37:3
offices
5:22
Oh
8:11 25:16 27:7,10 38:22
okay
7:6 8:3,19 9:1,4,12,15
10:6,11,16,23 11:3,19,23
12:11,17 13:5,8 15:23
18:17 20:3,10,21 23:9
23:12,15 24:6,10,12,23
26:14 28:17 29:9 31:8
31:20 35:16 36:14
38:16
once
24:2,3
ongoing
37:15
open
27:20
operating
6:2
opportunities
32:11
oral
5:15
order
26:1
ought
26:17
oversee
9:16
Owens

18:6

**P**

P
2:1 3:1,1,8
page
4:2,9 19:6 22:8 24:16
pages
39:3
Pam
1:16 2:6 5:14,20 6:19
40:12
Pamela
7:11
paper
38:7
paragraph
22:23
part
9:15 26:12 37:4
parties
2:4,20 41:17
party
6:10
passed
8:10
Patrice
7:11
pending
6:3
people
11:1 16:4 19:16 22:3
37:10
perfectly
16:9,14
performance
32:12,23 33:3,8 35:18
36:3
permanent
25:11 33:14
permanently
23:6
person
14:12,19 16:15
personally
31:22
personnel
37:4
Place
3:15
plaintiff
1:8 3:3 6:1,7
Plaintiff's
4:10 18:20
please
6:17 7:10 29:17
police
30:23
position
7:18,22 8:3 9:2,6 11:8

13:11 14:12,13,20 16:6
16:10,15 17:1,2 20:20
22:15 23:16,19 26:8
28:6,9,14 33:14,14,15,21
positions
27:20
possess
18:13 19:16 20:4 21:5
practices
26:23 27:1
prep
24:3,13
presence
16:19
PRESENT
3:20
presently
7:12 8:14 17:11
previous
14:7,13
previously
8:4
principal
11:12 27:23
prior
2:23
Pritchett
1:20 2:7 5:1
problem
38:14
Procedure
5:8
proceedings
5:16
process
18:19 21:21 22:7 27:15
produced
19:3
Professional
1:22 2:8 5:3
programs
9:16
prosecute
30:16
provide
20:7 39:11,15
provided
5:7
Public
1:23 2:9 5:4 41:22
punished
28:22 30:9,20 31:10
put
38:23 39:1
p.m
5:13 34:8,9 40:13

**Q**

qualifications
13:10,13,16

qualified
21:13 35:3
question
21:10 29:12 31:15
questions
2:18,19 13:18,19 22:5
34:13,20 41:9

---

**R**

R
3:1,12 41:1
race
14:11 28:15 30:3
read
7:4
reading
2:11
Realtime
1:21 2:8 5:2
reason
20:6 24:1
recall
33:19 36:11
receive
25:17
recommend
21:4,11 35:1
recommendation
11:18,20 12:3 20:18 34:22
35:5
recommended
12:17 20:21 21:15,16,18
record
29:8 34:5,5,11 40:8
records
39:18,19
reduced
41:10
REEXAMINATION
4:5 36:17
reflects
36:19
regarding
36:2
Registered
1:22 2:8 5:2
rehired
25:4
relating
2:15
remember
37:16,19
renewed
25:7,8
repeat
15:5 21:10
replacing
15:15,19
REPORTED
1:20

Reporter
1:21,23 2:8,9 5:2,3 6:23
represent
6:11,14 34:18
represents
41:12
reprimand
32:18
request
19:4
requirement
9:1,5,7 18:2,6,9 21:2
24:20
requirements
13:20 19:17
requires
29:3,19
requiring
23:13
respective
2:5
result
41:18
retain
27:12
reviewed
39:6
Reviewing
19:18
right
5:18 11:2 20:2 21:2,23
22:8 24:10 26:14 28:4
32:7 36:11 40:1
Road
5:12
Roberson
3:4,6,6 4:3,5 5:18,23
6:16 7:2,6,8 29:15
34:4,10 36:17 40:1,7
Rockford
5:12,22
Rose
3:14
roundtable
22:4
rules
2:14 5:7
run
30:22

---

**S**

S
2:1 3:1
SAITH
40:16
sat
22:3 27:16
saying
26:10 30:18
school

10:8,10,21 13:21 15:2,9,10
15:21 17:17 18:14 21:6
23:2 24:21 26:21 27:5
27:11 32:9 35:7 36:6
37:14 39:18
schools
9:17 10:6,8,12 19:8
scrap
38:6
secretary
7:20 8:6
see
18:16 19:8,12,19 24:15,22
30:23
seen
20:14
selected
14:20
sensitive
26:18
seventeen
10:5
sex
27:21
share
37:17
shared
37:12
show
18:23 20:10
sign
7:5 30:22
signature
2:10
Sims
1:7 6:1,7 32:1,22 34:1
35:18,21,23 36:2,5,13
36:20 38:12 39:4
sitting
22:4
six-hour
23:16
sorry
8:11 21:8
SOUTHERN
1:3
speak
9:20
staff
19:7
started
8:22
state
5:4 6:10 7:9 26:21 41:4
statement
16:20 17:1,6 20:13
statements
17:8
States
1:1 5:8 6:4
status

19:12
stenotypy
41:9
step
34:3
STIPULATED
2:3
stipulation
5:9
stipulations
7:1
stop
30:22
structured
22:2
structures
10:13
stuff
37:23
styled
6:6
substitute
32:2
supervise
10:4
supervision
41:11
supposed
30:13
Sure
15:6
swear
6:17
Sweeney
6:13
sworn
6:20
system
23:2 26:21

---

**T**

T
2:1,1 41:1,1
take
23:14 32:15,19 36:6
taken
2:6 41:8
talk
34:1
talked
35:22 36:1
talking
27:7
tear
38:22
tell
8:12 22:9 33:2,7
temporary
20:20 22:11,15 23:18,21
24:2 26:8

tenure
25:17 26:1,11
terms
13:9
Terry
20:19 34:22
testified
6:21 35:16
testimony
21:13 34:21
Thank
17:23 25:3 34:13,14 40:2
40:6
thereto
2:23 41:10
thing
27:15 31:8
things
19:3 24:12 36:1
think
33:22
thinking
16:8
third
26:6
three
10:7,8 12:2 17:11,16 18:13
25:10 27:16
three-person
11:6
ticket
31:1
time
2:21,22 7:22 9:5 15:1,13
22:6 23:8,11,23 26:23
today
5:20 19:4
Todd
3:21 20:14
told
29:10 33:5 35:20 36:4
36:20
transcript
41:13
trash
36:7
trial
2:21
true
41:12
truthful
31:17
try
29:15
two
27:15
type
39:1
typewriting
41:11

---

**U**

U
2:1
unanimous
12:2,4
understand
11:4 23:1 29:11,14,18,22
    29:23
understanding
9:9 22:11
United
1:1 5:8 6:4
unlawful
30:2
upset
33:11
Usual
6:23

---

**V**

versus
6:7 27:8
video
6:2
videotape
5:19
violate
30:8,19,21 31:9
violates
28:22 30:7
vs
1:9

---

**W**

waived
2:12
walked
33:10,18 35:23
want
34:2
wanted
16:20
wants
7:4
wasn't
21:21 35:2
watch
32:14
watched
32:17
way
14:2 16:8 24:12 29:16
welcome
40:4
went
12:10
we'll
34:5
white
3:14 15:4,7 16:14 28:7

---

William
8:8
Wingard
3:21 12:22 20:14 21:16
witness
2:11 5:14 6:17 41:14
woman
16:10
work
8:7 9:9 32:12
worked
26:5 32:1
worker
11:7 15:2 23:17 24:5
    25:5 28:3 32:4
workers
9:23 15:4,7 17:17 39:22
working
8:17,20,22 12:6 15:1,12
    24:6
works
25:5 26:13
wouldn't
28:18,23
write
31:3
writing
36:19

---

**Y**

year
25:5,8,15,19,23 26:6
years
8:2,20 25:10 27:16
young
36:9
Yuengert
3:12 4:4 6:12,13 7:3 15:8
    29:1,7,10 30:10 31:12
    34:2,16,17 36:14 40:5
y'all
12:3

---

**0**

0035
19:7
0037
20:12,17
0038
22:8
0045
24:16
07-704
6:6

---

**1**

1
17:13,14
116
41:23

---

12:08
5:13
12:35
34:6,8
12:40
34:8,11
12:45
40:8,13
18
4:10
1819
3:16
1994
7:17

---

**2**

2:07-CV-704-MEF
1:5
2000
17:12
2001
5:11
2002
18:6
2003
18:2
2005
18:10
2008
1:17 5:13,20 40:14
21
1:17
21st
5:12,20 40:13

---

**3**

34
4:4
35203
3:17
35238-0487
3:9
36
4:5
3765
3:7
380487
3:8

---

**7**

7
4:3,10 18:21 19:1 20:12
    24:17

---

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PLAINTIFF'S
EXHIBIT
7
Jones
PENGAD 800-631-6989

GLORIA SIMS,                          )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )    CIVIL ACTION NUMBER:
                                      )    2:07-cv-704-MEF
COOSA COUNTY BOARD OF                 )
EDUCATION,                            )
                                      )
        Defendant.                    )


## DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS IN DEPOSITION NOTICE

Comes now Defendant Coosa County Board of Education to respond to Plaintiff's Request for Production of Documents in its Deposition Notice of Todd Wingard and responds as follows:

Request:

1.    A list of all lunchroom workers at any of the Coosa County School Systems, including information as to whether they have a high school degree or GED and their date of hire.

Response:

Please see attached list. Bates 0035.

<u>Request</u>:

  2.  The personnel file of Lisa Cleveland.

<u>Response</u>:

  Please see attached file for Lisa Cleveland.  Bates 0036-0048.


            DONALD B. SWEENEY, JR.
              (SWE002)

OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

## CERTIFICATE OF SERVICE

      I hereby certify that on _May 21_____, 2008, I hand delivered the document to the following:

      Jerry Roberson, Esq.


_____
Of Counsel

| CNP STAFF | DATE HIRED | GED, HS DIPLOMA |
|---|---|---|
| Rebecca Beasley | 08-09-2007 | HS Diploma |
| Margaret Henderson | 09-18-2002 | HS Diploma |
| Barbara Murphy | 09-09-2003 | Neither |
| Sandra Thompson | 09-09-2003 | HS Diploma |
| Jerry McKinney | 12-01-2006 | HS Diploma |

| CNP STAFF | DATE HIRED | GED, HS DIPLOMA |
|---|---|---|
| Dianne Rayfield | 12-01-1985 | HS Diploma |
| Brenda Sayers | 10-27-1994 | HS Diploma |
| Lisa Cleveland | 08-08-2005 | Neither |
| Teresa Mitchell | 08-21-1996 | HS Diploma |
| Essie Moon | 09-01-1978 | Neither |
| Gwendolyn Chapman | 01-28-2003 | HS Diploma |
| Calvin Owens | 07-22-2002 | Neither |
| Michael Billingsley | 01-28-2003 | HS Diploma |

*Sims v. CCBE*
Produced by CCBE
**No. 0035**

# COOSA COUNTY BOARD OF EDUCATION

**TODD WINGARD**
*Superintendent*

(256) 377-4913
Fax: (256) 377-2385
boe@coosaschools.k12.al.us

P.O. Box 37
Rockford, AL 35136

August 5, 2005

Ms. Lisa Cleveland
Route 3, Box 41
Goodwater, Alabama 35072

Dear Ms. Cleveland:

At its meeting on August 4, 2005, the Coosa County Board of Education approved your nomination as a temporary 6-hour lunchroom worker.

If you accept this nomination, please return the information requested below to the Coosa County Board of Education:

1.  The completed enclosed forms (W-4, A-4, Retirement, Drug Free Workplace, I-9, Temporary Employment Understanding, Background Evaluation packet which contains 2 cards & 2 forms)
2.  A $49.00 money order made payable to the State Department of Education for your background evaluation
3.  A copy of your social security card
4.  A copy of your driver's license
5.  A copy of a TB test result given within the last year (either skin test or x-ray)

Information of interest to Board employees is also enclosed.

You will be eligible for insurance benefits through Public Employees' Health Insurance Plan (PEEHIP). Please come by the Superintendent's office and talk with Amy Davis regarding the coverage you desire.

Please give these matters your **immediate** attention.

Sincerely,

Todd Wingard
Superintendent of Education

TW:jd

Enclosures

pc: File

*Sims v. CCBE*
Produced by CCBE
*No. 0036*

# COOSA COUNTY BOARD OF EDUCATION

**TODD WINGARD** August 2, 2005
*Superintendent*

(256) 377-4913
Fax: (256) 377-2385
boe@coosaschools.k12.al.us

P.O. Box 37
Rockford, AL 35136

I would like to recommend Terry Chambers and Lisa Cleveland for the temporary lunchroom position at Rockford Elementary School. Effective August 8, 2005.

*Pamela Jones*

Pamela Jones

*Sims v. CCBE*
Produced by CCBE
No. 0037

# Coosa County Board of Education

**TODD WINGARD**
*Superintendent*

(256) 377-4913
Fax: (256) 377-2385
boe@coosaschools.k12.al.us

P.O. Box 37
Rockford, AL 35136

Re:    Letter of Understanding Concerning Temporary Employment

Pursuant to Code of Alabama 1975, Section 16-22A-5, I understand that a determination
has been made by this school system that due to exigent circumstances, the position of
___6 Hr. Lunchroom Worker___    must be filled on a temporary basis.

I also understand that the law of Alabama requires that a criminal history information
background check be conducted on all applicants who may have unsupervised access to a
child prior to employment with a public county or city school system. I acknowledge that
I am being employed temporarily and that my continued employment is conditioned upon
a suitability determination that will be made upon receipt of the completed criminal
history background check. If I am determined to be unsuitable for further employment, I
understand that I will be released from this temporary position at that time without
recourse against the employing school system.

I have read and understand and agree to accept this position under the conditions stated
above.

8-12-05
_____
Date

Lisa Cleveland
_____
Applicant's Signature

*Sims v. CCBE*
*Produced by CCBE*
*No. 0038*

# COOSA COUNTY BOARD OF EDUCATION

**TODD WINGARD**
*Superintendent*

(256) 377-4913
Fax: (256) 377-2385
boe@coosaschools.k12.al.us

P.O. Box 37
Rockford, AL 35136

August 5, 2005

Ms. Lisa Cleveland
Route 3, Box 41
Goodwater, Alabama  35072

Dear Ms. Cleveland:

At its meeting on August 4, 2005, the Coosa County Board of Education approved your nomination as a temporary 6-hour lunchroom worker.

If you accept this nomination, please return the information requested below to the Coosa County Board of Education:

1. The completed enclosed forms (W-4, A-4, Retirement, Drug Free Workplace, I-9, Temporary Employment Understanding, Background Evaluation packet which contains 2 cards & 2 forms)
2. A $49.00 money order made payable to the State Department of Education for your background evaluation
3. A copy of your social security card
4. A copy of your driver's license
5. A copy of a TB test result given within the last year (either skin test or x-ray)

Information of interest to Board employees is also enclosed.

You will be eligible for insurance benefits through Public Employees' Health Insurance Plan (PEEHIP). Please come by the Superintendent's office and talk with Amy Davis regarding the coverage you desire.

Please give these matters your **immediate** attention.

Sincerely,

Todd Wingard
Superintendent of Education

TW:jd

Enclosures

pc:  File

*Sims v. CCBE*
Produced by CCBE
No. 0039



STATE OF ALABAMA
# DEPARTMENT OF EDUCATION



Joseph B. Morton
State Superintendent
of Education

**Alabama
State Board
of Education**

October 26, 2005

Lisa Cleveland
Rt 3 Box 41
Goodwater, AL   35072

**Governor Bob Riley
President**

**Randy McKinney
District I
President Pro Tem**

Mr. Todd O Wingard, Superintendent
Coosa County
P O Box 37
Rockford, AL   35136-0037

**Betty Peters
District II**

RE:   Lisa Cleveland
SSN:   Redacted

**Stephanie W. Bell
District III**

**Dr. Ethel H. Hall
District IV
Vice President Emerita**

Dear Mr. Wingard:

**Ella B. Bell
District V**

A background review has been conducted on the above individual by the Alabama Bureau of Investigation (ABI) and the Federal Bureau of Investigation (FBI) pursuant to the Alabama Child Protection Act of 1999 and Act No. 2002-457. Based on the results of the criminal history record check:

**David F. Byers, Jr.
District VI**

*This individual <u>meets the suitability</u> criteria for employment and/or certification/licensure under the above statute.

**Sandra Ray
District VII
Vice President**

Sincerely,

**Dr. Mary Jane Caylor
District VIII**

Joseph B. Morton
State Superintendent of Education

**Joseph B. Morton
Secretary and
Executive Officer**

JBM/JHM/TC

cc: Lisa Cleveland

*If this letter is presented by a new employee to a school system other than the one which requested it, the system is advised to contact the Teacher Education and Certification Office to verify the individual's status.

*Sims v. CCBE*
Produced by CCBE
**No. 0040**

COOSA COUNTY SCHOOLS
Temporary Lunchroom Worker          CONTRACT

STATE OF ALABAMA
COOSA COUNTY

THIS CONTRACT between the Coosa County Board of Education and

_____Lisa_____Cleveland_____ as a __6/8__ FTE (6 hr.)

_Temporary Lunchroom Worker_____ and to perform duties as outlined by the

Superintendent and School Principal, effective __08-05-05__, for a term of

__Temporary__ for the _2005-06_ school year.

Said _Temporary Lunchroom Worker_____ is to be paid a salary of

_1 mo. @895.50 and $949.23 per month_ for remaining months based on actual number of days

worked for the school term __2005-06__ as provided below.

1.  At any time during the employee's probationary period, the employing
authority may remove an employee by furnishing said employee written
notification at least 15 days prior to the effective day of termination.

2.  Upon the completing by the employee of said probationary period, said
employee shall be deemed employed on a nonprobationary status and said
employee's employment shall thereafter not be terminated except for failure to
perform his or her duties in a satisfactory manner, incompetency, neglect of
duty, insubordination, immorality, justifiable decrease in jobs in the system,
or other good and just causes; provided, however, such termination of
employment shall not be made for political or personal reasons on the part of
any party recommending or voting to approve said termination.  Employment of an
employee on permanent status must be terminated only in the following manner:
The employing board of education shall give notice in writing to the employee,
stating in detail  the reasons for the proposed termination, the facts upon
which such reasons are based, and giving notice of the employee's rights to a
hearing.

Approved by direction of Coosa County Board of Education ___08-04-05___

                                      SIGNED: _Lisa Cleveland_____
                                                Temporary Lunchroom Worker

                                      SIGNED _Todd Wingard_____
                                                SUPERINTENDENT OF EDUCATION

*Sims v. CCBE*
Produced by CCBE
No. 0041

SIGN AND RETURN ONE COPY TO THE SUPERINTENDENT'S OFFICE.

# COOSA COUNTY BOARD O

**TODD WINGARD**
*Superintendent*

(256) 377-4913
Fax: (256) 377-2385
boe@coosaschools.k12.al.i

CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To *Lisa Cleveland*
Street, Apt No.; or PO Box No. *Rt 3  Box 41*
City, State, ZIP+4 *Goodwater) AL 35072*

PS Form 3800, June 2002    See Reverse for Instructions

ROCKFORD AL 35136
Postmark Here
2006
USPS

May 16, 2006

Ms. Lisa Cleveland
Route 3, Box 41
Goodwater, Alabama  35072

Dear Ms. Cleveland:

At a meeting of the Coosa County Board of Education on May 15, 2006
the following resolution was passed:

BE IT RESOLVED that the employment of Lisa Cleveland
by the Coosa County Board of Education shall terminate on the
24th day of May 2006,  and that Lisa Cleveland
will not be employed for the succeeding scholastic year.

BE IT FURTHER RESOLVED that Todd Wingard, Superintendent of Education
of Coosa County, is hereby instructed to notify Lisa Cleveland
in writing, of the action taken by the Coosa County Board of Education on
this day.

Yours truly,

COOSA COUNTY BOARD OF EDUCATION

Todd Wingard
Superintendent of Education

TW:jd

pc:  file

*Sims v. CCBE*
Produced by CCBE
No. 0042

NOTICE OF NON-RENEWAL

My signature below acknowledges receipt of notice of non-renewal of employment with the Coosa County Board of Education for the 2006-07 school year.  This notice was presented to me on or before May 24, 2006.

_Lisa Cleveland_ _(signature)_
Lisa Cleveland                                   5/17/06
                                                 Date

_Pamela Jones_ _(signature)_
Principal's Signature                            5/17/06
                                                 Date

**Sims v. CCBE**
Produced by CCBE
**No. 0043**

COOSA COUNTY SCHOOLS
Temporary Lunchroom Worker          **CONTRACT**

STATE OF ALABAMA
COOSA COUNTY

THIS CONTRACT between the Coosa County Board of Education and

_____Lisa_____Cleveland_____ as a ___1.0 FTE (6 hr.)_____

_Temporary Lunchroom Worker_____ and to perform duties as outlined by the

Superintendent and School Principal, effective __08-05-05___, for a term of

__Temporary___ for the _2005-06_ school year.

Said _Temporary Lunchroom Worker_____ is to be paid a salary of

_1 mo. @895.50 a  11 mo. @949.23_____.

for the school term _2005-06___ as provided below.

1.  At any time during the employee's probationary period, the employing
authority may remove an employee by furnishing said employee written
notification at least 15 days prior to the effective day of termination.

2.  Upon the completing by the employee of said probationary period, said
employee shall be deemed employed on a nonprobationary status and said
employee's employment shall thereafter not be terminated except for failure to
perform his or her duties in a satisfactory manner, incompetency, neglect of
duty, insubordination, immorality, justifiable decrease in jobs in the system,
or other good and just causes; provided, however, such termination of
employment shall not be made for political or personal reasons on the part of
any party recommending or voting to approve said termination.  Employment of an
employee on permanent status must be terminated only in the following manner:
The employing board of education shall give notice in writing to the employee,
stating in detail  the reasons for the proposed termination, the facts upon
which such reasons are based, and giving notice of the employee's rights to a
hearing.

Approved by direction of Coosa County Board of Education ___08-04-05___

SIGNED _____
                 Temporary Lunchroom Worker

SIGNED: _____
                 SUPERINTENDENT OF EDUCATION

**THIS CONTRACT IN LIEU OF THE ONE YOU NOW HOLD**

*Sims v. CCBE*
Produced by CCBE
No. 0044

# NEW HIRE CHECKLIST – SUPPORT PERSONNEL

NAME:  Lisa Cleveland

SCHOOL/POSITION:  Lunchroom

Hire Date:  8-4-05, effective 08-08-05

| APPL. | ACCEPT. | I-9 | W4 | DRUG FREE | RETIRE. | PEEHIP | NEW HIRE SENT | FINGER PRINTS | TB TEST | TEMP. EMPLOY. UNDERSTANDING |
|-------|---------|-----|-----|-----------|---------|--------|---------------|---------------|---------|------------------------------|
| ✓ | N B | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

**Sims v. CCBE**
Produced by CCBE
**No. 0045**

# COOSA COUNTY BOARD OF EDUCATION

**TODD WINGARD**
*Superintendent*

(256) 377-4913
Fax: (256) 377-2385
boe@coosaschools.k12.al.us

P.O. Box 37
Rockford, AL 35136

July 5, 2006

To:     Lisa Cleveland

From:  Todd Wingard T.W.
       Superintendent of Education

Re:     Nomination

At its meeting on June 29, 2006, the Coosa County Board of Education approved your nomination as a 6-hour lunchroom worker with the Coosa County School System for the 2006-07 school year.

If you have questions regarding this nomination, please contact me.

TW:jd

pc:  file

*Sims v. CCBE*
Produced by CCBE
No. 0046

COOSA COUNTY SCHOOLS
LUNCHROOM WORKER CONTRACT

STATE OF ALABAMA
COOSA COUNTY

THIS CONTRACT between the Coosa County Board of Education and

___Lisa Cleveland_____ a ___1 FTE (06 hour) lunchroom worker___ and to

perform duties as outlined by the Superintendent and School Principal, effective

__08/04/06__, for a term of ___184 Days___ for the ___2006 – 2007 school year.

Said ____Lunchroom Worker____ is to be paid a salary of ___1 mo @ $975.75 and 11

mo @ $1,059.08_____ for the school term ___2006 – 2007___ as provided below.

1.  At any time during the employee's probationary period, the employing authority may remove an employee by furnishing said employee written notification at least 15 days prior to the effective day of termination.

2.  Upon the completing by the employee of said probationary period, said employee shall be deemed employed on a non-probationary status and said employee's employment shall thereafter not be terminated except for failure to perform his or her duties in a satisfactory manner, incompetency, neglect of duty, insubordination, immorality, justifiable decrease in jobs in the system, or other good and just causes; provided, however, such termination of employment shall not be made for political or personal reasons on the part of any party recommending or voting to approve said termination. Employment of an employee on permanent status must be terminated only in the following manner: The employing board of education shall give notice in writing to the employee, stating in detail the reasons for the proposed termination, the facts upon which such reasons are based, and giving notice of the employee's rights to a hearing.

3.  I agree to submit to drug and/or alcohol tests at any time as a condition for my initial or continued employment as outlined by Coosa County Board of Education Policy EDG.

Approved by direction of Coosa County Board of Education ___06/29/06___

SIGNED: _____

SIGNED: _____
                SUPERINTENDENT

*Sims v. CCBE*
Produced by CCBE
No. 0047

COOSA COUNTY SCHOOLS
LUNCHROOM WORKER CONTRACT

STATE OF ALABAMA
COOSA COUNTY

THIS CONTRACT between the Coosa County Board of Education and

___Lisa Cleveland_____ a ___Lunchroom Worker_____ and to perform duties as

outlined by the Superintendent and School Principal, effective ____August 6, 2007_____,

for a term of ____184 days_____ for the ____2007-2008____ school year.

Said ____Lunchroom Worker_____ is to be paid a salary of _1 @ $1059.08 and 11 @

$1142.42_____for the school term __2007 – 2008__ as provided below.

1.    At any time during the employee's probationary period, the employing authority
      may remove an employee by furnishing said employee written notification at least
      15 days prior to the effective day of termination.

2.    Upon the completing by the employee of said probationary period, said employee
      shall be deemed employed on a non-probationary status and said employee's
      employment shall thereafter not be terminated except for failure to perform his or
      her duties in a satisfactory manner, incompetency, neglect of duty,
      insubordination, immorality, justifiable decrease in jobs in the system, or other
      good and just causes; provided, however, such termination of employment shall
      not be made for political or personal reasons on the part of any party
      recommending or voting to approve said termination. Employment of an
      employee on permanent status must be terminated only in the following manner:
      The employing board of education shall give notice in writing to the employee,
      stating in detail the reasons for the proposed termination, the facts upon which
      such reasons are based, and giving notice of the employee's rights to a hearing.

3.    I agree to submit to drug and/or alcohol tests at any time as a condition for my
      initial or continued employment as outlined by Coosa County Board of Education
      Policy EDG.

Approved by direction of Coosa County Board of Education _May 10, 2007_

SIGNED: _____

SIGNED: _____
                SUPERINTENDENT

Sign and return one copy to the Superintendent's Office.

*Sims v. CCBE*
Produced by CCBE
No. 0048

# FREEDOM COURT REPORTING

1  IN THE UNITED STATES DISTRICT COURT FOR THE

2  MIDDLE DISTRICT OF ALABAMA,

3  NORTHERN DIVISION

4

5  GLORIA SIMS,

6

7  Plaintiff,

8

9  vs.

10

11  COOSA COUNTY

12  BOARD OF EDUCATION,

13

14  Defendant.

15

16  CASE FILE #:

17  2:07-CV-704-MEF

18

19  STIPULATION

20  IT IS STIPULATED AND AGREED by and

21  between the parties throught their

22  respective counsel, that the deposition of

23  GLORIA SIMS may be taken before Meliaha

1  Cornelius, Commissioner, at the office of

2  Bradley, Arant, Rose & White, LLP, One

3  Federal Place, 1819 Fifth Avenue North,

4  Birmingham, Alabama 35203, on this 15th day

5  of January, 2008.

6  IT IS FURTHER STIPULATED AND AGREED

7  that the signature to and the reading of

8  the deposition by the witness be waived,

9  the deposition to have the same force and

10  effect as is full compliance had been had

11  with all laws and rules of Court relating

12  to the taking of depositions.

13  IT IS FURTHER STIPULATED AND AGREED

14  that it shall not be necessary for any

15  objections except as to form or leading

16  questions, and that counsel for the parties

17  may make objections and assign grounds at

18  the time of the trial, or at the time said

19  deposition is offered in evidence or prior

20  thereto.

21  IT IS FURTHER STIPULATED AND AGREED

22  that the notice of filing of the deposition

23  by the Commissioner is waived.

