**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **GLORIA SIMS, an individual,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.:** |
| **v.** | ) | |
| | ) | **2:07-cv-704-MEF** |
| **COOSA COUNTY BOARD OF EDUCATION,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Gloria Sims ("Plaintiff") has worked for the Coosa County Board of Education (the "Board" or "Defendant") off and on as a substitute lunchroom worker since 2004. For approximately six weeks beginning in August 2006, she worked daily in the high school lunchroom. Plaintiff applied for but was not selected when the job was permanently filled. Jerry McKinney, a black male, was awarded the position. Plaintiff claims the reason she did not get the job was due to her race and her gender. The Board's articulated reason is that Sims did not get the job because she lacked a high school diploma or (GED) as the job posting required. However, plaintiff asserts said reason is pretextual because the position has been filled on three occasions under this superintendent by candidates who did not possess those educational requirements.

Plaintiff also claims Jan Forbus, the Cafeteria Manager who supervised her, gave a

false and misleading job reference to Coosa Valley Hospital in April of 2007 when she applied for a job as a cafeteria worker. Plaintiff claims this was in retaliation for her EEOC discrimination complaint she had filed against the Board which claimed the hiring of McKinney was discriminatory. Forbus was one of the decision makers in that hiring.

There exist numerous genuine issues of material fact as well as direct evidence of discrimination which entitles Plaintiff to a jury trial on all her claims.

## I.    STATEMENT OF FACTS

### A.    Plaintiff's Employment as a Substitute Worker.

Plaintiff first applied for a position with the Board as a substitute in 2004. (Dep. of Pl., p. 23). The Board does not post substitute jobs and has no educational requirements for substitutes. (Dep. of Pl., p. 55; Pl's Ex. 1, Dep. I of Wingard, pp. 19, 22). Plaintiff worked as a substitute lunchroom worker in various locations and at the beginning of the 2005-2006 school year, Jan Forbus (white female), the Cafeteria Manager at Central High School, asked her to substitute daily because one of the regular employees, Michael Kelly, a black male, had just quit. (Dep. of Pl., pp. 23-25, 41-42; *see* Dep. of Forbus, p. 21). Plaintiff spoke only with Forbus about the assignment at the high school, who put her to work and told her she was doing a good job. (Dep. of Pl., pp. 42-43, 81). Forbus never criticized Sims' job performance. (Dep of Pl., p. 102). Sims testified that in August 2006, Forbus said that the lunchroom position was "a man's job". (Dep of Pl., p. 18). Sims also testified that Forbus told her that Pam Jones (African American female), the Child Nutrition Director and Forbus'

supervisor, said Forbus' needed "to get some color in the lunchroom". (Dep. of Pl., p. 18).

Sims job consisted primarily of keeping the cafeteria clean by mopping it, taking out the trash, etc. (Dep of Forbus, pp. 20-22). Sims also unloaded the trucks and stocked groceries in the freezer. (Dep Forbus, pp. 20-22). Sims had only minor involvement with food preparation. (Dep of Forbus, pp. 20-22). Forbus was the cafeteria manager who reported to Pam Jones, child nutrition director. (Dep of Forbus, p. 9). Forbus felt that Sims' position was better suited for a man because of the lifting involved. (Dep of Forbus, p. 57). Forbus doesn't recall making the statement, "It's a man's job" to Sims. (Dep of Forbus, p. 31). Forbus does admit that she heard Kim Abrams state that Pam Jones said "she needed to get some color in the lunchroom". (Dep of Forbus, pp. 39-40).

Barbara Murphy, a white female, also worked in the lunchroom when the Plaintiff worked as a substitute. (Dep of Murphy, p. 17). Murphy heard Forbus make the statement that the position Sims was working "was a man's job". (Dep of Murphy, p. 18). Murphy also heard Forbus say that Pam Jones had been overheard stating that "she needed to get some color in the lunchroom". (Dep of Murphy, p. 18). Murphy rated Sims' job performance as better than the black male she replaced, Michael Kelly. (Dep of Murphy, p. 17).

**B.     Filling the Lunchroom Worker Vacancy in the Fall of 2006.**

On September 5, 2006, as state law requires (Ala. Code § 16-22-15), the Board announced that it had a vacancy for a 6-Hour Temporary Lunchroom Worker. (Pl's Ex. 5).