1

2  I N D E X

3

4  DIRECT EXAMINATION BY:    PAGE NUMBER:

5  Mr. Sweeny:

6

7  CROSS-EXAMINATION BY:

8  Mr. Roberson:

9

10  REDIRECT EXAMINATION BY:

11  Mr. Sweeny:

12

13  DEFENDANT'S EXHIBITS:

14  1 -

15  2 -

16  3 -

17  4 -

18  5 -

19  6 -

20  7 -

21  8 -

22

23

1  IN THE UNITED STATES DISTRICT COURT FOR THE

2  MIDDLE DISTRICT OF ALABAMA,

3  NORTHERN DIVISION

4

5  GLORIA SIMS,

6

7  Plaintiff,

8

9  vs.

10

11  COOSA COUNTY

12  BOARD OF EDUCATION,

13

14  Defendant.

15

16  CASE FILE #:

17  2:07-CV-704-MEF

18

19  BEFORE:

20  MELIAHA CORNELIUS, Commissioner

21

22  APPEARANCES:

23  BRADLEY, ARANT, ROSE & WHITE,

1 (Pages 1 to 4)

EXHIBIT 7

(205) 397

NUE

BAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

1  LLP, by Mr. Donald Sweeny, One Federal
2  Place, 1819 Fifth Avenue North, Birmingham,
3  Alabama 35203, appearing on behalf of the
4  Defendant:  Coosa County Board of
5  Education.
6       JERRY D. ROBERSON, Attorney at
7  Law, 3765 Kinross Drive, Birmingham,
8  Alabama 35238, appearing on behalf of the
9  Plaintiff:  Gloria Sims.
10      I, MELIAHA CORNELIUS, a Court
11  Reporter of Birmingham, Alabama, acting as
12  Commissioner, certify that on this date, as
13  provided by the Alabama Rules of Civil
14  Procedure and the foregoing stipulation of
15  counsel, there came before me at the office
16  of Bradley, Arant, Rose & White, LLP, One
17  Federal Place, 1819 Fifth Avenue North,
18  Birmingham, Alabama 35203, beginning at
19  9:00 a.m. GLORIA SIMS, witness in the
20  above cause for oral examination, whereupon
21  the following proceedings were had:
22      GLORIA SIMS,
23      having been duly sworn and

Page 6

1       examined, testified as follows:
2  DIRECT EXAMINATION BY MR. SWEENY:
3   Q.  Are you Gloria Sims?
4   A.  Yes.
5   Q.  Where do you live, Ms. Sims?
6   A.  414 McClellan Lane, Sylacauga,
7  Alabama.
8   Q.  And you're the plaintiff in a
9  lawsuit against the Coosa County Board of
10  Education, Civil Action 207-CV-704-MEF?
11  A.  Yes.
12  Q.  I'm Donald Sweeny, and I represent
13  the Coosa County Board of Education.  Have
14  you been deposed before in any manner, a
15  deposition like we're taking this morning?
16  A.  No.
17  Q.  I will be asking you questions,
18  and it's my responsibility to ask clear
19  questions that you understand.  If I ask a
20  question that's not clear, will you ask me
21  to clarify it?
22  A.  Yes.
23  Q.  If you answer a question, I will

Page 7

1  assume that you understood the question; is
2  that fair?
3   A.  Yes.
4   Q.  And I'm going to rely on the
5  information you share with me in order to
6  assess the defense of my client in this
7  case, so will you be as complete as
8  possible in sharing information that fits
9  the questions that I ask?
10  A.  Yes.
11  Q.  And if at any time, you remember
12  additional information that you think would
13  be responsive to a question I've asked,
14  will you supplement your answer?
15  A.  Yes.
16  Q.  And at the end of the deposition,
17  I'll ask you if there's anything else that
18  you want to add to any of the questions or
19  information you shared with me.  Does that
20  sound fair?
21  A.  Yes.
22  Q.  And when we conclude the
23  deposition, I will assume that you've

Page 8

1  shared the pertinent information that fits
2  the questions that I ask.
3       If at any time you want to take
4  a break, please do so, and if you will, let
5  me finish my questions before you answer so
6  the court reporter will have an easy
7  question and answer script in the
8  deposition.
9       What is your date of birth?
10  A.  September 9th, 1961.
11  Q.  And you've given us your address,
12  are you married?
13  A.  No.
14  Q.  Have you been married?
15  A.  Yes.
16  Q.  What was your husband's name?
17  A.  Glenn Williams.
18  Q.  Does he live in Coosa County?
19  A.  Yes.
20  Q.  Did you have children of that
21  marriage?
22  A.  No.
23  Q.  Have you been previously married?

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1    A.  Yes.
2    Q.  How many times have you been
3  married?
4    A.  Three.
5    Q.  Three times.  You've just given me
6  your most recent husbands.  Will you share
7  the names of your previous husbands?
8    A.  Raymond Carden and Bernie Sims.
9    Q.  Do all three of those live in
10  Coosa County?
11    A.  No.
12    Q.  Where do the other two live?
13    A.  Talladega County.
14    Q.  As a result of these marriages,
15  did you have children?
16    A.  Yes.
17    Q.  What are names and ages of your
18  children?
19    A.  Cheyenne Carden, Shane Carden,
20  they are 21, and Mia Sims, she's 16.
21    Q.  Do either of those children still
22  live with you?
23    A.  Mia.

Page 10

1    Q.  Where does she attend school?
2    A.  CACC.
3    Q.  This lawsuit has been filed in
4  what we consider the middle district of
5  Alabama which embraces a territory roughly
6  from between Birmingham and Montgomery
7  across the middle section of the state.  Do
8  you have realatives that live in that area,
9  adult relatives that would be potential
10  members of the jury in this case?
11    A.  Are you saying in Montgomery?
12    Q.  Right.  Between Birmingham and
13  Montgomery, do you have relatives other
14  than your husband, former husbands?
15    A.  Yes.
16    Q.  Where do they live?
17    A.  Shirley Williams lives in Coosa
18  County.
19    Q.  Anyone else?
20    A.  Tammy Robbins lives in Shelby
21  County, and Teresa DeRotia lives in Shelby
22  County.
23    Q.  To the best of your knowledge,

Page 11

1  those are the relatives that you have that
2  live in the middle district?
3    A.  What's the middle district?
4    Q.  The middle district, the area that
5  we discussed.
6    A.  Yes.
7    Q.  Okay.  Let me show you what I will
8  mark as Defendant's Exhibit 1, the notice
9  of deposition in this case.  Defendant's
10  Exhibit 1, I request that you bring any
11  documents you have that would be supportive
12  of the allegations in your complaint.  Have
13  you done so?
14    MR. ROBERSON:  Yeah, that's what
15  those photos are.
16    MR. SWEENY:  Jerry, are these
17  copies?
18    MR. ROBERSON:  You can have
19  those, yeah.  There may be duplicates in
20  there.
21    MR. SWEENY:  I want to mark these
22  as Defendant's, I want to have them at the
23  end of my deposition, Defendant's Exhibit

Page 12

1  7.
2    Q.  (By Mr. Sweeny)  In order to have
3  an orderly presentation of documents,
4  Ms. Sims, let me identify documents that
5  I'll go over during the deposition.
6  Defendant's Exhibit 1 is the notice of a
7  deposition; Defendant's Exhibit 2 will be
8  your complaint; Defendant's Exhibit 3 will
9  be the notice of the temporary vacancy
10  posting for the position of the six hour
11  temporary lunchroom; Defendant's exhibit 4,
12  I believe, is the application that you
13  submitted for that position; Defendant's
14  Exhibit 5 is the interview scheduled for
15  the position that occurred on December 22nd
16  and 23rd; and Defendant's Exhibit 6 will be
17  your EEO complaint; and Defendant's Exhibit
18  7 will be the documents that you just
19  tendered to us.
20    The documents in Defendant's
21  Exhibit 7 include a employment screening
22  service, what is that document, Ms. Sims?
23    A.  It was a screening that Coosa

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1  Medical done on me when I applied for a job
2  at their medical hospital.
3     Q.  And why is this relevant to the
4  issues in your complaint?
5     A.  The Board of Education gave me a
6  bad reference.
7     Q.  Okay.  And that appears on Page 3
8  of that of that document?
9     A.  I believe so, yes.
10     Q.  Okay.  You have also included a
11  newspaper article that has the headlines
12  BOE Debates Diploma Qualifications, what is
13  that article?
14     A.  I really don't know.  I think it's
15  where I was fighting them about trying to
16  get the job back in the lunchroom to keep
17  from hiring another, Jerry McKinney.
18     Q.  What newspaper did that appear
19  in?
20     A.  Coosa County's paper.
21     Q.  Okay.  You also included an
22  article, PTO President Takes on Board of
23  Education, a two page article dated August

Page 14

1  4, 2006, what is that article?
2     A.  It was a board meeting where one
3  of the board members said they were hiring
4  according to race and not qualifications.
5     Q.  Okay.  Who was the board member?
6     A.  I really don't know his name.
7     Q.  Okay.  It's set forth in the
8  article.
9        You've also included your
10  complaint, an EEO filing of November 14,
11  2006, an affidavit of Barbra Murphy, an
12  affidavit of Sandra Thompson, and a, it
13  looks like another copy of your charge of
14  discrimination.
15        To the best of your knowledge,
16  Ms. Sims, are those all of the documents
17  that you have in your possession that are
18  pertinent to the allegations of your
19  complaint?
20     A.  Yes.
21     Q.  In the deposition notice, I
22  requested whether you have any tape
23  recordings of any conversations that would

Page 15

1  include matters relevant to your
2  allegations.  Do you have any tape
3  recordings?
4     A.  No.
5     Q.  In preparation for this
6  deposition, other than meeting with your
7  attorney, what did you do to prepare?  What
8  did you review, and what steps did you
9  take?
10     A.  I just called an attorney whenever
11  I didn't, when I seen that I was done
12  unfairly.
13     Q.  Okay.  You are alleging in your
14  complaint, and we'll go over your complaint
15  later, that you were the victim of gender
16  and race discrimination; is that accurate?
17     A.  Yes.
18     Q.  Will you share with me the names
19  of persons you think might have pertinent
20  information in support of your contentions
21  that you're the victim of race or gender
22  discrimination?
23     A.  Barbara Murphy.

Page 16

1     Q.  Let's just list them first, and
2  then I'll come back.  Who else?
3     A.  Sandra Thomas.
4     Q.  Sandra?
5     A.  I think it's Thomas or Thomason.
6     Q.  Okay.
7     A.  I don't know her last name, but
8  her first name is Margaret.
9     Q.  Okay.  Who else?
10     A.  And Becky.
11     Q.  Becky?
12     A.  I really don't know her last
13  name.  We also worked together.
14     Q.  Okay.  Anyone else?
15     A.  Ms. Forbes.
16     Q.  Anyone else?
17     A.  No.
18     Q.  Okay.  Have you talked with any of
19  these people about the contentions in your
20  lawsuit?
21     A.  No.
22     Q.  Who is Barbara Murphy?
23     A.  She is one of the lunchroom

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  workers.
2     Q.  And what do you believe, what
3  information do you believe that she has
4  that would support your contention that
5  you're the victim of discrimination?
6     A.  She heard the same thing I heard,
7  that it was a man's job, and they had to
8  get some color in there, in the lunchroom.
9     Q.  Do you remember when that
10 conversation took place?
11    A.  During our break when we was
12 having break during lunch, I was sitting at
13 the table.
14    Q.  Was that before you applied for
15 position, the temporary position?
16    A.  Yes.
17    Q.  And who else was there when, let's
18 see, who made the statement?
19    A.  Ms. Forbes.
20    Q.  And who else was in the room
21 besides you and Barbara Murphy?
22    A.  The other women that I've named,
23 Sandra and Ms. Margaret and Becky.

Page 18

1     Q.  And what is it that Ms. Forbes
2  said?
3     A.  She said that it was a man's job,
4  and that Pam Jones said she had to get some
5  color in the lunch room.
6     Q.  Did Ms. Forbes make both of those
7  comments in the same statement?
8     A.  Yes.
9     Q.  At the same time?
10    A.  Yes.
11    Q.  And to the best of your knowledge,
12 Barbara Murphy heard those statements being
13 made?
14    A.  Yes.
15    Q.  In your best recollection of when
16 that took place would be what?
17    A.  Probably around in August, but she
18 made the statement several times.
19    Q.  We will come back to the posting
20 notice.  The posting for the six hour
21 temporary lunch room position was September
22 5, 2006, you believe that these statements
23 were made prior to that?

Page 19

1     A.  Yes.
2     Q.  Some time August of 2006?
3     A.  Yes.
4     Q.  Okay.  Anything else that Barbara
5  Murphy might know pertinent to the
6  complaint?
7     A.  I don't know.
8     Q.  Sandra Thomas?
9     A.  The same thing.
10    Q.  What she would know would be as
11 far as you believe the same things Barbara
12 Murphy would know?
13    A.  Yes.
14    Q.  And that's because she was with
15 you when you heard Ms. Forbes make the
16 statements that you've just shared with
17 me?
18    A.  Yes.
19    Q.  Have you had any discussions with
20 Sandra Thomas or Thompson, which ever one
21 it might be?
22    A.  No.
23    Q.  Margaret whatever her last name is

Page 20

1  would, as far as you know would she have
2  heard the conversations that you just
3  described that Jan Forbes made?
4     A.  Yes.
5     Q.  Have you had any conversations
6  with Margaret about the contentions in your
7  lawsuit?
8     A.  No.
9     Q.  Would she know anything about your
10 allegations of discriminations other than
11 having heard Ms. Forbes make the comments
12 that you've said?
13    A.  No.
14    Q.  Becky, she she's similarly
15 positioned to Margaret?
16    A.  Becky has now got Ms. Forbes' job,
17 she's retired, she's the supervisor over
18 the lunchroom now.
19    Q.  When did she retire?
20    A.  I'm not sure.
21    Q.  Before September 5, 2006?
22    A.  After.
23    Q.  Was Becky present when Ms. Forbes

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 21 |
|---|

1  made the statements that you've shared with
2  us?
3      A.  Yes.
4      Q.  Have you had any discussions with
5  Becky?
6      A.  No.
7      Q.  And Jan Forbes, which she knows
8  whether she made the statements that you've
9  attributed to her?
10     A.  Yes.
11     Q.  Is there anything else that you
12  believe Ms. Forbes knows that would be
13  relevant to your contentions in the
14  lawsuit?
15     A.  I don't know.
16     Q.  As far as your educational
17  background, where did you attend high
18  school?
19     A.  HL Bourgeois in Homa, Louisiana.
20     Q.  I couldn't read the spelling of
21  the high school, would you spell it for me?
22     A.  B-O-U-R-G-E-O-I-S.
23     Q.  And that's where?

| Page 22 |
|---|

1      A.  Homa.
2      Q.  You attended high school for how
3  many years?
4      A.  11.
5      Q.  Through the 11th grade?
6      A.  Yes.
7      Q.  And that's as far as you completed
8  your education?
9      A.  Yes.
10     Q.  So you did not get a high school
11  degree?
12     A.  No.
13     Q.  And you have not gotten a GED; is
14  that correct?
15     A.  That's correct.
16     Q.  Have you had any other educational
17  training or employment related seminars or
18  special training that would be pertinent to
19  this lawsuit?
20     A.  No.
21     Q.  As far as your employment
22  background, let me start with when you
23  became employed as a substitute worker for

| Page 23 |
|---|

1  the Coosa County Board, was that in August
2  of 2006?
3      A.  I got my papers saying I was on
4  the list, calling list, I think it was
5  April of '04.
6      Q.  It was what?
7      A.  April of '04.
8      Q.  Okay.  And then when did you
9  actually start working as a substitute for
10  the Coosa County Board?
11     A.  The following school semester.
12     Q.  So for the, that would be August
13  of '04, '05?
14     A.  Yes.
15     Q.  How many days did you work as a
16  substitute during that year?
17     A.  I don't know.
18     Q.  Did you work at more than one
19  school?
20     A.  Yes.
21     Q.  What schools did you work at?
22     A.  I worked for the middle school and
23  elementary school lunchroom for that

| Page 24 |
|---|

1  school.
2      Q.  And then the next year, the
3  '05-'06 school year, did you continue
4  working as a substitute?
5      A.  Yes.
6      Q.  What schools did you work at?
7      A.  The high school.
8      Q.  Exclusively, you didn't continue
9  serving as a substitute at the middle or
10  elementary?
11     A.  No.
12     Q.  Do you have idea how many days,
13  you worked as a substitute during the
14  '05-'06 school year?
15     A.  It was around five to six weeks.
16     Q.  Would that have been in one block
17  of time or individual days and their
18  cumulative amount added up to five or six
19  weeks?
20     A.  It was all at one time.
21     Q.  Okay.  Were you substituting for a
22  particular employee at the high school?
23     A.  For the lunchroom, Ms. Forbes, for

6  (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 25

1  Michael -- I don't know his name, he quit,
2  and I was filling in on his job.
3     Q.  Okay.  Then in August you applied
4  for the position of temporary six hour
5  lunchroom position?
6     A.  Well, that job wasn't posted until
7  September, I believe.
8     Q.  Did you begin substituting in
9  August of '06?
10    A.  Yes.
11    Q.  Okay.
12    A.  For that job.
13    Q.  And then you applied in some time
14 in September of '06, applied for the
15 temporary position?
16    A.  Right.
17    Q.  Okay.  Now, against that
18 background, prior to your employment as a
19 substitute for the Coosa County Board of
20 Education, would you give me your
21 employment history?
22    A.  I worked at Quincey's.
23    Q.  Whereabouts?

## Page 26

1     A.  Sylacauga.
2     Q.  For how long?
3     A.  For three years.
4     Q.  What years?
5     A.  Probably from '80 to '83.
6     Q.  Okay.
7     A.  And then I went straight from
8  there, I left there and went straight to
9  Russell Mills in Sylacauga.
10    Q.  And how long did you work at
11 Russell Mills
12    A.  From '83 to '91.
13    Q.  Okay.  Why did you leave
14 Quincey's?
15    A.  Because I got hired at Russell
16 Mills.
17    Q.  Why did you leave Russell?
18    A.  To stay at home and be a mom with
19 my new baby.
20    Q.  Okay.  What was your next
21 employment after '91?
22    A.  The elastic corporation in
23 Columbiana.

## Page 27

1     Q.  I'm sorry, what?
2     A.  It was the ECA in Columbiana.
3     Q.  What did you do there?
4     A.  I was a knitter.
5     Q.  And you worked there for how
6  long?
7     A.  Let me think -- '95 to '98.
8     Q.  What did you do at Russell Mills?
9     A.  A seamer.
10    Q.  And after -- why did you leave the
11 position in Columbiana?
12    A.  It was straight midnights, and I
13 had trouble finding a sitter.
14    Q.  What was your next job?
15    A.  Selco Cleaners.
16    Q.  Where is that located?
17    A.  Chelsea, Alabama.
18    Q.  And what did you do there?
19    A.  I inspected clothes, inspector.
20    Q.  How long were you there?
21    A.  From 2000 to '02.
22    Q.  Your next position?
23    A.  Coosa Central High School.

## Page 28

1     Q.  As a substitute?
2     A.  Yes.
3     Q.  Have you ever been terminated from
4  any position of employment?
5     A.  No.
6     Q.  Have you previously filed an EEO
7  complaint against anyone?
8     A.  No.
9     Q.  Any company that you worked for?
10    A.  No
11    Q.  Have you ever been a plaintiff in
12 a lawsuit prior to this litigation?
13    A.  No.
14    Q.  Have you ever been a defendant in
15 a lawsuit?
16    A.  No.
17    Q.  Do you know the superintendent of
18 the Coosa County Board?
19    A.  Yes.
20    Q.  What is his name?
21    A.  Todd Wingard.
22    Q.  How well do you know Mr. Wingard?
23    A.  Just by being at the school, being

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1  superintendent.
2    Q  Are you contending in this lawsuit
3  that Todd Wingard has discriminated against
4  you because of your gender or your race?
5    A.  Yes.
6    Q.  On what basis?
7    A.  Because I'm a white female, and
8  they hired a black male.
9    Q.  Has Mr. Wingard ever said anything
10  to you that would indicate a discriminatory
11  animus toward you because of your gender?
12    A.  No.
13    Q.  And as far as conduct, what
14  conduct has Todd Wingard engaged in that
15  serves as the basis for your contention
16  that he's discriminated against you because
17  of your race and gender?
18    A.  They've done the hiring.
19    Q.  But you've never talked to him
20  about the reasons that upon which he based
21  his recommendation that somebody else be
22  hired; is that correct?
23    A.  That's correct.

Page 30

1    Q.  Would it be fair and correct to
2  say that all you know about Todd Wingard is
3  the fact that he recommended somebody else
4  to be employed for the position of the six
5  hour temporary cafeteria worker at Coosa
6  Central High School?
7    A.  Yes.
8    Q.  Do you know what information he
9  had prior to making the recommendation that
10  he did?
11    A.  No.
12    Q.  Do you know from whom he obtained
13  information about the person that he
14  recommended for the position?
15    A.  No.
16    Q.  So you really don't know any facts
17  about, that served as the basis for Todd
18  Wingard's recommendation?
19    A.  No.
20    Q.  Do you know any of the board
21  members that serve on the Coosa County
22  Board of Education?
23    A.  Not personally.

Page 31

1    Q.  Do you know David Edwards?
2    A.  I know him as a board member.
3    Q.  Do you know him beyond that?
4    A.  No.
5    Q.  Have you ever talked to him about
6  the contentions in your lawsuit?
7    A.  Yes.
8    Q.  When did you have conversations
9  with him?
10    A.  When I called and asked about my
11  job position, and he told me I needed to
12  come to the board meetings and try to talk
13  to them about trying to get my job back.
14    Q.  Did you have that conversation
15  with him after the decision was made to
16  hire, what is it, Jerry McKnight?
17    A.  McKinney.
18    Q.  Would that be -- let me rephrase
19  that. You talked to David Edwards at some
20  point about the position that you had
21  applied for with the Coosa County Board,
22  they had hired Jerry McKinney and so you
23  called David Edwards to discuss what?

Page 32

1    A.  Discuss what I need to do and I
2  told him I didn't think it was fair, and he
3  told me I need to come to the board
4  meetings and object and try to get my job
5  back.
6    Q.  What about the decision did you
7  think was unfair?
8    A.  Because I done my job well and I
9  didn't get it, and I had been working there
10  for a while.
11    Q.  Prior to calling David Edwards,
12  did you know him at all?
13    A.  No.
14    Q.  Why did you call Mr. Edwards?
15    A.  Because he was a board member.
16    Q.  Is he from your district or
17  something?
18    A.  Yes.
19    Q.  Okay. And you told him that you
20  didn't think the decision was fair?
21    A.  Yes.
22    Q.  Did you tell me that you thought
23  that you had been the victim of

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 33

1 discrimination?
2    A.  Yes.
3    Q.  What do you remember sharing with
4 him?
5    A.  I just told him that I thought I
6 was being discriminated against my sex and
7 race.
8    Q.  Okay.  Did he respond other than
9 suggest you come to the board and discuss
10 that?
11    A.  Yes.
12    Q.  All right.  What else did he say?
13    A.  That was it.
14    Q.  Did you come to the Board of
15 Education and make a statement?
16    A.  Yes.
17    Q.  All right.  Is that the board
18 meeting that's covered in one of the
19 articles in the newspaper that you've
20 shared with us in Defendant's Exhibit 7?
21    A.  Yes.
22    Q.  At the board meeting, what did you
23 share with the members of the board and

Page 34

1 superintendent?
2    A.  I just told them that I thought it
3 was not fair, that when I applied for the
4 job there was no, you didn't have to have a
5 high school diploma or a GED when I filled
6 my application out, and I just thought I
7 was done unfairly and I wanted my job back.
8    Q.  By that time, they had already
9 hired Jerry McKinney?
10    A.  He was subbing at that time.
11    Q.  Okay.  Do you remember what the
12 date was of the board meeting?
13    A.  I'm not for sure.
14    Q.  Okay.  During that board meeting
15 after you made the statement that you just
16 shared with me, did Mr. Wingard respond in
17 any fashion?
18    A.  No.
19    Q.  Did Mr. Edwards respond?
20    A.  No, I think they kind of put it
21 off to the next board meeting to make a
22 decision.
23    Q.  At that meeting, did any of the

Page 35

1 other board members comment in any
2 fashion?
3    A.  A couple of them did.  They said
4 that they didn't see where it said in the
5 guidelines that you had to have a GED or
6 high school diploma to work in the
7 lunchroom.
8    Q.  Do you remember which ones spoke
9 out?  I'll go over the list of them.  If
10 you remember, share with me, if not, we can
11 go over the names.
12    A.  I can't remember.
13    Q.  Okay.  Do you know Larry
14 Goodgain?
15    A.  Yes.
16    Q.  Have you talked to him about
17 contentions in your lawsuit?
18    A.  Yes.
19    Q.  When did you do that?
20    A.  I called him, and he said also
21 that I need to be at the board meetings.
22    Q.  Did you call him about the same
23 time you called David Edwards?

Page 36

1    A.  Yes.
2    Q.  Did he comment in any form or
3 fashion about what you shared with him?
4    A.  I called to ask about the
5 guidelines of being in the lunchroom.
6    Q.  Uh-huh.
7    A.  Because I wasn't for sure and he
8 said he didn't see where you had to have
9 that qualification.
10    Q.  Anything else that you remember
11 Mr. Goodgain sharing with you in the
12 conversation that you had?
13    A.  That's all I can remember.
14    Q.  At the board meeting that we just
15 talked about, did Mr. Goodgain say
16 anything?
17    A.  Yes.
18    Q.  What did she say?
19    A.  He said he did not see in the
20 guidelines where that was a requirement for
21 a lunchroom worker.
22    Q.  Anything else?
23    A.  No.

# FREEDOM COURT REPORTING

Page 37

1   Q.  Do you know Randall Hardeman?
2   A.  Yes.
3   Q.  How do you know him?
4   A.  From the board meetings.
5   Q.  Do you attend board meetings from
6  time to time?
7   A.  I went to those because I was
8  trying to get my job back.
9   Q.  Did you call him prior to the
10  board meeting?
11   A.  Yes.
12   Q.  About the same time that you
13  called Mr. Edwards and Mr. Goodgain?
14   A.  Yes.
15   Q.  What do you recall discussing with
16  him?
17   A.  The same thing I discussed with
18  the other -- Larry.
19   Q.  Okay.  And what did he say in
20  response during that telephone
21  conversation?
22   A.  That I needed to also be at the
23  next board meeting.

Page 38

1   Q.  Did Mr. Hardeman say anything at
2  the board meeting that you recall?
3   A.  They were all discussing whether
4  it was a qualification in the lunchroom.
5   Q.  Okay.  But do you remember
6  anything specific that he said?
7   A.  No.
8   Q.  David Tuck, do you know Mr. Tuck?
9   A.  No.
10   Q.  Did you call Mr. Tuck?
11   A.  No.
12   Q.  Was Mr. Tuck at the board meeting
13  when you appeared?
14   A.  I believe so.
15   Q.  Do you remember him saying
16  anything in particular?
17   A.  No.
18   Q.  Charles Frank Ward is a board
19  member, do you know Mr. Ward?
20   A.  No.
21   Q.  Other than what took place at the
22  board meeting that we've been discussing,
23  have you ever talked to Mr. Ward about your

Page 39

1  contentions?
2   A.  No.
3   Q.  Do you remember Mr. Ward saying
4  anything at the board meeting?
5   A.  They were just trying to all
6  decide whether that was in the guidelines
7  or not.
8   Q.  Did superintendent Wingard say
9  anything at that time that board meeting
10  after you made your statements?
11   A.  Yes, but I can't remember exactly
12  what he said.
13   Q.  Do you know Keith Bullard?
14   A.  Yes.
15   Q.  She's he's the principal at Coosa
16  Central High School?
17   A.  Yes.
18   Q.  Are you contending that
19  Mr. Bullard discriminated against you?
20   A.  Well, I believe in -- everybody
21  that had a decision in hiring discriminated
22  against me, and he was one of the ones that
23  interviewed me.