The posting, which the Board claims it has used for every Lunchroom Worker vacancy since 1997, specified the position required a high school diploma or GED. (Dep. of Pl., pp. 52-53, Pl's Ex. 5; Pl's Ex. 1, Dep I of Wingard, pp. 30-32, 48). Although Plaintiff possesses neither a high school diploma nor GED (Dep. of Pl., p. 22), she indicated she was interested and was interviewed for the position on September 22, 2006. (Dep. of Pl., p. 67).

A committee comprised of Forbus, Keith Bullard (white male), the Principal at Central High School, and Pamela Jones, who oversees all the lunchroom operations in the school system, interviewed each candidate. (Pl's Ex. 1, Dep. I of Wingard, p. 17; Dep. of Jones, pp. 9, 11; Dep. of Forbus, p. 33; Dep. of Pl., pp. 39-40). At Sims' interview, Forbus again complimented Sims on her job performance. (Dep of Pl., pp. 71; 103). The committee interviewed the following seven candidates:

| Candidate Name | Race/Gender | Diploma/GED |
|---|---|---|
| Plaintiff | White/Female | no |
| Krystal Benson | African American/Female | high school diploma |
| Anthony Braxton Borden | African American/Male | high school diploma |
| Gladdis M. Harris | African American/Female | no |
| Frank T. Jones | African American/Male | no |
| Jerry W. McKinney | African American/Male | high school diploma |
| Larry Wayne Rogers | White/Male | no |

Jones Aff. ¶7). There is no state requirement that a lunchroom worker have a GED or high school diploma. (Pl's Ex. 1, Dep I of Wingard, pp. 35-36). The school board could eliminate this requirement, as it is a matter of discretion. (Pl's Ex. 1, Dep I of Wingard, p. 36). Lunchroom workers do not provide instruction academic. (Pl's Ex. 1, Dep I of Wingard, p.

33). Substitute teachers, who do provide academic instruction, have no educational requirement and do not have to have a high school diploma or GED. (Pl's Ex. 1, Dep I of Wingard, pp. 33-36). Wingard's only rationale for the educational requirement is that "it sets a good example". (Pl's Ex. 1, Dep I of Wingard, pp. 33-36). Of the three people who were hired by Coosa County as lunchroom workers who do not have a GED, two are now tenured and the third will be tenured if she is rehired this year. (Dep of Murphy, p. 21; Dep of Forbus, p. 17; Dep of Owens, pp. 7, 14).

The Coosa County Board of Education employs approximately 200 people. (Pl's Ex. 1, Dep I of Wingard, p. 9). Until 2007, Coosa County was under a federal consent decree because its hiring practices were discriminatory. (Pl's Ex. 1, Dep I of Wingard, pp. 9-11). One of the areas addressed under the consent decree was minority hiring. (Pl's Ex. 1, Dep I of Wingard, pp. 11-12). Coosa County had to keep statistics about the race of their employees and periodically report that information to the Court. (Pl's Ex. 1, Dep I of Wingard, pp. 11-12). This school system did not receive unitary status (return of control) until an order last year. (Pl's Ex. 1, Dep I of Wingard, p. 10).

The committee recommended Jerry McKinney for the position, as Jones believed McKinney was the best candidate for the position. (Dep. of Jones, pp.11, 13). Wingard made a written recommendation to the Board that it hire McKinney for the 6-Hour Temporary Lunchroom Worker and the Board unanimously voted in favor of hiring McKinney. (Dep. of Pl., p. 77).

**C.    Sims' Last Day on the Job.**

Forbus told Sims that she was not recommended to fill the position because she did not have a high school diploma or GED.  (Dep of Pl., p. 45).  Forbus said that they hired a black male, McKinney, who had a high school diploma. (Dep. of Pl., pp. 44-47). Plaintiff told Forbus that when she applied (for the substitute position in April 2004) there was no educational requirement and she thought the decision was unfair and discriminatory. (Dep. of Pl., pp. 34, 45-46, 83).

Plaintiff received this news when "the kids were fixing to come in for lunch." (Dep. of Pl., pp. 44-45). Upon learning she did not get the job, Plaintiff became upset, began crying and left because she was emotionally unable to work. (Dep. of Pl., pp. 44-45, 107-108).