Page 40

1   Q.  Has Mr. Bullard ever said anything
2  to you that you believe indicated a
3  discriminatory attitude because of your
4  gender, that is because you're a female?
5   A.  No.
6   Q.  Has he ever said anything to you
7  that would indicate a discriminatory bias
8  because of your race, that is because
9  you're white?
10   A.  No.
11   Q.  Is Mr. Bullard black or white?
12   A.  He's white.
13   Q.  After the decision was made to --
14  or before the decision was made to
15  recommend Jerry McKinney for the position,
16  did you talk to Mr. Bullard?
17   A.  No.
18   Q.  After the decision was made to
19  hire Jerry McKinney, did you talk to
20  Mr. Bullard?
21   A.  No.
22   Q.  Have you had any conversations
23  with Mr. Bullard about why he did not

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

|  | Page 41 |
|---|---|
| 1 | recommend you for the position? |
| 2 | A.  No. |
| 3 | Q.  Have you had any conversations |
| 4 | with Mr. Bullard about why he recommended |
| 5 | Jerry McKinney? |
| 6 | A.  No. |
| 7 | Q.  So would it be fair and correct to |
| 8 | say that you have no information about why |
| 9 | Mr. Bullard recommended somebody else for |
| 10 | the position that you applied for rather |
| 11 | than you? |
| 12 | A.  Just that they made the decision |
| 13 | they needed a man. |
| 14 | Q.  But based on anything he said or |
| 15 | did, would it be fair and correct that you |
| 16 | have no basis to assert that Mr. Bullard |
| 17 | made his recommendation because of your |
| 18 | gender or race? |
| 19 | A.  That's right. |
| 20 | Q.  Just focusing on Coosa Central |
| 21 | High School, when you began substituting at |
| 22 | the high school in, let's just start, |
| 23 | during the '05-'06 school year for that |

|  | Page 42 |
|---|---|
| 1 | five to six week period who interviewed |
| 2 | you? |
| 3 | A.  Ms. Forbes called me because Mike |
| 4 | quit the day that school began for that |
| 5 | session, and she needed somebody, and I |
| 6 | went in, and I went straight to work, |
| 7 | Ms. Forbes. |
| 8 | Q.  Was Ms. Forbes the only one that |
| 9 | you really talked to about replacing him on |
| 10 | a substitute basis? |
| 11 | A.  Yes. |
| 12 | Q.  You didn't talk to Mr. Bullard at |
| 13 | that time? |
| 14 | A.  No. |
| 15 | Q.  Or Mr. Wingard? |
| 16 | A.  No. |
| 17 | Q.  When Ms. Forbes recommended that |
| 18 | you serve as the substitute at that time, |
| 19 | you were a woman, weren't you?  I just say |
| 20 | for that for the record, so that we have |
| 21 | that established. |
| 22 | A.  Yes. |
| 23 | Q.  So she did not discriminate |

|  | Page 43 |
|---|---|
| 1 | against you at that point because of your |
| 2 | gender? |
| 3 | A.  No. |
| 4 | Q.  She recommend that you work as a |
| 5 | substitute for the five to six week period |
| 6 | even though you were a woman? |
| 7 | A.  Right. |
| 8 | Q.  And you were white, a Caucasian at |
| 9 | that time too, weren't you? |
| 10 | A.  Yes. |
| 11 | Q.  So for the record, that did not |
| 12 | serve at any impediment for her to |
| 13 | recommend that you be employed as a |
| 14 | substitute at that time? |
| 15 | A.  No. |
| 16 | Q.  At any point while you served as a |
| 17 | substitute, were you actually evaluated by |
| 18 | the Coosa County Board? |
| 19 | A.  No. |
| 20 | Q.  So there's no formal evaluation, a |
| 21 | peppy instrument evaluated how you were |
| 22 | doing to your knowledge? |
| 23 | A.  No. |

|  | Page 44 |
|---|---|
| 1 | Q.  At the high school, was Ms. Forbes |
| 2 | your immediate supervisor? |
| 3 | A.  Yes. |
| 4 | Q.  Were you ever reprimanded by |
| 5 | Ms. Forbes or anyone else that was in a |
| 6 | supervisory position at Coosa Central High |
| 7 | School? |
| 8 | A.  No. |
| 9 | Q.  Did you ever have any problems or |
| 10 | disagreements with any of your supervisors |
| 11 | at Coosa Central High School? |
| 12 | A.  No. |
| 13 | Q.  Or any disagreements or problems |
| 14 | with co-employees? |
| 15 | A.  No. |
| 16 | Q.  At any time, did you walk off the |
| 17 | job? |
| 18 | A.  Yes. |
| 19 | Q.  Tell me about that. |
| 20 | A.  It was the day that Ms. Forbes |
| 21 | come in and told me that I didn't get the |
| 22 | job, and it was right before the lunch, the |
| 23 | kids were fixing to come in for lunch, and |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 45

1  she said they hired a male, and she said it
2  was a black male.  And I was so upset, I
3  left crying.
4    Q.  Okay.  And that's the only time
5  you've left the job?
6    A.  That's the only time.
7    Q.  Did you say anything to Ms. Forbes
8  after she advised you that Jerry McKinney
9  was going to be hired?
10   A.  I just told her I thought it was
11  not fair.
12   Q.  Did you ask her why the board had
13  voted to employ Mr. McKinney rather than
14  you?
15   A.  Yes.
16   Q.  What did she say?
17   A.  She said it's because he had a
18  GED, I mean, a high school diploma, and I
19  told her, I know I didn't, but when I
20  applied for the job, that wasn't one of the
21  qualifications when I filled my application
22  out.
23   Q.  What did she say to that?

Page 46

1    A.  I told her I thought I was being
2  done unfairly, and she said, you're right.
3    Q.  Ms. Forbes said that you were
4  being treated unfairly?
5    A.  Yes.
6    Q.  Did she say on the basis that the
7  board couldn't consider you because you did
8  not have a high school diploma or GED?
9    A.  She said I just didn't get the job
10  because of that.
11   Q.  And your response to that was that
12  was unfair?
13   A.  That was unfair.
14   Q.  And she said that she thought that
15  it was unfair that there was a requirement
16  that you have a high school diploma or
17  GED?
18   A.  No, it's just that because she's
19  made statements saying it was probably
20  going, a man was going to be put in that
21  position and she knew it was going to be a
22  black man.
23   Q.  Did she say that on that

Page 47

1  occasion?
2    A.  No, she said it several times
3  beforehand.
4    Q.  On that occasion --
5    A.  On that occasion, she just said,
6  you didn't get the based on, because you
7  didn't have a GED.
8    Q.  Okay.  You had been working for
9  six weeks or so in the position as a, you
10  call it a lunchroom worker or a cafeteria
11  workers, what's the position?
12   A.  Lunchroom worker.
13   Q.  The position that was posted, was
14  that for that same position that you had
15  been working as a substitute?
16   A.  Yes.
17   Q.  Share with me what your duties and
18  responsibilities were in that position.
19   A.  It was keeping the buffet bars
20  full of food, taking out the trash and
21  sweeping the and mopping the lunchroom, and
22  stocking the freezers and the coolers.
23   Q.  Did you do any cooking or food

Page 48

1  preparation?
2    A.  Every now and then if I got caught
3  up, if I had extra time and they were,
4  like, wrapping sandwiches or something, I'd
5  help them wrap sandwiches.
6    Q.  Did they have a division of labor
7  so that somebody else did most of the
8  cooking?
9    A.  Yes.
10   Q.  Who did most of the cooking?
11   A.  Barbara and Sandra and
12  Ms. Margaret and Becky.
13   Q.  And what was their position?
14   A.  They were the lunchroom workers,
15  they were the ones that done the food.
16   Q.  So it's the same job
17  classification?
18   A.  Yes.
19   Q.  But within that classification,
20  some people had other duties and
21  responsibilities?
22   A.  Yes.
23   Q.  But on occasion, you would be

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 49 |
|---|
| 1  asked to prepare food? |
| 2      A.  Well, they didn't ask me, but I |
| 3  didn't want to stand around doing nothing |
| 4  while they were back there working, so I |
| 5  helped them. |
| 6      Q.  When you prepared food, did you |
| 7  have to follow recipes? |
| 8      A.  No. |
| 9      Q.  Well, when you're preparing food, |
| 10 isn't it a general requirement that you |
| 11 would have to follow some kind of recipe? |
| 12     A.  Well, they would have the recipe, |
| 13 they would already have it mixed up and |
| 14 usually by the time I got back there, they |
| 15 were already getting it ready, and getting |
| 16 it ready to be put out. |
| 17     Q.  But if you have to prepare food, |
| 18 isn't it generally true that you have to |
| 19 read and follow recipes? |
| 20     A.  Yes. |
| 21     Q.  How did you learn that there was |
| 22 going to be an application process for this |
| 23 position? |

| Page 50 |
|---|
| 1      A.  Well, I asked Todd Wingard about |
| 2  benefits, I told him I needed benefits, and |
| 3  when was he going to post a job, and he |
| 4  said they were going to post it soon and I |
| 5  told them I was interested in the job and I |
| 6  wanted to put my name on it. |
| 7      Q.  Did he encourage, did Todd Wingard |
| 8  encourage or discourage you from applying? |
| 9      A.  No. |
| 10     Q.  Neither one? |
| 11     A.  Neither. |
| 12     Q.  He just shared the information? |
| 13     A.  Yes. |
| 14     Q.  So based on that conversation, did |
| 15 Mr. Wingard say or do anything that you |
| 16 interpreted as being discriminatory against |
| 17 you? |
| 18     A.  No. |
| 19     Q.  Did you see the posting notice, or |
| 20 did someone give that to you? |
| 21     A.  I seen the posting notice. |
| 22     Q.  Let's go ahead and mark these |
| 23 exhibits in order.  We have marked for |

| Page 51 |
|---|
| 1  identification the exhibit's I have |
| 2  previously mentioned, but let's make sure |
| 3  I've got them in sequence, Defendant's 1 is |
| 4  the deposition notice; Defendant's 2 is the |
| 5  complaint that you have filed; Defendant's |
| 6  3 is a temporary vacancy notice; |
| 7  Defendant's 4 is the application; |
| 8  Defendant's 5 is the interview schedule; |
| 9  and Defendant's 6 is the charge of |
| 10 discrimination, and then 7 is the |
| 11 information that you provided. |
| 12         (Whereupon, Defendant's Exhibit |
| 13         No.s 1, 2, 3, 4, 5, 6, and 7 |
| 14         have been marked for |
| 15         identification and copy of same |
| 16         is attached hereto.) |
| 17     Let me show you what I have |
| 18 marked as Defendant's Exhibit 3. |
| 19     MR. ROBERSON:  Can I see |
| 20 Defendant's 5?  I don't know that I've seen |
| 21 the interview thing. |
| 22     MR. SWEENY:  That's something we |
| 23 supplied for you.  It's just a schedule. |

| Page 52 |
|---|
| 1  That's just multiple copies of the same |
| 2  thing. |
| 3      MR. ROBERSON:  It's nothing but |
| 4  the interview schedule. |
| 5      MR. SWEENY:  That's correct. |
| 6      Q.  Looking at what we've marked as |
| 7  Defendant's Exhibit 3, is this the |
| 8  temporary vacancy posting that you saw in |
| 9  following which you applied for the |
| 10 position? |
| 11     A.  Yes. |
| 12     Q.  The position was a six hour |
| 13 temporary lunchroom worker, heavy lifting |
| 14 involved, what were the qualifications |
| 15 listed in this posting notice? |
| 16     A.  High school diploma or GED. |
| 17     Q.  So when you got the posting |
| 18 notice, you knew that one of the listed |
| 19 qualifications for the position was a high |
| 20 school diploma or GED? |
| 21     A.  Yes. |
| 22     Q.  That was clearly set forth in the |
| 23 posting notice? |

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1    A.  Yes.  But can I clarify
2    something?
3    Q.  Sure, please.
4    A.  When I seen that, I figured they
5    probably done that qualifications after I
6    filled my application out because at the
7    time I filled my application out, it wasn't
8    a qualification, so that's why I went ahead
9    and applied for the job.
10    Q.  All right.  I don't understand
11    your response.  When did you apply for a
12    position where there was a not a
13    requirement for a high school diploma or
14    GED?
15    A.  When I it went to apply, you have
16    to start like as a sub to get your foot in
17    the door, and when I went and applied for
18    the job, there wasn't no requirement on the
19    application for a high school diploma of
20    GED in the lunchroom, so I thought, you
21    know, since my application was already in
22    there that it wouldn't be, you know, I was
23    already in the door.

Page 54

1    Q.  Well, have you ever checked to see
2    if there were other posting notices for
3    hiring a lunchroom worker other than this?
4    A.  No.
5    Q.  When you were applying for a
6    substitute, you weren't applying because of
7    off some posting notice that you saw, were
8    you?
9    A.  No, I knew that they needed help
10    real bad.
11    Q.  Okay.
12    A.  And I asked a girl that works in
13    the lunchroom, well, do you have a high
14    school diploma or GED because she works
15    there and she said, no, you don't, she
16    said, I don't have one.
17    Q.  So when you were coming in to
18    apply for work, you were applying for a
19    substitute position?
20    A.  Yes.
21    Q.  And you were actually employed as
22    a substitute?
23    A.  Yes.

Page 55

1    Q.  For that substitute capacity,
2    there was no requirement that you have a
3    high school diploma or GED?
4    A.  No.
5    Q.  Okay.  From 1999 on, did you ever
6    see any actual posting notice for a
7    position of lunchroom worker other than
8    what we've marked as Defendant's Exhibit
9    3?
10    A.  No.
11    Q.  Do you know if the board has hired
12    any other permanent lunchroom workers since
13    1999?
14    A.  Yes.
15    Q.  Do you know the names of anyone
16    that's been hired since 1999 as a permanent
17    lunchroom worker?
18    A.  That doesn't have a GED or high
19    school diploma?
20    Q.  That's right.
21    A.  Yes.
22    Q.  Who?
23    A.  Barbara Murphy, Lisa Cleveland.

Page 56

1    Q.  Lisa what?
2    A.  Cleveland.  Calvin, I don't know
3    his last name and Teresa Mitchell.
4    Q.  Do you know when Barbara Murphy
5    was employed?
6    A.  She just got tenured probably last
7    year.  You go about four years.  You have
8    to work like three years as temporary then
9    when you go that fourth year, you get
10    tenure.
11    Q.  What about Lisa Cleveland?  How
12    long has she been employed?
13    A.  She's been there, this is probably
14    going on her third or fourth year.  She was
15    working temporary, and she just got a job
16    there this year without a GED or high
17    school diploma.
18    Q.  She's at the high school?
19    A.  She's at the high school.
20    Q.  Where is Lisa Cleveland?
21    A.  She's at the elementary lunchroom.
22    Q.  And Calvin?
23    A.  He's at the elementary lunchroom.

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1    Q.  How long has he been there?
2    A.  I don't know.  Probably about five
3  or six years.
4    Q.  Teresa Murphy?
5    A.  Mitchell.
6    Q.  Mitchell, where is she employed?
7    A.  She's at the elementary
8  lunchroom.
9    Q.  Do you know how long she's been
10  there?
11    A.  No, I do not.
12    Q.  You have not seen any posting
13  requirement though by the board of
14  education for a lunchroom worker other than
15  what we've marked as Exhibit 3.
16    A.  Well, yes, I've seen a posting in
17  the paper before, and I called Todd Wingard
18  about it, put my name on it.  It was the
19  job Lisa Cleveland now has.
20    Q.  Uh-huh.
21    A.  And he said he would put my name
22  on it, but he informed me that there was two
23  people ahead of me, but he'd go ahead and

Page 58

1  put my name on that posting, and Lisa
2  Cleveland got that job.
3    Q.  Do you know who actually crafted
4  or put together this posting notice for
5  Defendant's Exhibit 3?
6    A.  No, I do not.
7    Q.  Do you know who's idea it was to
8  include a qualification of a high school
9  diploma or GED?
10    A.  No, I did not.
11    Q.  Do you have any basis to contend
12  that the author of this posting with the
13  requirement of high school diploma or GED
14  included that qualification specifically to
15  discriminate against you?
16    A.  I have no idea.
17    Q.  Just so the record's clear, as far
18  as you know in general terms, is it as easy
19  for a woman to get a high school diploma or
20  GED as a man?
21    A.  Yes.
22    Q.  So having a high school diploma of
23  GED is not inherently discriminatory

Page 59

1  against women, is it?
2    A.  No.
3    Q.  Is there anything inherently
4  discriminating against white people for, to
5  have a requirement of high school diploma
6  or GED?
7    A.  Not that I know of.
8    Q.  So the terms of that qualification
9  as it would apply across the board, there's
10  nothing on the face of a requirement for
11  high school diploma or GED that's
12  discriminatory against someone because of
13  their gender or their race, is there?
14    A.  No.
15    Q.  Have you ever discussed with
16  Todd Wingard or anyone else at the board
17  why they included this qualification of
18  high school diploma on the posting for
19  September 5, 2006?
20    A.  I tried to discuss it with
21  Pam Jones but she just kind of just --
22    Q.  With who?
23    A.  Pam Jones.

Page 60

1    Q.  Uh-huh.
2    A.  The child nutritionist.
3    Q.  Uh-huh.
4    A.  And she really, really just kind
5  of blew me off to tell you the truth.
6    Q.  What did she say?
7    A.  She just kind throwed (sic) her
8  hand up and said you have to talk to Todd
9  is what she said.
10    Q.  Okay.  Did you do that?
11    A.  No, I couldn't ever get a hold to
12  him until we went to the board meeting.
13    Q.  Prior to the decision to employ
14  Jerry McKinney, did anybody tell you that you
15  the requirement of a high school diploma or
16  GED would be ignored or not be required?
17    A.  No.
18    Q.  Do you know if the State Board of
19  Education recommended that people working
20  in the lunchroom have a high school degree
21  or GED?
22    A.  To my knowledge, they didn't
23  require it.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1    Q.  My question is:  Do you know if
2  the State Board of Education recommend that
3  there be that requirement?
4    A.  No.
5    Q.  So you saw the posting and then
6  you, did you fill out an application for
7  the position after seeing this posting
8  notice?
9    A.  I had Pam Jones and Todd Wingard,
10  I told them both to put my name down on it
11  and they did.
12    Q.  Okay.  Let me show you what I've
13  marked as Defendant's Exhibit 4 and ask you
14  if that's your application for the
15  position.
16    A.  Yes.
17    Q.  This was dated August 20, 2004,
18  I'm just seeing that.  Was this something
19  that was already on file with the board?
20  Do you see in the left hand column,
21  Ms. Sims?
22    A.  Yes.
23    Q.  Is all of this in your handwriting

Page 62

1  except for Mr. Bullard's signature at the
2  bottom?
3    A.  Yes.
4    Q.  When this position came open in
5  September of 2006, was there anything that
6  had changed in the application that we're
7  now looking at that's been marked as
8  Defendant's Exhibit 4?
9    A.  No.
10    Q.  In this application, it says name
11  of high school graduated and you put down
12  high school, but that's where you attend
13  rather than graduated; correct?
14    A.  Right.
15    Q.  And was your last year of
16  attending that high school 1980?
17    A.  Yes.
18    Q.  And that's when you finished the
19  11th grade?
20    A.  Yes.
21    Q.  Are all of these references that
22  you've listed people that live in Coosa
23  County?

Page 63

1    A.  All but one.
2    Q.  Which one is not?
3    A.  Pam Looney.
4    Q.  And she lives where?
5    A.  Talladega County.
6    Q.  Okay.  I really can't read Page 2,
7  but apparently that sets forth some
8  information about the position.  Can you
9  read that information?
10    A.  No.
11    Q.  Okay.  Do you know how many people
12  applied for this position that we're
13  talking about?
14    A.  No.
15    Q.  Did you ever ask Keith Bullard or
16  Todd Wingard or any members of the board
17  how many people applied?
18    A.  No.
19    Q.  Have you gone to the board records
20  and reviewed the qualifications of the
21  other people that applied?
22    A.  No.
23    Q.  So I'm clear:  Would you know how

Page 64

1  many woman applied for the job?
2    A.  No.
3    Q.  Do you know how many woman applied
4  that had a high school degree?
5    A.  No.
6    Q.  Do you know how many white
7  applicants there were?
8    A.  No.
9    Q.  Do you know how many men applied
10  for the job?
11    A.  No.
12    Q.  Do you know how many black
13  applicant males applied for the position?
14    A.  No.
15    Q.  Do you know how many of those had
16  high school degrees?
17    A.  No.
18    Q.  Do you know if there were other
19  applicants for the position that did not
20  have a high school degree or diploma that
21  also were not considered?
22    A.  I don't know.
23    Q.  Did you ever discuss with

16  (Pages 61 to 64)

Page 65

1 Keith Bullard or Todd Wingard or any other
2 board member whether there were, in fact,
3 other applicants for the position who did
4 not have a degree, a high school degree who
5 were not considered because of that?
6 A. No.
7 Q. Let me show you what we've marked
8 as Defendant's Exhibit 5. This is a
9 document from the board of education files
10 that list interviews for the position that
11 occurred that is shown on Page 1 of
12 September 22nd and on Page 2, the 25th. It
13 list as the fourth person down Diane Sims,
14 is that you?
15 A. Yes.
16 Q. You're often referred to as Diane
17 Sims?
18 A. Yes.
19 Q. Okay. And were you interviewed on
20 September 22nd, 2006?
21 A. Yes.
22 Q. If I ask you if you know whether
23 Gladice Harris was a white female with a

Page 66

1 high school diploma, would you know?
2 A. No.
3 Q. If I ask you about each of these
4 applicants that appeared on page 1 and 2 of
5 this exhibit, would you know whether they
6 had a high school diploma?
7 A. No.
8 Q. Or what kind experience they might
9 have had that was pertinent to the position
10 which was being considered?
11 A. No.
12 Q. If it turns out that a number of
13 these, or do you have any reason to dispute
14 my representation that a number of these
15 people that applied and were interviewed
16 had a high school diploma?
17 A. No.
18 Q. Assume that the Court determines
19 that the requirement of a high school
20 diploma is a legitimate, nondiscriminatory
21 business criteria -- just assume that for
22 purposes of my question -- would you agree
23 that if someone applied for this position

Page 67

1 where there's a requirement of a high
2 school diploma that had the diploma and you
3 applied where you do not have a diploma
4 that they would be better qualified on that
5 criteria alone?
6 A. If that's what they were going by,
7 yes.
8 Q. So let me restructure it. The job
9 notice required a high school diploma or
10 GED, you applied, and you did not have a
11 high school diploma or GED; is that
12 correct?
13 A. That's correct.
14 Q. Assuming that there were a number
15 of these applicants that had a high school
16 diploma or GED, based on that criteria,
17 they would be better qualified for the
18 position as it was posted?
19 A. Yes.
20 Q. Who interviewed you on September
21 22nd?
22 A. Jan Forbes, Pam Jones, and
23 Keith Bullard.

Page 68

1 Q. I'm sorry, Jan Forbes and who?
2 A. Pam Jones and Keith Bullard.
3 Q. During that interview process, did
4 anything come up about whether you had a
5 high school diploma?
6 A. Yes.
7 Q. So you had an application that
8 we've previously marked and that indicated
9 that you graduated from high school.
10 A. But during the interview, I told
11 them I didn't, I couldn't --
12 Q. I'm not equivocating that. Let me
13 just establish that point. You had an
14 application that indicated that you had
15 graduated from high school.
16 A. Yes.
17 Q. Did they have that application
18 before them as they were talking to you as
19 far as you know?
20 A. Not that I know of.
21 Q. Okay. But when they were
22 interviewing, did they ask you if you were
23 a high school graduate?

# FREEDOM COURT REPORTING

Page 69

1    A.  I don't remember.
2    Q.  But that subject came up in some
3  fashion?
4    A.  I think I did it, and I told them
5  I finished in the 11th grade.
6    Q.  Okay.  And when you told them
7  that, what did they say?
8    A.  Nothing.
9    Q.  Did anybody say during that
10  interview that they could not consider you
11  because you were not a high school
12  graduate?
13    A.  No.
14    Q.  When did that come up?
15    A.  Just when we were sitting there
16  discussing that.
17    Q.  I'm sorry?
18    A.  When we were sitting there talking
19  about.  Ms. Forbes knew, I told her
20  earlier, you know, but I said, when I
21  filled my application out that wasn't a
22  requirement because one of the employees
23  that worked there told me it wasn't a

Page 70

1  requirement.
2    Q.  Okay.  But you knew from the
3  application that it was posted with that
4  requirement?
5    A.  Right.
6    Q.  So you were interviewed and then
7  you were still talking with Jan Forbes, Pam
8  Jones, and Keith Bullard.
9    A.  Yes.
10    Q.  And the subject of whether you
11  were qualified came up in terms of the
12  diploma?
13    A.  They just knew that I didn't have
14  a high school diploma.
15    Q.  And what did they say about that?
16    A.  Nothing.
17    Q.  How do you know that they knew
18  that you didn't have that?
19    A.  Because I already told Ms. Forbes.
20    Q.  And did she share that with the
21  others while y'all were sitting there
22  talking?
23    A.  I have no idea.

Page 71

1    Q.  Well you said that y'all were
2  sitting around talking, what were you
3  talking about?
4    A.  About -- I can't remember exact
5  words, but I know we was talking about the
6  job and Ms. Forbes told them, you know, I
7  had been doing a good job and that there
8  was one qualification, that I didn't have a
9  high school diploma.
10    Q.  Okay.
11    A.  But that was it, that was the end
12  of the conversation.
13    Q.  Based on that comment which is
14  when you, you know, you were being
15  interviewed, Ms. Forbes didn't say anything
16  discriminary against you because of your
17  gender, did she?
18    A.  Of course not, no.
19    Q.  And she didn't say anything
20  discriminary about you because of your
21  race?
22    A.  No.
23    Q.  What she said was that you had

Page 72

1  done a good job?
2    A.  Yes, she said that I was a good
3  employee.
4    Q.  Okay.  So just based on that
5  conversation and what she said, there was
6  no evidence that she was discriminating
7  against you because of your race or your
8  gender.
9    A.  Not in that interview.
10    Q.  Okay.  Let me count up with you
11  Ms. Sims on Page 1, there were six
12  applicants that were interviewed and four
13  on Page 2, for a total of ten applicants.
14  You're asking the Court to put you in the
15  position now held by Jerry McKinney;
16  correct?
17    A.  Yes.
18    Q.  Are you contending that if
19  Jerry McKinney had not gotten the position
20  that you would have been the next best
21  qualified?
22       MR. ROBERSON:  Object to the
23  form, you can answer.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

1     Q.  Let me rephrase that.  Are you
2  contending that you would have been, but
3  for your gender or race, are you contending
4  that you were better qualified than all of
5  the other applicants?
6     A.  Well, I think I was.  I was doing
7  such a good job.  I was getting
8  complimented on how well I was doing.
9     Q.  Do you know if the members of the
10  committee rated you as the second or third
11  or fourth or fifth or tenth person that was
12  interviewed?
13     A.  I don't know.
14     Q.  Would it be fair then to say,
15  Ms. Sims, that you don't know whether,
16  let's assume that Jerry McKinney did not
17  apply for the position, you don't know
18  whether you would have been the next person
19  selected or not, do you?
20     A.  Well, I don't know really know.  I
21  just been told that it was probably going
22  to be filled by a man.
23     Q.  Okay.  But in terms of whether you

Page 74

1  were better qualified than other white
2  females or other applicants that applied,
3  you don't know because you didn't look at
4  any of their credentials?
5     A.  No.
6     Q.  So would I be fair and correct to
7  say:  You have no basis to represent that
8  you were the best qualified person of the
9  applicants that applied?
10     MR. ROBERSON:  Object to the
11  form, you can answer.
12     Q.  Do you have any basis to make that
13  assertion?
14     A.  No.
15     Q.  As far as the process goes,
16  Ms. Sims, what is the employment process
17  that's followed when someone is hired by
18  the Coosa County Board?  Do you know the
19  steps that are required?
20     A.  No.
21     Q.  In this case, do you know if
22  Keith Bullard recommended that
23  Jerry McKinney be hired?

Page 75

1     A.  Yes.
2     Q.  Okay.  But you haven't discussed
3  with him why he made that recommendation?
4     A.  No.
5     Q.  Did he make that recommendation to
6  the superintendent?
7     A.  Yes.
8     Q.  And that's Todd Wingard?
9     A.  Right.
10     Q.  If I represented to you, Ms. Sims,
11  that under Alabama law the only way a
12  person can be hired for a permanent
13  position is for the superintendent to
14  recommend employment to the board, would
15  you have any reason to dispute that
16  assertion?
17     A.  No.
18     Q.  So assuming that's correct and I
19  think your attorney can verify that, the
20  superintendent then has to make a written
21  recommendation to the board to employ a
22  person on a permanent basis.
23     A.  Yes.

Page 76

1     Q.  As far as you know, did
2  Todd Wingard at a board meeting recommend
3  that Jerry McKinney be employed?
4     A.  Yes.
5     Q.  Do you know of, I've asked this
6  before but let me make sure it's clear on
7  the record:  Do you know the basis for
8  Mr. Wingard's recommendation that
9  Jerry McKinney be employed?
10     A.  No.
11     Q.  Do you know what information he
12  received from Keith Bullard?
13     A.  No.
14     Q.  Do you know if Keith Bullard ever
15  said anything to Mr. Wingard when he was
16  recommending that Jerry McKinney be hired
17  that he be hired because he's a male?
18     A.  No.
19     Q.  Do you have any basis to assert
20  that Mr. Bullard recommended to Mr. Wingard
21  that Jerry McKinney be hired because he's
22  black?
23     A.  No.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1    Q.  Do you have any basis to assert
2    that the reason Todd Wingard made his
3    recommendation for Jerry McKinney was
4    solely because he is a male?
5    A.  No.
6    Q.  Or solely because he was black?
7    A.  No.
8    Q.  Do you have any basis to assert
9    that the reason the board members voted to
10   hire Jerry McKinney was because he was a
11   male?
12   A.  Say that again.
13   Q.  Sure.  After Todd Wingard made the
14   recommendation that Jerry McKinney be
15   employed, is it correct that the board
16   members have to vote on that
17   recommendation?
18   A.  Yes.
19   Q.  To your knowledge, did the board
20   vote unanimously to hire Jerry McKinney?
21   A.  Yes.
22   Q.  Do you know if when Todd Wingard
23   made the recommendation he said anything to

Page 78

1    the board that he was recommending
2    Jerry McKinney because he was a male?
3    A.  No, not that I know of.
4    Q.  Or because he was black?
5    A.  No.
6    Q.  Do you know from anything that any
7    board member said when they voted to hire
8    Jerry McKinney that they were doing so
9    because he was black or because he was a
10   male?
11   A.  No.
12   Q.  Did you, have you worked at all
13   with Jerry McKinney?
14   A.  No.
15   Q.  Do you know him?
16   A.  No.
17   Q.  And you weren't there when he was
18   interviewed by the three members that did
19   the interviews, do you?
20   A.  No.
21   Q.  So you don't know what kind of
22   interview or impression he made?
23   A.  No.