**D.    The Derogatory Job Reference**

Sims filed her EEOC charge alleging race and sex discrimination on November 14, 2006.  (Pl's Ex. 10).  Due to personal reasons, Jan Forbus took a leave of absence from her job as cafeteria manager in October of 2006.  (Pl's Ex.8, Affidavit of Forbus).  On April 11, 2007, Forbus met with the Board's attorney to file an Affidavit to the EEOC responding to Sims' charge of discrimination.  (Pl's Ex.8, Affidavit of Forbus).  On April 27, 2007 approximately two weeks later, Forbus was contacted at her home by ESS, an employee screening service which was subcontracted by Coosa County Medical Center.  (Dep of Forbus, p.49). Sims, after being turned down for the permanent job position with the school, sought a job as a cafeteria worker for Coosa County Medical Center.  (Dep. of Pl, pp. 12-13).

Sims listed the Coosa County Board of Education as a previous place of employment. (Pl's Ex. 9). When Forbus was contacted, she provided information to ESS. (Pl's Ex. 6). Forbus has testified that Sims' attendance was good, but the report indicates that she stated to ESS that Sims' attendance was poor. (Dep of Forbus, pp. 49-50; Ex. 6).

Forbus cannot recall what she told ESS about Sims attendance. (Dep of Forbus, p. 50). Additionally, Forbus told ESS that Sims "walked off the job". (Pl's Ex. 6). Sims left the job crying and upset the day she was told McKinney was hired for the permanent position. (Dep of Pl., pp. 44-45, 107-108). Forbus does not recall that she told ESS anything about the circumstances of why Sims left that day crying. (Dep of Forbus, p. 53). The form also indicates that Sims is not eligible for rehire, although Forbus denies making this statement. (Pl's Ex. 6). Wingard testified that Sims was eligible for rehire. (Pl's Ex. 15, Dep II of Wingard, p. 40). Forbus was Sims' immediate supervisor. (Pl's Ex. 15, Dep II of Wingard, p. 35). Coosa County has no written policy about providing reference information for previous employees. (Pl's Ex. 15, Dep II of Wingard, p. 35). For lunchroom workers, the cafeteria manager would normally provide reference information. (Pl's Ex. 15, Dep II of Wingard, pp. 35-36). The cafeteria manager would supply this information as part of their job duties. (Pl's Ex. 15, Dep II of Wingard, pp. 36-39).

### E.    The Board's Prior Enforcement of its Education Requirement

During the time that Wingard and Jones have been in their positions, the Board has posted the Lunchroom Worker position at least nine times. (Jones Aff., ¶ 4; Pl's Ex. 16,

(reflecting 9 hires since 2001)).     Each posting for the position since 1997 consistently specified that candidates must possess a high school diploma or GED. (Jones Aff., ¶¶ 2, 4; Dep. of Jones, pp. 17-18).  Wingard's only rationale for the requirement is, since the Board is in the business of education, it is important to require all employees to have at least a high school education or equivalent. (Pl's Ex. 1, Dep. I of Wingard, pp. 34-35).

Three Lunchroom Workers who lack a high school diploma or GED were hired (Lisa Cleveland (white female), Barbara Murphy (white female), Calvin Owens (African American male)). (Pl's Ex. 1, Dep. I of Wingard, pp. 31, 46-50, 53; Dep. of Jones, pp. 17-18; Pl's Ex. 16; Jones Aff., ¶ 4 (providing race of employees)).  Jones and Wingard, decision makers in all lunchroom hirings, claim that they were not aware that these employees lacked the necessary educational qualifications and only learned that fact in the course of discovery in this lawsuit. (Pl's Ex. 1, Dep. I of Wingard, pp. 53-54; Dep. of Jones, p. 17). The other Lunchroom Workers hired during Wingard's and Jones' time in office have high school diplomas or GEDs. (Pl's Ex. 16).

Barbara Murphy finished only the first half of the 10th grade.  (Dep of Murphy, p. 8).  Murphy saw the job posting on the bulletin board at the Board of Education office, and there was no mention regarding any educational requirement.  (Dep of Murphy, p. 11).  Murphy completed a written job application listing her education achieved.  (Dep of Murphy, pp. 11-12).  Murphy interviewed with Pam Jones only.  (Dep of Murphy, pp. 12-13).  No one ever mentioned her lack of education would pose any problem for her.  (Dep of Murphy, pp. 13-

14).