Page 79

1    Q.  Do you have any reason to assert
2    that Jerry McKinney was unqualified for the
3    position?
4    A.  No.
5    Q.  As far as you know, did he have a
6    high school diploma?
7    A.  I didn't know.
8    Q.  As far as you know, was he able to
9    discharge the duties and responsibilities
10   of the position?
11   A.  I did not know.
12   Q.  Let me rephrase a question I
13   previously asked.  If there were ten other
14   applicants -- well, let's say:  If there
15   were a number of other applicants with a
16   high school degree, are you contending that
17   you would have gotten the job if
18   Jerry McKinney had not been hired?
19   A.  I would like to think so.
20   Q.  Do you have any basis for that
21   assertion from any conversation you had
22   with Todd Wingard?
23   A.  No.

Page 80

1    Q.  Or any board member?
2    A.  No.
3    Q.  Or Jan Forbes?
4    A.  No.
5    Q.  Or Pam Jones?
6    A.  No.
7    Q.  Or Keith Bullard?
8    A.  No.
9    Q.  Ms. Sims, let me show you what
10   we've marked as Defendant's Exhibit 6, your
11   EEO complaint.  Did anyone assist you in
12   preparing this complaint?
13   A.  My attorney.
14   Q.  Okay.  Appendix A, do you set
15   forth the basis for your belief that you've
16   been the victim of discrimination?
17   A.  Yes.
18   Q.  Do you see on Appendix A, the
19   second page of that exhibit?
20   A.  Yes.
21   Q.  In Paragraph 2, you indicate:  I
22   perform my duties in an exemplarily
23   manner.  Who was your supervisor when you

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1  were a substitute worker at the high
2  school?
3    A.  Jan Forbes.
4    Q.  Did she ever use that term,
5  exemplarily?
6    A.  She said I done a very good job.
7    Q.  But that's not her language, is
8  it, exemplarily manner?
9    A.  No.
10    Q.  When did she say that you had done
11  a good job?
12    A.  She told me all the time that I,
13  you know, I done a good job.
14    Q.  Did Ms. Forbes ever say anything
15  to you that indicated that she was bias
16  against you because of your gender?
17    A.  She would make the comment that it
18  was a man's position, a man's job.
19    Q.  Okay.  When you say in Paragraph 3
20  my position was previously held by a black
21  male, the position we're talking about is a
22  position of employment at the Coosa Central
23  High School; correct?

Page 82

1    A.  Yes.
2    Q.  And that's the position you had
3  been working in as a substitute?
4    A.  Yes.
5    Q.  You mentioned that you were paid
6  as a substitute only a minimum wage, is
7  that what substitutes are paid in Coosa
8  County?
9    A.  To my knowledge, they were paid
10  minimum wage.  I think it $6.50.
11    Q.  But you weren't paid less as a
12  substitute employee than any other
13  substitute, were you, to your knowledge?
14    A.  I don't know to my knowledge, I
15  don't know what the other subs made.
16    Q.  Well, when you would be called to
17  work as a substitute, wouldn't they tell
18  what the pay was?
19    A.  They told me it was minimum wage.
20    Q.  Okay.  And as far as you know,
21  were there substitute employees paid
22  minimum wage?
23    A.  I assume that.

Page 83

1    Q.  Okay.  You're not contending that
2  you were paid minimum wage as a substitute
3  because of your gender or race, are you?
4    A.  No.
5    Q.  Okay.  In Paragraph 4, you
6  attribute the statements to Jan Forbes and
7  Pam Jones.  To whom did you say that those
8  comments were discriminatory?  Do you see
9  that?  I told her that was discriminatory.
10    A.  To Ms. Forbes.
11    Q.  Okay.  At the time she made the
12  statements?
13    A.  Yes.
14    Q.  Now, Ms. Forbes didn't make the
15  determination of who would get the
16  position, did she?
17    A.  She was there, she done the
18  interview.
19    Q.  She was on the interview?
20    A.  Yes.
21    Q.  But it wasn't ultimately her final
22  responsibility to determine who would get
23  the job.

Page 84

1    A.  I guess everybody that was
2  interviewed, they made the final decision
3  and turned it over to Todd Wingard.
4    Q.  Okay.  If Jan Forbes stated that
5  she did not consider you as an applicant
6  because you did not have a high school
7  diploma, do you have any reason to dispute
8  that?
9    A.  No, I believe she wanted a man,
10  they wanted a man, and she wanted a man
11  there in there.
12    Q.  Okay.  But back to my question:
13  Do you have, do you believe that Jan Forbes
14  is an honest person?
15    A.  No.
16    Q.  Well, if she said or states that
17  she did not consider you because you didn't
18  meet the qualifications for the job, do you
19  have any reason to dispute that?
20    A.  I thought I had the
21  qualifications, I was doing the job.
22    Q.  Well, let's go back to the
23  posting.  When they interviewed you, they

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1  were interviewing you for a position that
2  required a high school diploma for its
3  equivalent?
4      A.  Right.
5      Q.  If Jan Forbes said because of that
6  qualification that was posted as a matter
7  of state law citing the qualifications that
8  she didn't think that she could consider
9  you, do you have any reason to dispute
10 that?
11     MR. ROBERSON:  Object to the
12 form.  The posting may be required as a
13 matter of state law, but I object to your
14 implication that a high school diploma is
15 required.
16     MR. SWEENY:  That's well taken.
17 Let me rephrase that.
18     Q.  Are you aware that by state law
19 boards of education must post positions of
20 employment?
21     A.  No.
22     Q.  Do you know if a board post a
23 position of requirement, post a position of

Page 86

1  employment that think must cite the
2  qualifications that they are going to use
3  in making the determination?
4      A.  Yes.
5      Q.  In this regard, they posted the
6  requirement of a high school diploma?
7      A.  Yes.
8      Q.  And based on that, if Ms. Forbes
9  says she didn't consider you for
10 employment, has she ever said anything to
11 you that would make you disbelieve that
12 that's what she did with regard to your
13 application?
14     A.  Well, I don't think I was really
15 ever considered.
16     Q.  Because you didn't have a high
17 school diploma?
18     A.  No, because of my sex and race.
19     Q.  That's just your assumption, isn't
20 it?
21     A.  Yes.
22     Q.  Now, if Pam Jones, if Pam Jones
23 said she didn't consider you because you

Page 87

1  didn't have a high school diploma, do you
2  have any reason to dispute that?
3      A.  Well, she didn't say that, but
4  Ms. Forbes said she heard her say she had
5  to get color in the lunchroom.
6      Q.  If Keith Bullard said that he
7  didn't think they could consider you
8  because you didn't have the qualifications
9  posted, do you have any reason to dispute
10 that?
11     A.  I don't know about Keith.
12     Q.  Do you think Keith is an honest
13 person?
14     A.  I really don't know.
15     Q.  Do you have any reason to assert
16 that he's a dishonest person?
17     A.  Not really, I don't really know
18 him.
19     Q.  In the interview committee in
20 discussing all of the applicants came to
21 the conclusion that they could not consider
22 someone that did not have a high school
23 diploma, do you have any basis to challenge

Page 88

1  that representation, that is if
2  Mr. Bullard, Ms. Forbes, and Ms. Jones
3  testified under oath that at the end of the
4  interview process they decided that they
5  could not consider you or any other
6  applicant who did not have a high school
7  diploma, do you have any reason to dispute
8  that they came to that conclusion?
9      A.  I don't guess.
10     Q.  Let's look for a minute at
11 Defendant's Exhibit 2, which is the
12 complaint in this lawsuit.
13     MR. ROBERSON:  Artfully crafted,
14 no doubt?
15     MR. SWEENY:  What?
16     MR. ROBERSON:  Artfully crafted,
17 no doubt.
18     MR. SWEENY:  Let's go off the
19 record.
20     (Whereupon, a discussion
21     was held off the record.)
22     MR. SWEENY:  Let's go back.
23     Q.  (By Mr. Sweeny) With regard to the

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 89 | Page 91 |
|---|---|
| 1  complaint, Paragraph 7 you attribute the | 1  applied for? |
| 2  statements to Jan Forbes and Pam Jones that | 2     A.  I applied at Coosa Medical. |
| 3  we previously discussed? | 3     Q.  Were you interviewed? |
| 4     A.  Yes. | 4     A.  Yes. |
| 5     Q.  All right.  And it's those | 5     Q.  Do you know why you did not get |
| 6  statements, statements that you attribute | 6  that position? |
| 7  to Jan Forbes and Pam Jones that serve as | 7     A.  Yes. |
| 8  the basis for your contention that you were | 8     Q.  Why? |
| 9  discriminated against because of your | 9     A.  I got a poor report from the Board |
| 10  gender and race? | 10  of Education, Jan Forbes. |
| 11     A.  Yes. | 11     Q.  And that's.  The basis for that is |
| 12     Q.  That you're attributing the | 12  what's in the exhibit that we've marked as |
| 13  discrimination to Jan Forbes and Pam Jones | 13  Defendant's Exhibit 7? |
| 14  rather than to Keith Bullard or | 14     A.  Yes. |
| 15  Todd Wingard or the members of the board? | 15     Q.  From ESS? |
| 16     MR. ROBERSON:  Object to the | 16     A.  Uh-huh, the screening. |
| 17  form, you can answer. | 17     Q.  What other position did you? |
| 18     A.  I believe they make a decision on | 18     A.  Wal-Mart. |
| 19  that. | 19     Q.  Where did you apply at Wal-Mart? |
| 20     Q.  Okay.  But not based on anything | 20     A.  In Alex City and Sylacauga. |
| 21  they said or have written or have told | 21     Q.  Do you know why you did not get |
| 22  you; correct? | 22  positions there? |
| 23     A.  Yes. | 23     A.  It was second shift, and I can't |

| Page 90 | Page 92 |
|---|---|
| 1     Q.  So wouldn't it be fair and correct | 1  work second shift, I'm raising a three- |
| 2  to say, when you say you think you were | 2  year-old. |
| 3  discriminated against, it's because of what | 3     Q.  You're raising a three-year-old? |
| 4  you heard Jan Forbes and, or Pam Jones | 4     A.  Yeah, my grand baby. |
| 5  say? | 5     MR. SWEENY:  Let's go off the |
| 6     A.  Yes. | 6  record. |
| 7     Q.  And page, on Paragraph 9 you said | 7     (Whereupon, a discussion |
| 8  that you've applied for other positions | 8     was held off the record.) |
| 9  with the Coosa County Board? | 9     Q.  Any other positions that you've |
| 10     A.  Other positions?  I applied for | 10  applied for other than the hospital or |
| 11  another job. | 11  Wal-Mart? |
| 12     Q.  Other jobs. | 12     A.  That's all I can think of -- Home |
| 13     A.  At Coosa Medical. | 13  Depot, I applied on the Internet, but I |
| 14     Q.  Have you applied for any other | 14  haven't heard nothing from them. |
| 15  position of employment with the Coosa | 15     Q.  You've got an application pending |
| 16  County Board other than this position? | 16  there? |
| 17     A.  No. | 17     A.  Yes. |
| 18     Q.  Have you been employed since | 18     Q.  After you did not get the position |
| 19  November of 2006? | 19  at the hospital, did you call and ask why |
| 20     A.  No. | 20  they had hired somebody else? |
| 21     Q.  So you're unemployed right now? | 21     A.  I called and asked why I didn't |
| 22     A.  Yes. | 22  get the job because the interview went |
| 23     Q.  What other positions have you | 23  well, and she said that I had a bad |

23 (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1  reference, and I asked from who, and she
2  said it was from Coosa Central High School.
3      Q.  In 10, you allege in legal terms
4  that the reason why a black male was hired
5  is pretectal, is it your assertion that the
6  requirement for a high school diploma was a
7  pretext in order for Jerry McKinney to be
8  hired rather than you?
9      A.  I have no idea, I believe so.
10     Q.  In Paragraph 11, you state that
11  defendant retaliated against you because of
12  your complaints of race discrimination.
13  Who is it that retaliated against you, and
14  how did they do that?
15     A.  Ms. Forbes kept saying that it was
16  a man's job, and I kept telling her it
17  wasn't.  Obviously, I was doing a good job
18  at it, and she said in her office and she
19  made statements several times that it was a
20  man's job, and then she said she heard Pam
21  Jones say that she had to get some color in
22  here.
23     Q.  But in this assertion for

Page 94

1  retaliation, is the basis for your claim of
2  retaliation what was reported to you by the
3  hospital?
4      A.  Yes.
5      Q.  Okay.  Any other retaliation that
6  comes to mind?
7      A.  No.
8      Q.  Section 4, gender discrimination,
9  have you shared -- let me go back.  Count 3
10  of this complaint in Paragraph's 5 through
11  13 relate to race discrimination and
12  retaliation, have you shared the basis for
13  those assertions in answering my previous
14  question?
15     A.  Yes.
16     Q.  Why you believe the you're the
17  victim of race and retaliation
18     A.  Yes.
19     Q.  Okay.  Count 4, Paragraphs 14
20  through 19 relate to gender discrimination
21  that you believe that you were a victim of
22  discrimination because of your gender.
23  Have you shared with me all of the basis

Page 95

1  that comes to mind why you think you've
2  been victimized because you're a female?
3      A.  Well, I just -- I believe that
4  they knew all along that they were going to
5  get a male in there, and they needed a
6  black in there because it was all whites at
7  that time.
8      Q.  Since August of 2007, have you
9  had, have you been treated by any doctor?
10     A.  I went and seen a doctor.  I was
11  having trouble sleeping.
12     Q.  What doctor did you?
13     A.  I seen Dr. Gurley.
14     Q.  Who?
15     A.  My gynecologist, I went and seen
16  him about not sleeping.
17     Q.  Where is he?
18     A.  He's out of Talladega.
19     Q.  What is his full name?
20     A.  Jerry Gurley.
21     Q.  Did he prescribe any medication
22  for you?
23     A.  He gave me something to help me

Page 96

1  sleep.
2      Q.  For how long did you take that?
3      A.  I' still taking it off and on.  I
4  don't take it like I should, but I still
5  take them.
6      Q.  Have you been to any other
7  physicians since August of 2006?
8      A.  Yes.
9      Q.  Who?
10     A.  Fazel Raheim, neurologist for
11  headaches.
12     Q.  Okay.  Was any medicine prescribed
13  for you?
14     A.  Yes.
15     Q.  What was prescribed?
16     A.  Amitriptyline and Keppra.
17     Q.  Are you still taking that
18  medication?
19     A.  Yes.
20     Q.  Have you seen any other doctor?
21     A.  No.
22     Q.  But you've attributing the need to
23  go see those two doctors based on what

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 97

1    Coosa County did?
2        A.  Well, at the time I got fired I
3    was having, I was so upset that I was
4    having trouble sleeping.  I was having
5    stomach problems.
6        Q.  Now, when were you fired?
7        A.  Well, I wasn't fired at the time.
8    I left when they told me that I didn't have
9    the job, I was so upset.
10       Q.  Have you seen any psychiatrist or
11   psychologist since August of 2006?
12       A.  No.
13       Q.  Have you had any other expenses
14   that you're claiming other than attorney
15   fees to date?
16       A.  No.
17       Q.  Have you paid any attorney fees to
18   date?
19       A.  No.
20       Q.  And what you're asking the Court
21   to do is to put you in the, among other
22   things, is to put you in the position of
23   lunchroom worker at Coosa Central?

Page 98

1        A.  I would like my job back.
2        Q.  All right.  As I indicated at the
3    start of this deposition, Ms. Sims, I would
4    give you an opportunity to add any other
5    information you wanted to any question I've
6    asked.  Is there anything else that you
7    want to share with me?
8        A.  Well, you know, I would like my
9    job back, and, you know, the back pay and
10   the benefits and stuff like that, and, you
11   know, compensatory and punitive damages
12   because, you know, I suffered, and I was
13   really, you know, stressed over it.  But as
14   far as, you know, Ms. Forbes did, you know,
15   every other day she would say it's a man's
16   job, and it's probably going to be filled
17   by a black male because they had to have a
18   black in the lunchroom.  And I told
19   Ms. Forbes, you know, I said, that's
20   discrimination and she said, you're right,
21   it is.  And I said, I need to talk to a
22   lawyer, and she said, I don't blame you,
23   Ms. Forbes, that was her exact words in her

Page 99

1    office.
2        Q.  Did Ms. Forbes ever say that she
3    was going to base her recommendation for
4    the person to be employed, that is
5    Ms. Forbes is going to base her
6    recommendation, on the basis of race?
7        A.  She didn't never say that.
8        Q.  Did she ever say that she was
9    going to make her recommendation based on
10   the gender of the person?
11       A.  She wouldn't tell me that.
12       Q.  When Ms. Forbes said she believed
13   other people might make a decision based on
14   gender or race?
15       A.  She wanted a male in there.
16       Q.  Based on what she said?
17       A.  Based on what she said because she
18   said it was heavy lifting in which I was
19   doing fine with the heavy lifting, I had no
20   problem with it, but she said that it's a
21   male's job, and they needed a male in
22   there.
23       Q.  What medical expenses have you

Page 100

1    entailed?  Have you itemized those?
2        A.  No, I'm not worried that.
3        MR. ROBERSON:  Like I said, we're
4    not making a claim for reimbursement for
5    medical expenses, but if you get farther
6    down the road and you think that we need
7    to, we'll provide you his bills, but we are
8    only making a claim for garden variety
9    emotional distress.  We're not claiming,
10   although it may be, but we're not claiming
11   in this lawsuit that she incurred or
12   sustained this treatment because of
13   discrimination, do you understand my
14   distinction?
15       MR. SWEENY:  Okay.  I accept that
16   stipulation.
17       MR. ROBERSON:  Okay.  Now that
18   doesn't mean we won't claim bills because
19   if she had had the position, she would have
20   benefits that would have been provided but
21   with that distinction.
22       MR. SWEENY:  That's clear and
23   that's helpful.

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1    Q.   (By Mr. Sweeny) Anything else that
2  you want to share with me, Ms. Sims?
3    A.   No, I just thought I was done
4  unfairly.  I done a good job.
5        MR. ROBERSON:  I do have a few
6  questions, if I may.
7  CROSS-EXAMINATION BY MR. ROBERSON:
8    Q.   Ms. Sims, when you went to work
9  there initially as a substitute, were you
10  ever advised that to be a permanent
11  employee you would have to have a high
12  school education?
13    A.   No.
14    Q.   Could you have obtained a GED if
15  you had ever been told that that was a
16  requirement?
17    A.   Yes.
18    Q.   Now, the person that you, in 2006
19  the person that quit and you took, you
20  started subbing every day for his position,
21  what was the race and gender of that
22  person?
23    A.   A black male.

Page 102

1    Q.   Do you remember his name?
2    A.   I think it was Michael Billingsly.
3    Q.   Okay.  And he was a black male and
4  for the record you're a while
5  female; correct?
6    A.   Yes.
7    Q.   Now, from the time that that
8  school year began until some time in
9  September when this posting occurred, did
10  you perform the job?
11    A.   Yes, I did.
12    Q.   Did you work for Ms. Forbes?
13    A.   Yes.
14    Q.   She was your supervisor?
15    A.   Yes.
16    Q.   Was your, did you have any
17  problems about coming to work?  That is,
18  was your attendance poor?
19    A.   No, I was there every day.
20    Q.   Were you ever criticized for any
21  aspect of your job performance?
22    A.   No.
23    Q.   In fact, were you told you were

Page 103

1  doing a good job?
2    A.   Yes.
3    Q.   And Ms. Forbes told you that?
4    A.   Yes.
5    Q.   When you went for the interview,
6  did she again complement you on the job
7  that you had been doing?
8    A.   Yes.
9    Q.   When you did that job, did you
10  have an 11th grade education?
11    A.   Yes.
12    Q.   Was there anything about that job
13  that you couldn't do, couldn't perform
14  because of your limited education?
15    A.   No.
16    Q.   Can you read?
17    A.   Yes.
18    Q.   In fact, you've mentioned that a
19  number of the workers in the high school
20  cafeteria, or in the school system
21  cafeterias do not have a high school
22  education; correct?
23        MR. SWEENY:  Object to form.

Page 104

1    A.   Correct.
2    Q.   They told you that?
3    A.   Yes.
4    Q.   Does Barbara Murphy have a high
5  school education?
6    A.   No.
7    Q.   And she cooks; right?
8    A.   Yes.
9    Q.   Are you aware of any difficulty
10  she has --
11        MR. SWEENY:  Object to the form.
12    Q.   -- in doing her job?
13    A.   No.
14    Q.   Do you know any reason why a
15  cafeteria worker should be required to have
16  a high school education?
17        MR. SWEENY:  Object to the form.
18    Q.   You can answer if you know of a
19  reason.
20    A.   I don't know of any reason.
21    Q.   Can you perform all aspects of the
22  job without a high school degree or a GED?
23    A.   Yes.

26  (Pages 101 to 104)

# FREEDOM COURT REPORTING

| Page 105 |
|---|

1  Q. And did you?
2  A. Yes.
3  Q. And did others?
4  A. Yes.
5  Q. In fact, this Lisa Cleveland, did
6  you work with her?
7  A. I have.
8  Q. When you worked at the elementary
9  school?
10  A. Yes, I subbed at both schools.
11  Q. Did you she tell you she didn't
12  have a high school degree?
13  A. Yes.
14  Q. Now, that was back when you worked
15  with her?
16  A. Yes.
17  Q. I don't know if she's got a GED or
18  not, do you?
19  A. No.
20  Q. But she's recently been hired in
21  this permanent position?
22  A. Yes.
23  Q. Okay. Now, while you worked at

| Page 106 |
|---|

1  the high school under supervision of
2  Ms. Forbes, did she make numerous
3  statements to you about who would fill that
4  position?
5  A. Yes.
6  Q. What did you say?
7  A. It was going to be a male and
8  probably a black male.
9  Q. Did you tell you that this was
10  indeed, quote, a man's job?
11  A. Yes.
12  Q. Did you perform it?
13  A. Yes.
14  Q. Okay. At the time you worked
15  there, was every employee in the cafeteria
16  white?
17  A. Yes.
18  Q. Did you say that Ms. Jones, is
19  Ms. Jones white or black?
20  A. She's black.
21  Q. And she's the child nutritionist;
22  is that correct?
23  A. Yes.

| Page 107 |
|---|

1  Q. She, Ms. Forbes told you that
2  Ms. Jones had indicated to her that, quote,
3  she needed to get some color in the
4  lunchroom?
5  A. Yes.
6  Q. What did you take that to mean?
7     MR. SWEENY: Object to the form.
8  A. That she wanted a black male.
9  Q. Okay. Now -- and after Ms. Forbes
10  made those statements, did you tell her
11  that she could not do that because that was
12  discrimination?
13  A. Yes.
14  Q. That is, you protested that that
15  was unfair; correct?
16  A. Yes, correct.
17  Q. And, in fact, Ms. Forbes agreed
18  with you, didn't she?
19  A. She did.
20  Q. And after that protest, they
21  filled the job with a black male; correct?
22  A. Correct.
23  Q. And when you found out when they

| Page 108 |
|---|

1  told you that Jerry McKinney was getting
2  the job, that's the day that you were upset
3  and you left work early before your shift
4  ended; correct?
5  A. Correct.
6  Q. Is that the only time you ever had
7  any difficulty at work?
8  A. That's the only time.
9  Q. Now --
10     MR. ROBERSON: Don, do you have
11  that exhibit with the -- yeah.
12     MR. SWEENY: Yes.
13  Q. Now, after this decision, you went
14  to some board meetings; correct?
15  A. Yes.
16  Q. And at those board meetings, you
17  heard board members make the statements
18  that they were making hiring decisions
19  based on race; is that correct?
20  A. That's correct.
21  Q. You also heard them make
22  statements that they filled some positions
23  with minorities when the minorities did not

27  (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  have all the qualifications required;
2  correct?
3    A.  Correct.
4    Q.  In other words, they filled the
5  position and allowed the minority to
6  candidate, to obtain to further their
7  education or whatever qualification they
8  didn't have.  They gave them a period of
9  time to obtain that; correct?
10     MR. SWEENY:  Object to the form.
11   A.  Correct.
12   Q.  That's what they said; right?
13     MR. SWEENY:  Object to the form.
14   A.  Yes.
15   Q.  Now, I'm going to show you , this
16  is one of the exhibit's that Don marked as
17  Defendant's Exhibit 7.  This is the
18  employment screening service at Coosa
19  Valley Medical Center, and this is just a
20  document I actually obtained in response to
21  a subpoena.  And I want to know show you on
22  Page 3 of this document, I'll ask you:
23  They say source contacted and it says Jan

Page 110

1  cafeteria manager, who are they talking
2  about?
3     MR. SWEENY:  Object to the form.
4    A.  My supervisor.
5    Q.  Jan Forbes?
6    A.  Jan Forbes.
7    Q.  Okay.  And they say start date,
8  and what does it say?
9    A.  April of '04.
10   Q.  End date?
11   A.  September of '06.
12   Q.  Okay.  Answers to standard
13  questions, it says, attendance and what did
14  Ms. Forbes indicate?
15   A.  That it was poor.
16   Q.  Is that true?
17   A.  No, it's not.
18   Q.  And this is the date ordered is
19  April 24th 2007; correct?
20   A.  Correct.
21   Q.  And the date completed is the same
22  date?
23   A.  Correct.  I have to stop for a

Page 111

1  minute.
2     MR. SWEENY:  Let's wait just a
3  minute.
4    Q.  Do you need to take a break?
5    A.  Probably.
6     MR. ROBERSON:  Okay.  Let's take
7  a break.
8     (Short recess)
9     MR. ROBERSON:  Let's go back on
10  the record.
11   Q.  Ms. Sims, on Exhibit 7, on Page 3
12  it says, eligibility for rehire and what
13  did Ms. Forbes indicate?
14     MR. SWEENY:  Object to the form.
15   A.  No.
16   Q.  All right.  Do you know any reason
17  why you would not be eligible for rehire
18  based on anything that occurred?
19   A.  No.
20   Q.  And it says, additional comments,
21  per cafeteria manager at the number listed,
22  applicant walked off the job.  Now, that's
23  the day that she told you they hired Mr. --

Page 112

1     MR. SWEENY:  Object to the form.
2    A.  Correct.
3    Q.  You have admitted that you had
4  became you upset and left the
5  work; correct?
6    A.  Correct.
7    Q.  This information doesn't say why
8  you walked off the job, does it?
9    A.  No.
10   Q.  She was not an employee but worked
11  as needed, that's what it says; correct?
12   A.  Correct.
13   Q.  Now, this is in April of '07 which
14  is after your EEOC charge alleging
15  discrimination that was filed in November
16  of '06; correct?
17   A.  Correct.
18   Q.  That's also a document in here;
19  correct?  What date is that?
20   A.  The 11-14 of '06.
21   Q.  Okay.  And that's your charge of
22  discrimination which was forwarded to the
23  school shortly after that date; correct?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1    A.  Correct.
2    Q.  And this was certainly after you
3  had made the complaint to Ms. Forbes that
4  what she, what the school board was doing
5  was discriminatory; correct?
6    A.  Correct.
7    Q.  Okay.  Now, in this position you
8  performed all responsibilities for
9  approximately six weeks; correct?
10    A.  Correct.
11    Q.  Never had any criticism of your
12  job performance; correct?
13    A.  Correct.
14    Q.  To your knowledge, had Jerry
15  McKinney ever worked in the lunchroom
16  before?
17    A.  No.
18    Q.  So if you had done the job for six
19  weeks without any criticism, you were more
20  qualified than Jerry McKinney, weren't
21  you?
22        MR. SWEENY:  Object to the form.
23    A.  Correct.