Lisa Cleveland was hired as a lunchroom worker in 2005.  (Dep of Cleveland, p. 7).
She does not have a high school diploma or a GED. (Dep of Cleveland, p. 10).  She saw the
job posting in the paper, but does not recall whether there was any educational requirement
listed. (Dep of Cleveland, p. 11).  She interviewed with Jean Hamm, Middle School cafeteria
manager and Pam Jones, child nutrition director.  (Dep of Cleveland, p. 12).  Neither lady
advised her she was not eligible for the job because of her limited education.  (Dep of
Cleveland, pp. 14-15).  Jones called her to tell her she had been selected. (Dep of Cleveland,
pp. 15-16).  She signed a one year contract, which she renewed at the start of the last two
school years (2006-2007 and 2007-2008).  (Dep of Cleveland, pp. 16-18).  She has not yet
signed for the year 2008-2009.  (Dep of Cleveland, p. 19)

Calvin Owens has worked as a lunchroom worker for six years.  (Dep of Owens, p.
7).  He works six hours per day, from 8:00 a.m. until 2:00 p.m.  (Dep of Owens, p. 12).  He
has an 11th grade education.    (Dep of Owens, p. 15).  Owens doesn't recall who he
interviewed with, but Pam Jones called him to tell him he had gotten the job.    (Dep of
Owens, p. 16, 22).  He provided a written application advising that he had only completed
the 11th grade.    (Dep of Owens, pp. 22-23).  At the time of his hiring, Wingard was the
superintendent.    (Dep of Owens, pp. 21-22).  No one ever advised Owens that he needed
a high school diploma to work there.    (Dep of Owens, p. 23).

Additionally, when minority candidates are hired, they are often given time to obtain

any mandatory educational requirement that they do not possess.    (Pl's Ex. 15, Dep II of Wingard, pp. 24, 33-34).  Pam Jones was a secretary to the child nutrition director who passed away.    (Pl's Ex. 15, Dep II of Wingard, p. 10). Jones did not even have a college degree when she was awarded the job of child nutrition director.    (Pl's Ex. 15, Dep II of Wingard, pp. 25-26).

The child nutrition director's written job posting requires that one be certified in child nutrition.    (Pl's Ex. 15, Dep II of Wingard, p. 23).  When Jones was hired, she was given time to obtain the educational component required for the child nutrition director position. (Pl's Ex. 15, Dep II of Wingard, p. 24).  After eight years, Jones has not completed any academic course work relating to child nutrition.    (Pl's Ex. 15, Dep II of Wingard, pp. 24-26).  Wingard has received a letter from the State Department of Education requiring him to submit a plan of action regarding Ms. Jones' completion of the nutrition certification course work.  (Pl's Ex. 15, Dep II of Wingard, p. 27).

**F.    Plaintiff's Protected Activity**

During her employment Sims made numerous complaints of discrimination. (Dep of Pl., p. 107, 117).  She had a conversation with Jan Forbus when she was told that a black male had been awarded the permanent position, and she indicated to Forbus that was discrimination.    (Dep. of Pl., p. 107,117).    Sims filed an EEOC charge alleging discrimination in November 2006.  (Pl' Ex. 10).  Both these complaints of discrimination occurred before Forbus' derogatory job reference was provided to Coosa County Medical

Center on April 27, 2007. (Pl's Ex. 6).  In fact, Forbus who was on leave, only became aware

of Sims' charge when she provided an Affidavit in response to the EEOC charge only two

weeks prior to the derogatory job reference.  (Pl's Ex. 8).

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c):

> Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed, 2d 265, 106 S. Ct. 2548 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Id. At 323.

> If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the nonmovant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. See *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e).  A dispute of material fact "is genuine... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

In deciding a motion for summary judgment, the evidence presented by the non-

movant, here the Plaintiff, must be believed and all justifiable inferences must be drawn in

their favor.  *Anderson*, 477 U.S. at 255.  Where the record tells two different stories, one

blatantly contradicted by the evidence, the Court is not required to adopt that version of the

facts when ruling on summary judgment. *Scott v. Harris*, 127 S. Ct 1769, 1776 (2007).

"Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . . "*Graham v. State Farm Mutual Ins. Co.,* 193 F. 3d 1274, at 1282 (11th Cir. 1999). "If the record presents factual issues the court must not decide them; it must deny the motion and proceed to trial". *Herzog v,. Castle Rock Entertainment,* 193 F. 3d 1241, at 1246 (11th Cir. 1999).