Page 114

1    Q.  Okay.  So when Mr. Sweeny ask you
2  if there's any basis, that's a basis for
3  your complaint, isn't it?
4        MR. SWEENY:  Object to the form.
5    A.  Yes.
6    Q.  Now, I want to show you this.
7  This is also part of Exhibit 7.  This is
8  the affidavit of Barbara Murphy, and I
9  would ask you to read the last, this was
10  provided to us when we obtained a copy of
11  the EEOC file.  This is actually an
12  affidavit that someone acting on behalf of
13  Coosa County obtained, not me.  Okay?  Read
14  what it says in the last paragraph of
15  Ms. Murphy's affidavit on the last page.
16    A.  I heard Jan Forbes say it was a
17  man's job, and I heard Jan Forbes say that
18  Pam said she was putting some color in the
19  lunchroom.
20    Q.  Is that exactly what you said in
21  this deposition today?
22    A.  Correct.
23    Q.  So Ms. Murphy has told Coosa

Page 115

1  County that she heard Pam make those
2  statements, she's sworn under oath that she
3  heard that; correct?
4    A.  Correct.
5    Q.  This is Sandra Thompson, her
6  affidavit, what does she say here in
7  Paragraph 4?
8    A.  Jan thought the board might have
9  hired an African American for the position
10  that Gloria Sims applied for, she didn't
11  know for sure.  Some of us were talking
12  among ourselves while working, and we all
13  thought that an African American may be
14  hired, but that was only what we thought.
15    Q.  So Ms. Thompson has sworn under
16  oath that Jan thought the board might have
17  to hire an African American, a black;
18  correct?
19    A.  Correct.
20    Q.  She doesn't come out and say
21  that's what Jan said, but that's what Jan
22  thought; correct?  That's what she says Jan
23  thought.

Page 116

1        MR. SWEENY:  Object to the form.
2    A.  Correct.
3    Q.  You heard Ms. Forbes make those
4  statements; correct?
5    A.  Correct.
6    Q.  Is Ms. Thompson a friend of
7  Jan Forbes?
8        MR. SWEENY:  Object to the form.
9    A.  Yes, she is.
10    Q.  Okay.  Now, Ms. Forbes has
11  retired; is that correct?
12    A.  Correct.
13    Q.  And Becky, I'm not sure if you
14  ever indicated her last name, Becky who was
15  a lunch room worker is now in the position
16  of the manager; correct?
17    A.  Correct.
18    Q.  And you say Becky also heard these
19  statements that Jan made?
20        MR. SWEENY:  Object to the form.
21    A.  Correct.
22    Q.  I mean, she was present.  I
23  shouldn't say she heard them, but she was

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 117

1  present when the statements were made, is
2  that a fair statement?
3      A.  Yes.
4      Q.  Okay.  So obviously, if these
5  statements were made, you had a good faith
6  basis for making a complaint that that was
7  discrimination, didn't you?
8      A.  Yes.
9      Q.  And did you make a complaint;
10 correct?
11     A.  Correct.
12     Q.  Then later after they awarded the
13 position, you filed an EEOC
14 charge; correct?
15     A.  Correct.
16     Q.  And now you filed this lawsuit;
17 correct?
18     A.  Correct.
19     Q.  Okay.  Now, you didn't get the job
20 at Coosa High School, but you had, you
21 applied for a position, was it a cafeteria
22 worker at the hospital?
23     A.  Correct.

Page 118

1      Q.  The hospital doesn't have anything
2  to do with the high school, does it?  I
3  mean, they are not connected or related,
4  are they?
5      A.  No, they are not.
6      Q.  Did it hurt you that when you
7  obtained this information that Ms. Forbes
8  indicated that you were not a good
9  employee, did that hurt?
10     A.  Yes, and it still does.
11     Q.  Was that vindictive in your mind?
12         MR. SWEENY:  Object to the form.
13     A.  Yes.
14     Q.  Okay.  I don't have any further
15 questions.
16 REDIRECT EXAMINATION BY MR. SWEENY:
17     Q.  Ms. Sims, may I ask you a couple
18 of more questions?
19     A.  Yes.
20     Q.  Your counsel just referred to an
21 affidavit of Barbara Murphy.  On Page 2 of
22 that affidavit, would you read the
23 paragraph at the top for the record?

Page 119

1      A.  After the decision was made to
2  offer Jerry McKinney the position, I heard
3  Jan Forbes say that Gloria Sims was not
4  considered because she did not have a high
5  school diploma.
6      Q.  Let me show you the affidavit of
7  Sandra Thompson.  On Page 2 of that, there
8  is a paragraph, would you read that for
9  us?
10     A.  Paragraph 2?  I know the position
11 was advertised to require a high school
12 diploma.
13     Q.  Your attorney made reference to
14 the employment screening service report
15 where they attribute a statement to the
16 cafeteria manager, and they say source
17 contact, Jan.  Do you have any reason to
18 assert that Keith Bullard knew what
19 Jan Forbes was saying to the ESS people?
20     A.  I have no idea.
21     Q.  Or Todd Wingard?
22     A.  I have no idea.
23     Q.  Or the board members?

Page 120

1      A.  I have no idea.
2      Q.  Do you know if she had any
3  authority to speak on behalf of the board
4  in answering the questions that were
5  presented to her by ESS?
6      A.  I figured she did.
7      Q.  You figured that she did, but do
8  you have any basis for that belief?
9      A.  I guess because she was
10 supervisor.
11     Q.  That was her individual opinion if
12 she said that; correct?
13     A.  Correct.
14     Q.  When the notice was posted for the
15 position that included a requirement for
16 high school diploma, do you know if the
17 board knew who was going to apply for the
18 position other than you?
19     A.  I believe so, yes.
20     Q.  What other applicants do you know
21 that they had information from in advance
22 of the posting other than you?
23     A.  I remember one day at work

30 (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 121

1  Ms. Forbes said Jerry, she did say
2  Jerry McKinney called her asking about the
3  job.
4      Q.  Anybody else?
5      A.  That's all that I knew.
6      Q.  Do you know whether the people
7  that put together the posting requirements
8  knew in advance of that requirement that
9  Jerry McKinney or any other black male
10  might apply for the job?
11      A.  I don't know.
12      Q.  Thank you very much.
13
14
15
16      FURTHER DEPONENT SAITH NOT
17
18
19
20
21
22
23

Page 122

1
2          C E R T I F I C A T E
3
4  STATE OF ALABAMA   )
5  JEFFERSON COUNTY   )
6
7      I HEREBY CERTIFY that the above and
8  foregoing transcript was taken down by me
9  in stenotype, and the questions and answers
10  thereto were transcribed by means of
11  computer-aided transcription, and that the
12  foregoing represents a true and correct
13  transcript of the testimony given by said
14  witness.
15      I FURTHER CERTIFY that I am neither
16  of counsel, nor of any relation to the
17  parties to the action, nor am I anywise
18  interested in the result of said cause.
19
20
21      MELIAHA CORNELIUS
22      T-2004
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| A | | | |
|---|---|---|---|
| **able** 79:8 | **allege** 93:3 | 51:7 53:6,7,19 | 92:21 93:1 |
| **accept** 100:15 | **alleging** 15:13 | 53:21 61:6,14 | 98:6 |
| **accurate** 15:16 | 112:14 | 62:6,10 68:7 | **asking** 6:17 |
| **acting** 5:11 | **allowed** 109:5 | 68:14,17 69:21 | 72:14 97:20 |
| 114:12 | **American** 115:9 | 70:3 86:13 | 121:2 |
| **action** 6:10 | 115:13,17 | 92:15 | **aspect** 102:21 |
| 122:17 | **Amitriptyline** | **applied** 13:1 | **aspects** 104:21 |
| **actual** 55:6 | 96:16 | 17:14 25:3,13 | **assert** 41:16 |
| **add** 7:18 98:4 | **amount** 24:18 | 25:14 31:21 | 76:19 77:1,8 |
| **added** 24:18 | **animus** 29:11 | 34:3 41:10 | 79:1 87:15 |
| **additional** 7:12 | **answer** 6:23 | 45:20 52:9 | 119:18 |
| 111:20 | 7:14 8:5,7 | 53:9,17 63:12 | **assertion** 74:13 |
| **address** 8:11 | 72:23 74:11 | 63:17,21 64:1 | 75:16 79:21 |
| **admitted** 112:3 | 89:17 104:18 | 64:3,9,13 | 93:5,23 |
| **adult** 10:9 | **answering** 94:13 | 66:15,23 67:3 | **assertions** 94:13 |
| **advance** 120:21 | 120:4 | 67:10 74:2,9 | **assess** 7:6 |
| 121:8 | **answers** 110:12 | 90:8,10,14 | **assign** 2:17 |
| **advertised** | 122:9 | 91:1,2 92:10 | **assist** 80:11 |
| 119:11 | **anybody** 60:14 | 92:13 115:10 | **assume** 7:1,23 |
| **advised** 45:8 | 69:9 121:4 | 117:21 | 66:18,21 73:16 |
| 101:10 | **anywise** 122:17 | **apply** 53:11,15 | 82:23 |
| **affidavit** 14:11 | **apparently** 63:7 | 54:18 59:9 | **assuming** 67:14 |
| 14:12 114:8,12 | **appear** 13:18 | 73:17 91:19 | 75:18 |
| 114:15 115:6 | **APPEARAN...** | 120:17 121:10 | **assumption** |
| 118:21,22 | 4:22 | **applying** 50:8 | 86:19 |
| 119:6 | **appeared** 38:13 | 54:5,6,18 | **attached** 51:16 |
| **African** 115:9 | 66:4 | **approximately** | **attend** 10:1 |
| 115:13,17 | **appearing** 5:3,8 | 113:9 | 21:17 37:5 |
| **ages** 9:17 | **appears** 13:7 | **April** 23:5,7 | 62:12 |
| **agree** 66:22 | **Appendix** 80:14 | 110:9,19 | **attendance** |
| **agreed** 1:20 2:6 | 80:18 | 112:13 | 102:18 110:13 |
| 2:13,21 107:17 | **applicant** 64:13 | **Arant** 2:2 4:23 | **attended** 22:2 |
| **ahead** 50:22 | 84:5 88:6 | 5:16 | **attending** 62:16 |
| 53:8 57:23,23 | 111:22 | **area** 10:8 11:4 | **attitude** 40:3 |
| **Alabama** 1:2 2:4 | **applicants** 64:7 | **Artfully** 88:13 | **attorney** 5:6 |
| 4:2 5:3,8,11,13 | 64:19 65:3 | 88:16 | 15:7,10 75:19 |
| 5:18 6:7 10:5 | 66:4 67:15 | **article** 13:11,13 | 80:13 97:14,17 |
| 27:17 75:11 | 72:12,13 73:5 | 13:22,23 14:1 | 119:13 |
| 122:4 | 74:2,9 79:14 | 14:8 | **attribute** 83:6 |
| **Alex** 91:20 | 79:15 87:20 | **articles** 33:19 | 89:1,6 119:15 |
| **allegations** | 120:20 | **asked** 7:13 | **attributed** 21:9 |
| 11:12 14:18 | **application** | 31:10 49:1 | **attributing** |
| 15:2 20:10 | 12:12 34:6 | 50:1 54:12 | 89:12 96:22 |
| | 45:21 49:22 | 76:5 79:13 | **August** 13:23 |

| | |
|---|---|
| 18:17 19:2 | |
| 23:1,12 25:3,9 | |
| 61:17 95:8 | |
| 96:7 97:11 | |
| **author** 58:12 | |
| **authority** 120:3 | |
| **Avenue** 2:3 5:2 | |
| 5:17 | |
| **awarded** 117:12 | |
| **aware** 85:18 | |
| 104:9 | |
| **a.m** 5:19 | |

| B | |
|---|---|
| **baby** 26:19 92:4 | |
| **back** 13:16 16:2 | |
| 18:19 31:13 | |
| 32:5 34:7 37:8 | |
| 49:4,14 84:12 | |
| 84:22 88:22 | |
| 94:9 98:1,9,9 | |
| 105:14 111:9 | |
| **background** | |
| 21:17 22:22 | |
| 25:18 | |
| **bad** 13:6 54:10 | |
| 92:23 | |
| **Barbara** 15:23 | |
| 16:22 17:21 | |
| 18:12 19:4,11 | |
| 48:11 55:23 | |
| 56:4 104:4 | |
| 114:8 118:21 | |
| **Barbra** 14:11 | |
| **bars** 47:19 | |
| **base** 99:3,5 | |
| **based** 29:20 | |
| 41:14 47:6 | |
| 50:14 67:16 | |
| 71:13 72:4 | |
| 86:8 89:20 | |
| 96:23 99:9,13 | |
| 99:16,17 | |
| 108:19 111:18 | |

# FREEDOM COURT REPORTING

**basis** 29:6,15 30:17 41:16 42:10 46:6 58:11 74:7,12 75:22 76:7,19 77:1,8 79:20 80:15 87:23 89:8 91:11 94:1,12,23 99:6 114:2,2 117:6 120:8

**Becky** 16:10,11 17:23 20:14,16 20:23 21:5 48:12 116:13 116:14,18

**began** 41:21 42:4 102:8

**beginning** 5:18

**behalf** 5:3,8 114:12 120:3

**belief** 80:15 120:8

**believe** 12:12 13:9 17:2,3 18:22 19:11 21:12 25:7 38:14 39:20 40:2 84:9,13 89:18 93:9 94:16,21 95:3 120:19

**believed** 99:12

**benefits** 50:2,2 98:10 100:20

**Bernie** 9:8

**best** 10:23 14:15 18:11,15 72:20 74:8

**better** 67:4,17 73:4 74:1

**beyond** 31:3

**bias** 40:7 81:15

**Billingsly** 102:2

**bills** 100:7,18

**Birmingham** 2:4 5:2,7,11,18 10:6,12

**birth** 8:9

**black** 29:8 40:11 45:2 46:22 64:12 76:22 77:6 78:4,9 81:20 93:4 95:6 98:17,18 101:23 102:3 106:8,19,20 107:8,21 115:17 121:9

**blame** 98:22

**blew** 60:5

**block** 24:16

**board** 1:12 4:12 5:4 6:9,13 13:5 13:22 14:2,3,5 23:1,10 25:19 28:18 30:20,22 31:2,12,21 32:3,15 33:9 33:14,17,22,23 34:12,14,21 35:1,21 36:14 37:4,5,10,23 38:2,12,18,22 39:4,9 43:18 45:12 46:7 55:11 57:13 59:9,16 60:12 60:18 61:2,19 63:16,19 65:2 65:9 74:18 75:14,21 76:2 77:9,15,19 78:1,7 80:1 85:22 89:15 90:9,16 91:9 108:14,16,17 113:4 115:8,16

119:23 120:3 120:17

**boards** 85:19

**BOE** 13:12

**bottom** 62:2

**Bourgeois** 21:19

**Bradley** 2:2 4:23 5:16

**break** 8:4 17:11 17:12 111:4,7

**bring** 11:10

**buffet** 47:19

**Bullard** 39:13 39:19 40:1,11 40:16,20,23 41:4,9,16 42:12 63:15 65:1 67:23 68:2 70:8 74:22 76:12,14 76:20 80:7 87:6 88:2 89:14 119:18

**Bullard's** 62:1

**business** 66:21

**B-O-U-R-G-E...** 21:22

---

## C

**C** 122:2,2

**CACC** 10:2

**cafeteria** 30:5 47:10 103:20 104:15 106:15 110:1 111:21 117:21 119:16

**cafeterias** 103:21

**call** 32:14 35:22 37:9 38:10 47:10 92:19

**called** 15:10 31:10,23 35:20 35:23 36:4

37:13 42:3 57:17 82:16 92:21 121:2

**calling** 23:4 32:11

**Calvin** 56:2,22

**candidate** 109:6

**capacity** 55:1

**Carden** 9:8,19 9:19

**case** 1:16 4:16 7:7 10:10 11:9 74:21

**Caucasian** 43:8

**caught** 48:2

**cause** 5:20 122:18

**Center** 109:19

**Central** 27:23 30:6 39:16 41:20 44:6,11 81:22 93:2 97:23

**certainly** 113:2

**certify** 5:12 122:7,15

**challenge** 87:23

**changed** 62:6

**charge** 14:13 51:9 112:14,21 117:14

**Charles** 38:18

**checked** 54:1

**Chelsea** 27:17

**Cheyenne** 9:19

**child** 60:2 106:21

**children** 8:20 9:15,18,21

**cite** 86:1

**citing** 85:7

**City** 91:20

**Civil** 5:13 6:10

**claim** 94:1 100:4

100:8,18

**claiming** 97:14 100:9,10

**clarify** 6:21 53:1

**classification** 48:17,19

**Cleaners** 27:15

**clear** 6:18,20 58:17 63:23 76:6 100:22

**clearly** 52:22

**Cleveland** 55:23 56:2,11,20 57:19 58:2 105:5

**client** 7:6

**clothes** 27:19

**color** 17:8 18:5 87:5 93:21 107:3 114:18

**Columbiana** 26:23 27:2,11

**column** 61:20

**come** 16:2 18:19 31:12 32:3 33:9,14 44:21 44:23 68:4 69:14 115:20

**comes** 94:6 95:1

**coming** 54:17 102:17

**comment** 35:1 36:2 71:13 81:17

**comments** 18:7 20:11 83:8 111:20

**Commissioner** 2:1,23 4:20 5:12

**committee** 73:10 87:19

**company** 28:9

**compensatory**

# FREEDOM COURT REPORTING

98:11
**complaint** 11:12
12:8,17 13:4
14:10,19 15:14
15:14 19:6
28:7 51:5
80:11,12 88:12
89:1 94:10
113:3 114:3
117:6,9
**complaints**
93:12
**complement**
103:6
**complete** 7:7
**completed** 22:7
110:21
**compliance** 2:10
**complimented**
73:8
**computer-aided**
122:11
**conclude** 7:22
**conclusion**
87:21 88:8
**conduct** 29:13
29:14
**connected** 118:3
**consider** 10:4
46:7 69:10
84:5,17 85:8
86:9,23 87:7
87:21 88:5
**considered**
64:21 65:5
66:10 86:15
119:4
**contact** 119:17
**contacted**
109:23
**contend** 58:11
**contending** 29:2
39:18 72:18
73:2,3 79:16

83:1
**contention** 17:4
29:15 89:8
**contentions**
15:20 16:19
20:6 21:13
31:6 35:17
39:1
**continue** 24:3,8
**conversation**
17:10 31:14
36:12 37:21
50:14 71:12
72:5 79:21
**conversations**
14:23 20:2,5
31:8 40:22
41:3
**cooking** 47:23
48:8,10
**cooks** 104:7
**coolers** 47:22
**Coosa** 1:11 4:11
5:4 6:9,13 8:18
9:10 10:17
12:23 13:20
23:1,10 25:19
27:23 28:18
30:5,21 31:21
39:15 41:20
43:18 44:6,11
62:22 74:18
81:22 82:7
90:9,13,15
91:2 93:2 97:1
97:23 109:18
114:13,23
117:20
**copies** 11:17
52:1
**copy** 14:13
51:15 114:10
**Cornelius** 2:1
4:20 5:10

122:21
**corporation**
26:22
**correct** 22:14,15
29:22,23 30:1
41:7,15 52:5
62:13 67:12,13
72:16 74:6
75:18 77:15
81:23 89:22
90:1 102:5
103:22 104:1
106:22 107:15
107:16,21,22
108:4,5,14,19
108:20 109:2,3
109:9,11
110:19,20,23
112:2,5,6,11
112:12,16,17
112:19,23
113:1,5,6,9,10
113:12,13,23
114:22 115:3,4
115:18,19,22
116:2,4,5,11
116:12,16,17
116:21 117:10
117:11,14,15
117:17,18,23
120:12,13
122:12
**counsel** 1:22
2:16 5:15
118:20 122:16
**count** 72:10 94:9
94:19
**County** 1:11
4:11 5:4 6:9,13
8:18 9:10,13
10:18,21,22
23:1,10 25:19
28:18 30:21
31:21 43:18

62:23 63:5
74:18 82:8
90:9,16 97:1
114:13 115:1
122:5
**County's** 13:20
**couple** 35:3
118:17
**course** 71:18
**court** 1:1 2:11
4:1 5:10 8:6
66:18 72:14
97:20
**covered** 33:18
**co-employees**
44:14
**crafted** 58:3
88:13,16
**credentials** 74:4
**criteria** 66:21
67:5,16
**criticism** 113:11
113:19
**criticized** 102:20
**CROSS-EXA...**
3:7 101:7
**crying** 45:3
**cumulative**
24:18

---

## D

**D** 3:2 5:6
**damages** 98:11
**date** 5:12 8:9
34:12 97:15,18
110:7,10,18,21
110:22 112:19
112:23
**dated** 13:23
61:17
**David** 31:1,19
31:23 32:11
35:23 38:8
**day** 2:4 42:4

44:20 98:15
101:20 102:19
108:2 111:23
120:23
**days** 23:15
24:12,17
**Debates** 13:12
**December** 12:15
**decide** 39:6
**decided** 88:4
**decision** 31:15
32:6,20 34:22
39:21 40:13,14
40:18 41:12
60:13 84:2
89:18 99:13
108:13 119:1
**decisions** 108:18
**defendant** 1:14
4:14 5:4 28:14
93:11
**Defendant's**
3:13 11:8,9,22
11:23 12:6,7,8
12:11,13,16,17
12:20 33:20
51:3,4,5,7,8,9
51:12,18,20
52:7 55:8 58:5
61:13 62:8
65:8 80:10
88:11 91:13
109:17
**defense** 7:6
**degree** 22:11
60:20 64:4,20
65:4,4 79:16
104:22 105:12
**degrees** 64:16
**DEPONENT**
121:16
**deposed** 6:14
**deposition** 1:22
2:8,9,19,22

8:8 11:9,23
12:5,7 14:21
15:6 51:4 98:3
114:21
**depositions** 2:12
**Depot** 92:13
**DeRotia** 10:21
**described** 20:3
**determination**
83:15 86:3
**determine** 83:22
**determines**
66:18
**Diane** 65:13,16
**difficulty** 104:9
108:7
**diploma** 13:12
34:5 35:6
45:18 46:8,16
52:16,20 53:13
53:19 54:14
55:3,19 56:17
58:9,13,19,22
59:5,11,18
60:15 64:20
66:1,6,16,20
67:2,2,3,9,11
67:16 68:5
70:12,14 71:9
79:6 84:7 85:2
85:14 86:6,17
87:1,23 88:7
93:6 119:5,12
120:16
**DIRECT** 3:4 6:2
**disagreements**
44:10,13
**disbelieve** 86:11
**discharge** 79:9
**discourage** 50:8
**discriminate**
42:23 58:15
**discriminated**
29:3,16 33:6

39:19,21 89:9
90:3
**discriminating**
59:4 72:6
**discrimination**
14:14 15:16,22
17:5 33:1
51:10 80:16
89:13 93:12
94:8,11,20,22
98:20 100:13
107:12 112:15
112:22 117:7
**discriminations**
20:10
**discriminatory**
29:10 40:3,7
50:16 58:23
59:12 71:16,20
83:8,9 113:5
**discuss** 31:23
32:1 33:9
59:20 64:23
**discussed** 11:5
37:17 59:15
75:2 89:3
**discussing** 37:15
38:3,22 69:16
87:20
**discussion** 88:20
92:7
**discussions**
19:19 21:4
**dishonest** 87:16
**dispute** 66:13
75:15 84:7,19
85:9 87:2,9
88:7
**distinction**
100:14,21
**distress** 100:9
**district** 1:1,2 4:1
4:2 10:4 11:2,3
11:4 32:16

**division** 1:3 4:3
48:6
**doctor** 95:9,10
95:12 96:20
**doctors** 96:23
**document** 12:22
13:8 65:9
109:20,22
112:18
**documents**
11:11 12:3,4
12:18,20 14:16
**doing** 43:22 49:3
71:7 73:6,8
78:8 84:21
93:17 99:19
103:1,7 104:12
113:4
**Don** 108:10
109:16
**Donald** 5:1 6:12
**door** 53:17,23
**doubt** 88:14,17
**Dr** 95:13
**Drive** 5:7
**duly** 5:23
**duplicates** 11:19
**duties** 47:17
48:20 79:9
80:22

--- E ---

**E** 3:2 122:2,2
**earlier** 69:20
**early** 108:3
**easy** 8:6 58:18
**ECA** 27:2
**education** 1:12
4:12 5:5 6:10
6:13 13:5,23
22:8 25:20
30:22 33:15
57:14 60:19
61:2 65:9

85:19 91:10
101:12 103:10
103:14,22
104:5,16 109:7
**educational**
21:16 22:16
**Edwards** 31:1
31:19,23 32:11
32:14 34:19
35:23 37:13
**EEO** 12:17
14:10 28:6
80:11
**EEOC** 112:14
114:11 117:13
**effect** 2:10
**either** 9:21
**elastic** 26:22
**elementary**
23:23 24:10
56:21,23 57:7
105:8
**eligibility**
111:12
**eligible** 111:17
**embraces** 10:5
**emotional** 100:9
**employ** 45:13
60:13 75:21
**employed** 22:23
30:4 43:13
54:21 56:5,12
57:6 76:3,9
77:15 90:18
99:4
**employee** 24:22
72:3 82:12
101:11 106:15
112:10 118:9
**employees** 69:22
82:21
**employment**
12:21 22:17,21
25:18,21 26:21

28:4 74:16
75:14 81:22
85:20 86:1,10
90:15 109:18
119:14
**encourage** 50:7
50:8
**ended** 108:4
**engaged** 29:14
**entailed** 100:1
**equivalent** 85:3
**equivocating**
68:12
**ESS** 91:15
119:19 120:5
**establish** 68:13
**established**
42:21
**evaluated** 43:17
43:21
**evaluation** 43:20
**everybody** 39:20
84:1
**evidence** 2:19
72:6
**exact** 71:4 98:23
**exactly** 39:11
114:20
**examination** 3:4
3:10 5:20 6:2
118:16
**examined** 6:1
**Exclusively** 24:8
**exemplarily**
80:22 81:5,8
**exhibit** 11:8,10
11:23 12:6,7,8
12:11,14,16,17
12:21 33:20
51:12,18 52:7
55:8 57:15
58:5 61:13
62:8 65:8 66:5
80:10,19 88:11

# FREEDOM COURT REPORTING

91:12,13
108:11 109:17
111:11 114:7
**exhibits** 3:13
50:23
**exhibit's** 51:1
109:16
**expenses** 97:13
99:23 100:5
**experience** 66:8
**extra** 48:3

**F**

**F** 122:2
**face** 59:10
**fact** 30:3 65:2
102:23 103:18
105:5 107:17
**facts** 30:16
**fair** 7:2,20 30:1
32:2,20 34:3
41:7,15 45:11
73:14 74:6
90:1 117:2
**faith** 117:5
**far** 19:11 20:1
21:16 22:7,21
29:13 58:17
68:19 74:15
76:1 79:5,8
82:20 98:14
**farther** 100:5
**fashion** 34:17
35:2 36:3 69:3
**Fazel** 96:10
**Federal** 2:3 5:1
5:17
**fees** 97:15,17
**female** 29:7 40:4
65:23 95:2
102:5
**females** 74:2
**fifth** 2:3 5:2,17
73:11

**fighting** 13:15
**figured** 53:4
120:6,7
**file** 1:16 4:16
61:19 114:11
**filed** 10:3 28:6
51:5 112:15
117:13,15
**files** 65:9
**filing** 2:22 14:10
**fill** 61:6 106:3
**filled** 34:5 45:21
53:6,7 69:21
73:22 98:16
107:21 108:22
109:4
**filling** 25:2
**final** 83:21 84:2
**finding** 27:13
**fine** 99:19
**finish** 8:5
**finished** 62:18
69:5
**fired** 97:2,6,7
**first** 16:1,8
**fits** 7:8 8:1
**five** 24:15,18
42:1 43:5 57:2
**fixing** 44:23
**focusing** 41:20
**follow** 49:7,11
49:19
**followed** 74:17
**following** 5:21
23:11 52:9
**follows** 6:1
**food** 47:20,23
48:15 49:1,6,9
49:17
**foot** 53:16
**Forbes** 16:15
17:19 18:1,6
19:15 20:3,11
20:16,23 21:7

21:12 24:23
42:3,7,8,17
44:1,5,20 45:7
46:3 67:22
68:1 69:19
70:7,19 71:6
71:15 80:3
81:3,14 83:6
83:10,14 84:4
84:13 85:5
86:8 87:4 88:2
89:2,7,13 90:4
91:10 93:15
98:14,19,23
99:2,5,12
102:12 103:3
106:2 107:1,9
107:17 110:5,6
110:14 111:13
113:3 114:16
114:17 116:3,7
116:10 118:7
119:3,19 121:1
**force** 2:9
**foregoing** 5:14
122:8,12
**form** 2:15 36:2
72:23 74:11
85:12 89:17
103:23 104:11
104:17 107:7
109:10,13
110:3 111:14
112:1 113:22
114:4 116:1,8
116:20 118:12
**formal** 43:20
**former** 10:14
**forth** 14:7 52:22
63:7 80:15
**forwarded**
112:22
**found** 107:23
**four** 56:7 72:12

**fourth** 56:9,14
65:13 73:11
**Frank** 38:18
**freezers** 47:22
**friend** 116:6
**full** 2:10 47:20
95:19
**further** 2:6,13
2:21 109:6
118:14 121:16
122:15