Direct evidence of discrimination, "in the context of employment discrimination law, means evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic". *Wright v. Southland Corp.*, 187 F. 3d 1287 at 1293 (11th Cir. 1999); accord *Carter v. City of Miami*, 870 F. 2d 578, 582 (11th Cir. 1989). ("only the most blatant remarks, whose intent could be nothing other than to discriminate" comprise direct evidence of discrimination). Direct evidence must indicate that the complained of employment decision was actually motivated by animus. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F. 3d 1354, 1358-1359 (11th Cir. 1999), cert denied, 529 U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000). A statement merely suggesting discriminatory motive is by definition circumstantial evidence. *Burrell v. Bd of Trs. Of Ga. Military Coll.*, 125 F. 3d 1390, 1393-1394 (11th Cir. 19970. A plaintiff who produces direct evidence of discrimination has stated a valid Title VII claim. *Wright*, 187 F. 3d at 1293.

III.    **ARGUMENT**

A.    **Sims Has Direct Of Evidence Of Discrimination**

Sims claims that when the Board did not hire her for the lunchroom worker position it discriminated against her on the basis of her race (white) and gender (female). Sims has direct evidence that the Board discriminated against her. Jan Forbus was a decision maker in the hiring of Jerry McKinney. Forbus is also an agent of the Board in the retaliatory, misleading and derogatory job reference she gave Sims. Forbus stated to Sims, during the six weeks Sims worked as a substitute "this position was a man job". That statement is, despite the attempt by the defendant to characterize it otherwise, direct evidence of discrimination. To amount to direct evidence, a statement must (1) made by the decision maker; (2) specifically relate to the challenged employment decisions; (3) reveal blatant discriminatory animus. *Chambers v. Wal-Disney World Company*, 132 F. Supp. 2nd 1356 (2001 US District Lexis 7159). Direct evidence of intentional discrimination is evidence which, if believed, "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. Able Services Inc.*, 161 F. 3rd 1318 at 1330 (11th Cir. 1998). First and foremost, "the evidence must indicate that the complained of employment decision was motivated by the decision makers animus." *Damon v. Flemming Supermarkets, Inc.*, 196 F. 3rd 1354. 1358-59 (11th Cir. 1999). A decision maker is broadly defined as a person involved in the challenged decision. *Trotter v. Board of Trustees*, 91 F. 3rd 1449, 1453-54 (11th Cir. 1996). Only statements by the persons

involved in the decision making process, here the interview panel members, could constitute direct evidence of discrimination. *Bass v. Bd. of Commissioners*, 256 F. 3rd 1095 (11th Cir. 2001).

Second, the decision maker's statement must specifically relate to the challenged employment decision. Forbus' statement that this is a man's job, and the selection by the Board of a male candidate, are adequate to meet this requirement. In the usual case, this requirement also ensures temporal proximately to the adverse decision. *Ross v. Rhodes Furniture Inc.*, 146 F. 3rd 1286 (11th Cir. 1998).

Third, direct evidence includes only the most blatant remarks, whose intent is nothing other than to discriminate on the basis of a protected trait. *Carter v. City of Miami*, 870 F. 3rd 578 (11th Cir. 1989). Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence. *Taylor v. Runion*, 175 F. 3rd 861, 867 (11th Cir. 1999).

Forbus' statement that this is a man's job is blatant, is close in time, clearly demonstrates animus, is directed at the hiring decision which is the adverse action in question, and was made by a decision maker. It is direct evidence. Unlike the assertion by the Defendant that it is hearsay, animus laced remarks are specifically not hearsay. The reason for this is simple. To be hearsay, a statement has to be offered for the truth of the matter asserted. Plaintiff is not trying to show that this indeed was a man's job, but the statement is only offered show that the decision maker harbored a gender-biased animus.

Sims does not assert that this position was a man's job, especially since, as a female, she performed it for six weeks without any difficulties. Everyone acknowledged that she was doing a satisfactory job. Her educational deficiency did not hinder her in her job performance. Even McKinney, the male who was selected, has testified that there is nothing about the job that could not be done by a woman. (Dep of McKinney, p. 17).

Additionally, the remarks are not hearsay because they are an exception under F.R.E. 801 (d)(2)(D). A statement by a party's agent (or employee) can constitute an admission if made concerning a matter within the scope of the agency or employment, if made during the existence of the relationship. Here, both Jones and Forbus were managing employees of the Defendant, who were decision makers concerning the hiring, who made the statements. As such, the statements are non-hearsay because they are admissions.