**G**

**garden** 100:8
**GED** 22:13 34:5
35:5 45:18
46:8,17 47:7
52:16,20 53:14
53:20 54:14
55:3,18 56:16
58:9,13,20,23
59:6,11 60:16
60:21 67:10,11
67:16 101:14
104:22 105:17
**gender** 15:15,21
29:4,11,17
40:4 41:18
43:2 59:13
71:17 72:8
73:3 81:16
83:3 89:10
94:8,20,22
99:10,14
101:21
**general** 49:10
58:18
**generally** 49:18
**getting** 49:15,15
73:7 108:1
**girl** 54:12
**give** 25:20 50:20
98:4
**given** 8:11 9:5

122:13
**Gladice** 65:23
**Glenn** 8:17
**Gloria** 1:5,23
4:5 5:9,19,22
6:3 115:10
119:3
**go** 12:5 15:14
35:9,11 50:22
56:7,9 57:23
84:22 88:18,22
92:5 94:9
96:23 111:9
**goes** 74:15
**going** 7:4 45:9
46:20,20,21
49:22 50:3,4
56:14 67:6
73:21 86:2
95:4 98:16
99:3,5,9 106:7
109:15 120:17
**good** 71:7 72:1,2
73:7 81:6,11
81:13 93:17
101:4 103:1
117:5 118:8
**Goodgain** 35:14
36:11,15 37:13
**gotten** 22:13
72:19 79:17
**grade** 22:5
62:19 69:5
103:10
**graduate** 68:23
69:12
**graduated** 62:11
62:13 68:9,15
**grand** 92:4
**grounds** 2:17
**guess** 84:1 88:9
120:9
**guidelines** 35:5
36:5,20 39:6

# FREEDOM COURT REPORTING

**Gurley** 95:13,20
**gynecologist**
95:15

---

**H**

**hand** 60:8 61:20
**handwriting**
61:23
**Hardeman** 37:1
38:1
**Harris** 65:23
**headaches** 96:11
**headlines** 13:11
**heard** 17:6,6
18:12 19:15
20:2,11 87:4
90:4 92:14
93:20 108:17
108:21 114:16
114:17 115:1,3
116:3,18,23
119:2
**heavy** 52:13
99:18,19
**held** 72:15 81:20
88:21 92:8
**help** 48:5 54:9
95:23
**helped** 49:5
**helpful** 100:23
**hereto** 51:16
**high** 21:17,21
22:2,10 24:7
24:22 27:23
30:6 34:5 35:6
39:16 41:21,22
44:1,6,11
45:18 46:8,16
52:16,19 53:13
53:19 54:13
55:3,18 56:16
56:18,19 58:8
58:13,19,22
59:5,11,18

60:15,20 62:11
62:12,16 64:4
64:16,20 65:4
66:1,6,16,19
67:1,9,11,15
68:5,9,15,23
69:11 70:14
71:9 79:6,16
81:1,23 84:6
85:2,14 86:6
86:16 87:1,22
88:6 93:2,6
101:11 103:19
103:21 104:4
104:16,22
105:12 106:1
117:20 118:2
119:4,11
120:16
**hire** 31:16 40:19
77:10,20 78:7
115:17
**hired** 26:15 29:8
29:22 31:22
34:9 45:1,9
55:11,16 74:17
74:23 75:12
76:16,17,21
79:18 92:20
93:4,8 105:20
111:23 115:9
115:14
**hiring** 13:17
14:3 29:18
39:21 54:3
108:18
**history** 25:21
**HL** 21:19
**hold** 60:11
**Homa** 21:19
22:1
**home** 26:18
92:12
**honest** 84:14

87:12
**hospital** 13:2
92:10,19 94:3
117:22 118:1
**hour** 12:10
18:20 25:4
30:5 52:12
**hurt** 118:6,9
**husband** 10:14
**husbands** 9:6,7
10:14
**husband's** 8:16

---

**I**

**idea** 24:12 58:7
58:16 70:23
93:9 119:20,22
120:1
**identification**
51:1,15
**identify** 12:4
**ignored** 60:16
**immediate** 44:2
**impediment**
43:12
**implication**
85:14
**impression**
78:22
**include** 12:21
15:1 58:8
**included** 13:10
13:21 14:9
58:14 59:17
120:15
**incurred** 100:11
**indicate** 29:10
40:7 80:21
110:14 111:13
**indicated** 40:2
68:8,14 81:15
98:2 107:2
116:14 118:8
**individual** 24:17

120:11
**information** 7:5
7:8,12,19 8:1
15:20 17:3
30:8,13 41:8
50:12 51:11
63:8,9 76:11
98:5 112:7
118:7 120:21
**informed** 57:22
**inherently** 58:23
59:3
**initially** 101:9
**inspected** 27:19
**inspector** 27:19
**instrument**
43:21
**interested** 50:5
122:18
**Internet** 92:13
**interpreted**
50:16
**interview** 12:14
51:8,21 52:4
68:3,10 69:10
72:9 78:22
83:18,19 87:19
88:4 92:22
103:5
**interviewed**
39:23 42:1
65:19 66:15
67:20 70:6
71:15 72:12
73:12 78:18
84:2,23 91:3
**interviewing**
68:22 85:1
**interviews** 65:10
78:19
**involved** 52:14
**issues** 13:4
**itemized** 100:1

---

**J**

**Jan** 20:3 21:7
67:22 68:1
70:7 80:3 81:3
83:6 84:4,13
85:5 89:2,7,13
90:4 91:10
109:23 110:5,6
114:16,17
115:8,16,21,21
115:22 116:7
116:19 119:3
119:17,19
**January** 2:5
**JEFFERSON**
122:5
**Jerry** 5:6 11:16
13:17 31:16,22
34:9 40:15,19
41:5 45:8
60:14 72:15,19
73:16 74:23
76:3,9,16,21
77:3,10,14,20
78:2,8,13 79:2
79:18 93:7
95:20 108:1
113:14,20
119:2 121:1,2
121:9
**job** 13:1,16 17:7
18:3 20:16
25:2,6,12
27:14 31:11,13
32:4,8 34:4,7
37:8 44:17,22
45:5,20 46:9
48:16 50:3,5
53:9,18 56:15
57:19 58:2
64:1,10 67:8
71:6,7 72:1
73:7 79:17
81:6,11,13,18

83:23 84:18,21
90:11 92:22
93:16,17,20
97:9 98:1,9,16
99:21 101:4
102:10,21
103:1,6,9,12
104:12,22
106:10 107:21
108:2 111:22
112:8 113:12
113:18 114:17
117:19 121:3
121:10
**jobs** 90:12
**Jones** 18:4 59:21
59:23 61:9
67:22 68:2
70:8 80:5 83:7
86:22,22 88:2
89:2,7,13 90:4
93:21 106:18
106:19 107:2
**jury** 10:10

**K**
**keep** 13:16
**keeping** 47:19
**Keith** 39:13
63:15 65:1
67:23 68:2
70:8 74:22
76:12,14 80:7
87:6,11,12
89:14 119:18
**Keppra** 96:16
**kept** 93:15,16
**kids** 44:23
**kind** 34:20
49:11 59:21
60:4,7 66:8
78:21
**Kinross** 5:7
**knew** 46:21

52:18 54:9
69:19 70:2,13
70:17 95:4
119:18 120:17
121:5,8
**knitter** 27:4
**know** 13:14 14:6
16:7,12 19:5,7
19:10,12 20:1
20:9 21:15
23:17 25:1
28:17,22 30:2
30:8,12,16,20
31:1,2,3 32:12
35:13 37:1,3
38:8,19 39:13
45:19 51:20
53:21,22 55:11
55:15 56:2,4
57:2,9 58:3,7
58:18 59:7
60:18 61:1
63:11,23 64:3
64:6,9,12,15
64:18,22 65:22
66:1,5 68:19
68:20 69:20
70:17 71:5,6
71:14 73:9,13
73:15,17,20,20
74:3,18,21
76:1,5,7,11,14
77:22 78:3,6
78:15,21 79:5
79:7,8,11
81:13 82:14,15
82:20 85:22
87:11,14,17
91:5,21 98:8,9
98:11,12,13,14
98:14,19
104:14,18,20
105:17 109:21
111:16 115:11

119:10 120:2
120:16,20
121:6,11
**knowledge**
10:23 14:15
18:11 43:22
60:22 77:19
82:9,13,14
113:14
**knows** 21:7,12

**L**
**L** 1:19
**labor** 48:6
**Lane** 6:6
**language** 81:7
**Larry** 35:13
37:18
**law** 5:7 75:11
85:7,13,18
**laws** 2:11
**lawsuit** 6:9 10:3
16:20 20:7
21:14 22:19
28:12,15 29:2
31:6 35:17
88:12 100:11
117:16
**lawyer** 98:22
**leading** 2:15
**learn** 49:21
**leave** 26:13,17
27:10
**left** 26:8 45:3,5
61:20 97:8
108:3 112:4
**legal** 93:3
**legitimate** 66:20
**let's** 16:1 17:17
41:22 50:22
51:2 73:9
79:14 84:22
88:10,18,22
92:5 111:2,6,9

**lifting** 52:13
99:18,19
**limited** 103:14
**Lisa** 55:23 56:1
56:11,20 57:19
58:1 105:5
**list** 16:1 23:4,4
35:9 65:10,13
**listed** 52:15,18
62:22 111:21
**litigation** 28:12
**live** 6:5 8:18 9:9
9:12,22 10:8
10:16 11:2
62:22
**lives** 10:17,20,21
63:4
**LLP** 2:2 5:1,16
**located** 27:16
**long** 26:2,10
27:6,20 56:12
57:1,9 96:2
**look** 74:3 88:10
**looking** 52:6
62:7
**looks** 14:13
**Looney** 63:3
**Louisiana** 21:19
**lunch** 17:12 18:5
18:21 44:22,23
116:15
**lunchroom**
12:11 13:16
16:23 17:8
20:18 23:23
24:23 25:5
35:7 36:5,21
38:4 47:10,12
47:21 48:14
52:13 53:20
54:3,13 55:7
55:12,17 56:21
56:23 57:8,14
60:20 87:5

97:23 98:18
107:4 113:15
114:19

**M**
**making** 30:9
86:3 100:4,8
108:18 117:6
**male** 29:8 45:1,2
76:17 77:4,11
78:2,10 81:21
93:4 95:5
98:17 99:15,21
101:23 102:3
106:7,8 107:8
107:21 121:9
**males** 64:13
**male's** 99:21
**man** 41:13 46:20
46:22 58:20
73:22 84:9,10
84:10
**manager** 110:1
111:21 116:16
119:16
**manner** 6:14
80:23 81:8
**man's** 17:7 18:3
81:18,18 93:16
93:20 98:15
106:10 114:17
**Margaret** 16:8
17:23 19:23
20:6,15 48:12
**mark** 11:8,21
50:22
**marked** 50:23
51:14,18 52:6
55:8 57:15
61:13 62:7
65:7 68:8
80:10 91:12
109:16
**marriage** 8:21

marriages 9:14
married 8:12,14
  8:23 9:3
matter 85:6,13
matters 15:1
McClellan 6:6
McKinney
  13:17 31:17,22
  34:9 40:15,19
  41:5 45:8,13
  60:14 72:15,19
  73:16 74:23
  76:3,9,16,21
  77:3,10,14,20
  78:2,8,13 79:2
  79:18 93:7
  108:1 113:15
  113:20 119:2
  121:2,9
McKnight 31:16
mean 45:18
  100:18 107:6
  116:22 118:3
means 122:10
medical 13:1,2
  90:13 91:2
  99:23 100:5
  109:19
medication
  95:21 96:18
medicine 96:12
meet 84:18
meeting 14:2
  15:6 33:18,22
  34:12,14,21,23
  36:14 37:10,23
  38:2,12,22
  39:4,9 60:12
  76:2
meetings 31:12
  32:4 35:21
  37:4,5 108:14
  108:16
Meliaha 1:23

4:20 5:10
122:21
member 14:5
  31:2 32:15
  38:19 65:2
  78:7 80:1
members 10:10
  14:3 30:21
  33:23 35:1
  63:16 73:9
  77:9,16 78:18
  89:15 108:17
  119:23
men 64:9
mentioned 51:2
  82:5 103:18
Mia 9:20,23
Michael 25:1
  102:2
middle 1:2 4:2
  10:4,7 11:2,3,4
  23:22 24:9
midnights 27:12
Mike 42:3
Mills 26:9,11,16
  27:8
mind 94:6 95:1
  118:11
minimum 82:6
  82:10,19,22
  83:2
minorities
  108:23,23
minority 109:5
minute 88:10
  111:1,3
Mitchell 56:3
  57:5,6
mixed 49:13
mom 26:18
Montgomery
  10:6,11,13
mopping 47:21
morning 6:15

multiple 52:1
Murphy 14:11
  15:23 16:22
  17:21 18:12
  19:5,12 55:23
  56:4 57:4
  104:4 114:8,23
  118:21
Murphy's
  114:15

——— N ———
N 1:19 3:2
name 8:16 14:6
  16:7,8,13
  19:23 25:1
  28:20 50:6
  56:3 57:18,21
  58:1 61:10
  62:10 95:19
  102:1 116:14
named 17:22
names 9:7,17
  15:18 35:11
  55:15
necessary 2:14
need 32:1,3
  35:21 96:22
  98:21 100:6
  111:4
needed 31:11
  37:22 41:13
  42:5 50:2 54:9
  95:5 99:21
  107:3 112:11
neither 50:10,11
  122:15
neurologist
  96:10
never 29:19 99:7
  113:11
new 26:19
newspaper
  13:11,18 33:19

nondiscrimin...
  66:20
North 2:3 5:2,17
NORTHERN
  1:3 4:3
notice 2:22 11:8
  12:6,9 14:21
  18:20 50:19,21
  51:4,6 52:15
  52:18,23 54:7
  55:6 58:4 61:8
  67:9 120:14
notices 54:2
November 14:10
  90:19 112:15
No.s 51:13
number 3:4
  66:12,14 67:14
  79:15 103:19
  111:21
numerous 106:2
nutritionist 60:2
  106:21

——— O ———
O 1:19
oath 88:3 115:2
  115:16
object 32:4
  72:22 74:10
  85:11,13 89:16
  103:23 104:11
  104:17 107:7
  109:10,13
  110:3 111:14
  112:1 113:22
  114:4 116:1,8
  116:20 118:12
objections 2:15
  2:17
obtain 109:6,9
obtained 30:12
  101:14 109:20
  114:10,13

118:7
obviously 93:17
  117:4
occasion 47:1,4
  47:5 48:23
occurred 12:15
  65:11 102:9
  111:18
offer 119:2
offered 2:19
office 2:1 5:15
  93:18 99:1
Okay 11:7 13:7
  13:10,21 14:5
  14:7 15:13
  16:6,9,14,18
  19:4 23:8
  24:21 25:3,11
  25:17 26:6,13
  26:20 32:19
  33:8 34:11,14
  35:13 37:19
  38:5 45:4 47:8
  54:11 55:5
  60:10 61:12
  63:6,11 65:19
  68:21 69:6
  70:2 71:10
  72:4,10 73:23
  75:2 80:14
  81:19 82:20
  83:1,5,11 84:4
  84:12 89:20
  94:5,19 96:12
  100:15,17
  102:3 105:23
  106:14 107:9
  110:7,12 111:6
  112:21 113:7
  114:1,13
  116:10 117:4
  117:19 118:14
ones 35:8 39:22
  48:15

# FREEDOM COURT REPORTING

open 62:4
opinion 120:11
opportunity
  98:4
oral 5:20
order 7:5 12:2
  50:23 93:7
ordered 110:18
orderly 12:3

---

**P**

P 1:19
page 3:4 13:7,23
  63:6 65:11,12
  66:4 72:11,13
  80:19 90:7
  109:22 111:11
  114:15 118:21
  119:7
paid 82:5,7,9,11
  82:21 83:2
  97:17
Pam 18:4 59:21
  59:23 61:9
  63:3 67:22
  68:2 70:7 80:5
  83:7 86:22,22
  89:2,7,13 90:4
  93:20 114:18
  115:1
paper 13:20
  57:17
papers 23:3
paragraph
  80:21 81:19
  83:5 89:1 90:7
  93:10 114:14
  115:7 118:23
  119:8,10
Paragraphs
  94:19
Paragraph's
  94:10
part 114:7

particular 24:22
  38:16
parties 1:21
  2:16 122:17
pay 82:18 98:9
pending 92:15
people 16:19
  48:20 57:23
  59:4 60:19
  62:22 63:11,17
  63:21 66:15
  99:13 119:19
  121:6
peppy 43:21
perform 80:22
  102:10 103:13
  104:21 106:12
performance
  102:21 113:12
performed
  113:8
period 42:1 43:5
  109:8
permanent
  55:12,16 75:12
  75:22 101:10
  105:21
person 30:13
  65:13 73:11,18
  74:8 75:12,22
  84:14 87:13,16
  99:4,10 101:18
  101:19,22
personally 30:23
persons 15:19
pertinent 8:1
  14:18 15:19
  19:5 22:18
  66:9
photos 11:15
physicians 96:7
place 2:3 5:2,17
  17:10 18:16
  38:21

plaintiff 1:7 4:7
  5:9 6:8 28:11
please 8:4 53:3
point 31:20 43:1
  43:16 68:13
poor 91:9
  102:18 110:15
position 12:10
  12:13,15 17:15
  17:15 18:21
  25:4,5,15
  27:11,22 28:4
  30:4,14 31:11
  31:20 40:15
  41:1,10 44:6
  46:21 47:9,11
  47:13,14,18
  48:13 49:23
  52:10,12,19
  53:12 54:19
  55:7 61:7,15
  62:4 63:8,12
  64:13,19 65:3
  65:10 66:9,23
  67:18 72:15,19
  73:17 75:13
  79:3,10 81:18
  81:20,21,22
  82:2 83:16
  85:1,23,23
  90:15,16 91:6
  91:17 92:18
  97:22 100:19
  101:20 105:21
  106:4 109:5
  113:7 115:9
  116:15 117:13
  117:21 119:2
  119:10 120:15
  120:18
positioned 20:15
positions 85:19
  90:8,10,23
  91:22 92:9

108:22
possession 14:17
possible 7:8
post 50:3,4
  85:19,22,23
posted 25:6
  47:13 67:18
  70:3 85:6 86:5
  87:9 120:14
posting 12:10
  18:19,20 50:19
  50:21 52:8,15
  52:17,23 54:2
  54:7 55:6
  57:12,16 58:1
  58:4,12 59:18
  61:5,7 84:23
  85:12 102:9
  120:22 121:7
potential 10:9
preparation
  15:5 48:1
prepare 15:7
  49:1,17
prepared 49:6
preparing 49:9
  80:12
prescribe 95:21
prescribed
  96:12,15
present 20:23
  116:22 117:1
presentation
  12:3
presented 120:5
President 13:22
pretectal 93:5
pretext 93:7
previous 9:7
  94:13
previously 8:23
  28:6 51:2 68:8
  79:13 81:20
  89:3

principal 39:15
prior 2:19 18:23
  25:18 28:12
  30:9 32:11
  37:9 60:13
probably 18:17
  26:5 46:19
  53:5 56:6,13
  57:2 73:21
  98:16 106:8
  111:5
problem 99:20
problems 44:9
  44:13 97:5
  102:17
Procedure 5:14
proceedings
  5:21
process 49:22
  68:3 74:15,16
  88:4
protest 107:20
protested
  107:14
provide 100:7
provided 5:13
  51:11 100:20
  114:10
psychiatrist
  97:10
psychologist
  97:11
PTO 13:22
punitive 98:11
purposes 66:22
put 34:20 46:20
  49:16 50:6
  57:18,21 58:1
  58:4 61:10
  62:11 72:14
  97:21,22 121:7
putting 114:18

---

**Q**

# FREEDOM COURT REPORTING

qualification 36:9 38:4 53:8 58:8,14 59:8 59:17 71:8 85:6 109:7
qualifications 13:12 14:4 45:21 52:14,19 53:5 63:20 84:18,21 85:7 86:2 87:8 109:1
qualified 67:4 67:17 70:11 72:21 73:4 74:1,8 113:20
question 6:20,23 7:1,13 8:7 61:1 66:22 79:12 84:12 94:14 98:5
questions 2:16 6:17,19 7:9,18 8:2,5 101:6 110:13 118:15 118:18 120:4 122:9
Quincey's 25:22 26:14
quit 25:1 42:4 101:19
quote 106:10 107:2

**R**
R 122:2
race 14:4 15:16 15:21 29:4,17 33:7 40:8 41:18 59:13 71:21 72:7 73:3 83:3 86:18 89:10 93:12 94:11,17

99:6,14 101:21 108:19
Raheim 96:10
raising 92:1,3 99:3,6,9
Randall 37:1
rated 73:10
Raymond 9:8
read 21:20 49:19 63:6,9 103:16 114:9 114:13 118:22 119:8
reading 2:7
ready 49:15,16
real 54:10
realatives 10:8
really 13:14 14:6 16:12 30:16 42:9 60:4,4 63:6 73:20 86:14 87:14,17,17 98:13
reason 66:13 75:15 77:2,9 79:1 84:7,19 85:9 87:2,9,15 88:7 93:4 104:14,19,20 111:16 119:17
reasons 29:20
recall 37:15 38:2
received 76:12
recess 111:8
recipe 49:11,12
recipes 49:7,19
recollection 18:15
recommend 40:15 41:1 43:4,13 61:2 75:14 76:2
recommendati... 29:21 30:9,18

41:17 75:3,5 75:21 76:8 77:3,14,17,23 99:3,6,9
recommended 30:3,14 41:4,9 42:17 60:19 74:22 76:20
recommending 76:16 78:1
record 42:20 43:11 76:7 88:19,21 92:6 92:8 102:4 111:10 118:23
recordings 14:23 15:3
records 63:19
record's 58:17
REDIRECT 3:10 118:16
reference 13:6 93:1 119:13
references 62:21
referred 65:16 118:20
regard 86:5,12 88:23
rehire 111:12,17
reimbursement 100:4
relate 94:11,20
related 22:17 118:3
relating 2:11
relation 122:16
relatives 10:9,13 11:1
relevant 13:3 15:1 21:13
rely 7:4
remember 7:11 17:9 33:3 34:11 35:8,10

35:12 36:10,13 38:5,15 39:3 39:11 69:1 71:4 102:1 120:23
rephrase 31:18 73:1 79:12 85:17
replacing 42:9
report 91:9 119:14
reported 94:2
reporter 5:11 8:6
represent 6:12 74:7
representation 66:14 88:1
represented 75:10
represents 122:12
reprimanded 44:4
request 11:10
requested 14:22
require 60:23 119:11
required 60:16 67:9 74:19 85:2,12,15 104:15 109:1
requirement 36:20 46:15 49:10 53:13,18 55:2 57:13 58:13 59:5,10 60:15 61:3 66:19 67:1 69:22 70:1,4 85:23 86:6 93:6 101:16 120:15 121:8
requirements

121:7
respective 1:22
respond 33:8 34:16,19
response 37:20 46:11 53:11 109:20
responsibilities 47:18 48:21 79:9 113:8
responsibility 6:18 83:22
responsive 7:13
restructure 67:8
result 9:14 122:18
retaliated 93:11 93:13
retaliation 94:1 94:2,5,12,17
retire 20:19
retired 20:17 116:11
review 15:8
reviewed 63:20
right 10:12 25:16 33:12,17 41:19 43:7 44:22 46:2 53:10 55:20 62:14 70:5 75:9 85:4 89:5 90:21 98:2,20 104:7 109:12 111:16
road 100:6
Robbins 10:20
Roberson 3:8 5:6 11:14,18 51:19 52:3 72:22 74:10 85:11 88:13,16 89:16 100:3,17 101:5,7 108:10

111:6,9
**room** 17:20 18:5
18:21 116:15
**Rose** 2:2 4:23
5:16
**roughly** 10:5
**rules** 2:11 5:13
**Russell** 26:9,11
26:15,17 27:8

---

**S**

**S** 1:19
**SAITH** 121:16
**Sandra** 14:12
16:3,4 17:23
19:8,20 48:11
115:5 119:7
**sandwiches** 48:4
48:5
**saw** 52:8 54:7
61:5
**saying** 10:11
23:3 38:15
39:3 46:19
93:15 119:19
**says** 62:10 86:9
109:23 110:13
111:12,20
112:11 114:14
115:22
**schedule** 51:8,23
52:4
**scheduled** 12:14
**school** 10:1
21:18,21 22:2
22:10 23:11,19
23:22,23 24:1
24:3,7,14,22
27:23 28:23
30:6 34:5 35:6
39:16 41:21,22
41:23 42:4
44:1,7,11
45:18 46:8,16

52:16,20 53:13
53:19 54:14
55:3,19 56:17
56:18,19 58:8
58:13,19,22
59:5,11,18
60:15,20 62:11
62:12,16 64:4
64:16,20 65:4
66:1,6,16,19
67:2,9,11,15
68:5,9,15,23
69:11 70:14
71:9 79:6,16
81:2,23 84:6
85:2,14 86:6
86:17 87:1,22
88:6 93:2,6
101:12 102:8
103:19,20,21
104:5,16,22
105:9,12 106:1
112:23 113:4
117:20 118:2
119:5,11
120:16
**schools** 23:21
24:6 105:10
**screening** 12:21
12:23 91:16
109:18 119:14
**script** 8:7
**seamer** 27:9
**second** 73:10
80:19 91:23
92:1
**section** 10:7
94:8
**see** 17:18 35:4
36:8,19 50:19
51:19 54:1
55:6 61:20
80:18 83:8
96:23

**seeing** 61:7,18
**seen** 15:11 50:21
51:20 53:4
57:12,16 95:10
95:13,15 96:20
97:10
**Selco** 27:15
**selected** 73:19
**semester** 23:11
**seminars** 22:17
**September** 8:10
18:21 20:21
25:7,14 59:19
62:5 65:12,20
67:20 102:9
110:11
**sequence** 51:3
**serve** 30:21
42:18 43:12
89:7
**served** 30:17
43:16
**serves** 29:15
**service** 12:22
109:18 119:14
**serving** 24:9
**session** 42:5
**set** 14:7 52:22
80:14
**sets** 63:7
**sex** 33:6 86:18
**Shane** 9:19
**share** 7:5 9:6
15:18 33:23
35:10 47:17
70:20 98:7
101:2
**shared** 7:19 8:1
19:16 21:1
33:20 34:16
36:3 50:12
94:9,12,23
**sharing** 7:8 33:3
36:11

**Shelby** 10:20,21
**shift** 91:23 92:1
108:3
**Shirley** 10:17
**Short** 111:8
**shortly** 112:23
**show** 11:7 51:17
61:12 65:7
80:9 109:15,21
114:6 119:6
**shown** 65:11
**sic** 60:7
**signature** 2:7
62:1
**similarly** 20:14
**Sims** 1:5,23 4:5
5:9,19,22 6:3,5
9:8,20 12:4,22
14:16 61:21
65:13,17 72:11
73:15 74:16
75:10 80:9
98:3 101:2,8
111:11 115:10
118:17 119:3
**sitter** 27:13
**sitting** 17:12
69:15,18 70:21
71:2
**six** 12:10 18:20
24:15,18 25:4
30:4 42:1 43:5
47:9 52:12
57:3 72:11
113:9,18
**sleep** 96:1
**sleeping** 95:11
95:16 97:4
**solely** 77:4,6
**somebody** 29:21
30:3 41:9 42:5
48:7 92:20
**soon** 50:4
**sorry** 27:1 68:1

69:17
**sound** 7:20
**source** 109:23
119:16
**speak** 120:3
**special** 22:18
**specific** 38:6
**specifically**
58:14
**spell** 21:21
**spelling** 21:20
**spoke** 35:8
**stand** 49:3
**standard** 110:12
**start** 22:22 23:9
41:22 53:16
98:3 110:7
**started** 101:20
**state** 10:7 60:18
61:2 85:7,13
85:18 93:10
122:4
**stated** 84:4
**statement** 17:18
18:7,18 33:15
34:15 117:2
119:15
**statements**
18:12,22 19:16
21:1,8 39:10
46:19 83:6,12
89:2,6,6 93:19
106:3 107:10
108:17,22
115:2 116:4,19
117:1,5
**states** 1:1 4:1
84:16
**stay** 26:18
**stenotype** 122:9
**steps** 15:8 74:19
**STIPULATED**
1:20 2:6,13,21
**stipulation** 5:14