Likewise, the black nutritional director, Pam Jones' statement which was repeated by Forbus that she "needed to get some color in the lunchroom" is also direct evidence. This statement also meets all three tests. It is blatant, it show an animus or prejudice toward the hiring of blacks, it is directed to the job decision at issue, was close in time, and was made by a decision maker. Furthermore, the hiring of a black male to replace a black male seems to be more than just a coincidence. Both statements were made close in time to the hiring decision. When they were made, the Board was under a consent decree for discrimination, and was being "encouraged" to hire more minorities. These are statements, that if believed by a reasonable jury, could form the basis of a verdict based on illegal discrimination. As

such, each entitles Plaintiff to a jury trial on that issue.

Direct evidence must reflect a discriminatory attitude correlating to the discrimination complained of by the Plaintiff. *Van Voorhis v. Hillsborough County Bd. Of County Comm'rs*, No. 07-12672, 2008 U.S. App. Lexis 258, 2008 WL 66258, at 3 (11th Cir., Jan. 8, 2008) (statement that the defendant "didn't want any old pilots" qualified as direct evidence of discrimination); *Wilson v. B/E Aerospace, Inc.*, 376 F. 3d 1079, 1086 (11th Cir. 2004).

### B.    Sims' Prima Facie Case

Plaintiff asserts that she has direct of evidence of discrimination.  If this Court rules that the statements are not direct evidence, then she must prove her case using circumstantial evidence within the *McDonnell Douglas* framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Texas Department of Community Affairs v. Burdine*, 450 U.S 248, 252-253 (1981).  Under *McDonnell Douglas*, Plaintiff must establish a prima facie case.  For her failure to hire claim, she must establish:

> 1) that she is in a protected class, (eg, white, female);
>
> 2) that she applied for and was qualified for a job for which the employer was seeking applicants;
>
> 3) that despite her qualifications, she was rejected; and
>
> 4) that after her rejection, the position was filled by a person outside the Plaintiff's protected class.

*EEOC v. Joe's Stone Crabs*, 296 F. 3d 1265, 1273 (11th Cir. 2002).

Plaintiff has shown that as a white female, she was not hired and that a black male was

selected for the position.

Because Plaintiff has made out a prima facie case, a presumption of unlawful discrimination arises, and the burden shifts to the Board to articulate some legitimate non-discriminatory reason for not hiring Plaintiff. *Burdine*, 450 US at 254; *Combs v. Plantation Patterns,* 106 F 3d 1519, 1528 (11th Cir. 1997). The Board must produce evidence that the Plaintiff was rejected, or someone else was preferred, for a legitimate non-discriminatory reason. The defendant's burden is of production, not of persuasion. *Burdine*, 450 U.S at 254. It is sufficient if the employer produces admissible evidence which would allow the trier of fact to rationally conclude that the employment decision was not motivated by discriminatory animus. *Combs*, 106, F. 3d at 1528.

Once the Board articulates a legitimate, non-discriminatory reason, the presumption of discrimination is eliminated and the burden shifts back to the Plaintiff. Plaintiff must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination. *Combs*, 106 F. 3d at 1528. This evidence must show such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions that the employer's proffered legitimate reasons for it's actions that a reasonable fact finder could find them unworthy of credence. *Combs v. Plantation Patterns*, 106 F. 3d 1519, 1528 (11th Cir. 1997).

The defendant contends that the Plaintiff was not qualified for the job because of the educational requirement in the posting. However, Plaintiff has demonstrated that although

the written posting required a high school diploma or GED, the Defendant has violated this requirement in 1/3 of all it's hirings under this superintendent. Three people have been hired who did not possess this educational requirement. Two are now tenured. The requirement is unnecessary, discretionary, and has never been followed. Pam Jones has interviewed all of the people who were hired and who did not possess this educational requirement. It is shear lunacy to suggest that Jones was not aware of their lack of an educational requirement, as all completed written job applications. Even a de-minimus examination of their qualifications would have revealed it. This stated requirement is not an official qualification, at least according to the defendant's own hiring practices. As such, the plaintiff was qualified for the position. Additionally, the failure to conform to its own stated hiring practices demonstrates that the Defendant's assertions in this case are but a pretext for discrimination.