# FREEDOM COURT REPORTING

Page 134

| | | | | |
|---|---|---|---|---|
| 100:16 | supervisors | 96:2,4,5 107:6 | territory 10:5 | throught 1:21 |
| stocking 47:22 | 44:10 | 111:4,6 | testified 6:1 88:3 | throwed 60:7 |
| stomach 97:5 | supervisory | taken 1:23 85:16 | testimony | time 2:18,18 |
| stop 110:23 | 44:6 | 122:8 | 122:13 | 7:11 8:3 18:9 |
| straight 26:7,8 | supplement 7:14 | Takes 13:22 | Thank 121:12 | 19:2 24:17,20 |
| 27:12 42:6 | supplied 51:23 | talk 31:12 40:16 | thereto 2:20 | 25:13 34:8,10 |
| stressed 98:13 | support 15:20 | 40:19 42:12 | 122:10 | 35:23 37:6,6 |
| stuff 98:10 | 17:4 | 60:8 98:21 | thing 17:6 19:9 | 37:12 39:9 |
| sub 53:16 | supportive | talked 16:18 | 37:17 51:21 | 42:13,18 43:9 |
| subbed 105:10 | 11:11 | 29:19 31:5,19 | 52:2 | 43:14 44:16 |
| subbing 34:10 | sure 20:20 34:13 | 35:16 36:15 | things 19:11 | 45:4,6 48:3 |
| 101:20 | 36:7 51:2 53:3 | 38:23 42:9 | 97:22 | 49:14 53:7 |
| subject 69:2 | 76:6 77:13 | talking 63:13 | think 7:12 13:14 | 81:12 83:11 |
| 70:10 | 115:11 116:13 | 68:18 69:18 | 15:19 16:5 | 95:7 97:2,7 |
| submitted 12:13 | sustained | 70:7,22 71:2,3 | 23:4 27:7 32:2 | 102:7,8 106:14 |
| subpoena | 100:12 | 71:5 81:21 | 32:7,20 34:20 | 108:6,8 109:9 |
| 109:21 | Sweeny 3:5,11 | 110:1 115:11 | 69:4 73:6 | times 9:2,5 |
| subs 82:15 | 5:1 6:2,12 | Talladega 9:13 | 75:19 79:19 | 18:18 47:2 |
| substitute 22:23 | 11:16,21 12:2 | 63:5 95:18 | 82:10 85:8 | 93:19 |
| 23:9,16 24:4,9 | 51:22 52:5 | Tammy 10:20 | 86:1,14 87:7 | today 114:21 |
| 24:13 25:19 | 85:16 88:15,18 | tape 14:22 15:2 | 87:12 90:2 | Todd 28:21 29:3 |
| 28:1 42:10,18 | 88:22,23 92:5 | telephone 37:20 | 92:12 95:1 | 29:14 30:2,17 |
| 43:5,14,17 | 100:15,22 | tell 32:22 44:19 | 100:6 102:2 | 50:1,7 57:17 |
| 47:15 54:6,19 | 101:1 103:23 | 60:5,14 82:17 | third 56:14 | 59:16 60:8 |
| 54:22 55:1 | 104:11,17 | 99:11 105:11 | 73:10 | 61:9 63:16 |
| 81:1 82:3,6,12 | 107:7 108:12 | 106:9 107:10 | Thomas 16:3,5 | 65:1 75:8 76:2 |
| 82:13,17,21 | 109:10,13 | telling 93:16 | 19:8,20 | 77:2,13,22 |
| 83:2 101:9 | 110:3 111:2,14 | temporary 12:9 | Thomason 16:5 | 79:22 84:3 |
| substitutes 82:7 | 112:1 113:22 | 12:11 17:15 | Thompson | 89:15 119:21 |
| substituting | 114:1,4 116:1 | 18:21 25:4,15 | 14:12 19:20 | told 31:11 32:2,3 |
| 24:21 25:8 | 116:8,20 | 30:5 51:6 52:8 | 115:5,15 116:6 | 32:19 33:5 |
| 41:21 | 118:12,16 | 52:13 56:8,15 | 119:7 | 34:2 44:21 |
| suffered 98:12 | sweeping 47:21 | ten 72:13 79:13 | thought 32:22 | 45:10,19 46:1 |
| suggest 33:9 | sworn 5:23 | tendered 12:19 | 33:5 34:2,6 | 50:2,5 61:10 |
| superintendent | 115:2,15 | tenth 73:11 | 45:10 46:1,14 | 68:10 69:4,6 |
| 28:17 29:1 | Sylacauga 6:6 | tenure 56:10 | 53:20 84:20 | 69:19,23 70:19 |
| 34:1 39:8 75:6 | 26:1,9 91:20 | tenured 56:6 | 101:3 115:8,13 | 71:6 73:21 |
| 75:13,20 | system 103:20 | Teresa 10:21 | 115:14,16,22 | 81:12 82:19 |
| supervision | | 56:3 57:4 | 115:23 | 83:9 89:21 |
| 106:1 | **T** | term 81:4 | three 9:4,5,9 | 97:8 98:18 |
| supervisor | T 1:19,19 122:2 | terminated 28:3 | 26:3 56:8 | 101:15 102:23 |
| 20:17 44:2 | 122:2 | terms 58:18 59:8 | 78:18 92:1 | 103:3 104:2 |
| 80:23 102:14 | table 17:13 | 70:11 73:23 | three-year-old | 107:1 108:1 |
| 110:4 120:10 | take 8:3 15:9 | 93:3 | 92:3 | 111:23 114:23 |

# FREEDOM COURT REPORTING

top 118:23
total 72:13
training 22:17
 22:18
transcribed
 122:10
transcript 122:8
 122:13
transcription
 122:11
trash 47:20
treated 46:4
 95:9
treatment
 100:12
trial 2:18
tried 59:20
trouble 27:13
 95:11 97:4
true 49:18
 110:16 122:12
truth 60:5
try 31:12 32:4
trying 13:15
 31:13 37:8
 39:5
Tuck 38:8,8,10
 38:12
turned 84:3
turns 66:12
two 9:12 13:23
 57:22 96:23
T-2004 122:22

**U**

U 1:19
Uh-huh 36:6
 57:20 60:1,3
 91:16
ultimately 83:21
unanimously
 77:20
understand 6:19
 53:10 100:13

understood 7:1
unemployed
 90:21
unfair 32:7
 46:12,13,15
 107:15
unfairly 15:12
 34:7 46:2,4
 101:4
UNITED 1:1 4:1
unqualified 79:2
upset 45:2 97:3
 97:9 108:2
 112:4
use 81:4 86:2
usually 49:14

**V**

vacancy 12:9
 51:6 52:8
Valley 109:19
variety 100:8
verify 75:19
victim 15:15,21
 17:5 32:23
 80:16 94:17,21
victimized 95:2
vindictive
 118:11
vote 77:16,20
voted 45:13 77:9
 78:7
vs 1:9 4:9

**W**

wage 82:6,10,19
 82:22 83:2
wait 111:2
waived 2:8,23
walk 44:16
walked 111:22
 112:8
Wal-Mart 91:18
 91:19 92:11
want 7:18 8:3

11:21,22 49:3
98:7 101:2
109:21 114:6
wanted 34:7
 50:6 84:9,10
 84:10 98:5
 99:15 107:8
Ward 38:18,19
 38:23 39:3
wasn't 25:6 36:7
 45:20 53:7,18
 69:21,23 83:21
 93:17 97:7
way 75:11
week 42:1 43:5
weeks 24:15,19
 47:9 113:9,19
went 26:7,8 37:7
 42:6,6 53:8,15
 53:17 60:12
 92:22 95:10,15
 101:8 103:5
 108:13
weren't 42:19
 43:9 54:6
 78:17 82:11
 113:20
we'll 15:14
 100:7
we're 6:15 62:6
 63:12 81:21
 100:3,9,10
we've 38:22 52:6
 55:8 57:15
 65:7 68:8
 80:10 91:12
Whereabouts
 25:23
white 2:2 4:23
 5:16 29:7 40:9
 40:11,12 43:8
 59:4 64:6
 65:23 74:1
 106:16,19

whites 95:6
Williams 8:17
 10:17
Wingard 28:21
 28:22 29:3,9
 29:14 30:2
 34:16 39:8
 42:15 50:1,7
 50:15 57:17
 59:16 61:9
 63:16 65:1
 75:8 76:2,15
 76:20 77:2,13
 77:22 79:22
 84:3 89:15
 119:21
Wingard's
 30:18 76:8
witness 2:8 5:19
 122:14
woman 42:19
 43:6 58:19
 64:1,3
women 17:22
 59:1
words 71:5
 98:23 109:4
work 23:15,18
 23:21 24:6
 26:10 35:6
 42:6 43:4
 54:18 56:8
 82:17 92:1
 101:8 102:12
 102:17 105:6
 108:3,7 112:5
 120:23
worked 16:13
 23:22 24:13
 25:22 27:5
 28:9 69:23
 78:12 105:8,14
 105:23 106:14
 112:10 113:15

worker 22:23
 30:5 36:21
 47:10,12 52:13
 54:3 55:7,17
 57:14 81:1
 97:23 104:15
 116:15 117:22
workers 17:1
 47:11 48:14
 55:12 103:19
working 23:9
 24:4 32:9 47:8
 47:15 49:4
 56:15 60:19
 82:3 115:12
works 54:12,14
worried 100:2
wouldn't 53:22
 82:17 90:1
 99:11
wrap 48:5
wrapping 48:4
written 75:20
 89:21

**X**

X 3:2

**Y**

yeah 11:14,19
 92:4 108:11
year 23:16 24:2
 24:3,14 41:23
 56:7,9,14,16
 62:15 102:8
years 22:3 26:3
 26:4 56:7,8
 57:3
year-old 92:2
y'all 70:21 71:1

**$**

$6.50 82:10

**0**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 136

**02** 27:21
**04** 23:5,7,13
  110:9
**05** 23:13 24:3,14
  41:23
**06** 24:3,14 25:9
  25:14 41:23
  110:11 112:16
  112:20
**07** 112:13

---
**1**

**1** 3:14 11:8,10
  12:6 51:3,13
  65:11 66:4
  72:11
**10** 93:3
**11** 22:4 93:10
**11th** 22:5 62:19
  69:5 103:10
**11-14** 112:20
**13** 94:11
**14** 14:10 94:19
**15th** 2:4
**16** 9:20
**1819** 2:3 5:2,17
**19** 94:20
**1961** 8:10
**1980** 62:16
**1999** 55:5,13,16

---
**2**

**2** 3:15 12:7 51:4
  51:13 63:6
  65:12 66:4
  72:13 80:21
  88:11 118:21
  119:7,10
**2:07-CV-704-...**
  1:17 4:17
**20** 61:17
**2000** 27:21
**2004** 61:17
**2006** 14:1,11
  18:22 19:2

20:21 23:2
59:19 62:5
65:20 90:19
96:7 97:11
101:18
**2007** 95:8
  110:19
**2008** 2:5
**207-CV-704-...**
  6:10
**21** 9:20
**22nd** 12:15
  65:12,20 67:21
**23rd** 12:16
**24th** 110:19
**25th** 65:12

---
**3**

**3** 3:16 12:8 13:7
  51:6,13,18
  52:7 55:9
  57:15 58:5
  81:19 94:9
  109:22 111:11
**35203** 2:4 5:3,18
**35238** 5:8
**3765** 5:7

---
**4**

**4** 3:17 12:11
  14:1 51:7,13
  61:13 62:8
  83:5 94:8,19
  115:7
**414** 6:6

---
**5**

**5** 3:18 12:14
  18:22 20:21
  51:8,13,20
  59:19 65:8
  94:10

---
**6**

**6** 3:19 12:16

51:9,13 80:10

---
**7**

**7** 3:20 12:1,18
  12:21 33:20
  51:10,13 89:1
  91:13 109:17
  111:11 114:7

---
**8**

**8** 3:21
**80** 26:5
**83** 26:5,12

---
**9**

**9** 90:7
**9th** 8:10
**9:00** 5:19
**91** 26:12,21
**95** 27:7
**98** 27:7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**DEFENDANT'S EXHIBIT**

|

GLORIA SIMS,                          )
                                      )
    Plaintiff,                    )
                                      )
v.                                    )    CIVIL ACTION NUMBER:
                                      )    2:07-cv-704-MEF
COOSA COUNTY BOARD OF                 )
EDUCATION,                            )
                                      )
    Defendant.                    )

## NOTICE TO TAKE DEPOSITIONS
## AND PRODUCTION OF DOCUMENTS

TO:   Jerry Roberson, Esq.
      Roberson & Roberson
      P.O. Box 380487
      Birmingham, AL  35238

      Please take notice that pursuant to the Federal Rules of Civil Procedure 30, Defendants will take the deposition of Gloria Sims, Plaintiff, upon oral examination before an officer authorized by law to administer oaths.

      Said deposition shall be taken on ~~Monday~~ Tuesday, January ~~14~~ 15, 2008 beginning at 9:00 a.m., at the offices of Bradley Arant Rose & White, One Federal Place, 1819 Fifth Avenue North, Birmingham, Alabama, and shall continue and/or be resumed from time to time until completed.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant requests that deponent named herein produce at the time and date of the above set deposition copies of any and documents of whatsoever kind or nature regarding or relevant to the above-referenced lawsuit including, but not limited to:

1.    All records, notes, memoranda, correspondence, audio or video recordings.

2.    All documents which said deponent has utilized to prepare for testimony or refresh said deponent's recollection as to any of the subjects set forth herein.


DONALD B. SWEENEY, JR.
(SWE002)


OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

2

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2007, I mailed by United States Postal Service the document to the following:

Jerry Roberson, Esq.
Roberson & Roberson
P.O. Box 380487
Birmingham, AL  35238

_____
Of Counsel

DEFENDANT'S
EXHIBIT

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION    RECEIVED

GLORIA SIMS, an individual,    )
    )                                   2007 AUG -3  P 2: 13
    Plaintiff,    )    PLAINTIFF DEMANDS TRIAL
    )    BY A STRUCK JURY
v.    )
    )    Civil Action No.:
COOSA COUNTY BOARD OF    )
EDUCATION,    )    2:07-CV-704-MEF
    )
    Defendant.    )

## COMPLAINT

### 1. JURISDICTION

1.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 42

U.S.C. § 2000 et seq. and 42 U.S.C. § 1981. These statutes provide for injunctive and

other relief as a remedy for race discrimination, gender discrimination and retaliation.

2.    The Plaintiff has fulfilled all conditions precedent to the institution of this

action. The Plaintiff timely filed his EEOC charge of discrimination within 180 days of the

last discriminatory act. The Plaintiff timely filed her suit within 90 days of her receipt of the

Right to Sue letter from the Equal Employment Opportunity Commission (EEOC).

### II. PARTIES

3.    The Plaintiff Gloria Sims is a white female citizen of the United States and

is a resident of Sylacauga, Alabama. She was employed by the Defendant, Coosa County

Board of Education, at its Coosa County Central High School in August 2006.

4.    The Defendant, Coosa County Board of Education is the former employer of

the Plaintiff and is subject to suit under 42 U.S.C.§ 2000e et seq.(Title VII), and 42 U.S.C.

A-2

§ 1981(race discrimination). The Coosa County Board of Education employs in excess of 15 people. It is headquartered in Coosa County and transacts its business in Coosa County.

### III. RACE DISCRIMINATION AND RETALIATION

5.   Plaintiff adopts and incorporates each and every material allegation contained in paragraphs 1-4 above as if fully set forth herein.

6.   Plaintiff was employed by the Defendant as a part-time lunchroom worker in August of 2006. Plaintiff performed her job duties and responsibilities in an exemplary manner. Plaintiff applied for the position after receiving a posting for the position. The temporary position that the Plaintiff received indicates that a highschool diploma or GED is required. Plaintiff had neither.

7.   While Plaintiff worked the temporary position, she was informed that the job posting would be made on a permanent basis. The permanent position would be for a job which paid $11.25 per hour and would have benefits. Plaintiff performed this work for minimum wage. When Plaintiff applied for the job, Plaintiff was told by Jan Forbus, her supervisor, that this was "a man's position". Jan Forbus also told Plaintiff, that Pam Jones, Forbus' supervisor, told her that she "needed to get some color in the lunchroom". The Plaintiff understood that statement to mean that Pam Jones intended to hire a black for the position. Plaintiff complained that the statement manifested an intent to discriminate against her on the basis of her race and gender.

8.   Plaintiff later found out that a black male had been hired in the permanent position.

9.   After the Plaintiff learned that a black male had been hired in this position,

she filed a charge of discrimination with the Equal Employment Opportunity Commission. Since the filing of her EEOC charge, the Plaintiff has applied for jobs with other employers. The Defendant, Coosa County Board of Education, has provided those subsequent employers with false, derogatory, and inaccurate job references for the Plaintiff. Said conduct amounts to retaliation under both Title VII and 42 U.S.C. § 1981.

10.    Coosa County Board of Education has articulated a reason for the black male's hiring and said reason is pretextual.

11.    Defendant discriminated against Plaintiff on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq., and in the making and enforcement of her employment contract, pursuant to 42 U.S.C. § 1981. Plaintiff also alleges that the Defendant retaliated against her because of her complaints of racial discrimination.

12.    As a proximate result of the aforementioned conduct of the Defendant, Plaintiff has suffered embarrassment, humiliation, mental distress, emotional pain and mental anguish.

13.    The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein. This suit for back-pay (plus interest), front pay in lieu of reinstatement, injunctive relief and a declaratory judgment is her only means of securing adequate relief. Plaintiff is now suffering and will continue to suffer irreparable injuries from Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court. The Defendant engaged in the discriminatory practices complained of herein with malice and/or reckless indifference to the Plaintiff's federally protected rights, thereby entitling the Plaintiff to punitive damages.

## IV.  GENDER DISCRIMINATION

14.    Plaintiff adopts and incorporates each and every material allegation contained in paragraphs 1-13 above as fully set forth herein.

15.  .  Plaintiff alleges that the articulated reasons given by the Defendant Coosa County Board of Education for her not receiving the permanent position are pretextual. Plaintiff further alleges that her gender was a motivating factor in the Defendant's decision not to hire her.  Plaintiff states that she was told that this "a man's position".

16.    Defendant discriminated against Plaintiff on the basis of her gender in violation of 42 U.S.C.§ 2000e et seq.  Said statute provides that employers are prohibited from discriminating against employees on the basis of their gender.

18.    The Plaintiff alleges that Defendant Coosa County Board of Education engaged in the discriminatory practices complained of herein with malice and/or reckless indifference to the Plaintiff's federally protected rights, thereby entitling her to punitive damages. .

19.    The Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein and back-pay, front-pay in lieu of reinstatement, injunctive and declaratory judgment is her only means of securing adequate relief.  The Plaintiff is now suffering and will continue to suffer irreparable injury from the Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

## .V. PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial provide appropriate relief as follows:

a)    Issue a declaratory judgment that the employment policies, practices,

procedures, conditions and customs of the Defendant are in violation of (Title VII) 42

U.S.C.§ 2000e et seq., a statute which prohibits employers from discriminating on the basis

of race, gender, or retaliatory motive as concerns the Plaintiff's non-hiring and other terms

and conditions of her employment.

b)     Grant the Plaintiff a permanent injunction enjoining Defendant, its agents,

successors, employees, attorneys and those acting in concert with the Defendant and/or

at the Defendant's request from continuing to violate Title VII.

c)     Enter an order requiring the Defendant to make the Plaintiff whole by

awarding the Plaintiff back-pay, compensatory and punitive damages, reinstatement of

position Plaintiff would have occupied if Defendant had not discriminated against her

because of her race or gender, and/or in lieu thereof, front-pay.

d)     Plaintiff further prays for such other and further relief and benefits as the

cause of justice may require, including but not limited to an award of costs, attorneys' fees,

and expenses incurred in this litigation.

Respectfully submitted,

Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238
Phone Number: 205.981.3906
Fax Number:     205.981.3908
E-mail: jdratty@charter.net

**Please serve the Defendant by Certified Mail:**
Coosa County Board of Education
Todd Wingard, Superintendent of Board of Education
P.O. Box 37
Rockford, Alabama 35136

# COOSA COUNTY BOARD OF EDUCATION

| TODD WINGARD | (256) 377-4913 | P.O. Box 37 |
|---|---|---|
| *Superintendent* | Fax: (256) 377-2385 | Rockford, AL 35136 |
| | boe@coosaschools.k12.al.us | |



**DEFENDANT'S EXHIBIT**
3

## TEMPORARY VACANCY POSTING

Posting Date:  September 5, 2006

The Coosa County Board of Education in Rockford, Alabama has the following vacancy:

### 1 –  6-Hour Temporary Lunchroom Worker (Heavy lifting involved).

QUALIFICATIONS:  High School Diploma or GED

SALARY:           Based upon the Coosa County Board of Education Support
                  Personnel Salary Schedule

POSTING TIME:     Minimum of Seven (7) Days

APPLICATION PROCEDURE:     Obtain an application from the Superintendent's
                           Office, P. O. Box 37, Rockford, Alabama  35136,
                           2001 Nixburg Road – (256-377-4913)

CONTACT:                   Todd Wingard, Superintendent or
                           Pamela Jones, Child Nutrition Director
                           Coosa County Board of Education
                           P. O. Box 37
                           Rockford, AL  35136
                           256-377-4913

**It is the policy of the Coosa County Board of Education that no person shall, on the grounds of race, color, disability, sex, religion, national origin, or age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, or employment.**

△ - 3

*+ added to*
*Subst Janitor List*  ) *5-9-05*

*Called Ham + Jordan*
*+ added to Sub'd Room*

*Mark'*
*4-25-05*

DEFENDANT'S
EXHIBIT

4

## COOSA COUNTY SCHOOLS SUBSTITUTE APPLICATION

### CHECK POSITION DESISRED

LUNCHROOM ✓ , JANITOR ✓ , TEACHER/AIDE ___

DATE *August 20 2004*

Name *Gloria Sims*    Soc. Sec. # *Redacted*

Address: *225 Farr Ln Syl 35151*   Phone: *245-2167 (256)*
*249-2167*

Name of Spouse: _____   Employed By: _____

Name of High School Graduated *N. L. Bourgeois* Date: *1980*

College Training: _____
               (Name of College)      (Major)      (Minor)

Teaching Experience: _____

Have you ever been convicted of a crime? *NO* Explain: _____

References: **(No Relatives)**

| NAME | ADDRESS | OCCUPATION | PHONE |
|------|---------|-----------|-------|
| Todd Adams | | Road Comm. | 249-3055 |
| Dennis Farr | | Fair Motel | 245-2167 |
| Terry Mitchell | | Probate Judge | 377-4919 |
| Pam Croney | | Paralegal | 249-4908 |

Are you willing to comply with all policies and procedures set by the Coosa County
Board of Education and its agents? *Yes*

Signature *Gloria D Sims*

....................

I recommend the above person as a substitute teacher for the Coosa County School
System.

Signature *Keith Bull*

Title *Principal*

*approved: Joe Wingard*
*4-25-2005*

*4-84*

**Sims v. CCBE**
Produced to EEOC
No. 0048

To:     GLORIA    SIMS                          August 1, 2006

From:   Todd Wingard
        Superintendent of Education

You have completed all of the requirements and are eligible to
substitute with the Coosa County School system for the 2006-07 school
year in the following checked capacity/capacities:

_____   Substitute Teacher/Aide at $5.35 per hour
          Will increase to $7.50 per hour at 10-1-06

   ✓      Substitute Lunchroom Worker at $5.35 per hour
          Will increase to $6.50 per hour at 10-1-06

   ✓      Substitute Janitor at $5.35 per hour
          Will increase to $6.50 per hour at 10-1-06

_____   Substitute Bus Driver at $35.00 per day
          Will increase to $45.00 per day at 10-1-06

Your name is on the call list at each of our schools.  The number
we have listed for you is 249-2167    .  If this number is not
correct or if you wish to have your name removed from the list,
please contact the Superintendent's office.

Thank you for your interest in working as a substitute in our schools.

TW:jd

pc: file

Sims v. CCBE
Produced to EEOC
No. 0049

**DEFENDANT'S EXHIBIT**

5

**Interviews for Lunchroom Position:**      **September 22, 2006**

8:00 A.M.                    **Gladdis Harris**

8:30 A.M.                    **Anthony Borden**

9:00 A.M.                    **Jerry McKinney**

9:30 A.M.                    **Diane Sims**

9:45 A.M.                    **Frank Jones**

10:00 A.M.                   **Chalyiss Hannon**

*Sims v. CCBE*
*Produced to EEOC*
*No. 0050*

**Lunchroom Interviews  09-25-2006     Central High School**

**Larry Rogers** ✓                8:00 a.m.

**Krystal Benson** ✓              8:30 a.m.

**Brenda Bielema** ✓              8:45 a.m.

**Willie Gilbert** (NOT Interviewed)    9:00 a.m.

*Sims v. CCBE*
Produced to EEOC
**No. 0051**

DEC-22-2006 FRI 10:15 AM                    FAX NO.                        P. 04

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| | ☐ FEPA | |
| | ☒ EEOC | 420-2007-00692 |

and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Gloria Sims | (256) 208-0600 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 414 McClellan Lane    Sylacauga, Al 35151 | 09/09/1961 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Coosa County Board of Education | Over 15 | (256) 377-4913 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| P.O. Box 37 Rockford, AL 35136 | Coosa |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| | | DATE DISCRIMINATION TOOK PLACE |
|---|---|---|
| ☒ RACE    ☐ COLOR    ☒ SEX    ☐ RELIGION    ☐ AGE | | EARLIEST (ADEA/EPA)    LATEST (ALL) |
| ☒ RETALIATION    ☐ NATIONAL    ☐ DISABILITY    ☐ OTHER (Specify) | | Position filled October 2006 |
| ORIGIN | | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See Attachment A

DEFENDANT'S
EXHIBIT

6

RECEIVED
EEOC

NOV 14 2006

BHAM

| | NOTARY – (When necessary for State and Local Requirements) |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | |
| I declare under penalty of perjury that the foregoing is true and correct | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| | SIGNATURE OF COMPLAINANT    _Gloria D. Sims_ |
| _Gloria D. Sims_ | |
| Date 11/14/06    Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)    11/14/06 |

EEOC FORM 5 (10/94)

4-6

## Gloria Sims v. Coosa County Board of Education
### Attachment A

I was hired as a substitute worker to work in the lunch room at the Coosa County Central High School in August 2006. I worked in the lunchroom performing the duties of what was posted as a six hour temporary lunchroom worker. I enclose a copy of that posting as Exhibit A.

I performed my duties in an exemplary manner. I received numerous compliments on the way the lunchroom was kept clean and on how well I performed my job.

My position was previously held by a black male. During the course of my performing the job, I was told the position would be posted permanently. I was only paid minimum wage to work the job. The position, if permanent, would pay $11.25 per hour and would have benefits.

I applied for the temporary position. When I applied, I was told by Jan Forbus, my supervisor, that this was a "man's position". Jan Forbus also told me that Pam Jones, a black female who works as a child nutritionist, and Forbus' supervisor, told her that she needed to "get some color in the lunchroom". I told her that was discrimination. She agreed. After the black man quit this job, the lunchroom was comprised of an all white staff. I took this statement to mean that they preferred to hire a black in the position.

My coworkers, Barbara Murphy and Sandra allegedly heard Jan Forbus make the statement that Pam made that statement.

I believe that I have been discriminated against in the terms and condition of my employment. My employer has violated Title VII by discriminating against me on the basis of my gender, female, as well as my race, white. The person hired into the permanent position is a black male. The Defendant has violated Title VII by retaliating against me for opposing its unlawful hiring practices.

# COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD                    (256) 377-4913                    P.O. Box 37
Superintendent                  Fax: (256) 377-2385              Rockford, AL 35136
                                twc@coosaschools.k12.al.us

## TEMPORARY VACANCY POSTING

Posting Date: September 5, 2006

The Coosa County Board of Education in Rockford, Alabama has the following vacancy:

### 1 -- 6-Hour Temporary Lunchroom Worker (Heavy lifting involved).

**QUALIFICATIONS:** High School Diploma or GED

**SALARY:**                     Based upon the Coosa County Board of Education Support
                                Personnel Salary Schedule

**POSTING TIME:**               Minimum of Seven (7) Days

**APPLICATION PROCEDURE:**      Obtain an application from the Superintendent's
                                Office, P. O. Box 37, Rockford, Alabama 35136,
                                2001 Nixburg Road -- (256-377-4913)

**CONTACT:**                    Todd Wingard, Superintendent or
                                Pamela Jones, Child Nutrition Director
                                Coosa County Board of Education
                                P. O. Box 37
                                Rockford, AL 35136
                                256-377-4913

It is the policy of the Coosa County Board of Education that no person shall, on the grounds of race, color, disability, sex, religion, creed, national origin, or age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, or employment.

NOV 14 2006

Vol. 15 No. 30  August 4, 2006   The only new~~~ ~~~ver dedicated to serving the people of Coosa County   Price: 50¢

# PTO President takes on BOE

## Abrams challenges school board's judgment regarding continued court supervision

By SHERRY UNGER

Central High School PTO President Kristy Abrams' address to the Coosa County Board of Education concerning a fundraiser for a cafeteria/gym facility at the Central Elementary/Middle School transcended quickly into a rebuke of the Board for desiring to remain under court supervision.

Asserting a desire to make the school system the best it could be, Abrams questioned the Board's recent 3-2 vote rejecting a resolution to willingly comply with the constitution in fair treatment of all faculty and students, with one school system for all, having worked to

## "We are not competent to run our school system."

—Larry Goodgame, Member
Coosa County Board of Education

remove all vestiges of segregation. Though those who wrote the articles of the resolution, the entire discussion before the vote centered on the desire of

some Board members to remain under the Federal desegregation Consent Decree, which has been an issue in Coosa County for 36 years.