Sims also had evidence that minority applicants have been treated better than she was, as Jones was hired without meeting mandatory educational requirements and has been given eight years to obtain them, even though she has failed to do so. (Dep II of Wingard, pp. 23-24).

### C.    Sims' Retaliation Claim

Title VII provides protection against retaliation for those who oppose unlawful employment practices. A plaintiff bringing a retaliation claim may establish a prima facie case by showing that:

(1).    The Plaintiff engaged in a statutorily protected activity;

(2).    The employer took an adverse employment action;

(3).    There is a causal connection between the protected activity and the adverse action.

*Wideman v. WalMart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir. 1998).

> The statutory language prohibiting retaliation provides:
>
> > It shall be an unlawful employment practice for an employer to discriminate against any of his employees.......because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this sub-chapter.  emphasis added. 42 U.S.C. § 2000 e-3.

There can be no serious dispute that for Title VII purposes, Sims' complaints to Forbus about discrimination are protected activities.  The filing of internal complaints to supervisors alleging racially disparate treatment in assignments is a protected activity.  See *Carr v. Stillwaters Development Company, L.P.,* 83 F 2nd 1269 (M. D. Ala.1999), holding that "voicing one's concerns about racial discrimination to one's superiors, ..., is protected activity".  See *Rollins v. Florida Department of Law Enforcement,* 868 F. 2nd 397, 400 (11th Cir. 1989).  ("The protection afforded by the statute [Title VII] is not limited to individuals who have filed formal complaints, but extends as well to those...... who informally voice complaints to their superiors or use their employers' internal grievance procedures").

Sims has also met the second prong of retaliation, as she has sustained an adverse action, by not being considered for the hospital position which had no educational

requirements.  What constitutes an adverse employment action was clearly defined in *Bass v. Board of County Commissioners*, 265 F. 3d 1095 (11th Cir. 2001):

> "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, **deprives him or her of employment opportunities**, or adversely affects his or her status as an employee." *Gupta v. Florida Board of Regions*, 212 F. 3d 571, 587 (11th Cir. 2000) While "not everything that makes an employee unhappy is an actionable adverse action," *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996), conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute an adverse action under Title VII.  See *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Robinson v. City of Pittsburgh*, 120 F. 3d 1286. 1300 (3d Cir. 1997).
> *Bass*, at 1118. emphasis added.

In order to be an adverse employment action, the employment action must be materially adverse as viewed by reasonable persons in the circumstances.  *Davis v. Town of Lake Park*, 245 F. 2d 1232, 1239 (11th Cir. 2001).  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indicia that might be unique to a particular situation.  *Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp. 1314, 1330 (M.D. Fla. 2002).

The present factual situation has already been decided in Plaintiff's favor by the U.S. Supreme Court, in *Charles T. Robinson, SR., Petitioner v. Shell Oil Company*, 519 U.S. 337, (1997).  The Court noted:

A former employee, shortly after having been fired from his employment, filed a charge against the employer with the EEOC, alleging that he had been discharged because of his race. While that charge was pending, he applied for a job with another company, which contacted his former employer for an employment reference. Alleging that the former employer gave a negative reference in retaliation for his having filed the EEOC charge, the former employee brought an action in Federal District Court against his former employer under 704(a) of the Title VII of the Civil Rights Act of 1964 (42 USCS 2000e-3(a)), which makes it unlawful "for an employer to discriminate against his employees or applicants for employment" who have availed themselves of Title VII's protections or assisted others in so doing.

On certiorari, the United States Supreme Court reversed. In an opinion by Thomas, J., expressing the unanimous view of the court, it was held that the term "employees," as used in 704(a), includes former employees, such that the former employee in the case at hand could bring suit against his former employer for post-employment actions allegedly taken in retaliation for the employee's having filed a complaint with the EEOC. *Charles T. Robinson, SR., Petitioner v. Shell Oil Company*, 519 U.S. 337, (1997).

Thus Plaintiff has demonstrated that this fact pattern does give rise to a claim for retaliation. The Court further lowered the burden of proving a retaliatory job reference in *Hillig v. Rumsfeld*, 381 F. 3d 1028 (10th Cir. 2004), which held:

**Even though we do not require the plaintiff to show the loss of a specific job**, we do not define "adverse employment action" as encompassing every "action taken by a plaintiff's employer . . . . that may affect the plaintiff's future employment opportunities . . . ." *Aquilino v. Univ. of Kan.*, 268 F. 3d 930, 935 (10th Cir. 20010. We exclude from that definition those acts that merely have a *de minimis* impact upon an employee's future job opportunities. *Id. at 934*.