The Coosa County school system has been under Court Supervision since 1968. The first agreement was worked out between Superintendant Lloyd McClenney and Judge Frank Johnson Jr. under which the school system was in compliance for over twenty years, but because of shifting demographics the system became non-

compliant as charged by the plaintiffs. Many deemed the charges questionable considering that the situation was not contrived but of natural relocating of people of their own will.

To vote to stay under a lawsuit is the most absurd thing I have ever seen. It is saying we are not competent enough in this county to run this system ourselves," Abrams admonished.

See BOE, p. 6

## Kellyton says no to gambling

By CHRISTA JENNINGS

After not being able to meet since May 2 because of the lack of a quorum, the Kellyton Council had a variety of issues to discuss during Tuesday's meeting.

Many citizens had voiced their concerns over a sweepstakes establishment on Highway 280 near Kellyton, with guests at Tuesday's meeting also concerned with the matter.



## Councilman sends stolen documents to Ethics Commission

By SHERRY UNGER

The July meeting of the Goodwater Water and Sewer Board saw another chapter written in an ongoing saga of a Goodwater Councilman receiving stolen water board documents amidst accusations of past ethics violations involving city officials.

Goodwater Councilman Genovis Whelsone appeared before the Water Board at the July meeting to present a let-

DEFENDANT'S EXHIBIT
7

## BOE, continued

He mentioned specifically...
well have other free spots. So... asked.

"We are not competent to run our school system," said Board member Larry Goodgame. "We have problems in this school system that need to be under federal control."

"You are elected officials. Why are you not capable of running this job? And if you are not then you should step down," Abrams stated.

Chairman David Edward interjected that he was competent to do the job issue with Abrams stated that Chairman her perspective that David Edwards had expressed for that white students will leave the school system once... the District Eligibility and the District Eligibility Edwards... considered... by... expressing his offense to the

comment concerning "white" students, saying, "If you read the newspaper, then you would know that I said that there are children who can afford to will go to Benjamin Russell, Comer, Fayetteville, Sylacauga, if they can afford to pay the tuition. My concern is that we will have less money to run our schools. We will lose more teacher units because it is based on dollars per student. That affects the number of teachers, counselors, workers in the lunchroom and everything else. That is my concern."

Edwards went on to say that rules requiring that students attend schools in the districts where they physically reside, being... across... Coosa County students are attending the

other schools outside the county, thus depriving the school of needed funds.

Goodgame expressed his concerns as being the need for black teachers teaching black students, pointing out that the teachers' cultural ratio does not mirror the students' 50-50 black and white mix. He expressed doubt that more black teachers would be hired if the Consent Decree should be lifted.

Suggesting that Abrams commentary to the fine her commentary to the agenda to discuss, Goodgame and David Tuck drew fire from several directions for trying to limit her comments. Chairman Edwards refused the situation with a threat to adjourn the meeting.

Abrams then continued, "I understand what you saying about the money for the school. But I don't feel we need to handcuff people to stay in the school. I believe we need to make the school better."

She pointed out to the Board that being under a court order is not an attractive thing for anyone looking to move into the community.

"I don't want my kids to go anywhere else, she continued, "but I want them to have the best education that they can have. I do not care if the teachers are black or white. It does not matter to me."

"Goodgame added his personal and professional perspective as a matter, saying, "I want to go on record that as a black male, I know it plays a big part in the education of black students. As an educator, I know it plays a big part as to how many black teachers they come in contact with during the day."

Abrams questioned why it is believed that a court order is needed to be able to hire black teachers, asking, "Are we hiring the best person or are we just hiring them based on color?"

"We are hiring them based on color," Goodgame answered.

"The Superintendent makes the recommendations We, as a board, vote on those recommendations. We do not make the recommendations."

"I want the truth to get out now," he continued, "if we're going to talk about the truth." Todd Superintendent.

Wingard retaliated, "We do all we can to try to give minorities a chance. We've got minority teachers on the agenda tonight that don't even have a teaching certificate. Some of these minorities we've brought in the last three years, we've done alternate certificate routs because they didn't even go into educational school. We have two or three teachers sitting right now who can't pass their PRAXIS. So you are not being accurate in what you say."

The PRAXIS Series Assessments provide tests and other services that states use as part of their teaching license certification process.

"I am not saying that you are not trying to hire minority teachers, so don't take offense at that," Goodgame replied, as he turned to redirect toward timing comments forward Abrams.

"I am taking offense to what you are standing there saying, that we as a board are not doing the best we can to run this school system," he told Abrams, before interjecting that this was the first time he had seen her at a board meeting.

Without defending her absence from previous Board meetings, Abrams lobbed the recommendations at Goodgame, stating back the president of the PTO at the high school and attending with her daughter at the other school, she had never seen Goodgame at any of the PTO meetings. She stated that

jobs not with... members sho... attend PTO meetings.

She later commented that this was her first Board meeting, and that she would be coming in the future.

Abrams then reversed her attention to the original topic to address fundraising for the cafeteria and Gymnasium, prompting Chairman Edwards' report that he had a worked on professional sports initiatives and talked with Alabama Power in efforts to obtain funding for those facilities.

The PTO President then flip-flopped back to the issue of the court order, urging... need the community... keep the community...... invest... keep or bond... money on and go for a better vision. We need to get out from under this. How much money has been wasted on lawyers and attorneys because of this lawsuit? We could have already built this. I want us to go in and say what can we give our kids that will help every child in there to be a better student, to be a better person. That is what I want."

Abrams and Edwards eventually found common ground in their mutual desire to get more funds into the school, thus enabling the Board to be more competitive when offering positions with better pay and provide an attractive school program for future students.

Edwards suggested property tax as an option for funding that could be approached again.

---

## ATTENTION
WONDALE EMPLOYEES

## 2006 MEMBER APPRECIATION & ANNUAL MEETING
### FRIDAY, AUGUST 11, 2006

**CAEC Headquarters**
U.S. Hwy. 31 North
Prattville

### SCHEDULE

4 p.m.    Registration opens
4 p.m.    Billingsley High School Jazz Choir
4:30 p.m.    Polls open for voting
5 p.m.    Alleluia Quartet
6 p.m.    Spoken For
7 p.m.    Your Business Session will include:
  ◊ Statement of quorum
  ◊ Reading of the notice of the meeting

# BOE debates diploma qualification

**BY KRISTY ABRAMS**

Should students be held to a higher standard than employees hired in by the school system? Gone are the days that a senior in high school can pass required courses and receive a high school diploma. Gone are the days a student might drop out of school and go to work in a mill because those same mills now require a high school diploma or GED equivalent. Ironically at this board meeting a presentation on Adequate Yearly Progress (AYP) was reported which included a 90% graduation rate requirement for high school students. Yet at the Coosa County Board of Education meeting a debate ensued over a job posting that required a high school diploma or equivalent for a lunchroom worker position. It was determined that in 1998 the State

Department of Education sent out a recommendation that employees see have a high school diploma or equivalent for non-teacher jobs (a substitute is not considered an employee of the Bd. of Ed.). No actual policy was ever put into place by the Coosa County Board stipulating the requirement but then Superintendent Jimmy Lawrence, followed State recommendations for job postings from that time forward. Any employee hired prior to that diploma or equivalent was grandfathered in. Board member Larry Goodgame stated that a policy needed to be put into place to keep any further problems from arising in the future. Later as a vote for the cafeteria position in question arose, the person who met the required qualifications, was recommended by three super-

vising employees to the superintendent and then to the Board of Education failed to receive the job by a three to two vote (Goodgame and Tuck in favor and Edwards, Hardiman and Ward opposed).

Added to the agenda were remarks from Larry Goodgame concerning incidents that had occurred on the busses. A student on a bus had gotten up from their seat and had thrown a twinkie, which struck the bus driver on the back of the head. Other concerns from bus drives had been brought to his attention that they felt had not been properly handled. Although each instance would have to be addressed separately, Superintendent Todd Wingard stated that an incident with a pop tart being thrown (assuming this was the same incident mentioned previously) had been addressed personally by him.

Wingard had been unable to contact the child's parents so he rode the bus home with the student, "To ensure the safety of those on the bus" and waited to discuss the student's behavior. Procedures in handling and notifying the bus drivers of the action taken will be looked into and reviewed on an individual basis to see if changes need to occur.

The Presentations and Delegations portion of the board meeting hailed good news from every school. Reports on Parental Involvement Month were given by Coordinator Debbie Mullins. Mullins presented calendars to each board member which contained the award winning poster titled, "Swinging to See What Your Child Is Doing" from CES student, Chelsea Hagan. Linda Mason reported for Central Elementary School the

best year ever on dibels (reading test) scores. From the high school, Coach Doyle was proud to announce that the girls athletic department now has their own weight room. Lisa McEwen presented a system wide AYP report to the board. CES and CHS are in year one delay. It takes two years to get into school improvement and two years showing improvement to come out. Students are counted several times in determining AYP because they break scores down into subgroups (black, white, free and reduced lunch, and special education). McEwen stated, "Not only does every child count but they are counted several times." Parents should be aware that not only do test scores play a role but attendance does as well and was the determining factor that kept Central Middle School from

entering into year one delay. Attendance must be at 95% and one subgroup's attendance was at 94.2%, which kept the middle school from entering year one delay. It takes everyone, (parents, students, teachers, board members and administration) working together to achieve the goals set before us. A great statement to close was the quote Mrs. McEwen used from Helen Keller, "Alone you can do little; Together we can do so much!" Chairman of the Board David Edwards offered up a round of applause and praised the employees, teachers and students for their involvement in helping to relate to the good news stories presented by each school.

The next Board of Education meeting will be held Thursday, November 30th at 5:30 p.m.



**BOE**

**BY KRISTY ABRAMS**

Should students be held higher standard than employees hired in by the school ees hired in by the school senior in high school can req required courses and rece senior in high school can o temp? Gone are the days of high school diploma. Goin out of school and go to w a mill because those same the days a student might higher standard than emp school diploma or GED equi diploma or GED equi a mill because those same now require a high school ...graduation rate requi Yearly Progress (AYP reported which include ing a presentation on A the Coosa County Board required a high school worker position. It was mined that in 1998 the



*A Hire Rate of Success*

# Employment Screening Services

http://www.es2.com
1401 Providence Park Birmingham, AL 35242
Phone: 205-879-0143
Fax: 205-380-7548
Email: results@es2.com

**Coosa Valley Medical Center**

Attn: Human Resources 315 West Hickory Street
Sylacauga, AL 35150

## Profile Information

**Name:** gloria sims
**DOB:** 06/06/****

**The following are included in this report:**

| Search Type | Detail | Status |
|---|---|---|
| Social Security Report | | Complete |
| Statewide Criminal | Alabama | Complete - No Record |
| Past Employment Verification | chs | Complete |

## Social Security Report

| | |
|---|---|
| **Social Security Number** | 434-39-**** |
| **Name** | gloria sims |
| **DOB** | 06/06/**** |
| **Search ID** | 596129 |
| **Date Ordered** | 04/24/2007 |
| **Date Completed** | 04/24/2007 |

**Results**

| Valid SSN | yes |
|---|---|
| State Issued | Louisiana |
| Date Issued | 1980 |

| **D CARDEN, GLORIA** (DOB: September, ****) (SSN: 43439xxxx) | |
|---|---|
| **Address 1**<br>153 HWY 231 N<br>HARPERSVILLE AL 35078<br>County: SHELBY AL<br>Date first reported: September, 1996<br>Date last reported: June, 2001 | **Address 2**<br>6935 OLD SYL HWY<br>CHILDERSBURG AL 35044<br>County: TALLADEGA AL<br>Date first reported:<br>Date last reported: |
| **Address 3**<br>RR 1 | |

Gloria Sims

0013

CHILDERSBURG AL 35044 -9801
County: TALLADEGA AL
Date first reported:
Date last reported:

---

**CARDEN, GLORIA D** (DOB: September, ****) (SSN: 43439xxxx)

| **Address 1** | **Address 2** |
|---|---|
| 6935 OLD SYLACAUGA HWY | RR 1 BOX 310 |
| CHILDERSBURG AL 35044 -8811 | CHILDERSBURG AL 35044 -9801 |
| County: TALLADEGA AL | County: TALLADEGA AL |
| Date first reported: | Date first reported: |
| Date last reported: | Date last reported: |
| **Address 3** | **Address 4** |
| 153 HWY 231 N | 11A MAIN ST APT A |
| HARPERSVILLE AL 35078 | BIRMINGHAM AL 35213 -3727 |
| County: SHELBY AL | County: JEFFERSON AL |
| Date first reported: | Date first reported: |
| Date last reported: | Date last reported: |

---

**SIMS, GLORIA D** (DOB: September, ****) (SSN: 43439xxxx)

| **Address 1** | **Address 2** |
|---|---|
| 153 HWY 231 N | RR 1 BOX 310 |
| HARPERSVILLE AL 35078 | CHILDERSBURG AL 35044 -9801 |
| County: SHELBY AL | County: TALLADEGA AL |
| Date first reported: September, 1996 | Date first reported: |
| Date last reported: April, 2006 | Date last reported: |

**Other Names Found**

---

**CARDEN, RAYMOND** (DOB: ) (SSN: 43439xxxx)

| **Address 1** |
|---|
| 506 WOODLAWN AVE |
| SYLACAUGA AL 35150 -1970 |
| County: TALLADEGA AL |
| Date first reported: |
| Date last reported: |

---

## Statewide Criminal

| | |
|---|---|
| **Jurisdiction Searched** | Alabama |
| **Name Searched** | gloria sims |
| **DOB Searched** | 06/06/**** |
| **SSN Searched** | 434-39-**** |
| **Search ID** | 596130 |
| **Date Ordered** | 04/24/2007 |
| **Date Completed** | 04/24/2007 |
| **Records Searched** | Felony and Misdemeanor |
| **Status** | No Records Found |

## Past Employment Verification

| | |
|---|---|
| **Name Searched** | gloria sims |
| **DOB** | 06/06/**** |
| **SSN** | 434-39-**** |
| **Search ID** | 596131 |

Gloria Sims

0014

**Date Ordered**      04/24/2007
**Date Completed**    04/24/2007

| **Information Provided** | | **Information Searched** | |
|---|---|---|---|
| Company | chs | Company | CENTRAL HIGH SCHOOL |
| Company Phone | (256) 329-9437 | Company Phone | (256) 329-9437 |
| Company Location | alexander city | Company Location | COOSA COUNTY, AL |
| Position Held | sub teacher | Position Verified | GENERAL CLEANING - SUBSTITUTE |
| Start Date | 04/04 | | |
| End Date | 9/06 | End Date | 2006 |
| | | Source Contacted | JAN (CAFETERIA MANAGER) |

Answers to Standard Questions
   Attendance      Poor
   Eligibility for Rehire No

Additional Comments
PER CAFETERIA MANAGER AT THE NUMBER LISTED, APPLICANT WALKED OFF THE JOB. SHE WAS NOT AN EMPLOYEE BUT WORKED AS NEEDED.

---

Employment Screening Services, Inc. (ESS) does not make any representation, guarantee or warranty as to the accuracy of the information provided to Client. Information provided to Client will be obtained from various sources and accurately transcribed in all material respects; however, neither ESS can guarantee the reliability of any informing source. Please note: The information In this report is derived from records in accordance with the Fair Credit Reporting Act (FCRA, U.S.C.§1681). This Information may only be used to verify statements made by an individual for employment purposes or in connection with other legitimate business needs. The depth of information available varies. Although every effort has been made to insure accuracy or completeness, final verification of an individual's identity and proper uses of report contents are the user's responsibility.

Gloria Sims
0015

STATE OF ALABAMA          )
COOSA COUNTY             )

### AFFIDAVIT
### OF
### SANDRA THOMPSON

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared     Sandra Thompson, who being by me first duly sworn, deposes and says as follows:

My name is Sandra Thompson. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am employed by the Coosa County Board of Education as a lunchroom worker at Coosa County Central High School.

Jan thought the Board might have to hire an African-American for the position that Gloria Sims applied for. She didn't know for sure. Some of us were talking amongst ourselves while working and we all thought that an African American may be hired but that was only what we thought.

I never heard Pam Jones, the Director of the program, ever make that statement.

All of us thought that the heavy lifting that was required would be better handled by a male than a female.

**Sims v. CCBE**
Produced to EEOC
**No. 0009**

But I never heard anyone say that Gloria Sims did not get the position because she was a female or because she was white.

I know that the position was advertised to require a high school diploma.

Sandra Thompson

Sworn to and subscribed before me this the _17_ day of April, 2007.

Notary Public

My Commission expires: Sept 27, 2008
(Seal)

**Sims v. CCBE**
Produced to EEOC
**No. 0010**

# COOSA COUNTY BOARD OF EDUCATION

TODD WINGARD
*Superintendent*

(256) 377-4913
Fax: (256) 377-2385
boe@coosaschools.k12.al.us

P.O. Box 37
Rockford, AL 35136

STATE OF ALABAMA    )
COOSA COUNTY        )

## AFFIDAVIT
## OF
## BARBARA MURPHY

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Barbara Murphy, who being by me first duly sworn, deposes and says as follows:

My name is Barbara Murphy. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am employed by the Coosa County Board of Education as a lunchroom worker at Coosa County Central High School.

I am aware of the statements that Gloria Sims makes in her complaint to the EEOC.

As part of the operation of the lunchroom, there is a lot of heavy lifting that must be done. I have heard Jan Forbus say something like it was a man's job.

I heard Jan Forbus say it was a man's job and I heard Jan Forbus say that Pam said that she was putting some color in the lunchroom.

*Sims v. CCBE*
Produced to EEOC
*No. 0007*

After the decision was made to offer Jerry McKinney the position, I heard Jan Forbus say that Gloria Sims was not considered because she did not have a high school diploma.

*Barbara Murphy*
Barbara Murphy

Sworn to and subscribed before me this the __17__ day of April, 2007.

*Rebecca Lee Beasley*
Notary Public

My Commission expires: *September 27, 2008*
(Seal)

Sims v. CCBE
Produced to EEOC
No. 0008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**   RECEIVED

GLORIA SIMS, an individual,            )
                                       )            2007 AUG -3  P 2: 13
            Plaintiff,                 )
                                       )   PLAINTIFF DEMANDS TRIAL
                                       )   BY A STRUCK JURY COURT
v.                                     )        MIDDLE DISTRICT ALA
                                       )   Civil Action No.:
COOSA  COUNTY  BOARD  OF               )   2:07-CV-704-MEF
EDUCATION,                             )
                                       )
            Defendant.                 )

## COMPLAINT

### 1. JURISDICTION

1.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 42

U.S.C. § 2000 et seq. and 42 U.S.C. § 1981. These statutes provide for injunctive and

other relief as a remedy for race discrimination, gender discrimination and retaliation.

2.     The Plaintiff has fulfilled all conditions precedent to the institution of this

action. The Plaintiff timely filed his EEOC charge of discrimination within 180 days of the

last discriminatory act. The Plaintiff timely filed her suit within 90 days of her receipt of the

Right to Sue letter from the Equal Employment Opportunity Commission (EEOC).

### II. PARTIES

3.     The Plaintiff Gloria Sims is a white female citizen of the United States and

is a resident of Sylacauga, Alabama. She was employed by the Defendant, Coosa County

Board of Education, at its Coosa County Central High School in August 2006.

4.     The Defendant, Coosa County Board of Education is the former employer of

the Plaintiff and is subject to suit under 42 U.S.C.§ 2000e et seq.(Title VII), and 42 U.S.C.

§ 1981(race discrimination). The Coosa County Board of Education employs in excess of 15 people. It is headquartered in Coosa County and transacts its business in Coosa County.

### III. RACE DISCRIMINATION AND RETALIATION

5.    Plaintiff adopts and incorporates each and every material allegation contained in paragraphs 1-4 above as if fully set forth herein.

6.    Plaintiff was employed by the Defendant as a part-time lunchroom worker in August of 2006. Plaintiff performed her job duties and responsibilities in an exemplary manner. Plaintiff applied for the position after receiving a posting for the position. The temporary position that the Plaintiff received indicates that a highschool diploma or GED is required. Plaintiff had neither.

7.    While Plaintiff worked the temporary position, she was informed that the job posting would be made on a permanent basis. The permanent position would be for a job which paid $11.25 per hour and would have benefits. Plaintiff performed this work for minimum wage. When Plaintiff applied for the job, Plaintiff was told by Jan Forbus, her supervisor, that this was "a man's position". Jan Forbus also told Plaintiff, that Pam Jones, Forbus' supervisor, told her that she "needed to get some color in the lunchroom". The Plaintiff understood that statement to mean that Pam Jones intended to hire a black for the position. Plaintiff complained that the statement manifested an intent to discriminate against her on the basis of her race and gender.

8.    Plaintiff later found out that a black male had been hired in the permanent position.

9.    After the Plaintiff learned that a black male had been hired in this position,

she filed a charge of discrimination with the Equal Employment Opportunity Commission. Since the filing of her EEOC charge, the Plaintiff has applied for jobs with other employers. The Defendant, Coosa County Board of Education, has provided those subsequent employers with false, derogatory, and inaccurate job references for the Plaintiff. Said conduct amounts to retaliation under both Title VII and 42 U.S.C. § 1981.

10.    Coosa County Board of Education has articulated a reason for the black male's hiring and said reason is pretextual.

11.    Defendant discriminated against Plaintiff on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq., and in the making and enforcement of her employment contract, pursuant to 42 U.S.C. § 1981. Plaintiff also alleges that the Defendant retaliated against her because of her complaints of racial discrimination.

12.    As a proximate result of the aforementioned conduct of the Defendant, Plaintiff has suffered embarrassment, humiliation, mental distress, emotional pain and mental anguish.

13.    The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein. This suit for back-pay (plus interest), front pay in lieu of reinstatement, injunctive relief and a declaratory judgment is her only means of securing adequate relief. Plaintiff is now suffering and will continue to suffer irreparable injuries from Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court. The Defendant engaged in the discriminatory practices complained of herein with malice and/or reckless indifference to the Plaintiff's federally protected rights, thereby entitling the Plaintiff to punitive damages.

## IV.  GENDER DISCRIMINATION

14.    Plaintiff adopts and incorporates each and every material allegation contained in paragraphs 1-13 above as fully set forth herein.

15.    Plaintiff alleges that the articulated reasons given by the Defendant Coosa County Board of Education for her not receiving the permanent position are pretextual. Plaintiff further alleges that her gender was a motivating factor in the Defendant's decision not to hire her.  Plaintiff states that she was told that this "a man's position".

16.    Defendant discriminated against Plaintiff on the basis of her gender in violation of 42 U.S.C.§ 2000e et seq.  Said statute provides that employers are prohibited from discriminating against employees on the basis of their gender.

18.    The Plaintiff alleges that Defendant Coosa County Board of Education engaged in the discriminatory practices complained of herein with malice and/or reckless indifference to the Plaintiff's federally protected rights, thereby entitling her to punitive damages.

19.    The Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein and back-pay, front-pay in lieu of reinstatement, injunctive and declaratory judgment is her only means of securing adequate relief.  The Plaintiff is now suffering and will continue to suffer irreparable injury from the Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

## V. PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial provide appropriate relief as follows:

a)    Issue a declaratory judgment that the employment policies, practices,

procedures, conditions and customs of the Defendant are in violation of (Title VII) 42 U.S.C.§ 2000e et seq., a statute which prohibits employers from discriminating on the basis of race, gender, or retaliatory motive as concerns the Plaintiff's non-hiring and other terms and conditions of her employment.

b)      Grant the Plaintiff a permanent injunction enjoining Defendant, its agents, successors, employees, attorneys and those acting in concert with the Defendant and/or at the Defendant's request from continuing to violate Title VII.

c)      Enter an order requiring the Defendant to make the Plaintiff whole by awarding the Plaintiff back-pay, compensatory and punitive damages, reinstatement of position Plaintiff would have occupied if Defendant had not discriminated against her because of her race or gender, and/or in lieu thereof, front-pay.

d)      Plaintiff further prays for such other and further relief and benefits as the cause of justice may require, including but not limited to an award of costs, attorneys' fees, and expenses incurred in this litigation.

Respectfully submitted,

Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238
Phone Number: 205.981.3906
Fax Number:     205.981.3908
E-mail: jdratty@charter.net

**Please serve the Defendant by Certified Mail:**
Coosa County Board of Education
Todd Wingard, Superintendent of Board of Education
P.O. Box 37
Rockford, Alabama 35136

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 420-2007-00692 |

and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Gloria Sims | (256) 208-0600 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 414 McClellan Lane | Sylacauga, Al. 35151 | 09/09/1961 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Coosa County Board of Education | Over 15 | (256) 377-4913 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| P.O. Box 37 Rockford, Al. 35136 | | Coosa |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ AGE
☒ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)    LATEST (ALL)

Position filled October 2006

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

**See Attachment A**

RECEIVED
EEOC

NOV 1 4 2006

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| *Gloria D. Sims* | *Gloria D. Sims* |
| *11/14/06*        Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)  *11/14/06* |

EEOC FORM 5 (10/94)

## Gloria Sims v. Coosa County Board of Education
### Attachment A

I was hired as a substitute worker to work in the lunch room at the Coosa County Central High School in August 2006. I worked in the lunchroom performing the duties of what was posted as a six hour temporary lunchroom worker. I enclose a copy of that posting as Exhibit A.

I performed my duties in an exemplary manner. I received numerous compliments on the way the lunchroom was kept clean and on how well I performed my job.

My position was previously held by a black male. During the course of my performing the job, I was told the position would be posted permanently. I was only paid minimum wage to work the job. The position, if permanent, would pay $11.25 per hour and would have benefits.

I applied for the temporary position. When I applied, I was told by Jan Forbus, my supervisor, that this was a "man's position". Jan Forbus also told me that Pam Jones, a black female who works as a child nutritionist, and Forbus' supervisor, told her that she needed to "get some color in the lunchroom". I told her that was discrimination. She agreed. After the black man quit this job, the lunchroom was comprised of an all white staff. I took this statement to mean that they preferred to hire a black in the position.

My coworkers, Barbara Murphy and Sandra allegedly heard Jan Forbus make the statement that Pam made that statement.

I believe that I have been discriminated against in the terms and condition of my employment. My employer has violated Title VII by discriminating against me on the basis of my gender, female, as well as my race, white. The person hired into the permanent position is a black male. The Defendant has violated Title VII by retaliating against me for opposing its unlawful hiring practices.

RECEIVED
EEOC

NOV 1 4 2006

BIRMINGHAM DISTRICT OFFICE

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA<br>☒ EEOC | |

| | and EEOC |
|---|---|

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.)<br>Ms. Gloria Sims | HOME TELEPHONE (Include Area Code)<br>(256) 208-0600 | |
|---|---|---|
| STREET ADDRESS    CITY, STATE AND ZIP CODE<br>414 McClellan Lane    Sylacauga, Al. 35151 | | DATE OF BIRTH<br>09/09/1961 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME<br>Coosa County Board of Education | NUMBER OF EMPLOYEES, MEMBERS<br>Over 15 | TELEPHONE (Include Area Code)<br>(256) 377-4913 |
|---|---|---|
| STREET ADDRESS    CITY, STATE AND ZIP CODE<br>P.O. Box 37 Rockford, Al. 35136 | | COUNTY<br>Coosa |

| NAME | TELEPHONE NUMBER (Include Area Code) | |
|---|---|---|
| STREET ADDRESS    CITY, STATE AND ZIP CODE | | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE<br>EARLIEST (ADEA/EPA)    LATEST (ALL) |
|---|---|
| ☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ AGE<br>☒ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER (Specify) | Position filled October 2006<br><br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

**See Attachment A**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Gloria D. Sims*<br>Date 11/14/06    Charging Party (Signature) | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br>*Gloria D. Sims*<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year)   11/14/06 |

EEOC FORM 5 (10/94)

**Gloria Sims v. Coosa County Board of Education**
**Attachment A**

I was hired as a substitute worker to work in the lunch room at the Coosa County Central High School in August 2006. I worked in the lunchroom performing the duties of what was posted as a six hour temporary lunchroom worker. I enclose a copy of that posting as Exhibit A.

I performed my duties in an exemplary manner. I received numerous compliments on the way the lunchroom was kept clean and on how well I performed my job.

My position was previously held by a black male. During the course of my performing the job, I was told the position would be posted permanently. I was only paid minimum wage to work the job. The position, if permanent, would pay $11.25 per hour and would have benefits.

I applied for the temporary position. When I applied, I was told by Jan Forbus, my supervisor, that this was a "man's position". Jan Forbus also told me that Pam Jones, a black female who works as a child nutritionist, and Forbus' supervisor, told her that she needed to "get some color in the lunchroom". I told her that was discrimination. She agreed. After the black man quit this job, the lunchroom was comprised of an all white staff. I took this statement to mean that they preferred to hire a black in the position.

My coworkers, Barbara Murphy and Sandra allegedly heard Jan Forbus make the statement that Pam made that statement.

I believe that I have been discriminated against in the terms and condition of my employment. My employer has violated Title VII by discriminating against me on the basis of my gender, female, as well as my race, white. The person hired into the permanent position is a black male. The Defendant has violated Title VII by retaliating against me for opposing its unlawful hiring practices.