In this case, we are satisfied the record contains sufficient evidence to support the conclusion Hilling had suffered more than *de minimis* harm to her future employment prospects with the United States Attorney's Office. Specifically, there was evidence showing the negative references were very unfavorable. *Id. at 146* (Reusch's testimony that she had said Hillig was a "shitty employee"). Moreover, Wooden, the hiring authority at the DOJ, testified that applicants with negative job references would not be hired over applicants without such references. *Id. at 106.* Thus, Hillig has shown that her negative references seriously harm her ability to obtain employment at the DOJ in the future. In other words, Hillig has shown that the negative references carried a "significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Berry, 74 F.3d at 986.*

The 9th Circuit has also held that a Plaintiff need not show that they did not get a specific job if he can show a retaliatory motive for a false reference. *Hashimoto v. Dalton*, 118 F. 3d 671 (9th Cir. 1997).

Here Sims was applying for an entry level hospital cafeteria worker. The job had no educational requirement. Sims was not even considered for this employment because Forbus said her attendance was poor, she walked off the job, and she was not eligible for rehire. (Pl's Ex. 6). Forbus' reference was the kiss of death when it came to Plaintiff's attempt to secure an entry level job she was clearly qualified to hold.

In order to state a retaliation claim, Sims need only show that she had a "reasonable belief" that an unlawful employment practice was occurring, and is not required to show that the employer actually engaged in an unlawful employment practice. *Berman v. Orkin Exterminating Company, Inc.*, 160 F.3d 697, (11th Cir. 1998). Sims' complaints and her

EEOC charge were, under these circumstances, objectively reasonable.

A plaintiff in a retaliation case has the burden of proving that the persons responsible for plaintiff sustaining an adverse action actually have knowledge of her complaint. Here, the defendant claims that Jones, Forbus, Bullard and Wingard were the decision makers as regards the hiring of McKinney. Sims complained to Forbus and filed her EEOC charge prior to the negative reference. Plaintiff has demonstrated that Forbus knew about her complaints before the reference, as Forbus provided an affidavit to the EEOC only two weeks earlier. (Pl's Ex. 8).

The third prong of Sims' retaliation claim is the causal relationship between the protected activity and the adverse action. In addressing evidence of a casual relationship, the Courts look to the timing of the protected activity (Sims' complaints) and the adverse action (job reference). Here, Forbus was made aware of Sims' EEOC charge only two weeks before she gave Sims the derogatory job reference. Forbus was on leave when Sims filed her EEOC charge. Forbus found out about it when she completed her affidavit to give to the EEOC on April 11, 2006. Surely this is close enough in time to provide a strong inference of retaliation.

Finally, in *Burlington Northern & Santa Fe Railway Company v. Sheila White,* 126 S. Ct. 2405, (2006), the Supreme Court specifically stated that:

> 42 U.S.C. 2000e-3a "seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms. The White court noted that the proper test was whether a retaliation plaintiff could show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination". The court refers to material adversity

to separate significance from trivial harms. The Court refers to a reasonable employee's reactions because of the provision standard for judging harm must be objective and thus judicially administrable. The standard is phrased in general terms because the significance of any given act of retaliation may depend on the particular circumstances.

Sims might well have been dissuaded from making her charge if she had known it would keep her from obtaining other employment opportunities because she would receive a derogatory and untrue job reference.

## IV.    CONCLUSION

There are genuine issues of material fact which require that summary judgment be denied.  The plaintiff has direct evidence of discrimination which precludes the granting of summary judgment.

Respectfully submitted,

s/Jerry Roberson
Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238
Telephone:    (205) 981-3906
Fax:          (205) 981-3908
E-mail: **jdratty@charter.net**
        **tlbaker@charter.net**

## CERTIFICATE OF SERVICE

       I hereby certify that on the 17th day of June, 2008, I electronically filed the foregoing with the Clerk of the Court using the using the Electronic Filing system which will send notification of such filing to the following:

Donald B. Sweeney, Jr. (SWE002)
Anne Regina Yuengert
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2119
Telephone:    (205) 521-8000
Facsimile:    (205) 521-8800


                                        s/Jerry Roberson
_____    Jerry Roberson (ROB010)